# 7-ELEVEN, INC.

# INDIVIDUAL STORE FRANCHISE AGREEMENT

**EXHIBIT A**

# TABLE OF CONTENTS

1. Statement of Intent and Definitions ..... 1
2. Independent Contractor ..... 1
3. Franchise Fee, Down Payment and Grand Opening Fee ..... 2
4. Training; 7-Eleven Operations Manual ..... 2
5. Ownership of 7-Eleven System; Confidentiality; Noncompetition ..... 2
6. Effective Date ..... 3
7. License ..... 4
8. Lease ..... 4
9. Term ..... 6
10. 7-Eleven Charge ..... 6
11. Your Withdrawals ..... 7
12. Bookkeeping and Financial Matters ..... 7
13. Open Account; Financing; and Minimum Net Worth ..... 9
14. Audit Rights ..... 9
15. Merchandising and Inventory; Recommended Vendors ..... 10
16. 7-Eleven Foodservice Standards ..... 12
17. Loyalty Programs, Delivery and Digital Technology ..... 13
18. Your Indemnification; Insurance ..... 14
19. Your Additional Covenants ..... 16
20. Maintenance and Utilities ..... 17
21. Taxes ..... 18
22. Advertising ..... 18
23. Service Mark and Related Trademarks ..... 19
24. Renewal of Franchise ..... 21
25. Assignment ..... 22
26. Termination ..... 23
27. Mutual Termination; Termination by You ..... 28
28. Close Out Procedure ..... 28
29. Mediation ..... 29
30. Governing Law; Jurisdiction; Enforcement ..... 30
31. Miscellaneous Provisions ..... 30

EXHIBITS:

A - Store
B - 7-Eleven Equipment
C - Intentionally left blank
D - Selected Provisions
E - Definitions
F - Survivorship
G - Required Proprietary Products
H - Release of Claims and Termination
I - Security Agreement
J - Procedures for Selection of Third Party Reviewer and for Reviewing Vendor Negotiating

# STORE FRANCHISE AGREEMENT

In consideration of the mutual promises and agreements contained in this Agreement, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

**1. Statement of Intent and Definitions.**

(a) Statement of Intent.

(1) Franchising is a method of distributing goods or services in a consistent manner. The customer expects a similar shopping experience at a franchised business, regardless of its location or operator. By signing this Agreement, you acknowledge the importance of these concepts, and agree to participate in the 7-Eleven System, which promotes a uniform method of operating a convenience store. You recognize that a uniform presentation of a high quality 7-Eleven Image is critical to the customer's perception of the 7-Eleven System, and that you agree to contribute to that perception by operating your Store in compliance with this Agreement.

(2) You recognize the benefits to you and the 7-Eleven System (including the benefits of scale that a large chain gets from its high volume of purchases) of purchasing the products and services sold at your Store from common vendors and/or distributors. You agree to provide excellent customer service.

(3) You acknowledge and agree that providing excellent customer service is vital to the success of the 7-Eleven System and your Store, and that excellent customer service includes, among other things: (a) proficiency in the English language, (b) prompt, efficient and courteous service to all customers, and any other standards we identify from time to time.

(4) You agree that the 7-Eleven System is subject to modification based on changes in technology, competitive circumstances, customer expectations, and other market variables. Those changes to the 7-Eleven System may include changes in operating standards, products, programs, services, methods, forms, policies and procedures; changes in the design and appearance of the building, signage and equipment; changes to the 7-Eleven Operations Manual; and changes to the Service Mark and Related Trademarks.

(5) You recognize the advantages of the 7-Eleven System and wish to obtain a franchise for a 7-Eleven Store. You understand and acknowledge that an investment in the Store involves business risks and that your business abilities and efforts are vital to the success of the Store. You agree that the terms of this Agreement are acceptable to you, and are material and reasonable.

(b) Headings. The captions used in the paragraphs and subparagraphs of this Agreement are inserted only for purpose of reference. These captions will not govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof, nor will they otherwise be given any legal effect.

(c) Definitions. "We," "us", "our" or "7-Eleven" means 7-Eleven, Inc., the franchisor. "You" or "your" means the Franchisee, as defined more fully in Exhibit E. Initially capitalized terms used in this Agreement are defined in Exhibit E or in one of the other Exhibits to this Agreement.

**2. Independent Contractor.** You and we agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship. You agree: (a) to conspicuously identify yourself as the owner and operator of the Store and to hold yourself out to the public as an independent contractor; (b) to control the manner and means by which you operate the Store; and (c) to exercise complete control over and responsibility for all labor relations and the conduct of your agents and employees. You and your agents and employees: (i) are not and may not be considered or held out to be our agents or employees; or (ii) may not negotiate or enter any agreement or incur any liability in our name, on our behalf, or purporting to bind us or any of our or your successors-in-interest. Without in any way limiting the preceding statements, we do not exercise any discretion or control over your employment policies or employment decisions, and all employees of the Store are solely your employees. No actions you, your agents or employees take will be attributable to us or be considered actions obligating us.

3. **Franchise Fee, Down Payment and Grand Opening Fee.** You agree to pay us the Franchise Fee, the Down Payment and the Grand Opening Fee stated in Exhibit D upon the execution of this Agreement. Except as provided in Paragraphs 4 and 6 with respect to the Down Payment and Grand Opening Fee, and Paragraphs 4, 6, 26, and 27 with respect to the Franchise Fee, the Down Payment, the Franchise Fee and the Grand Opening Fee will be deemed fully earned and nonrefundable when paid in consideration for the administrative and other expenses we incur in granting the franchise.

4. **Training; 7-Eleven Operations Manual.**

(a) Initial Training. Prior to the Effective Date, you and any individual you designate as a manager for your Store must complete to our satisfaction the initial training program for operating a franchised 7-Eleven Store. If you are a corporation or other entity, you must at all times have a designated manager for the Store. If you franchise more than one 7-Eleven store, you must at all times have a designated manager for each additional Store. Any manager you designate must successfully complete our initial training program. If your designated manager ceases employment at your Store for any reason, the individual you designate as the replacement manager must complete our initial training program within the time period that we require, as may set forth and modified in the 7-Eleven Operations Manual from time to time. You will be responsible for paying all costs and expenses related to any initial training, including your employees' wages and benefits (if applicable), except our costs of providing the initial training. If you elect to obtain initial training for more than two (2) individuals at any time during the term of this Agreement, you will also be responsible for paying us an additional fee for such training in an amount we deem appropriate. If you or any of the individuals you designate as managers fail to complete the initial training program to our satisfaction prior to the Effective Date, or we determine that you will not be able to do so prior to the completion of the initial training , then: (a) the business relationship, if any, between us will immediately terminate; (b) this Agreement will not become effective; and (c) we will refund to you the Down Payment, the Franchise Fee and the Grand Opening Fee, without interest, after deducting any amount you owe us, including any initial training expenses for which we have reimbursed you or which we have paid on your behalf. You agree that if you incur any expenses in attempting to obtain a 7-Eleven Store franchise or if you rely in any other way on the possibility that you will obtain a franchise from us (including incurring out-of-pocket expenses other than those for which we may reimburse you under this Paragraph 4), you will have done so solely at your own risk, based on your own judgment and not in reliance upon any statements or representations from us or our agents or representatives.

(b) Ongoing Training. We agree to offer additional training that we deem necessary based on any changes that are made to the 7-Eleven System. You will be responsible for all expenses, including any computer programs we deem necessary, the costs of travel, lodging, meals and wages, incurred by your employees and other personnel in connection with any additional training program. You agree to participate in and complete to our satisfaction, and to train your employees on any additional training programs we make available relating to: (a) the proper sale of age restricted products or the sale of other products that are regulated and which could lead to a violation of law if not properly sold; and (b) other training programs we designate as required. We may make additional training programs available through computers or other electronic devices, and you will be required to use such equipment to complete additional training.

(c) Employee Training. You agree that you are solely responsible for ensuring that your employees are at all times adequately trained in the operation of the 7-Eleven Store so that your employees can provide excellent customer service and properly carry out the operations of the Store in accordance with the 7-Eleven System and this Agreement.

(d) 7-Eleven Operations Manual. We agree to provide you with access to our 7-Eleven Operations Manual on the 7-Eleven Intranet through your in-Store computer, or through any other means we deem appropriate. The 7-Eleven Operations Manual contains suggestions and mandatory requirements regarding, among other things, the 7-Eleven System, providing excellent customer service, training, Store operations and accounting procedures. You acknowledge the importance of the 7-Eleven Operations Manual and agree to comply with all mandatory standards, specifications, operating procedures and other material contained in the 7-Eleven Operations Manual, as amended from time to time. We may modify the 7-Eleven Operations Manual at any time in our sole discretion. We may provide assistance and information to you through methods other than the 7-Eleven Operations Manual.

5. **Ownership of 7-Eleven System; Confidentiality; Noncompetition.**

(a) Ownership of 7-Eleven System. You acknowledge that we are and will remain the sole owner of all rights in and to the 7-Eleven System, the 7-Eleven Operations Manual, any information, manuals, materials, and any other confidential communications (whether in electronic or other form) provided to you concerning the operation of a 7-Eleven

Store or related to the 7-Eleven System. You also acknowledge that you are acquiring no property interest in or other right to them, other than a license to use them during the Term of this Agreement. You agree to at all times treat the 7-Eleven Operations Manual and any other manuals, materials, confidential communications, and the information contained therein, as confidential, and must maintain such information as secret and confidential in accordance with Paragraph 5(b) of this Agreement.

(b) Confidentiality. You agree at all times: (i) not to communicate, divulge or use the Confidential Information for the benefit of any other person or entity; (ii) not to use the Confidential Information for your own benefit, except in connection with the operation of the Store during the Term of this Agreement; and (iii) to divulge such Confidential Information only to those of your employees who must have access to it in order to operate the Store. Except as we may expressly permit in writing, you agree not to download, print, transmit via e-mail or any other means, copy, duplicate, record, or otherwise reproduce the Confidential Information, in whole or in part, or otherwise make the Confidential Information available to any unauthorized person. The agreement in this Paragraph 5(b) will survive the expiration, termination or transfer of this Agreement or any interest herein and will be perpetually binding upon you. At our request, you agree to obtain execution of agreements similar to those set forth in this Paragraph 5(b) from your employees, agents, independent contractors, and any other of your personnel who have received or will have access to the Confidential Information. Such agreements must be in the form that we require.

(c) New Developments. If you or your employees develop any new concept, process or improvement in the operation or promotion of the Store, you agree to promptly notify us and provide us with all necessary related information, without compensation. You hereby grant to us a perpetual royalty-free license to use and sublicense the use of any such concept, process or improvement in any way we choose.

(d) Noncompetition.

(1) In-Term Non-compete. Except as otherwise permitted by us in writing, during the term of this Agreement, you agree not to, for yourself, or through, on behalf of or in conjunction with any other person, partnership, corporation, limited liability company or other entity or association, maintain, operate, engage in, or have any financial or beneficial interest in, advise, assist, make loans to, or lease to, a Competitive Business which is, or is intended to be, located within ½ mile of any 7-Eleven convenience store, except for any interest you: (a) had in a Competitive Business as of the Effective Date of this Agreement; or (b) have in a Competitive Business located within ½ mile of a 7-Eleven convenience store that you owned prior to our opening of such 7-Eleven convenience store.

(2) Nothing in this Paragraph 5(d) will prevent you from owning, for investment purposes only, an ownership interest in a business entity as a passive investor without any involvement in the operations of such business entity.

(3) You and we agree that the foregoing agreement contains reasonable limitations as to time, geographical area and scope of activity to be restrained and does not impose a greater restraint than is necessary to protect our goodwill or other business interests. Such agreement will be construed as independent of any other agreement or provision of this Agreement. If all or any portion of an agreement in this Paragraph 5(d) is held unreasonable or unenforceable by a court having valid jurisdiction in an unappealed final decision to which we are a party, you agree to be bound by any lesser agreement imposed by or resulting from the court order as if the resulting agreement were separately stated in and made a part of this Paragraph 5(d).

(4) You acknowledge that we will have the right, in our sole discretion, to reduce the scope of any agreement in this Paragraph 5(d) without your consent, effective immediately upon notice to you, and you agree to promptly comply with any agreement as so modified.

(5) You agree that the existence of any claims you may have against us, whether arising under this Agreement or otherwise, will not constitute a defense to the enforcement by us of this Paragraph 5(d).

(6) You acknowledge that any breach of any of the terms of the covenant contained in Paragraph 5(d) will result in irreparable injury to us and that we are entitled to injunctive relief to prevent any such breach.

**6. Effective Date.**

(a) Commencement of Obligations. Your and our rights and obligations derived from the grant of the franchise and the right to become part of the 7-Eleven system of franchisees (including those set forth in Paragraphs 7(a), 8, 10, 11, 12, 14, and 17) will begin as of the Effective Date. All of your and our other rights and obligations (including, without limitation, those in Paragraphs 4, 5, 6, 7(b), 18, 19, 25, 26, 27, and 28) will become effective as of the date that the last party executes this Agreement.

(b) Conditions to Occurrence of Effective Date. We agree to use our best efforts to make the Store available to you within a reasonable time. However, you agree that, in order for the Effective Date to occur, all of the following conditions must be met to our sole satisfaction on or before the date the Store becomes available: (1) you and any individual you designate as a manager of your Store must be certified by us as having satisfactorily completed the initial training program; (2) you will have paid us all amounts you owe us under this Agreement; (3) all licenses, permits, and bonds required by applicable laws or regulations or by us for the operation of the Store (or any portion of the Store) must be available and, where possible, obtained; (4) you will not have granted a security interest in the Collateral or the franchise to anyone except us or our Affiliate; (5) you will not have made any misrepresentation to us in connection with obtaining the 7-Eleven Store franchise; and (6) you will not have taken any action that would be, or is, a breach of this Agreement.

(c) Failure to Meet Conditions for Effective Date to Occur. If (1) you fail to meet any of the conditions contained in Paragraph 6(b); (2) the Store is not available within ninety (90) days after you satisfactorily complete initial training; or (3) the Effective Date does not occur within one hundred-twenty (120) days after the date you and we signed this Agreement (or, if the Store is under construction, within thirty (30) days after the completion date, if such date is later than one hundred-twenty (120) days after you and we signed this Agreement), then, except for your post-termination obligations and Paragraph 5, this Agreement will not become effective and will be null and void and of no further force or effect, unless you and we agree in writing otherwise. If this Agreement does not become effective as provided in this Paragraph 6(c) through no fault of yours, then we agree to refund the Down Payment, the Franchise Fee and the Grand Opening Fee to you, without interest, minus any amount you owe us as provided in this Agreement.

**7. License.**

(a) Grant of License. As of the Effective Date, we grant to you, upon the terms and conditions in this Agreement, the right and license, and you accept the right and obligation, to operate a 7-Eleven Store at the Store location identified in Exhibit A in accordance with this Agreement under the Service Mark, Related Trademarks, and the 7-Eleven System and to use the Trade Secrets and the Proprietary Products in connection with the operation of the Store.

(b) Reserved Rights. You agree that this Agreement does not grant you any exclusive or protected territory. You further acknowledge that we are not obligated to grant any additional franchises to you. This Agreement does not grant you the right or license to operate the Store or to offer or sell any products or services offered and sold by 7-Eleven Stores at or from any location other than the Store location identified in Exhibit A or through any other channel or method of distribution other than a 7-Eleven Store, including by or through the Internet or similar electronic media. You agree that we and our Affiliates retain all other rights, including the right to establish and operate, and to grant others the right to establish and operate, convenience or other stores under the Service Mark and Related Trademarks, any trade names, and other service marks and trademarks, at any site other than the Store location, including sites that are adjacent or proximate to the Store location. We and our Affiliates also retain the right to offer and sell, and grant others the right to offer and sell, any products and services similar or dissimilar to those offered by 7-Eleven Stores, whether identified by the Service Mark, Related Trademarks or by other trademarks, trade names or service marks, through any other channel or by any other method of distribution, including by or through the Internet or similar electronic media, on any terms and conditions we deem appropriate. If we decide to subcontract to you (and you agree to accept) certain of our obligations in connection with the sale of products and/or services over the Internet, we will compensate you for your efforts to fulfill those obligations in a reasonable amount to be mutually agreed upon by you and us, otherwise there is no obligation to share any revenues with you related to the sale of products and/or services over the Internet or through any other channel or method of distribution.

**8. Lease.**

(a) Lease of Store and 7-Eleven Equipment; Use of 7-Eleven Equipment.

(1) Beginning on the Effective Date, we lease the Store and 7-Eleven Equipment to you solely for the operation of a franchised 7-Eleven Store pursuant to this Agreement and in accordance with the 7-Eleven System.

You agree to comply with all local, state and federal laws, statutes, regulations, ordinances, and rules of any applicable governmental entity with respect to the operation, use, repair and possession of the Store and the 7-Eleven Equipment.

(2) If we currently own the Store, we may sell the Store and lease it back or enter into other similar transactions in connection with a financing of the Store or the improvements. If we currently lease the Store, then the Lease to you is a sublease and certain provisions of the master lease are included on Exhibit A. If we are not currently leasing the Store but we lease it in the future, the Lease to you will be a sublease, and we will amend Exhibit A to summarize certain provisions of the master lease. You agree to comply with all terms and provisions of the master lease referred to in Exhibit A and not cause a breach of any such master lease. We reserve from the Lease and/or common area such portions thereof, if any, as we may elect to use for: the installation of banking or other similar equipment, attended or self-service gasoline, attended or self-service car washes, a photo kiosk, signs or bill boards, or telecommunications towers and other telecommunications equipment of any type, and any additional areas that we consider necessary for the installation, maintenance, repair, and operation of related equipment. You agree to give us unobstructed non-exclusive rights to enter and exit in connection with these reserved rights. You agree that we may remodel the Store at any time in accordance with one of our remodel programs and that you cannot remodel the Store without our prior written consent.

(3) If we currently own the 7-Eleven Equipment, we may sell it and lease it back or enter into other similar transactions in connection with a financing of the 7-Eleven Equipment. If we currently lease the 7-Eleven Equipment, then the Lease to you is a sublease, and certain provisions of the master lease are included on Exhibit B. If we are not currently leasing the 7-Eleven Equipment but we lease it in the future, then the Lease to you will be a sublease, and we agree to amend Exhibit B to summarize certain provisions of the master lease. You agree to comply with all terms and provisions of the master lease referred to in Exhibit B and not cause a breach of any such master lease. We may, at our option, remove or replace any of the 7-Eleven Equipment or add new 7-Eleven Equipment, including cash registers and point of sale computers and 7-Eleven Equipment of a type or category other than that which currently exists. Any new or additional 7-Eleven Equipment will be added to the list of 7-Eleven Equipment on Exhibit B or we agree to otherwise provide you with electronic or written notice of such changes to the 7-Eleven Equipment. You agree to, at all times use, as we require, all 7-Eleven Equipment currently in the Store or that we add to the Store. The use of the 7-Eleven Equipment may require you to incur costs in connection with the operation of such 7-Eleven Equipment, including, without limitation, maintenance expenses, making Purchases, subscription fees for in-store music services, and other expenses. We may provide you with replacement Equipment if certain Equipment is damaged or becomes inoperable. If we do so, and if you fail to promptly return the damaged or inoperable equipment to us, we may charge you for the cost of the replacement Equipment by debiting your Open Account.

(4) You may not modify, alter, remodel or add to the Store or 7-Eleven Equipment or discontinue using any of the 7-Eleven Equipment required under the 7-Eleven System without first obtaining our written consent. You may not use the 7-Eleven Equipment other than in connection with the operation of the Store.

(b) Third Party Beneficiary. You are not a third-party beneficiary of, and will have no right directly or independently to enforce, any master lease. Such rights are reserved to us to exercise in our sole discretion on a case by case basis. We are not assigning to you any rights of exclusivity or non-competition or any other rights or remedies under any master lease, and we may elect to enforce, or not to enforce, our rights under any master lease (including rights of exclusivity and non-competition), in our sole discretion. In the event we elect to enforce such rights, any proceeds paid to us as a result will be first applied to reimburse us for our attorneys' fees and costs incurred. Any remaining proceeds resulting from a finding in our favor with respect to breaches of exclusivity or non-competition covenants in the master lease will be credited to your Open Account after deducting from such proceeds the amount determined by multiplying the remaining proceeds by the percentage used to calculate the 7-Eleven Charge. However, our agreement to share proceeds resulting from our enforcement of such provisions in any master lease does not imply that you have any rights or remedies under the master lease.

**(c) DISCLAIMER OF WARRANTIES. YOU AGREE TO TAKE ALL OF THE STORE AND 7-ELEVEN EQUIPMENT LEASED UNDER THIS AGREEMENT IN "AS-IS" CONDITION, WITH ALL FAULTS AND DEFECTS, SUBJECT TO THE MASTER LEASE, IF ANY, AND ALL DOCUMENTS OF RECORD AFFECTING THE STORE AND THE 7-ELEVEN EQUIPMENT. WE MAKE NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE STORE AND THE 7-ELEVEN EQUIPMENT, INCLUDING WARRANTIES OF HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, NON-DISTURBANCE, INTERFERENCE OR INFRINGEMENT.**

(d) Condemnation Awards. We will be entitled to all awards paid in connection with any condemnation affecting the Store and, to the extent necessary to effectuate this provision, you assign to us all rights in any condemnation award to which you may be entitled, whether for loss of profits, goodwill, moving expenses, loss of leasehold or otherwise. Any proceeds from a condemnation award paid to us will be first applied to pay our attorneys' fees and costs incurred. Provided you do not Transfer or receive a Refund pursuant to Paragraph 26(e), any remaining condemnation award proceeds specifically attributed to the "goodwill of the Store as a going concern" will be credited to your Open Account after deducting from such proceeds the amount determined by multiplying the remaining proceeds by the percentage used to calculate the 7-Eleven Charge.

(e) Breach of Lease. You and we intend to create only a landlord-tenant/lessor-lessee relationship with respect to the Lease provided herein. If you breach this Agreement, then we will be entitled (in addition to any other rights under this Agreement) to invoke all judicial and other rights and remedies available to a landlord or lessor, at law or in equity, including summary proceedings for possession of leased property; the right to appointment of a receiver or similar remedies; and/or the right to terminate, cancel, or declare a forfeiture of this Lease. If you receive notice of breach, non-renewal or termination from us and you fail to vacate the Store and surrender the 7-Eleven Equipment prior to the effective date of termination stated in the notice, then you will be deemed to be a tenant at sufferance and a trespasser, you agree to immediately vacate and surrender the Store and the 7-Eleven Equipment, and you will not be entitled to any notice to quit or vacate.

**9. Term.** Unless sooner terminated as provided in Paragraph 26, the Term of this Agreement will end on the Expiration Date.

**10. 7-Eleven Charge.**

(a) 7-Eleven Charge. You agree to pay us the 7-Eleven Charge for the License, the Lease and our continuing services. The 7-Eleven Charge is due and payable each Collection Period with respect to the Receipts from that Collection Period at the time the deposit of those Receipts is due. We may reconcile the 7-Eleven Charge account reflected in the Financial Summaries on a monthly or other periodic basis. At the reconciliation, we may make appropriate adjustments for changes in hours of operation or other items necessitating an adjustment to the total 7-Eleven Charge for the Accounting Period or any portion thereof. You may not withhold Receipts or prevent payment of the 7-Eleven Charge to us on the grounds of the alleged non-performance or breach of any of our obligations to provide services to you or any other obligations to you under this Agreement or any related agreement.

(b) Adjustment to 7-Eleven Charge for Failure to Meet Recommended Vendor Purchase Requirement. If at any time during the Term of this Agreement we determine based upon data available to us ("Determination Date") that your total Purchases of all products, and, separately, total purchases of cigarettes, do not meet the Recommended Vendor Purchase Requirement for any consecutive three (3) full Accounting Periods, you agree that we may unilaterally amend this Agreement to increase the percentage used to calculate your 7-Eleven Charge by two (2) percentage points for the Accounting Period next following the Determination Date, regardless of whether you meet the Recommended Vendor Purchase Requirement for such Accounting Period. For example, if 50% was used to calculate your 7-Eleven Charge before the increase, 52% will be used to calculate your 7-Eleven Charge after the increase. After the Accounting Period in which the increased percentage is applied, the percentage previously used to calculate the 7-Eleven Charge may be reinstated; provided, however, that such percentage may be increased again pursuant to this Paragraph 10(b) if you fail to meet the Recommended Vendor Purchase Requirement for any other consecutive three (3) full Accounting Periods during the Term.

(c) Adjustment to 7-Eleven Charge upon Declaration of Invalidity of Certain Provisions. If any part of Paragraphs 15, 16 and/or 22 is declared invalid by a court of competent jurisdiction and we do not terminate this Agreement under Paragraphs 31(e) and 26(a)(12), then you agree that we may unilaterally amend this Agreement to increase the percentage used to calculate your 7-Eleven Charge by two (2) percentage points for the remainder of the Term of this Agreement. If we elect to terminate this Agreement under Paragraphs 31(e) and 26(a)(12), we will offer you a different 7-Eleven franchise agreement, which you do not have to accept, with a term equal to the term then-remaining under this Agreement, the terms of which will take into account the current economic situation, the effect of the court's final decision, and such other factors as we deem appropriate.

If we adjust your 7-Eleven Charge pursuant to Paragraph 10(b) or 10(c) above, then you will continue to pay the Advertising Fee pursuant to Paragraph 22(a) during the period of the adjustment. If we adjust your 7-Eleven Charge

pursuant to Paragraph 10 (c) above, then you will continue to pay the Advertising Fee if allowed by the Court's decision.

**11. Your Withdrawals.** Provided that you are not in breach of this Agreement, you may withdraw from the Open Account an amount up to your Available Withdrawal Amount. We may set forth in the 7-Eleven Operations Manual processes for how withdrawals will be processed.

**12. Bookkeeping and Financial Matters.**

(a) Bookkeeping; Inspection of Records. We have the right to maintain Bookkeeping Records with respect to your operation of the Store as part of our records. You may perform or obtain any additional bookkeeping you wish. Either party may inspect records of the operation of the Store prepared or obtained by the other party where the records are maintained during normal business hours.

(b) Deposits; Cash Payments for Daily Purchases/Operating Expenses; Payment Methods.

(1) You agree to:

(i) properly prepare and date the Cash Report and submit it daily or at other times we specify;

(ii) deposit all Receipts into Store safes or other currency control devices as designated by us before depositing such Receipts in the Bank or an approved night depository;

(iii) deposit the Receipts for each Collection Period within twenty-four (24) hours after the end of the Collection Period in the Bank or approved night depository, except for cash you spend from that day's Receipts for Purchases or Operating Expenses paid on that day, provided that you properly report, and provide us with invoices related to, such cash expenditures for Purchases and/or Operating Expenses; and

(iv) deliver to us, at the times we specify, written verification by the Bank of the deposit (this verification must be dated as of the next day the bank is open for business immediately following the end of the Collection Period).

(2) If we request, you agree to deliver the Receipts (except for authorized and documented cash expenditures for Purchases and Operating Expenses) to us rather than depositing the Receipts in the Bank. We have the right at any time to require that you cease paying for Purchases and/or Operating Expenses with cash out of the Receipts or limit those Purchases and/or Operating Expenses that you are permitted to make with cash out of the Receipts.

(3) You understand and agree that we may withdraw or use for our benefit any amounts you deposit in the Bank or deliver to us at any time, without paying any interest or other compensation to you. You agree that we have the right to apply Receipts first to the payment of the 7-Eleven Charge and then to amounts that we pay on your behalf. We will pay interest on credit balances in the Open Account as specified by Paragraph 13(c).

(4) You agree to accept payment for all goods and services at the Store by use of cash, checks, food stamps, specified credit cards, charge cards, fleet cards, debit cards, pre-paid cards, coupons, designated 7-Eleven customer loyalty program rewards, mobile or electronic payment, or any other payment methods used by customers that we may require from time to time.

(c) Reports and Other Bookkeeping Information.

(1) You agree to prepare and furnish to us, on forms, at times (including at each courier pick-up), and in the manner (including submission in an electronic format) that we require:

(i) daily summaries of Purchases;

(ii) daily reports of Receipts;

(iii) all information we request regarding the vendors from which you make purchases;

(iv) actual sales data; and

(v) all additional reports that we may reasonably require from time to time.

(2) We may require you to prepare or furnish any required reports using in-store computers, cash register equipment or other types of equipment in the Store.

(3) You agree to deliver or furnish to us, with the frequency and at the times we require, copies of bank drafts, vendor and other receipts, invoices for Purchases, and receipts and bills for Operating Expenses. You also agree to keep us currently advised electronically or in writing, as we specify, of all your actual retail selling prices (which you alone will set) and of all discounts, allowances, and/or premiums you receive. In addition, you agree to use electronic equipment we provide to order, check-in and scan all products that are capable of being handled in those ways. You further agree to keep (for such time period that we specify from time to time, such time period not to exceed seven (7) years) and make available to us any records, electronic documents, or other documents relating to the operation of the Store that we request you to retain and/or make available. You acknowledge that we are relying on the accuracy of all information you provide relating to the operation of the Store. You agree that all information that you provide will be truthful, accurate, complete, and in compliance with all applicable laws and with all policies or requirements we implement from time to time, provided that any changes in policies or requirements will not change the fundamental requirements of Paragraph 12(c)(1). A further description of bookkeeping practices to be used at the Store and our bookkeeping dispute resolution procedures are included in the 7-Eleven Operations Manual; however, such bookkeeping dispute resolution procedures do not supersede the dispute resolution provisions contained in Paragraphs 29 and 30, and we are not required to comply with such bookkeeping dispute resolution procedures as a condition to the exercise of our rights under Paragraphs 29 and 30. We may require you to: (i) certify annually that you are (a) verifying the eligibility of your employees to work in the United States, including, but not limited to, obtaining valid Form I-9 documentation for all employees and completing electronic verification of all your current and prospective employees through one or more state or federal on-line systems we may designate that verify the eligibility of such employees to work in the United States, and (b) in compliance with all applicable laws relating in any way to the operation of the Store, including, without limitation, all wage and hour and immigration laws; (ii) make available to us any records, electronic documents, or other documents relating to the operation of the Store that we request in support of such certification; and (iii) engage independent auditors at your expense that we designate or approve to confirm the accuracy of such certification.

(d) <u>Electronic Invoices.</u> If we have an arrangement with any of your vendors to pay for Purchases through Electronic Invoices, you agree not to pay, or request that we pay, such vendors in any manner other than through Electronic Invoices in accordance with our requirements related to Electronic Invoice payments.

(e) <u>Financial Summaries and Assistance That We Provide You</u>. If you are not in Material Breach of this Agreement, we may: (1) provide you with Financial Summaries; (2) enable payment, on your behalf and in accordance with the vendors' payment terms, after you approve and submit them to us, bank drafts and invoices for Purchases (as verified by the vendor statements or the appropriate vendor), and bills for Operating Expenses ; provided, however, that we have the right to immediately pay all Electronic Invoices upon receipt and without your prior approval, subject to your right to dispute the accuracy of such Electronic Invoices with the vendor after payment, and (3) assist you in preparing and filing your business tax reports and returns (except your income tax, related personal tax returns, and governmental census reports) to the extent the information is available from the Bookkeeping Records. You authorize us to collect discounts and allowances that were not already deducted from invoices, and to charge you for the market value of any premiums you receive based upon Purchases. You acknowledge that we may prepare Interim Financial Summaries at any time.

(f) <u>7-Eleven Store Information System</u>. You agree to use the 7-Eleven Store Information System in connection with your operation of the Store in accordance with our requirements. You agree that we own all information and data compiled by or stored in the 7-Eleven Store Information System, and that we will have electronic access to, and the right to use in any manner we elect (including selling and retaining all proceeds from such sales) the information compiled and managed by or stored in the 7-Eleven Store Information System or any other store information systems used at or by the Store at the times and in the manner that we specify. You may not in any way use or disclose all or any part of the information or data compiled by or stored in the 7-Eleven Store Information System, except in connection with your operation of the Store and as needed to effectively work with your Store suppliers. You may not sell all or any part of the information or data

compiled by or stored in the 7-Eleven Store Information System to any individual or entity.

**13. Open Account; Financing; and Minimum Net Worth.**

(a) Open Account. As part of the Bookkeeping Records, we agree to establish and maintain an Open Account for you. You agree to pay us any unpaid balance in the Open Account upon expiration or termination of the Agreement or earlier as provided in Paragraph 13(b). We will debit all Purchases, Operating Expenses, withdrawals you make and amounts you owe us which relate directly or indirectly to the operation of the Store to the Open Account for the Accounting Period in which we receive invoices, reports or other information with respect to such Purchases, Operating Expenses and amounts you owe us, regardless of when we pay such amounts for you. We will debit the difference between the Down Payment and the unpaid balance on your initial investment to the Open Account. We will credit all Receipts to the Open Account for the Accounting Period in which the Cash Report relating to those Receipts is dated, provided that you properly deposit those Receipts in the Bank, deliver them to us, or otherwise properly account for them as provided in this Agreement. We will also credit the Operating Credit to the Open Account, and may also credit any amounts we owe you to the Open Account. We will compute the balance in the Open Account in the manner we consider appropriate on a monthly basis or at any time during an Accounting Period that we consider it necessary. We will show the Open Account balance in the Financial Summaries or Interim Financial Summaries that we prepare for each Accounting Period (or any portion thereof).

(b) Financing. We agree to finance any unpaid balance in the Open Account as a loan to you, provided that (1) you are not in Material Breach of this Agreement; (2) you have granted us, and we continue to have, a first lien on the Collateral; and (3) you have executed a Security Agreement and financing statements (including any renewal or continuation financing statements that we require). If at any time there has been a Material Breach by you or we believe that any of the conditions set forth above are not met or if we reasonably believe that our security interest is threatened, we may discontinue the financing described above. If we do so, you agree to immediately pay us the unpaid balance in the Open Account.

(c) Interest. If we provide financing on the unpaid balance in the Open Account as described above, then the amount of the unpaid balance in the Open Account at the beginning of each Accounting Period will bear interest for the number of days in the then-current Accounting Period at the rate specified in Exhibit D. If there is a credit balance in the Open Account at the beginning of any Accounting Period, then the amount of the credit balance will bear interest for the number of days in the then-current Accounting Period at the rate specified in Exhibit D. We will credit or debit, as applicable, to the Open Account an amount equal to the accrued interest. However, at our sole option, we may limit the credit balance amount in the Open Account upon which we will pay interest to you upon notice to you. Any such notice will be effective three (3) days after we send such notice to you, and such notice will advise you of your right to withdraw the full current credit balance in the Open Account. We will pay you interest as determined under this Paragraph 13(c) on the current credit balance until the notice is effective.

(d) Minimum Net Worth.

(1) Beginning on the Effective Date and continuing through and including the Accounting Period during which we notify you that we are changing the Minimum Net Worth requirement, you agree to maintain at all times a Minimum Net Worth of at least fifteen thousand dollars ($15,000).

(2) Beginning with the first full Accounting Period after we notify you as described above and continuing through the remainder of the Term, the Minimum Net Worth requirement for the Store will be ten thousand dollars ($10,000). At such time, if you operate more than one (1) franchised 7-Eleven Store and your franchise agreement(s) covering such stores so provide(s), then the Minimum Net Worth requirement of your second and subsequent franchised 7-Eleven Stores is five thousand dollars ($5,000). You further agree that we may transfer Net Worth in excess of the Minimum Net Worth in one (1) of your 7-Eleven Stores to another of your 7-Eleven Stores which has a Net Worth below the Minimum Net Worth, or directly to us if the other Store's Franchise Agreement is terminated or expires and there was an unpaid balance in the Open Account at the time of termination or expiration.

**14. Audit Rights.** We have the right, at our option, to enter the Store and conduct Audits and other inspections: (1) during hours that the Store is required to be open upon seventy-two (72) hours' notice or (2) at any time and without notice (a) after we learn of a Robbery, Burglary, theft, mysterious disappearance of Inventory, Receipts and/or all or any portion of the Cash Register Fund, or casualty; (b) if you fail to properly account for Receipts or report Purchases and/or Operating Expenses within the time periods provided for in this Agreement; (c) if Net Worth is less than the Minimum Net Worth required under

Paragraph 13(d); or (d) if the last Audit we conducted reflects an Inventory Overage or Inventory Shortage of more than one percent (1%) of the Retail Book Inventory. You and we acknowledge that accurate Audits may be made while the Store is open for business, and you agree to cooperate with us and our representatives in conducting the Audit. You agree that, if you operate more than one (1) franchised 7-Eleven Store, and we are properly conducting an Audit at one (1) of your Stores, then we have the right to simultaneously conduct Audits of all of your 7-Eleven Stores, regardless of whether the conditions for Auditing your other 7-Eleven Stores have been met. Both parties shall receive copies of the report on each Audit. Audits shall be binding twenty-four (24) hours after receipt of such report unless either party gives notice that such party believes the Audit to be incorrect. If such notice is given, either party may cause a re-Audit to be performed within a reasonable period of time. If any such re-Audit conducted for you becomes binding and results in an adjustment in any Inventory Shortage or Inventory Overage reflected by the last Audit of more than 2% of the Retail Book Inventory, we agree to bear the reasonable cost of such re-Audit. In all other cases, you shall bear the full cost of any re-Audit. Notwithstanding anything to the contrary contained in this Agreement, we have the right to reverse any Inventory Overage that would be reflected on the Bookkeeping Records for the Store.

**15. Merchandising and Inventory; Recommended Vendors.**

(a) Initial Inventory. On or before the Effective Date, we agree to: (a) procure the initial Inventory which you will purchase for its Cost Value, except in the case of consigned merchandise; (b) debit your Open Account for any prepaid Operating Expenses; and (c) provide other services we deem reasonably necessary to prepare the Store to open for business.

(b) Ongoing Inventory and Categories. After the Effective Date, you agree to at all times during the Term of this Agreement carry at the Store all Categories of Inventory that we specify. You may delete any Category if such Category does not meet sales goals that we establish, provided that you obtain our prior written consent, which consent will not be unreasonably withheld. You agree to carry, use and offer for sale at the Store only the Inventory and other products that are consistent with the type, quantity, quality, and variety associated with the 7-Eleven Image and as we specify in the Agreement. You agree to comply with all of our standards and specifications for all Inventory, including Proprietary Products and other products and services carried, used or offered for sale at the Store.

(c) Proprietary Products. You agree that we have developed and may develop for use in the 7-Eleven System certain Proprietary Products all of which are proprietary to us and which constitute our Trade Secrets. You acknowledge the importance of the Proprietary Products to the 7-Eleven System, and agree to maintain in the Store at all times a Reasonable and Representative Quantity of all Proprietary Products listed in Exhibit G or otherwise in writing. We may change the Proprietary Products that you are required to offer from time to time upon reasonable notice (delivered in electronic or other form) to you by providing you with written notice of the change in the Proprietary Products that you are required to offer. Effective beginning thirty (30) days after we notify you of the change, you agree to carry and offer for sale the new or modified Proprietary Products.

(d) Product Packaging and Display. If we require that a product (including a Proprietary Product) be sold in a standardized container or special packaging (including a container or package that bears the Service Mark), or be sold using certain display cases, equipment, or other related components (including bags and napkins), you may use only the standardized containers, packaging, display cases, equipment and other components that conform to the type, style and quality we specify and that bear any distinctive identification we may designate. You agree to properly account for these items as required by this Agreement and to carry all components designated by us as necessary for displaying and selling any Proprietary Product. You may use containers, packaging, display cases, equipment and related components designated for use in connection with designated Proprietary Products only in connection with the offer, sale or promotion of designated Proprietary Products, unless you obtain our prior written permission.

(e) Nationally/Regionally Promoted Products and Exclusive Products. You agree to carry at the Store a Reasonable and Representative Quantity of all designated (i) nationally or regionally advertised or promoted products that are supported by electronic or published media and (ii) products that are exclusive to 7-Eleven in the convenience store channel. You agree to carry the products specified in (i) and (ii) above during the entire duration of the national or regional advertising or promotional campaign or period of exclusivity, as applicable. Notwithstanding the foregoing, you may discontinue carrying any nationally or regionally advertised or exclusive products if such products do not meet sales goals that we establish and you follow the process we establish for determining whether the items meet such goals. The method for determining sales goals and the process for deletion for such products will be included in the 7-Eleven Operations Manual. This Paragraph 15(e)

shall not apply to Proprietary Products.

(f) Suggested Retail Selling Prices. We may suggest retail selling prices for Inventory items and services that you offer at your Store. You have no obligation to sell Inventory items and services at our suggested retail selling prices, but you agree to accurately and timely report to us your actual retail selling prices as required by this Agreement.

(g) Vendor Requirements.

(1) You agree to purchase your Inventory and other products and services only from Bona Fide Suppliers. Except for shares in publicly-traded companies, you agree not to have or maintain any ownership or voting interest in any vendor from which your Store purchases Inventory, unless we otherwise consent in writing.

(2) You agree to at all times during the Term purchase at least eighty-five percent (85%) of your total Purchases and, separately, eighty-five percent (85%) of your cigarette purchases, both computed monthly at cost, from Recommended Vendors in compliance with the Recommended Vendor Purchase Requirement, which is further defined in Exhibit E.

(3) You acknowledge the value, importance, and benefits to the 7-Eleven System of a uniform method and close control of production, distribution, and/or delivery of Proprietary Products. You agree to purchase all of your requirements for such Proprietary Products solely from or through a source (including manufacturers, wholesalers, and distributors) we designate or from us. You agree not to offer or sell at the Store any products which directly compete with the Proprietary Products we designate as exclusive, unless you obtain our prior written consent.

(h) Recommended Vendor Procedure. If you want a Bona Fide Supplier who is not currently a Recommended Vendor to become a Recommended Vendor, you or the Bona Fide Supplier must submit to us a written request for approval and comply with the Recommended Vendor procedure set forth in this Paragraph 15(h). Upon our receipt of your request to have a Bona Fide Supplier become a Recommended Vendor, we agree to review the qualifications of the Bona Fide Supplier, after submission of all necessary data and adequate cooperation, to determine whether the Bona Fide Supplier meets our reasonable business and related requirements for a Recommended Vendor. We reserve the right to determine, in our sole discretion, whether a Bona Fide Supplier meets the necessary requirements to become a Recommended Vendor. The process for Recommended Vendor approval and the general requirements a Bona Fide Supplier must meet to become a Recommended Vendor are set out on the 7-Eleven Intranet. We reserve the right to revoke our approval of a Bona Fide Supplier as a Recommended Vendor if the Bona Fide Supplier fails to continue to meet any of our then-current criteria. We are not required to approve any particular Bona Fide Supplier as a Recommended Vendor. We will provide you with at least fifteen (15) days' notice of any new Recommended Vendors.

(i) Designated Service Vendors. We may require you to use only designated vendors that provide equipment as an integral part of certain services that are offered at your 7-Eleven Store, including pay telephone services, automated teller machines (ATMs), and other financial and/or electronic services. You agree to comply with our reporting requirements with respect to such services and revenue derived from the sale of such services, as those requirements may be modified from time to time.

(j) Our Vendor Negotiating Practices and Treatment of Discounts and Allowances.

(1) In negotiating our contracts with Recommended Vendors and manufacturers (in either case "Vendor") for products and services sold in 7-Eleven Stores, we will take the following steps:

(i) We agree to make a commercially reasonable effort to obtain the lowest cost for products and services available from such Vendor to 7-Eleven Stores on a Market Basket Basis by identifying all available discounts, allowances and other opportunities for price adjustments. We make no guarantee, warranty, or promise that we will obtain the best pricing or most advantageous terms on behalf of 7-Eleven Stores. We also do not guarantee the performance of suppliers and distributors to 7-Eleven Stores, and are not responsible or liable if the products or services provided by a supplier or distributor fail to conform to or perform in compliance with our contractual terms with the supplier or distributor.

(ii) We will then determine whether or not to accept any discounts, allowances and other opportunities for available price adjustment by:

- evaluating the limitations, restrictions and conditions placed on the adjustment by the Vendor, and

- taking into consideration whether the nature and requirements of a particular Vendor's offer is consistent with our business concept and strategies.

If we decide to accept an allowance, we will ask the Vendor to lower the cost for products and services available from such Vendor to 7-Eleven Stores in lieu of providing the allowance. If the Vendor advises us that it will not lower the cost of its products and services and we decide to accept the allowance, we will do so according Paragraph 15(j) (1) (iii) through (vi).

(iii) If cooperative advertising allowances are available from the Vendor and the Vendor advises us that it will not lower the cost of its products and services to 7-Eleven Stores in lieu of providing such cooperative advertising allowances, then we will accept and use such cooperative advertising allowances as designated by the Vendor.

(iv) If there are any other allowances available from the Vendor and the Vendor advises us that it will not lower the cost of its products and services to 7-Eleven Stores in lieu of providing such allowances, then we will request that the Vendor provide such allowances as cooperative advertising to be used as designated by the Vendor.

(v) If the Vendor advises us that it will not provide such other allowances as cooperative advertising, then we will accept and use such allowances as designated by the Vendor.

(vi) We will request from the Vendor written confirmation that the Vendor will not lower the cost of its products and services to 7-Eleven Stores in lieu of providing any available allowances.

(vii) We will use commercially reasonable efforts to include in all of our contracts with Recommended Vendors provisions for minimum standards for in-stock rates, assortment, delivery time windows, quality standards, customer assistance and other standards designed to assist the Store, as well as incentives for the Recommended Vendor for meeting the standards and penalties for failure to comply with such standards.

(2) Anything in this Paragraph 15(j) or Exhibit J to the contrary notwithstanding, we will treat all discounts and allowances in the manner provided for in the definition of Cost of Goods Sold set forth in Exhibit E.

(k) Review of Vendor Negotiating Practices and Treatment of Discounts and Allowances. We agree to pay the reasonable costs, up to a total of $75,000 per calendar year, incurred by the Franchisee Selection Committee (defined in Exhibit J) in relation to the retention of an independent third party ("Third Party Reviewer") as provided in Exhibit J and for the conduct of the review contemplated by Exhibit J, each in accordance with the procedures set forth in Exhibit J. You agree that (i) the dispute resolution procedures set forth in Exhibit J are the exclusive procedures for resolving any disputes relating to or arising from our undertaking under Paragraph 15(j)(1) and (2); (ii) the review process contemplated by this Paragraph 15(k) shall be the sole remedy for any breach or alleged breach of Paragraphs 15(j) and (k); and (iii) in no event will you be entitled to recover monetary damages or equitable relief for our failure to meet our obligations under Paragraph 15(j)(1) or under the definition of System Transaction Amounts in Exhibit E and the damages that you may be entitled to based upon our failure to meet our obligations under Paragraph 15(j)(2) are limited, all as provided in Exhibit J.

**16. 7-Eleven Foodservice Standards.**

(a) Compliance with 7-Eleven Foodservice Standards. You agree to operate the Store, including the Foodservice Facility, at all times in compliance with the 7-Eleven Foodservice Standards and in compliance with all applicable laws, regulations and codes, including the U.S. Food & Drug Administration Model Food Code.

(b) 7-Eleven Foodservice Standards Related to Fresh Foods. Without limiting the generality of Paragraph 16(a), you agree to comply with all of our merchandising and shelf life requirements with respect to Fresh Foods and to purchase Fresh Foods only from Recommended Vendors.

(c) Foodservice Certification Standards. Where required by applicable laws or regulations, you agree to

cause all Store employees to be certified as qualified to work in the Foodservice Facility before they begin work there and prominently display the certificates evidencing each employee's certification.

(d) Quality Inspections. We will have the right to enter the Store premises at any time during the times in which the Store is required to be open for the purpose of conducting inspections to determine whether the Store is in compliance with 7-Eleven Foodservice Standards and the 7-Eleven Image. You agree to cooperate with our representatives in such inspections by rendering such assistance as they may reasonably request. You also agree to permit us to remove a reasonable number of samples of food or non-food items from the Store, without payment, subject to your ability to properly write off any such products, in amounts reasonably necessary for testing by us or an independent laboratory to determine whether such samples meet the 7-Eleven Foodservice Standards.

(e) Failure to Comply with 7-Eleven Foodservice Standards. If you do not comply with the 7-Eleven Foodservice Standards, including quality standards or other reasonable operating standards that we establish from time to time, and you fail to cure your breach after being given a reasonable opportunity to do so, then, in addition to whatever rights we may have under Paragraph 26, we may perform (or have performed) any action necessary to remedy the breach. If we do so, we may debit your Open Account for the cost of curing the breach. If you receive three (3) notices that you have failed to comply with the 7-Eleven Foodservice Standards within any five (5) year period, then, in addition to whatever rights we may have under Paragraph 26, we may remove the entire Foodservice Facility or portions of the Foodservice Facility, as we consider appropriate, from the Store and debit your Open Account for the cost of this removal and of restoring the Store to its previous condition. If we determine, in our sole discretion, that your failure to comply with any of the 7-Eleven Foodservice Standards presents a threat to the health or safety of any person, or violates any federal, state, or local health regulation (including the U.S. Food & Drug Administration Model Food Code), then we may require you to immediately stop serving any or all items from the Foodservice Facility. In that event you will not be permitted to resume offering or selling such items until you have cured the breach to our sole satisfaction.

**17. Loyalty Programs, Delivery and Digital Technology.**

(a) You agree to participate in any 7-Eleven customer loyalty program which we designate from time to time in the 7-Eleven Operations Manual, including customer redemptions of qualifying merchandise. In general terms, by way of examples only, a 7-Eleven customer loyalty program may allow customers to earn points for each qualifying Store purchase, which points may then be redeemed at the Store or other 7-Eleven Stores for future 7-Eleven purchases, or may allow customers to earn a free qualifying item following a specified number of purchases of qualifying items (such as a free proprietary beverage following the prior purchase of a certain number of qualifying items). The details of any current or future 7-Eleven customer loyalty program will be described in the 7-Eleven Operations Manual and updated from time to time.

(b) We may require you to arrange for Adequate Delivery Service (as defined below) to a designated delivery area that we may determine and modify in our sole discretion, in strict compliance with all standards governing such activity as may be set forth in the 7-Eleven Operations Manual. You may only provide delivery services to customers situated within your delivery area. You acknowledge and agree that your delivery area is non-exclusive and that we and other franchisees may deliver within your delivery area. "Adequate Delivery Service" means delivery service in accordance with our then-current standards for delivery (as may be set forth in the 7-Eleven Operations Manual), including standards governing online, smartphone or other now or hereafter developed modes enabling customers to place orders for delivery.

Adequate Delivery Service does not require you today to engage personnel and vehicles to effect delivery but, instead, requires you to utilize third party providers of delivery service to accomplish delivery on behalf of your 7-Eleven Store. Although not currently contemplated, 7-Eleven reserves the right to substitute for today's protocol a future requirement that you furnish delivery services directly and engage such personnel, and obtain such vehicles, as in the future may be specified in the 7-Eleven Operations Manual.

(c) You understand and agree that the 7-Eleven System may feature digital, e-commerce, m-commerce, delivery and other ordering capabilities, platforms, "apps" and other now or hereafter developed infrastructure, tools, systems and analytics, and that these capabilities may constantly evolve and may require continued focus, investment and innovation, all of which may trigger your need to comply with all current and any hereafter developed hardware and software maintenance and utilization requirements we impose, as provided hereafter. Among other things, such technology may facilitate customers placing orders for pickup at your 7-Eleven Store; delivery from your 7-Eleven Store; and, participation in any now or hereafter

developed 7-Eleven customer loyalty program.

You agree to utilize, maintain, retire and allow replacement of the technology serving your 7-Eleven Store as and when we require in the 7-Eleven Operations Manual or otherwise in writing. This technology may include computer hardware, software, wired and/or wireless internet connections and service, required dedicated telephone and, whenever possible, power lines, "smartphone" automated customer purchase and tracking facilities, and other computer-related accessories, peripherals and equipment that we specify in the 7-Eleven Operations Manual. You also agree to maintain at all times a functioning e-mail address for your business and such wi-fi service for your customers as we designate in the 7-Eleven Operations Manual.

You understand and agree that modes of computerization and communication may rapidly evolve and that, accordingly, we may require you at your expense to maintain and utilize at your Store such hereafter developed or modified modes of computerization, hardware, software, equipment, accessories, facilities, capabilities, communication, media and/ or interfaces as we, in our business judgment, determine to incorporate into the 7-Eleven System. You shall do so at such time and in such manner as we designate in the 7-Eleven Operations Manual or other written notices. In connection with the foregoing, you may be required to enter into related license and support agreements requiring you to pay for standard support and maintenance fees.

(d) You acknowledge and agree that upon notice to you, and in addition to any other remedies we may have under this Agreement, we may disable or restrict your participation in any and all delivery, customer loyalty, digital, e-commerce, m-commerce, and other similar programs set forth in this Paragraph 17 and in the 7-Eleven Operations Manual if you fail to meet brand standards applicable to any of these programs or your operation of the Store.

**18. Your Indemnification and Insurance Obligations.**

(a) We agree to be responsible for all fire and casualty loss or damage to the Store building (specified in Exhibit A) and 7-Eleven Equipment (specified in Exhibit B) unless caused by your intentional acts or the intentional acts of your agents or employees.

(b) You agree to be responsible for and indemnify us, our Affiliates, and our and their respective officers, directors, agents, representatives, employees, successors and assigns (collectively, the "7-Eleven Indemnified Parties") from all losses arising out of or relating to your Store and its operation, except those losses that arise directly and exclusively from our failure to reasonably perform our maintenance responsibilities as set forth in Paragraph 20(d). This indemnification will survive the expiration, termination, or transfer of this Agreement or any interest in this Agreement. You agree to defend (at your expense) the 7-Eleven Indemnified Parties from and against any and all proceedings directly or indirectly arising out of our relating to your Store and its operation. Any 7-Eleven Indemnified Party may, at your expense, defend (which shall include selection of counsel) and control the defense of any proceeding described in this subsection and agree to settlements and take other remedial, corrective or other actions, provided that the 7-Eleven Indemnified Party will seek your advice and counsel, and keep you informed, with regard to any proposed or contemplated settlement.

(c) You will obtain before you begin operating the Store, and maintain during the term of this Agreement, at your expense, occurrence based insurance policies protecting you and the 7-Eleven Indemnified Parties against any demand or claim for bodily injury, personal injury, death, or property damage, or any other loss, liability, or expense whatsoever arising or occurring upon or in connection with the development or operation of the Store. Such policies shall be in form and written by a responsible carrier satisfactory to us (e.g., having an AM Best Rating of at least A- with a financial size category of at least X or its equivalent by a recognized insurance rating service) who is duly licensed by the appropriate governmental authorities and shall include, at a minimum, the following:

(1) commercial general liability insurance, written on an occurrence basis, including broad form contractual liability covering your indemnity obligations in this Agreement, broad form property damage, bodily injury, personal injury, advertising injury, products/completed operations, products liability, independent contractor coverage, liquor liability (if applicable) and fire damage legal liability coverage in the amount of at least One Million Dollars (US$1,000,000) per occurrence combined single limit for bodily injury, personal injury, and property damage, and at least Two Million Dollars (US$2,000,000) annual aggregate for bodily injury, personal injury, and property damage. If you operate more than one Store under a 7-Eleven Franchise Agreement, this required annual aggregate amount will increase by at least One Million Dollars (US$1,000,000) for each additional such Store that you operate;

(2) auto liability insurance covering any type of vehicle, whether owned or leased, in a combined single limit of at least One Million Dollars ($1,000,000) per occurrence for bodily injury and property damage;

(3) special form property insurance written on ISO CP 10 30 - Commercial Property Policy – "Special Form" Causes of Loss (formerly known as All-Risk) form, or its equivalent, and at a minimum such policy shall insure against destruction or damage by fire and other perils covered under such an ISO policy, and such other hazards or risks which a prudent business person would insure against. The policy(ies) required under this Agreement shall provide up to full replacement cost coverage for Inventory and Store Supplies, and shall not exclude flood coverage if the Store is located in a Flood Zone A or V, and shall not exclude earthquake coverage. Except with our prior written consent, which shall not be unreasonably withheld, the policy shall not have a deductible amount in excess of Twenty-Five Thousand Dollars ($25,000) for any one occurrence;

(4) workers' compensation insurance, or its equivalent, in amounts prescribed by the state in which the Store is located, including Employers' Liability, and such other insurance as may be required by the state or localities in which the Store is located; provided, that if such states or localities in which the Store is located does not require Workers' Compensation insurance, or if such insurance is required but coverage limits are not specified, then you will obtain such insurance coverage and coverage amounts that we reasonably require, but not less than the following for Employers' Liability: Five Hundred Thousand Dollars ($500,000) for each accident, Five Hundred Thousand Dollars ($500,000) disease – policy limit and Five Hundred Thousand Dollars ($500,000) disease – each employee;

(5) comprehensive crime/money and securities insurance with a limit per loss of not less than Ten Thousand Dollars ($10,000) for on premises losses and Ten Thousand Dollars ($10,000) for off premises losses, and covering all loss, damage or destruction of money and securities while same is in the care, custody and control of you or your employees, agents or contractors or as may otherwise be your responsibility under this Agreement.

You agree that we may periodically add to, modify, substitute or delete the types and amounts of insurance coverage which you are required to maintain under this Agreement, and all features and elements thereof, by written notice to you (through modifications to the 7-Eleven Operations Manual or otherwise). Within thirty (30) days of delivery or attempted delivery of this written notice to you, you agree to purchase insurance conforming to any such newly established standards and limits.

(d) <u>Deductibles; Waiver of Subrogation.</u> You may, with our prior written consent, have reasonable deductibles for the insurance policies and coverages required under this Paragraph. All required insurance policies shall also include a waiver of subrogation in favor of the 7-Eleven Indemnified Parties.

(e) <u>No Limitation/Independent Obligations.</u> Your obligation to obtain and maintain the insurance described in this Paragraph shall not be limited in any way because of any insurance we maintain, nor shall your performance of that obligation relieve you of your independent obligations and liability under the indemnity provisions of this Agreement.

(f) <u>Additional Insured/Loss Payee</u>. We shall be named as an additional insured on all liability insurance policies and we shall be named as a loss payee in connection with our interest in fees under business income insurance policies and our interest, if any, in real and/or personal property under any comprehensive crime/money and securities policies. All insurance policies will contain a provision that we, although named as an additional insured and/or loss payee, shall nevertheless be entitled to recover under said policies on any loss we incur due to your negligence. All of your policies shall be written so as to provide insurance that is primary and non-contributory with respect to the coverages afforded to us and each of the 7-Eleven Indemnified Parties. Any insurance policy maintained by the 7-Eleven Indemnified Parties shall be solely for the benefit of the 7-Eleven Indemnified Parties and considered to be in excess of any policy carried or maintained by you.

(g) <u>Proof of Insurance</u>. At least thirty (30) days before you begin operating the Store, and at least thirty (30) days before any policy expires, you must give us Certificates of Insurance evidencing the coverage required by this Agreement. The Certificates, except for Workers' Compensation or its equivalent, shall name us as either additional insured or loss payee as applicable, and shall state that our interest will not be affected by your breach of any policy provisions. Additionally, all Certificates shall state that we will receive at least thirty (30) days' prior written notice before any material alteration to or cancellation of the coverages occurs. You shall provide us with copies of all insurance policies you obtain in connection with the requirements of this paragraph at any time we request, and you shall make any changes we request to

such policies if we determine the policies do not meet the requirements of this paragraph.

(h) Failure to Obtain Insurance. If you fail to procure or maintain the insurance required by this Agreement, we may, but do not have to, immediately procure such insurance and charge you the costs for the insurance. You must immediately pay us these costs, together with a reasonable fee for our expenses in procuring such insurance. These remedies shall be in addition to any other remedies we may have.

(i) Amount and Adequacy of Insurance. By requiring the amounts of insurance coverages and limits described in this Paragraph, we are not representing that these amounts are consistent with local, state or federal laws, rules, regulations, permits, etc., that the amounts are sufficient to fully protect you for potential liability losses that may arise out of the operation of your store, or that the amounts are sufficient to adequately protect you from potential liability under this Agreement. The insurance requirements and or limits of coverage set forth in this Agreement shall in no way limit your liability arising under the Agreement or any other agreement or as a result of any related activities. You should consult with an attorney, insurance professional, or other professionals as you deem prudent or necessary to determine if the amounts and limits of insurance coverages required in this Paragraph are appropriate for your business and personal situations and whether you should obtain coverage in addition to the coverages we require.

**19. Your Additional Covenants.** In addition to your other covenants and obligations contained in this Agreement, you agree to:

(a) maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store;

(b) devote your full time and best efforts to the business of the Store and to maximizing the Store's sales and Gross Profit;

(c) supervise the Store's operations and make yourself available to meet with us, at our request, during reasonable business hours;

(d) maintain the Store as a 24-Hour Operation, unless prohibited by law or we agree in writing to different operating hours;

(e) provide us access to the Store, 7-Eleven Equipment, Inventory, Receipts, Cash Register Fund, cash register readings, banking and other equipment readings (including readings from lottery equipment), money order blanks, bank drafts, and Store supplies at any time and for any period of time during the times in which the Store is required to be open;

(f) properly record all sales of Inventory at the time of sale at the retail prices you set and generally offer to customers of the Store;

(g) promote the 7-Eleven System and use and display the Marks by requiring that all persons working in the Store wear only approved, branded apparel, maintained in neat and clean condition, while working in the Store;

(h) at all times, comply with all laws, rules, regulations, and other legal and governmental requirements concerning or relating to the operation of the Store, including without limitation all labor, wage and hour, and employment laws (including obtaining valid Form I-9 documentation for all employees). In addition, you agree to verify the eligibility of your employees to work in United States by completing electronic verification of all your employees through one or more state or federal on-line systems we may designate that verify the eligibility of such employees to work in the United States;

(i) comply with and/or to assist us to the fullest extent possible in our efforts to comply with Anti-Terrorism Laws. In connection with such compliance, you certify, represent, and warrant that none of your property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that you are not otherwise in violation of any of the Anti-Terrorism Laws. Any violation of the Anti-Terrorism Laws by you, or your employees or any "blocking" of your assets under the Anti-Terrorism Laws will constitute grounds for immediate termination of this Agreement and any other agreement you have entered with us or one of our Affiliates, in accordance with the termination provisions of this Agreement;

(j) refrain from representing to anyone, including the media, that you are our representative, and refrain from making any comment to anyone which purports to be a comment about us or the 7-Eleven System as one of our representatives. You agree at all times to clearly identify yourself as one of our franchisees in any public statements about us or the 7-Eleven System;

(k) execute all license agreements or similar agreements with us or third parties required for the installation and/or use of computer hardware or software in connection with the operation of your Store;

(l) authorize us to obtain from third parties all information regarding the operation of your Store (for example, information from state lottery agencies and vendors) and execute all documentation required to effectuate such authorization; and

(m) promptly notify us when, in relation to your operation of the Store, you have (i) received a verbal or written notice of any type regarding a possible violation of any law, ordinance, rule or regulation; (ii) received a subpoena, notice of inspection, or any other law enforcement or governmental inquiry; or (iii) otherwise become aware that you or any aspect of your Store operations is the subject of law or governmental enforcement activity.

If you are an existing 7-Eleven franchisee, you hereby represent and certify that, with respect to all 7-Eleven convenience stores operated by you, your affiliates, owners or guarantors: (a) you are in compliance, and have been in compliance for the 12 months prior to your execution of this Agreement, with all laws, rules, regulations, and other legal and governmental requirements concerning or relating to labor, wage and hour, employment and immigration; and (b) you, intentionally or through your gross negligence, have not understated or inaccurately reported the sales, or otherwise misstated any reports or bookkeeping information you are required to report to us, at any of your franchised 7-Eleven stores for the 12 months prior to your execution of this Agreement.

**20. Maintenance and Utilities.**

(a) Your Maintenance Obligations. Except to the extent we may expressly assume any of the following responsibilities in writing, you agree to be responsible for all maintenance, repairs, replacements, janitorial services and expenses relating to the Store and 7-Eleven Equipment, including: (1) maintaining the Store, 7-Eleven Equipment, other property in the Store and landscaped areas in a clean, attractive, orderly, safe, and sanitary condition and in good repair and operating condition, reasonable wear and tear excepted (2) replacing light bulbs, ballasts, vault doors, glass, and door closers on the Store and 7-Eleven Equipment; and (3) cleaning the Store interior, the parking lot and walk areas, including snow and ice removal.

(b) Maintenance Contracts. We will arrange for the performance of your required maintenance of the 7-Eleven Equipment or any equipment in the Store that we deem appropriate by contractors that we select, which contractors may include us or our affiliates. You may be required to sign Maintenance Contracts covering some or all of such maintenance services. We will provide you with a list of the equipment that is being covered by such maintenance services. We will pay for such maintenance on your behalf, and charge such costs to your Open Account at the end of each Accounting Period in the amount stated in Exhibit D. Any services performed on your behalf will not include any maintenance services on the HVAC Equipment. Upon written notice to you, we may cease arranging for the performance of your required maintenance of the 7-Eleven Equipment or any equipment in the Store on your behalf and charging such costs to your Open Account, in which case you agree to select, and pay for, contractors we approve to perform your required maintenance. You agree to arrange for the maintenance of any other equipment in the Store not covered by such maintenance services. Any Maintenance Contracts you sign for landscaped areas outside the Store or any other services related to the Store must be with reputable, financially responsible firms.

(c) Your Failure to Maintain the Store. If the Store, 7-Eleven Equipment or landscape is not maintained as required above and the condition continues for seventy-two (72) or more hours after we provide notice to you, or if the condition exists upon expiration or termination of this Agreement, then we will have the right to cause the maintenance to be performed at your expense and/or to obtain Maintenance Contracts for the Store and 7-Eleven Equipment and charge you for the maintenance.

(d) Maintenance Performed By or Through Us. When we consider it necessary during the Term of this Agreement, we agree to: (1) repaint and repair the interior and exterior of the Store; (2) replace 7-Eleven Equipment, including

cash registers and point-of-sale computers; (3) replace plate glass in front windows and front doors; (4) repair the floor covering, exterior walls, roof, foundation, and parking lot; (5) maintain the structural soundness of the Store; and (6) maintain the HVAC Equipment. You hereby consent to the foregoing. We may charge you for any of the repairs or replacements contemplated by this Paragraph 20(d), if, in our reasonable opinion, your abuse or neglect makes them necessary.

(e) Utilities. We agree to pay for sewer, water, gas, heating oil and electricity for operation of the Store and to pay for all telephone lines used for the operation of the Store, except for the main telephone line at the Store, the cost of which is your expense.

**21. Taxes.** We agree to pay all real and personal property taxes related to the Store and 7-Eleven Equipment specified in Exhibits A and B. You agree to be solely responsible for, and must pay, all other taxes, including sales, inventory, payroll, occupancy, business and income taxes and personal property taxes related to the Store and any equipment at the Store other than the 7 Eleven Equipment provided by or through us.

**22. Advertising.**

(a) Advertising Fee.

(1) You agree to pay us the Advertising Fee in the same manner and at the same time as you pay us the 7-Eleven Charge in accordance with Paragraph 10. Advertising Fees become our property to be spent by us in accordance with Paragraph 22(a)(3) and are not held by us in trust.

(2) Through the end of the December 2018 Accounting Period, the amount of the Advertising Fee will be determined for each applicable Accounting Period, as follows:

| Base Period Gross Profit | Formula for Determination of Advertising Fee |
|---|---|
| More than $400,000 | Gross Profit for the Accounting Period x 0.015 (1.5%) |
| $300,000 to $400,000 | (Base Period Gross Profit x 0.045) - $12,000 Gross Profit for the Base Period Gross Profit Accounting Period |
| Less than $300,000 | Gross Profit for the Accounting Period x 0.005 (.5%) |

"Base Period Gross Profit" is defined in Exhibit E. If the Store has not been in operation for twelve (12) full months, then the average Gross Profit for all 7-Eleven Stores in the then-currently assigned 7-Eleven market or other Store unit group designated by us in which the Store is located for the twelve (12) months immediately preceding the current Accounting Period will be used to determine the Base Period Gross Profit for the first year of Store operations.

The following is an example of how the above formula for a Base Period Gross Profit of between $300,000 to $400,000 results in an Advertising Fee for a given Accounting Period: if Base Period Gross Profit equals $340,000, and the current Accounting Period Gross Profit equals $28,333.33, then the formula results in an Advertising Fee of $274.83, determined as follows:

$340,000.00 x 0.045 = $15,300 minus $12,000 = $3,300

$3,300 divided by $340,000 = .0097 (.97%)

.0097 times $28,333.33 = $274.83

(3) Beginning with the January 2019 Accounting Period and continuing through the remainder of the Term, the amount of the Advertising Fee will be 1% of the Current Period Gross Profit for each Accounting Period.

(4) We may arrange for all advertising of the 7-Eleven System, the Service Mark, the Related Trademarks, or merchandise sold in or services offered by 7-Eleven Stores, as we desire. We will spend the Advertising

Fees we collect for Advertising Materials and Programs which may, in our sole discretion, be used for the general benefit of the 7-Eleven System, for local, regional, and/or national promotions, or for specific 7-Eleven Store(s). We may accept suggestions from 7-Eleven franchisees on the use of the funds collected as Advertising Fees. However, we have and will continue to have the sole and absolute right to determine how Advertising Fees will be spent, including the selection, direction and geographic allocation of Advertising Materials and Programs and the types of media utilized. You further agree that we and our Affiliates have no fiduciary obligation to you or to other 7-Eleven franchisees with respect to such determinations or expenditures of the Advertising Fees.

(5) We undertake no obligation to make expenditures of Advertising Fees which are equivalent or proportionate to a franchisee's Advertising Fee payment or to ensure that any particular franchisee benefits directly or pro rata from such expenditures or from the Advertising Materials and Programs funded by the Advertising Fees.

(6) You agree that we have the right to pay or reimburse our expenses of creating, developing, maintaining and administering Advertising Materials and Programs from the Advertising Fees; provided, however, that we agree not to use the Advertising Fees to pay or reimburse ourselves for any internal costs for administering Advertising Materials and Programs or for any in-house advertising agency costs. You further acknowledge that company-operated Stores or other 7-Eleven franchisees may not be required to pay an Advertising Fee, and you agree to pay the Advertising Fee notwithstanding the payment by other 7-Eleven franchisees or company-operated Stores of greater, lesser or no Advertising Fees.

(7) We agree to advise you annually of Advertising Fee receipts and our advertising expenditures, including in what markets the sums were spent and the type of advertising done, all in the form and manner which we determine in our sole discretion to be appropriate. We are not required to audit the receipts and expenditures of the Advertising Fees or any portion thereof. We will annually advise you of the total amount of our advertising expenditures that are allocated to the Company-operated stores.

(b) Local Advertising/Advertising Approval. In addition to your payment of the Advertising Fee, you may engage in any local print, radio or television advertising you wish if that advertising accurately portrays the Service Mark, the Related Trademarks and/or the 7-Eleven System, does not jeopardize the 7-Eleven Image, pertains only to the operation of your Store, is in compliance with all applicable laws, and does not breach any agreement binding on you or us. However, to protect the goodwill accumulated in the Service Mark and Related Marks, you agree to obtain our written approval before engaging in any advertising or display of the Service Mark or the Related Trademarks if the proposed advertising materials have not been prepared by us or previously approved by us during the twelve (12) month period preceding their proposed use. You agree to submit any unapproved advertising materials to us, and we agree to approve or disapprove such materials within a reasonable time of our receipt of the materials. You may not use any unapproved advertising materials that display Service Mark or the Related Trademarks. You agree to promptly discontinue the use of any advertising materials, whether or not we have previously approved them, upon notice from us. Our advertising approval procedure is set forth in the 7-Eleven Operations Manual.

(c) Internet Promotion. We expressly reserve the right to promote and display all forms of the Service Mark and Related Trademarks, the 7-Eleven System, and the 7-Eleven Image by use of the Internet. You may not: (i) engage in any advertising or display of the Service Mark or Related Trademarks; or (ii) market or promote any products or merchandise sold in 7-Eleven Stores or containing, bearing, or associated with the Service Mark or Related Trademarks by use of the Internet, Internet websites, email, mail order, or similar means, which allows for the display, marketing, or sale of any such products or merchandise other than by sale through the Store.

(d) Foodservice Promotion. You agree to properly utilize the Foodservice point-of-sale support and layouts we designate in accordance with the design of the Foodservice Facility that do not contain pre-printed prices. We may, at our option, add to or change the signs in the Foodservice Facility at any time.

**23. Service Mark and Related Trademarks.**

(a) Right to Use the Marks. We grant you the right to use the Service Mark and Related Trademarks during the Term of this Agreement in accordance with this Agreement and our standards and specifications. (The Service Mark and Related Trademarks are collectively referred to in this Paragraph 23 as the "Marks".)

(b) Agreements Regarding the Marks. You agree:

(1) That as between us and you, we are the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them.

(2) Not to take any action that would prejudice or interfere with our rights in and to the Marks. Nothing in this Agreement will give you any right, title, or interest in or to any of the Marks, except the right to use the Marks in accordance with the terms and conditions of this Agreement.

(3) That all goodwill arising from your use of the Marks will inure solely and exclusively to our benefit, and that upon expiration or termination of this Agreement and the license granted herein, no monetary amount will be attributable to you for any goodwill associated with your use of the Marks.

(4) Not to directly, or by assisting another, challenge or contest our ownership of or rights in or the validity or enforceability of the Marks, any license granted under this Agreement, or any Trade Secret, copyright in any work, or copyrighted works that we own, use or license.

(5) That any unauthorized use of the Marks will constitute an infringement of our rights in the Marks. You agree to provide us with all assignments, affidavits, documents, information and assistance related to the Marks that we reasonably request, including all such instruments necessary to register, maintain, enforce and fully vest our rights in the Marks.

(6) That we will have the right to substitute different trade names, trademarks, service marks, logos and commercial symbols for the current Marks to use in identifying the 7-Eleven System and 7-Eleven Stores, services and products. In such event, we may require you to discontinue or modify your use of any of the Marks or to use one or more additional or substitute marks. We will pay the costs related to such discontinuation, modification, or substitution of the Marks; provided, however, that you will be responsible for all costs associated with changing letterhead, business cards or other business-related items and permitted trademarked items and all trademarked supplies and trademarked merchandise.

(c) Use of the Marks. You further agree that you will:

(1) Operate and advertise the Store only under the name "7-Eleven," without prefix or suffix, unless otherwise authorized or required by us in writing.

(2) Not use the Marks as part of any corporate, legal or other name, or on any employment-related materials.

(3) Not use the Marks to incur any obligation or indebtedness on behalf of us.

(4) Not use any Marks except as expressly authorized in this Agreement.

(5) Comply with our instructions in filing and maintaining requisite trade name or fictitious name registrations, and execute any documents deemed necessary by us or our counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

(6) Not use the Marks as part of any domain name, homepage, e-mail address, metatag, or otherwise in connection with any website or other online presence without our prior consent (which consent will be subject to revocation upon notice by us) and in accordance with guidelines provided by us, as may be set forth in the 7-Eleven Operations Manual or otherwise in writing.

(d) Certain Prohibited Conduct. In addition to other prohibitions in this Agreement, you may not, at any time:

(1) use, except as permitted by this Agreement, the Service Mark, any other trade indicia, that we own or license, including the Related Trademarks, the goodwill represented by any of them, the 7-Eleven System, the Trade Secrets, any Advertising Materials or Programs that we own, use or license, or claim any right to any of them, except a right

to use them that is expressly granted by the terms of this Agreement;

(2) use any work of authorship which is substantially similar to a work subject to a copyright we own or license;

(3) make, support or help another to make use of any name, trademark, service mark, trade dress or other visual or audible material which is not expressly permitted by this Agreement and comprises in part the numeral "7" or the term "eleven" or is otherwise likely to cause confusion with or dilute the distinctiveness of the Service Mark or any other trade indicia, including the Related Trademarks, that we own or license; or

(4) commit any other act which may adversely affect or be detrimental to us, other 7-Eleven franchisees, or any of our rights in or to the Service Mark, other trade indicia, including the Related Trademarks, or any copyright or Trade Secret that we own or license, the 7-Eleven Image, or the 7-Eleven System.

You acknowledge that any breach of any of the terms of the covenants contained in Paragraph 23(d)(1) through (4) will result in irreparable injury to us and that we are entitled to injunctive relief to prevent any such breach.

(e) Infringement and Dilution. You agree to notify us immediately of any apparent infringement or dilution of or challenge to our use of or rights in any Mark by any person. You agree not to communicate with any person other than us or our counsel and your counsel in connection with any such apparent infringement, dilution, challenge or claim. We will have complete discretion to take any action we deem appropriate in connection with any infringement or dilution of, or challenge or claim to, any Mark and the right to control exclusively, or to delegate control of, any settlement, litigation, Patent and Trademark Office proceeding or other proceeding arising out of any such alleged infringement, dilution or challenge or claim, or otherwise relating to any Mark. You agree to execute all such instruments and documents, render such assistance, and do such acts or things as may, in our opinion, reasonably be necessary or advisable to protect and maintain our interests in the Marks.

(f) Domain Names; Use of Internet.

(1) You acknowledge that we are the lawful, rightful and sole owner of the Internet domain names "www.7-Eleven.com" and "www.7-11.com" and any other Internet domain names registered by us. You unconditionally disclaim any ownership interest in such domain names or any similar Internet domain names. You agree not to register or to use any Internet domain name in any class or category, or any other URL, that contains words and/or numbers used in or similar to those used in the Service Mark or any Related Trademark, or any abbreviation, acronym, phonetic variation or visual variation of those words and/or numbers. You will assign to us any such domain name(s) you own on the Effective Date.

(2) You agree not to establish an Internet website that displays the Marks or relates or refers to the Store without our prior written approval and our grant of a license to use the Marks on such website.

**24. Renewal of Franchise.** On the Expiration Date of this Agreement, you may, at your option, exercise a one-time right to renew your franchise rights under this Agreement for one (1) term, if all of the following conditions have been met:

(a) You give us written notice of your election to renew not less than nine (9) months or more than twelve (12) months before the Expiration Date.

(b) We, in our sole judgment, decide to keep the Store open as a 7-Eleven Store.

(c) The law permits the renewal of your franchise and the continued operation of the Store.

(d) We determine, in our sole judgment, that your Store is in compliance with the 7-Eleven Foodservice Standards.

(e) You are not in Material Breach of this Agreement, and you are current on all amounts you owe to us as of the Expiration Date.

(f) You have maintained the Minimum Net Worth required by Paragraph 13(d) throughout the one (1) year period immediately preceding the Expiration Date.

(g) You complete, to our satisfaction, a review of your Store operations to ensure that you are meeting the requirements of the 7-Eleven System and otherwise operating in a manner consistent with the 7-Eleven Image and standards. We will use a performance measurement rating form that we develop from time to time to evaluate your operation, and will inform you in writing of the status of your evaluation. We will begin this review process approximately 1 year prior to the Expiration Date, unless any laws require us to begin the review process sooner. If you do not meet our requirements for renewal, we will notify you of our decision not to offer you a renewal prior to the Expiration Date, and allow you the opportunity to sell your interest in the franchise pursuant to paragraph 25 of this Agreement.

(h) You sign and deliver to us our then-current form of Store Franchise Agreement for franchise renewals, which agreement shall supersede this Agreement in all respects. The terms of the then-current renewal agreement may be materially different than the terms of this Agreement and the agreements we are then offering to prospective franchisees, including with respect to the length of the term offered thereunder.

(i) You sign and deliver to us a mutual termination of this Agreement and general release of claims, in a form substantially similar to Exhibit H to this Agreement.

(j) You pay us a renewal fee in connection with the renewal of the franchise in the amount of $50,000.00.

(k) We have not sent you four (4) or more notices of Material Breach of this Agreement during the two (2) year period immediately preceding the Expiration Date.

(l) You have completed any additional training we require. We agree to pay the reasonable costs associated with the training specified in Exhibit D to this Agreement.

(m) We are offering a single-unit 7-Eleven convenience store franchise program for individual store franchises in the State and MSA in which your Store is located.

(n) You meet all of our then-current qualification requirements for prospective franchisees, including, without limitation, any applicable financial or net worth requirements.

**25. Assignment.**

(a) <u>Assignment by Us</u>. We will have the right to transfer or assign this Agreement and all or any part of our rights or obligations herein to any person or legal entity without your consent, and upon such transfer or assignment, the transferee or assignee will be solely responsible for all our obligations arising under this Agreement subsequent to the transfer or assignment. Without limitation of the foregoing, we may sell our assets to a third party; may offer our securities privately or publicly; may merge with or acquire other corporations, or may be acquired by another corporation; or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring.

(b) <u>Assignment by You.</u>

(1) Neither your interest under this Agreement nor all, or substantially all, of the Collateral may be transferred or assigned in any way, partially or completely, without our prior written consent. Without limitation of the foregoing, you may not (a) assign the Lease or transfer an interest in all or substantially all of the Collateral without assigning the entire Agreement in accordance with this Section 25(b), (b) sublease all or any portion of the Store or 7-Eleven Equipment, or (c) transfer an ownership interest in you (if you are an entity) or a controlling ownership interest in an entity with an ownership interest in you, without our prior written consent. We may condition our consent on the satisfaction of all of the following conditions:

(i) You authorize us to provide the transferee with, and the transferee executes, a disclosure form containing a waiver and a release by the transferee of any claim against us for any amount paid to you or representation made by you;

(ii) You authorize us to provide the transferee with a list of all 7-Eleven stores available for franchise in the division or general area where the Store is located;

(iii) You execute, at our option, a mutual termination of this Agreement and general release of claims (in a form similar in all material respects to Exhibit H) or an assignment of this Agreement and general release of claims (in a form similar in all material respects to Exhibit H) and an indemnity for any claim by the transferee in any way arising out of or related to the transfer and arrangements or communications between you and the transferee;

(iv) You pay all amounts due us or our Affiliates in full and make arrangements satisfactory to us for the payment of all amounts which may become due upon delivery of final Financial Summaries, including the payment into the Open Account of all premium monies you will receive for the franchise; and

(v) This Agreement has not been terminated and no termination is pending and you are not in Material Breach of this Agreement.

(2) We will approve or disapprove a proposed transferee or assignee for training within sixty (60) days after we have received all information regarding the proposed transaction that we reasonably require. If approved, the transferee must, at our option, execute either the then-current form of 7-Eleven Store Franchise Agreement or an assumption of this Agreement (in either case providing for the then-current financial terms, including the Down Payment, 7-Eleven Charge, Franchise Fee and all other current terms), complete the then-required training, and be otherwise determined in our sole opinion to meet all qualifications needed to become a 7-Eleven franchisee, including those general qualifications set forth in the then-current 7-Eleven Operations Manual.

(3) You and your proposed transferee must have met all of the conditions set forth in this Paragraph 25(b) in order to obtain our final approval of the proposed transfer or assignment. After you transfer or assign your interest under this Agreement and the Collateral, you will have no further right, claim or interest in or to the franchise, the Store, or any assets used or acquired in conjunction with them.

(4) You may not grant a security interest in, or otherwise encumber, this Agreement or the Collateral.

(c) Our Right of First Refusal. If you wish to transfer or assign any interest in this Agreement pursuant to any bona fide offer received from a third party to purchase such interest, then you agree to promptly notify us in writing of the offer, and provide us with such information and documentation relating to the offer as we may require. We or our designee will have the right and option, exercisable within fifteen (15) Business Days after receipt of such written notification and copies of all required documentation describing the terms of the offer, to send written notice to you that we or our designee intend to purchase the interest on the terms and conditions offered by the third party as stated in the notice. If we or our designee elect to purchase the interest, closing must occur on or before sixty (60) calendar days from the date of our or our designee's notice to you of our or our designee's election to purchase or any other date agreed by the parties in writing. If the third party offer provides for payment of consideration other than cash, we or our designee may elect to purchase the interest for the reasonable cash equivalent. A material change in the terms of any offer prior to our providing you notice of our intent to exercise our right to purchase the interest will constitute a new offer subject to the same right of first refusal as an initial offer.

**26. Termination.**

(a) Termination by Us with No Opportunity to Cure. We may terminate this Agreement immediately upon notice to you for the occurrence of any one (1) or more of the following events (each of which you acknowledge is a Material Breach and constitutes good cause for termination):

(1) you have made or make any material misrepresentation or omission in connection with your application for and acquisition of the franchise, execution of this Agreement, or your operation of the Store;

(2) you, intentionally or through your gross negligence, understate or fail to accurately report the Store's sales for any period, or otherwise misstate any reports or bookkeeping information you are required to report to us;

(3) you fail to comply with any federal, state, or local wage and hour law, or fail to comply with any

federal, state, or local law related to any employment or immigration matter;

(4) you abandon the Store (meaning you have deserted, walked away from, or closed the Store under circumstances leading us to conclude that you have no intent to return to the Store, regardless of how many days have passed since the apparent abandonment);

(5) you, any of your owners, or the owner of a controlling ownership interest in an entity with an ownership interest in you makes a purported transfer in violation of Paragraph 25;

(6) you are or have been convicted by a trial court of, or plead or have pleaded guilty or no contest to, a felony or a crime of moral turpitude;

(7) we have evidence that you have engaged in any dishonest, unethical, immoral, or similar conduct as a result of which your association with the Store could, in our sole opinion, have a material adverse effect on the goodwill associated with the 7-Eleven System or the 7-Eleven Marks;

(8) you misappropriate or disclose without our written authorization any Confidential Information (provided, however, that we will not deem you in breach of this Agreement as a result of isolated incidents of disclosure by one of your employees if you have taken reasonable steps to prevent such disclosure, including the steps a reasonable and prudent owner of confidential and proprietary information would take to prevent disclosure of such information by its employees, and further provided that you pursue all reasonable legal and equitable remedies against such employee for such disclosure);

(9) a voluntary or involuntary petition in bankruptcy is filed by or against you, you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due, or a receiver or trustee is appointed;

(10) you fail on four (4) or more separate occasions within any twenty-four (24) consecutive month period to comply with the terms of this Agreement, whether or not you correct the failures after our delivery of notice to you;

(11) your assets, property, or interests are blocked under any Law relating to terrorist activities, or you or any of your owners otherwise violate any such Law; or

(12) a provision of this Agreement (including all or any part of Paragraphs 15, 16, or 22), which we, in our sole discretion, determine to be material, is declared invalid by a court of competent jurisdiction, as set forth in Paragraph 31(c).

To the extent there exists any conflict or inconsistency between the terms of this Paragraph 26(a) and any other terms of this Agreement, the terms of this Paragraph 26(a) will govern.

Any breach under Paragraphs 26(a)(1), (2), (3), (6), or (7) of this Agreement by you, your affiliates and/ or any guarantor of yours will be deemed a non-curable default under this Agreement and all other 7-Eleven franchise agreements between or among us and you, your affiliates, and/or your guarantor(s); if the nature of the default under any other such agreement would have permitted us (or our affiliate) to terminate this Agreement if the default had occurred under this Agreement, then we will have the right to terminate all such other agreements in the same manner provided for in this Agreement for termination hereof.

(b) <u>Termination by Us with an Opportunity to Cure</u>. We may terminate this Agreement upon notice to you, subject to your right to cure within the cure periods described below, for the occurrence of any one (1) or more of the following events (each of which you acknowledge is a Material Breach and constitutes good cause for termination):

(1) you fail to operate the Store as a 24-Hour Operation (or for a different number of hours of operation which we have agreed to in writing before the reduction in hours of operation), unless the reduction (i) is the result of governmental regulation, and (ii) is not directly or indirectly caused by your acts or omissions, and do not correct the failure within two (2) days after delivery of written notice;

(2) you (a) use any of the 7-Eleven Marks without authorization, or (b) offer or sell any Proprietary Product or other product bearing any of the 7-Eleven Marks which you have obtained from a source not authorized to produce or offer such products, and do not correct the failure within three (3) days after delivery of written notice;

(3) you fail to comply with any 7-Eleven Foodservice Standards for the Foodservice Facility and do not correct the failure within three (3) days after delivery of written notice;

(4) you (a) fail to properly record, deposit, deliver, or expend and report Receipts or deliver deposit slips, cash reports, and all supporting documents, receipts for cash Purchases, and invoices or other reports of Purchases as required by Paragraph 12, or (b) fail to permit any Audit provided for in Paragraph 14 or deny us access to any part of the Store or its records, and do not correct the failure within three (3) days after delivery of written notice;

(5) except as provided in Paragraph 26(a)(2), you fail to report the Store's sales or to pay us or any of our affiliates any amounts when due and do not correct the failure within three (3) days after delivery of written notice;

(6) the Net Worth for your Store falls below the required minimum, and you do not correct the failure within three (3) days after delivery of written notice;

(7) you fail (a) to maintain the insurance this Agreement requires (including but not limited to workers' compensation insurance) or to send us satisfactory evidence of such insurance within the required time, or significantly modify your insurance coverage without our written approval, or (b) to remit to us insurance proceeds to which we are entitled, and do not correct the failure within five (5) days after delivery of written notice;

(8) you fail to provide the certification relating to your compliance with all laws required under Paragraph 12(c)(3), fail to make available to us any records, electronic documents, or other documents relating to the operation of the Store that we request in support of such certification, fail to engage independent auditors at your sole expense to review your immigration, payroll, and personnel records and practices, and confirm the accuracy of such certification, or such independent auditors you engage fail to confirm the accuracy of such certification, and do not correct that failure within five (5) days after delivery of notice;

(9) you fail to participate in or properly implement as required any 7-Eleven Customer Loyalty Program, or fail to provide Adequate Delivery Service to all or any portion of the Delivery Area, and do not correct the failure within fifteen (15) days after delivery of written notice;

(10) you violate any law, ordinance, rule or regulation relating to the Store's operation and do not correct the noncompliance or violation within fifteen (15) days after delivery of written notice of the noncompliance or violation;

(11) you fail to notify us that you have received verbal or written notice of any type regarding a possible violation of any law, ordinance, rule or regulation relating to the Store's operation and do not correct the failure within fifteen (15) days after delivery of written notice of the failure;

(12) you fail to pay when due any federal or state income, service, sales, employment, or other taxes due on the Store's operation, unless you are in good faith timely contesting your liability for such taxes through appropriate proceedings, and do not correct your failure within thirty (30) days after delivery of written notice;

(13) a tax lien is imposed on you which affects the Store, so long as such failure to pay or the imposition of such tax lien is not caused by us, and you fail to either satisfy the lien or provide us written evidence that you are in good faith timely contesting the lien through appropriate proceedings within thirty (30) days after delivery of written notice;

(14) you fail to obtain or maintain all licenses, permits, or bonds necessary, in our opinion, for your operation of the Store, so long as such failure to obtain or maintain the licenses, permits, or bonds is not caused by us, and do not correct that failure within thirty (30) days after delivery of notice;

(15) the unpaid balance in the Open Account becomes immediately due and payable, but you do not

repay our loan to you in accordance with this Agreement, and do not correct that failure within thirty (30) days after delivery of notice; and

(16) you fail to comply with any other obligation under this Agreement or any other agreement between us (or any of our affiliates) and you relating to the Store, or with our master lease for the Store (assuming a copy of that lease or the pertinent provisions have been supplied to you), and do not correct the failure to our satisfaction within thirty (30) days after we deliver written notice.

(c) Termination on Death or Incapacitation. We may terminate this Agreement upon thirty (30) days' notice (or such longer period that we may determine or as required by applicable law) if you die or become incapacitated. However, if you are more than one (1) individual and only one (1) individual dies or becomes incapacitated, we may, at our option, (1) continue this Agreement with the survivor or non-incapacitated individual or (2) require the survivor or non-incapacitated individual to execute our then-current form of Store Franchise Agreement, which contains the same financial terms as this Agreement, for the remainder of the Term of this Agreement.

(d) Market Withdrawal. We may terminate this Agreement upon not less than thirty (30) days' Withdrawal Notice (or such longer time that we determine or as required by applicable law), if we determine, in good faith and in a normal course of business, to cease the operation of all 7-Eleven Stores in the relevant geographic market area (being the state or metropolitan statistical area ("MSA") or similar designation as periodically established by the Office of Management and Budget or any replacement governmental office), or in a geographically separate area outside of a MSA in which the Store is located. You acknowledge that such determination and action will be "good cause" for termination. In the event of a sale, transfer or assignment of all of our right in the Stores in the area, or a decision by us to close the Stores in your area, you will have the right of first refusal, or of purchase, as the case may be, to be exercised within the first ten (10) days after you receive the Withdrawal Notice, to acquire and receive assignment of all of our non-proprietary rights in and to the Store, the equipment (specifically excluding, without limitation, the 7-Eleven Store Information System), and the real property. Such right will be exercisable upon the same terms as agreed upon between us and a bona fide third party transferee, or in the absence of such an agreement, at a purchase price determined by an appraiser appointed by us and upon terms acceptable to us. If the purchase price is to be determined by an appraiser appointed by us, the decision of the appraiser will be final. All costs of appraisal will be shared equally by you and us. This Paragraph 26(d) does not apply if our agreement to sell, transfer or assign to a third-party our rights in the Store(s) in your area and/or the Franchise Agreement(s) related to such Store(s) contemplates that the Store(s) will continue to be operated as 7-Eleven Stores.

(e) Transfer and Refund Rights.

(1) In addition to the other grounds for termination set forth in this Agreement, this Agreement will terminate before the Expiration Date:

(a) thirty (30) days before a condemnation (or transfer instead of condemnation) which results in our decision to discontinue operations of the Store as a 7-Eleven Store;

(b) if there is casualty damage to the Store or 7-Eleven Equipment which we determine cannot reasonably be repaired or replaced within thirty (30) days; or

(c) thirty (30) days before the Store permanently closes because applicable law requires permanent closure of the Store, provided that the required closure is not the result of our or your acts or omissions.

If this Agreement is terminated pursuant to this Paragraph 26(e), or if we lose our Leasehold Rights, and provided that you paid a Franchise Fee to us for the Store, then for one hundred eighty (180) days following the date of such termination, you will have the right to choose either (i) to transfer to another 7 Eleven Store available as a franchise (a "Transfer"), or (ii) to receive a refund of a portion of the Franchise Fee paid by you (a "Refund"), on the terms and conditions stated below, but you will not have the right to both a Refund and a Transfer. If, upon the expiration of such one hundred eighty day (180) day period, you have not elected to Transfer as provided below, you will be deemed to have elected to receive the Refund.

(2) In order to elect to Transfer, you agree to either sign the then-current 7-Eleven Store Franchise Agreement for the new Store or complete a "Transfer Election Form". If you elect to Transfer, and you meet the conditions

set forth below, the Transfer will be completed within a reasonable time after you elect to Transfer, but in no event later than six (6) months after you elect to Transfer. If you are otherwise eligible for a Transfer, you must also meet all of the following conditions:

(a) you are not selling or assigning your interest in the Store or transferring your interest to a third party pursuant to Paragraph 25;

(b) you are not in Material Breach of this Agreement at the time of your election to Transfer;

(c) you have had a Net Worth in an amount greater than or equal to the Minimum Net Worth required by Paragraph 13(d) for the one (1) year immediately before your election;

(d) you execute and deliver to us the then-current 7-Eleven Store Franchise Agreement available for 7-Eleven Stores in the area in which the Store to which you wish to Transfer is located and a mutual termination of this Agreement and general release of claims, in a form substantially similar in all material respects to Exhibit H. You will not be required to pay a Franchise Fee under the new Store Franchise Agreement that you execute, and the term of such new Store Franchise Agreement will be equal to the term then remaining under this Agreement;

(e) you have not been served with four (4) or more notices of Material Breach within the two (2) years before your election; and

(f) you complete any additional training we request, but we agree to bear the costs for the training as provided in Exhibit D.

If you have satisfied these conditions and you choose a Transfer, then the Transfer may be to any comparable 7-Eleven Store you select (i) which is available for franchise, (ii) which has been open for business as a 7-Eleven Store for at least twelve (12) months, (iii) which is located within the same MSA as the Store, and (iv) for which you meet our then-current qualifications as we determine in our sole discretion. We will not be responsible for your moving or relocation expenses or any premium amount, broker's fee or any other payment to a third party arising in connection with the Transfer.

(3) If you elect the Refund, the Refund will be calculated by dividing the Franchise Fee you paid when you signed this Agreement by one hundred twenty (120); and multiplying the result by the number of calendar months from the first day of the next month following the date you notify us of your election to receive the Refund through the month of the scheduled Expiration Date. If you are otherwise eligible for a Refund, you also agree to meet all the following conditions:

(a) you are not selling or assigning your interest in the Store for a premium, or transferring your interest to a third party pursuant to Paragraph 25;

(b) you are not in Material Breach of this Agreement at the time you elect to receive the Refund;

(c) you have had a Net Worth in an amount greater than or equal to the Minimum Net Worth required by Paragraph 13(d) for the one (1) year immediately before your election; and

(d) you execute and deliver to us a mutual termination of this Agreement and general release of claims, in a form substantially similar in all material respects to Exhibit H; and (E) you have not been served with four (4) or more notices of Material Breach within the two (2) years before your election.

(4) You will not have the right to a Transfer or Refund if (i) we terminate this Agreement for cause; (ii) you voluntarily terminate this Agreement; (iii) there has been a condemnation which results in our deciding to discontinue 7-Eleven operations at the Store and if you received any portion of a condemnation award as provided in Paragraph 8(d); or (iv) our Leasehold Rights expire and are not renewed or otherwise extended, or if our Leasehold Rights are terminated, as a result of your or your employees' acts or omissions.

(5) You agree that if one of the events giving you the right to elect a Transfer or Refund occurs, you

will have no right to receive any damages from us, and the Transfer or Refund will be your sole and exclusive remedy

(f) Our Right to Assume Operation of the Store. We may enter the Store premises and take possession of the Store, 7-Eleven Equipment, Inventory, Receipts, Cash Register Fund, money order blanks, bank drafts and Store supplies and continue the operation of the Store for your (or your heirs' or legal representatives') benefit and account pending the expiration or termination of this Agreement or resolution of any dispute under this Agreement if: (1) the Store is not open for operation as provided in Exhibit D; (2) you die or become incapacitated, except as otherwise provided in Exhibit F ("Survivorship"), or, (3) in our opinion, a divorce, dissolution of marriage, or criminal proceeding or incident in which you are involved jeopardizes the operation of the Store or harms the 7-Eleven Image. On behalf of yourself, your heirs, and your legal representatives, you hereby consent to our operating the Store pursuant to the terms of this Paragraph 26(f) and agree to release and indemnify us from and against any liability arising in connection with our operation of the Store pursuant to this Paragraph 26(f). If we elect to take possession of and continue operating the Store, then, in addition to all other fees and payments owed under this Agreement on account of the Store's operation, we may charge you a reasonable management fee, not to exceed five percent (5%) of the Store's Gross Profits, plus any out-of-pocket expenses incurred in connection with the Store's management.

**27. Mutual Termination; Termination by You.**

(a) Mutual Termination. This Agreement may be terminated at any time by written agreement between you and us.

(b) Termination by You. You may terminate this Agreement upon at least seventy-two (72) hours written notice to us (or shorter notice, if we accept it). If you elect to terminate this Agreement and provide us less than thirty (30) days prior written notice, you agree to pay us a termination fee in an amount equal to five thousand dollars ($5,000). We have the right to debit such termination fee to your Open Account.

**28. Close Out Procedure.**

(a) Post-Expiration/Termination Obligations. Upon the expiration or termination of this Agreement, all rights granted to you hereunder will terminate and you agree to:

(1) Immediately and without any further notice (unless further notice is required by law and cannot be waived) peaceably surrender the Store and 7-Eleven Equipment, which must be in the same condition as when you first received them, normal wear and tear excepted. If we are required by law to provide you any notice, and such notice may be waived, then you hereby waive your right to receive such notice. As a condition of your surrender, we may require you to perform certain cleaning, maintenance or other functions at the Store that you are obligated to perform under this Agreement, and we may perform such requirements on your behalf and charge your Open Account if you fail to perform them;

(2) Transfer to us, or, at our option, a third-party transferee, the Final Inventory of the Store. We or such third-party transferee will pay you an amount equal to the Cost Value of the Final Inventory in accordance with Paragraph 28(b)(2) below. We agree to permit you to transfer the Final Inventory to a third- party transferee only if all amounts that you owe us and our Affiliates are paid in full and you make arrangements satisfactory to us for the payment of any amounts which may become due upon delivery of final Financial Summaries. You agree that any property belonging to you and left in the Store after the surrender and transfer will become our sole property;

(3) Transfer to us the Receipts, Cash Register Fund, prepaid Operating Expenses, money order blanks, bank drafts, lottery tickets (if applicable) and Store supplies;

(4) Immediately cease using the Service Mark, the Related Trademarks, and all elements of the 7-Eleven System, including the Confidential Information and Trade Secrets;

(5) Return to us any copy of the Trade Secrets and Confidential Information, including the 7-Eleven Operations Manual and any other manuals we provided you, along with all copies or duplicates thereof, all of which are acknowledged to be our sole property. If you possess any of the foregoing in electronic form, you will delete such material from your computers and other storage devices and not use such material and not retain any copy or record of any of the foregoing, except your copy of this Agreement and of any correspondence between you and us;

(6) Execute all necessary documentation to transfer all licenses and permits relating to the Store to us; and

(7) Comply with all other post-expiration/termination obligations set forth in this Agreement.

(b) Settlement of Open Account. Within thirty (30) days after you surrender and transfer the Store and 7-Eleven Equipment in accordance with Paragraph 28(a), we agree to:

(1) Credit your Open Account for the Receipts, Cash Register Fund, prepaid Operating Expenses, usual and reasonable amounts of Store supplies transferred to us, or a third-party transferee, as applicable;

(2) Credit your Open Account an amount equal to the Cost Value of the Final Inventory;

(3) Debit your Open Account $200 as a closing fee; and

(4) Remit to you any amount by which we estimate the Net Worth (except for any amount due you under Paragraph 27) will exceed the greater of $10,000 or 25% of your total assets (as reflected on the balance sheet that we prepare for the Store for the applicable Accounting Period). We may withhold any additional amounts required by bulk transfer laws or any other similar laws or state or federal agencies.

(c) Payment of Indebtedness to Us; Delivery of Final Financial Summaries. Upon termination or expiration of this Agreement, any unpaid balance on the Open Account will be immediately due and payable upon demand by us. Within one hundred five (105) days after the last day of the month in which the surrender and transfer of the Store and 7-Eleven Equipment occurs, we agree to deliver final Financial Summaries to you. If the final Financial Summaries reflect a credit balance in the Open Account, we agree to deliver a check in the amount of the credit balance with the final Financial Summaries. If the final Financial Summaries reflect a debit balance in the Open Account, you agree to immediately pay us the debit balance. Your endorsement of any check sent with the final Financial Summaries or other acceptance of the funds tendered by us acknowledges your release of all claims affecting the figures set forth in the final Financial Summaries.

**29. Mediation.** We and you acknowledge that during the Term of this Agreement certain disputes may arise between us that we and you are unable to resolve, but that may be resolvable through mediation. To facilitate such resolution, we and you agree that, except as otherwise specified below, if any dispute between you and us cannot be settled through negotiation, then before commencing litigation to resolve the dispute, you and we will first attempt in good faith to settle the dispute by non-binding mediation unless you or we advise the other in writing that we decline to mediate the dispute. The mediation will be conducted under the auspices and then-prevailing mediation rules of the American Arbitration Association or any successor organization (the "AAA"), unless you and we agree to mediate under the auspices of another mediation organization or other rules. The mediation is subject to the following terms and conditions:

(a) Unless otherwise agreed, the mediation will take place at a mutually accessible neutral location within the market area in which your Store is located.

(b) You and we agree to share equally the mediator's fees and expenses and the fees charged by AAA (or any other organization used for the mediation). Each of us agrees to be solely responsible for any other expenses you or we incur in connection with the mediation. You and we agree that any mediation between you and us, and any mediation between any other 7-Eleven franchisee and us, will be confidential and non-discoverable and that statements made by either side in any such mediation proceeding will not be admissible for any purpose in a subsequent legal proceeding, and you and we agree to execute documents to evidence such agreement. Either party can terminate the mediation at any time.

(c) This mediation provision does not apply to any dispute involving (i) the Service Mark or the Related Trademarks; (ii) a failure by you to deposit Receipts as required by this Agreement; (iii) possession of the Store, (iv) any violation of law relating to the Store where you have admitted the violation or a judicial or administrative body has made a finding of a violation; (v) an alleged violation by you under Paragraph 26(a) of this Agreement.

(d) Either you or we may seek a temporary restraining order, preliminary injunction or any other equitable relief at any time prior to or during the course of a dispute if, in your or our reasonable belief, such relief is necessary to avoid irreparable damage or to preserve the status quo.

(e) Except for the judicial actions described in Paragraphs 29(c) and (d), above, if a mediation has been commenced, neither you nor we will initiate judicial proceedings or arbitration proceedings until the mediation has been completed as contemplated or terminated by Paragraph 29(b) above. Any applicable statute of limitations will be suspended for the time in which the mediation process is pending.

**30. Governing Law; Jurisdiction; Enforcement.**

(a) Governing Law. Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. sections 1501 et seq.), this agreement, and all controversies, disputes, or claims arising from or relating to this agreement or its validity, will be governed by and interpreted and construed under the laws of the State of Texas (without regard to its conflict of law rules).

(b) Jurisdiction. With respect to any controversy not finally resolved through mediation (as described above), you and (if you are an entity) your owners agree that all judicial actions brought by us against you or your owners, or by you or your owners against us, our affiliates, or our or their respective owners, officers, directors, agents, or employees, must be brought exclusively in the state or federal court of general jurisdiction located closest to where we, as franchisor, have our principal business address when the action is commenced. You and each of your owners irrevocably submit to the jurisdiction of such courts and waive any objection you or they might have to either jurisdiction or venue. Despite the foregoing, we may bring an action seeking a temporary restraining order or temporary or preliminary injunctive relief, in any federal or state court in the state in which you reside or the Store is located.

(c) Costs And Attorneys' Fees. If we incur costs and expenses (internal or external) to enforce our rights or your obligations under this Agreement, you agree to reimburse all costs and expenses we incur, including, without limitation, reasonable accounting, attorneys', arbitrators', and related fees. Your obligation to reimburse us arises whether or not we begin a formal legal proceeding against you to enforce this Agreement. If we do begin a formal legal proceeding against you, the reimbursement obligation applies to all costs and expenses we incur preparing for, commencing, and prosecuting the legal proceeding and until the proceeding has completely ended (including appeals and settlements).

(d) Waiver of Jury Trial. **WE AND YOU (AND YOUR OWNERS) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER US OR YOU (OR YOUR OWNERS). WE AND YOU (AND YOUR OWNERS) ACKNOWLEDGE THAT WE AND YOU (AND THEY) MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERING THIS WAIVER'S RAMIFICATIONS.**

(e) Limitation of Claims. **ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN US AND YOU WILL BE BARRED UNLESS A JUDICIAL PROCEEDING IS COMMENCED IN THE APPROPRIATE FORUM WITHIN TWO (2) YEARS FROM THE DATE ON WHICH THE VIOLATION, ACT, OR CONDUCT GIVING RISE TO THE CLAIM OCCURS, REGARDLESS OF WHEN THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIM.**

**31. Miscellaneous Provisions.**

(a) Nonwaiver. No act or omission by you or us, or any custom, course of dealing, or practice at variance with this Agreement, will constitute a waiver of (a) any right you or we have under this Agreement or (b) the other party's breach of this Agreement, unless it is a waiver in writing, signed by the party to be bound as provided in Paragraph 31(g) below. No waiver by you or us of any right under or breach of this Agreement will be a waiver of any other subsequent, preexisting or continuing right or breach, and our failure, refusal or neglect to exercise any right under any other franchise agreement, or to insist upon any other franchisee's strict compliance with every term of their agreement, will not be deemed to waive or impair our right to demand your strict compliance with every term of this agreement.. Our acceptance of any payment you make to us after any breach of this Agreement (including our acceptance of the 7-Eleven Charge) will not be a waiver of the breach, even if we know of the breach at the time we accept the payment. No special or restrictive legend or endorsement on any check or similar item you give to us will constitute a waiver, compromise, settlement or accord and satisfaction. You authorize us to remove or obliterate any such legend or endorsement, and agree that such legend or endorsement will have no effect.

(b) Disclosure. You hereby consent to our use and disclosure of any information relating to this Agreement or the Store or contained in the Bookkeeping Records to anyone; provided, however, that we will only disclose your Financial Summaries on an anonymous basis, unless we are legally compelled to disclose them on a non-anonymous basis by subpoena, court order, or otherwise.

(c) Circumstances Beyond a Party's Control. Neither you nor we will be liable in damages to the other for any failure or delay in performance due to any acts of terrorism, governmental act or regulation, war, civil commotion, earthquake, fire, flood, other disaster or similar event, or for any other event beyond your or our control, if the affected party (a) promptly notifies the other of the failure or delay and (b) takes all reasonable steps to mitigate damages caused by such failure or delay.

(d) Notices.

(i) Except as otherwise provided herein, any notices required to be provided under this Agreement must be in writing and may be (a) personally delivered, or (b) sent by an expedited delivery service, or (c) mailed by certified or registered mail, return receipt requested, first-class postage prepaid, or (d) sent by facsimile or electronic mail, as long as the sender confirms the facsimile by sending an original confirmation copy of the notice by certified or registered mail or expedited delivery service within three (3) Business Days after transmission. If you send us a written request to give copies of your notices to someone you designate and include the name and address of your designee, we agree to send copies of your notices to your designee. If you or your designee cannot be promptly located, we agree to deliver the notice to one of your employees at the Store, and, thereafter, to mail such notice to you by prepaid postage return receipt requested. Any notice will be deemed to have been received (i) in the case of personal delivery, at the time of delivery, or (ii) in the case of an expedited delivery service, three (3) Business Days after being deposited with the service, or (iii) in the case of registered or certified mail, three (3) Business Days after the date of mailing, or (iv) in the case of facsimile or electronic mail, upon transmission with proof of receipt, as long as a confirmation copy of the notice is sent as described above. If notices are sent by electronic mail, the sender will be required to confirm the electronic mail by sending an original confirmation copy of the notice by certified or registered mail or expedited delivery service within three (3) Business Days after transmission. Notices to you by electronic mail will be addressed to the Store address, the electronic mail address for the Store computer or other electronic mail address to which you have access and that we have previously designated in a written notice to you, or to your address shown on the signature page to this Agreement. We will send an electronic reminder to your Store computer to notify you of any electronic notice. Notices to us by electronic mail will be addressed to the address shown on the signature page to this Agreement or other address that we designate in writing.

(ii) We reserve the right to establish electronic mailings (i.e., email), web sites, or other forms of communications in which to communicate and distribute information to 7-Eleven franchisees. You agree that we may utilize such electronic communications to effectively provide binding notices to you. You agree to provide notices to us as set forth above unless we expressly consent and provide for electronic notices from you.

(e) Severability. Except as expressly provided to the contrary herein, each provision of this Agreement and any portion thereof is considered severable. If, for any reason, any provision of this Agreement contravenes any existing or future law or regulation, the provision will be considered modified to conform to the law or regulation as long as the resulting provision remains consistent with the parties' original intent. If it is impossible to so modify the provision, such provision will be deleted from this Agreement. If any provision of this Agreement (including all or any part of Paragraphs 15, 16 or 22) is declared invalid by a court of competent jurisdiction for any reason, the parties will continue to be bound by the remainder of this Agreement, which will remain in full force and effect; provided, that if any provision of the Agreement, which we, in our sole discretion, determine to be material, is declared invalid by a court of competent jurisdiction, we reserve the right to terminate this Agreement in accordance with Paragraph 26(a)(12) and, in connection with such termination, offer you a different 7-Eleven franchise agreement in accordance with Paragraph 10(c).

(f) Personal Qualification. We are entering into this Agreement with the person(s) named as the "Franchisee(s)" on the signature page; in reliance upon his, her or their personal qualifications; and upon the representation and agreement that he, she or they agree to be the Franchisee(s) of the Store, will actively and substantially participate in the operation of the Store and will have full authority and responsibility for the operation of the Store. No changes in the ownership and/or control of the franchise may be made without our advance written consent. Any person(s) subsequently added as a "Franchisee" in a writing signed by the parties must likewise actively and substantially participate in the operation of the Store and have full authority and responsibility for the operation of the Store.

(g) Complete Agreement. **This Agreement and the Exhibits, Amendments, and Addenda to this Agreement, including any other agreements specified in Exhibit D (all of which are hereby incorporated herein and made a part of this Agreement), contain the entire, full and complete agreement between us and you concerning the Store. This is a fully integrated agreement and it supersedes all earlier or contemporaneous promises, representations, agreements and understandings. No agreement relating to the matters covered by this Agreement will be binding on us or you unless and until it has been made in writing and duly executed by you and one of our authorized officers. Our agents or employees may not modify, add to, amend, rescind or waive this Agreement in any other manner, including by conduct manifesting agreement or by electronic signature, and you are hereby put on notice that any person purporting to amend or modify this Agreement other than by a written document signed by one of our authorized officers, is not authorized to do so. You represent and warrant that you have supplied us with all information we requested and that all such information is complete and accurate. You further represent and warrant that you have not received nor relied on any representations relating to the Store except as expressly contained in this Agreement, or (i) as to the future or past income, expenses, sales volume or potential profitability, earnings or income of the Store or any other location, except as provided in Item 19 of our Franchise Disclosure Document, or (ii) as to site specific information, except as provided in our "Here Are The Facts" supplemental disclosure.**

(h) Consents. All consents required to be given by us pursuant to this Agreement must be given in writing, and such consents may be granted or withheld in our sole discretion.

(i) Interpretation. As used in this Agreement and all exhibits and attachments hereto,

(i) the words "you agree" or "we agree" or "you will" or "we will" mean an imperative duty and will be interpreted and construed to have the same meaning and effect as the words "you shall" or "you must" or "we shall" or "we must"; and

(ii) the words "including", "include" or "includes" will be interpreted and construed to have the same meaning and effect as the words "including, but not limited to" or "including, without limitation".

(j) **WAIVER OF DAMAGES. YOU HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGE AGAINST US, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREE THAT IN THE EVENT OFA DISPUTE, YOU WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY YOU. IF ANY TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES SHALL CONTINUE IN FULL FORCE AND EFFECT.**

(k) Consultation with Advisors. You acknowledge that you have received, read and understands this Agreement and the related exhibits and agreements, that we have afforded you sufficient time and opportunity to consult with lawyers and other business and financial advisors selected by you about the potential benefits and risks of entering into this Agreement, and that you are entering into this Agreement of your own volition.

(l) Savings Clause. Any of your obligations that contemplate the performance of such obligation after the termination or expiration of this Agreement or the transfer of any interest herein, including Paragraphs 5, 17, 18, 19, 28, 29, and 30, will be deemed to survive such termination, expiration or transfer and will remain binding until fully discharged to our sole satisfaction.

(m) Fees. We may charge you a fee that we establish in our sole discretion if you request any changes or services related to the Agreement that we are not required to perform, including but not limited to name changes, incorporations, adding or removing an individual or entity from the Agreement, transfers or assignments of the Agreement (other than an assignment under Paragraph 25(b) of this Agreement to a transferee that pays us an initial franchise fee), or other similar activities.

(n) <u>The Exercise of Our Business Judgment.</u> We have the right to develop, operate, and change the 7-Eleven System in any manner not specifically prohibited by this Agreement. Whenever this Agreement reserves our right to take or withhold an action, or to grant or decline to grant you the right to take or omit an action, we may, except as this Agreement specifically provides, make our decision or exercise our rights based on information then available to us and our judgment of what is best for us or the 7-Eleven System when we make our decision, whether or not we could have made other reasonable or even arguably preferable alternative decisions and whether or not our decision promotes our financial or other individual interest.

You and we have executed this Agreement as of the last date set forth below.

| | 7-ELEVEN, INC. |
|---|---|
| Signature Arron B. Yount 12/31/18 | Signature |
| | Jeanne E. Lynch Assistant Secretary |
| Full Name (Typed) | Full Name (Typed) |
| Date | |

7-Eleven Store No. 2367 - 16981C

801 Broadway
Store Address — Street

King City — CA — 93930-3303
City — State — Zip

FRANCHISEE(S)

| | |
|---|---|
| Signature | Signature |
| Sung Hun Choe<br>Full Name (Typed) | Full Name (Typed) |
| Date 12.27.18 | Date |
| Signature | Signature |
| Full Name (Typed) | Full Name (Typed) |
| Date | Date |

# EXHIBIT A

## STORE

YOU ACCEPT THE STORE AS IS IN ITS CONDITION ON THE DATE OF THIS EXHIBIT, EXCEPT AS SPECIFICALLY NOTED ON THIS EXHIBIT

This Exhibit is based on the information we have on the date of this Agreement. It is accurate to the best of our knowledge and belief. If you request, we agree to make a complete copy of any master lease or any documents recorded against the Store available to you. If you have any questions about this Exhibit or you would like a more complete explanation of any item, please contact the Market Manager.

Store and Adjoining Property Lease Information:

7-ELEVEN Store No. 2367 - 16981C

Street 801 Broadway

King City — CA — 93930-3303
City — State — Zip

[ ] Plot Plan and Legal Description Attached

[ ] Owned by us

[X] Leased by us

The term of our lease covering the real estate for the Store that is in effect on the Effective Date is scheduled to end on May 31 2024, but the lease may end earlier. We have 1 option(s) to extend the lease, for a term of 5 years for each option. We have no obligation to renew or exercise any option to extend the lease. The Term of this Agreement will end on the Expiration Date.

Special Charges:

Common Area (including landscaped areas): If we lease the Store, the master lease or declarations or other documents recorded against the Store, may impose common area maintenance charges or other charges for which you will be responsible; provided that such charges must have been provided for by the terms of the initial master lease or the terms of any options that existed at the time of the initial master lease. Please consult the master lease or recorded documents for a complete description of any such charges that will be assessed against the Store.

Other (for example, maintenance, required services, co-operative Advertising, rent taxes):

Special Operating Provisions:

We have disclosed information on this Exhibit to the best of our knowledge but the master lease, if any, or any declarations or other documents of record against the Store, or any state or local ordinances, permits, etc., may result in charges or operating restrictions involving the Store that are not listed on this Exhibit. You should refer to any master lease for the Store, documents recorded against the Store and local laws to determine the extent of any of these restrictions.

FRANCHISEE

By ______________________ By ______________________

Sung Hun Choe

Date 12.27.18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

7-ELEVEN, INC.

By ______________________

Arron B. Yount

Date 12/31/18

EXHIBIT B

7-ELEVEN EQUIPMENT

YOU ACCEPT THE EQUIPMENT AS IS IN ITS CONDITION ON THE DATE OF THIS EXHIBIT, EXCEPT AS SPECIFICALLY NOTED ON THIS EXHIBIT.

7-Eleven Equipment includes all equipment owned or leased by us that is located at the store as of the Effective Date of this Agreement, or added to the Store at any time.

FRANCHISEE

By ____________________

Sung Hun Choe

Date 12.27.18

By ____________________

Date ____________________

By ____________________

Date ____________________

By ____________________

Date ____________________

7-ELEVEN, INC.

By ____________________

Arron B. Yount

Date 12/31/18

EXHIBIT C

# INTENTIONALLY OMITTED

EXHIBIT D

SELECTED PROVISIONS

(a) You agree that the Store will be a 24-Hour Operation, unless prohibited by law or we agree in writing to different operating hours. If the Store is prohibited by law from doing business as a 24-Hour Operation, you agree that the Store will operate the maximum number of hours permitted by law. Laws regulating the maximum number of hours may change from time to time, and this may change the number of hours you will operate the Store.

(b) The Franchise Fee was $ 0.00. The Down Payment was $ 0.00. The Down Payment included a $20,000.00 contribution toward the estimated Cost Value of the initial Inventory, a $ 0.00 payment toward the estimated initial governmental fees for necessary licenses, permits, and bonds (an Operating Expense), and a $ 0.00 payment for the initial Cash Register Fund. The monthly Operating Credit is $200. The Grand Opening Fee is $8,000. The Grand Opening Fee is payable if the Effective Date of this Agreement is on or after January 1, 2019.

(c) The initial annual interest rate we charge you on the unpaid balance in the Open Account will be 6.50 %. The annual interest rate we charge you on the unpaid balance in the Open Account will be adjusted, effective each March 1, and will continue in effect through the last day of February of the following year. The initial and ongoing annual interest rate will be 2% over the prime rate charged by Bank of America (or any successor) as of the first working day of each calendar year during which the adjustment becomes effective. If the interest charged under the Franchise Agreement or this Exhibit D is greater than the maximum interest permitted by applicable law, the excess amount charged will be considered automatically credited to the principal balance of the loan, since we intend to avoid charging any interest that would violate any applicable law.

(d) We agree to pay you interest on any credit balance in the Open Account pursuant to Paragraph 13 at the prime rate charged by Bank of America (or any successor), as of the first working day of each calendar year, minus 2%. The annual interest rate will be adjusted, effective each March 1, and will continue in effect through the last day of February of the following year.

(e) You agree to attend both Store and classroom training. If you are only one individual, you agree to attend the training. If you are a corporation, you agree to designate a principal, owner, or manager to receive training. Each participant must successfully complete each phase of training in order to continue the training process.

(f) The percentage(s) used to adjust retail to cost for determining Cost Value and Inventory Variation will be computed by dividing recent, historical Purchases at cost (including delivery charges, cost equalization, and adjustment for discounts and allowances received) by recent, historical Purchases at retail. Special Items Purchases, consigned merchandise, write-offs, and product markdowns will be excluded from Purchases at cost as well as Purchases at retail. For Stores not previously operated as 7-Eleven Stores, until the Store has been in operation for 3 months, the average percentage(s) for all 7-Eleven Stores in the 7-Eleven market where the Store is located will be used. After the Store has been in operation for three months, the percentage(s) will be computed for the Store based on the recent, historical Purchases of the Store.

(g) All Withdrawals or other payments from us to you will be in the form of electronic bank transfers.

(h) 7-Eleven Charge:

(1) For a 24-Hour Operation:

The 7-Eleven Charge for the Store will be determined according to table 1 on the attached Schedule D (except as otherwise provided in Paragraphs 10(b) and/or (c) of the Franchise Agreement) beginning

on the Effective Date and continuing through and including the Accounting Period during which we notify you that we are changing to table 2. Beginning with the first full Accounting Period after we notify you as described above and continuing through the remainder of the Term, the 7-Eleven Charge for the Store will be determined according to table 2 on the attached Schedule D (except as otherwise provided in Paragraphs 10(b) and/or (c) of the Franchise Agreement).

(2) For permitted reduction in hours of operation:

If you have our permission to operate the Store as less than a 24-Hour Operation, the 7-Eleven Charge for the Store will be the percentage as determined by (i)(1) above plus 0.1% of the Gross Profit for each hour during a normal week of operation that the Store is closed.

(3) For non-permitted reduction in hours of operation:

If you operate the Store less than the required number of hours at any time without our permission, the 7-Eleven Charge for that Accounting Period will be the percentage as determined by (i)(1) or (2) above, as applicable, plus 4% of the Gross Profit if you operate at least 136 hours per week or 6% of the Gross Profit if you operate less than 136 hours per week. This increase in the 7-Eleven Charge is not our only remedy, and is in addition to other remedies available to us.

(i) Other special provisions (specify):

______________________________________________________________________________
______________________________________________________________________________
______________________________________________________________________________
______________________________________________________________________________

(j) The monthly maintenance fee described in Paragraph 20 will be $__________, which amount we will charge to your Open Account at the end of each Accounting Period. We have the right to change such charge from time to time upon notice to you if our costs for arranging any of such maintenance changes.

FRANCHISEE

______________________________

By ______________________________ By ______________________________

Sung Hun Choe ______________________________

Date 12-27-18 Date ______________________________

By ______________________________ By ______________________________

______________________________ ______________________________

Date ______________________________ Date ______________________________

7-ELEVEN, INC.

By ______________________________

Arron B. Yount

Date 12/31/18

SCHEDULE D
TABLE 1

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $150,000 or less | 48% of Current Period Gross Profit |
| $150,001 to $300,000 | $72,000 + .49 (Base Period Gross Profit - $150,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $300,001 - $400,000 | $145,500 + .52 (Base Period Gross Profit - $300,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $400,001 - $500,000 | $197,500 + .53 (Base Period Gross Profit - $400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $500,001 - $750,000 | $250,500 + .55 (Base Period Gross Profit - $500,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $750,001 - $1,000,000 | $388,000 + .56 (Base Period Gross Profit - $750,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,000,001 or more | $528,000 + .57 (Base Period Gross Profit - $1,000,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

"Base Period Gross Profit" is defined in Exhibit E. If the Store has not been in operation for twelve (12) full months, then the Base Period Gross Profit shall be $150,000 for the first two (2) Accounting Periods, and thereafter, until the thirteenth Accounting Period of Store operations, will be twelve (12) multiplied by the average of all prior full Accounting Periods for the Store.

TABLE 2

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $200,000 or less | 45% of Current Period Gross Profit |
| $200,001 to $250,000 | $90,000 + .49 (Base Period Gross Profit - $200,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $250,001 - $300,000 | $114,500 + .54 (Base Period Gross Profit - $250,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $300,001 - $350,000 | $141,500 + .55 (Base Period Gross Profit - $300,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $350,001 - $400,000 | $169,000 + .56 (Base Period Gross Profit - $350,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $400,001 - $450,000 | $197,000 + .57 (Base Period Gross Profit - $400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $450,001 - $650,000 | $225,500 + .58 (Base Period Gross Profit - $450,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $650,001 - $900,000 | $341,500 + .59 (Base Period Gross Profit - $650,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $900,001 to $1,400,000 | $489,000 + .58 (Base Period Gross Profit - $900,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,400,001 - $1,600,000 | $779,000 + .57 (Base Period Gross Profit - $1,400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,600,001 or more | $893,000 + .56 (Base Period Gross Profit - $1,600,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

"Base Period Gross Profit" is defined in Exhibit E. If the Store has not been in operation for twelve (12) full months, then the Base Period Gross Profit shall be $200,000 for the first two (2) Accounting Periods, and thereafter, until the thirteenth Accounting Period of Store operations, will be twelve (12) multiplied by the average of all prior full Accounting Periods for the Store.

# EXHIBIT E

## DEFINITIONS

"Accounting Period" means a calendar month during your operation of the Store, except that if the Effective Date, expiration, termination or surrender of the Store and 7-Eleven Equipment occurs during any calendar month, the portion of that month which follows the Effective Date or precedes the other events will be an Accounting Period. We have the right to change the Accounting Period at any time upon written notice to you.

"Advertising Fee" means an amount equal to the percentage of Current Period Gross Profit specified in Paragraph 22.

"Advertising Materials and Programs" means all materials, programs and promotions advertising or promoting the 7-Eleven System, 7-Eleven Stores and/or the products or services provided by 7-Eleven Stores, including the following: in-Store and out-of-Store advertising and promotional materials and displays; point-of-sale display materials; window, counter and other promotional signage; billboards; direct mail, newspaper and print advertising; other advertising and promotional materials; Internet website(s); television and radio media; Store grand opening/re-opening events and promotions; and national, regional, local, and Store-specific advertising and promotional campaigns and events, including with respect to each of the foregoing, creation, development, maintenance, administration, space and time charges, agency planning, selection, and placement.

"Affiliate" means, with respect to any person or entity, any other person or entity controlling, controlled by, or under common control with such person or entity.

"Agreement" or "Franchise Agreement" means this agreement between you and us for the operation of the Store under the 7-Eleven System and Service Mark

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.

"Audit" means: (i) a physical count of the Inventory (priced at retail value determined as provided in this Agreement), Receipts, Cash Register Fund, cash, bank drafts, and supplies of items for which you earn a commission (e.g., lottery tickets and money order blanks), pursuant to our normal procedures; and (ii) any other review or inspection of records relating to the operation of the Store.

"Available Withdrawal Amount" means an amount you may withdraw from the Open Account which equals the amount by which your Net Worth exceeds your Minimum Net Worth at the time we process the withdrawal request.

"Bank" means the bank or similar institution that we designate for the Store and, specifically, the account established for the Store.

"Base Period Gross Profit" means the Gross Profit of the Store for the immediately preceding twelve (12) month period (not including the then current month), regardless of who operated the Store during such twelve (12) month period.

"Bona Fide Suppliers" means persons or entities regularly conducting the business of supplying or distributing merchandise, supplies or services to retail businesses and performing all of the functions normally associated with such activities; provided that, unless you obtain our prior written consent, neither you, your Affiliate, nor any other 7-Eleven franchisee may be a Bona Fide Supplier.

"Bookkeeping Records" means the Financial Summaries and other records and reports that we prepare or that we require you to prepare relating to the operation of the Store. We may, at our option, change the format, manner or

timing of the records we prepare and the procedures for collecting or compiling data for the reports. The Bookkeeping Records will be based upon information you supply to us, information obtained by us from Audits, Store inspections and vendors, and, where necessary or appropriate, information based upon estimates or factors concerning Store transactions. We prepare the Bookkeeping Records in accordance with the terms of this Agreement, and such terms will control over any external accounting rules. We currently maintain the inventory records and reports derived from these records by using the Retail Method (see definition of "Retail Book Inventory"), and adjust the retail value to cost as described in Exhibit D. However, we reserve the right to change our method of Inventory valuation from the Retail Method to the Cost Method either for the entire Store or for one (1) or more product categories. If we exercise this right, you agree to enter an amendment to this Agreement which contemplates reasonable conforming changes to this Agreement to address conversion from the Retail Method to the Cost Method. Such conforming amendment will be designed to have no material effect on you or us.

"Burglary" means the stealing of Inventory from within the Store during a period of time when the Store is closed as permitted by this Agreement, all doors are properly closed and locked, and entry is by actual force evidenced by visible marks made by tools, explosives, electricity, or chemicals.

"Business Day" means any day other than Saturday, Sunday or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving and Christmas.

"Cash Register Fund" means the amount agreed to in writing by you and us for change in the Store.

"Cash Report" means the electronic form or other method of reporting your Receipts and/or Net Sales and/or any other information that we require from time to time. You agree to complete a Cash Report for each Collection Period. Each Cash Report must indicate the time and date at which the Collection Period ended.

"Cash Variation" means the unaccounted for difference between Receipts required to be deposited or delivered to us and the actual Receipts deposited or delivered to us as reflected in the Cash Report.

"Category" means a distinct, measurable and manageable group of products and/or services sold from a 7-Eleven Store as specified by us.

"Collateral" has the meaning given such term in the Security Agreement.

"Collection Period" means each time period for which you report Receipts. Your first Collection Period will start when you begin operating the Store, and may end, at your discretion, at any time within your first 24 hours of operation. Each subsequent Collection Period will begin as soon as the immediately preceding Collection Period ends and must be 24 hours in length (unless we agree otherwise).

"Competitive Business" means any business that is the same as or similar to a 7-Eleven Store (except 7-Eleven Stores operated under valid agreements with us) that is operated under a trade name or brand with at least 50 store locations and that offers franchises or licenses for such trade name or brand.

"Confidential Information" means knowledge, know-how (for example, methods and processes) and other information concerning the operation or another aspect of a 7-Eleven Store which may be communicated to you or of which you may be apprised in connection with the operation of the Store under the terms of this Agreement, including all information contained in the 7-Eleven Operations Manual; all information, knowledge, know-how, techniques and materials used in or related to the 7-Eleven System which we provide to you in connection with this Agreement; and information or data compiled by or stored in the 7-Eleven Store Information System.

"Cost of Goods Sold" means the Cost Value of Inventory at the beginning of the Accounting Period plus the cost of Purchases during the Accounting Period (including delivery charges and cost equalization), and minus the Cost

Value of the Inventory at the end of the Accounting Period. We will make adjustment so that any bad merchandise (caused by you or your employees) and Inventory Variation will not be included in Cost of Goods Sold. We will credit to Cost of Goods Sold all discounts and allowances (including promotional and display allowances) paid to us and allocated or reasonably traceable to Purchases, except for:

(a) Wholesale Vendor discounts and allowances (that is, discounts and allowances customarily offered by vendors to wholesalers; provided, however, that in the event we become a wholesaler to you, for any products or services that we sell to you for which we receive wholesaler discounts or allowances, the wholesale prices to you will be competitive with the other wholesalers of those products on a Market Basket Basis); and

(b) reimbursements to us for our expenditures under vendors' co-operative advertising or other similar programs where the vendor partially or wholly reimburses us (or where costs are shared) for advertising expenditure programs, so long as we actually spend the money in accordance with the vendor's criteria for advertising the vendor's product.

We will credit discounts and allowances, not allocated or reasonably traceable to individual store Purchases, to Cost of Goods Sold on the basis of Store sales or Purchases compared with sales or purchases of all affected stores. We will credit discounts, allowances and the value of premiums you receive to Cost of Goods Sold. We will not be obligated to credit any uncollected discounts or allowances to Cost of Goods Sold. We are not required to credit System Transaction Amounts to Cost of Goods Sold. We are not required to credit vendor-supplied equipment or equipment reimbursements to Cost of Goods sold if:

(a) the equipment is part of a vendor's standard provision of services to its customers in general (for example, where a vendor generally offers merchandise racks to its customers);

(b) a vendor provides equipment as an integral part of a service for which you receive a commission, rental fee or royalty (for example, ATM's, copier machines, telephones, etc.); or,

(c) we made a commercially reasonable effort to negotiate with the vendor to obtain a lower product cost instead of the equipment.

We are also not required to credit monies paid to us by vendors to purchase equipment to Cost of Goods Sold if the monies are actually used by us to purchase equipment as designated by the vendor.

"Cost Method" means a method of inventory valuation whereby (a) a perpetual unit inventory is maintained (as confirmed by a periodic physical count of the inventory) and (b) inventory at cost is computed as the unit inventory times net unit cost.

"Cost Value" means the cost value of the Inventory at any time, determined by: (a) deducting from the Retail Book Inventory the included retail value of all consigned merchandise, and designated Special Items; (b) adjusting from retail value to cost as specified in Exhibit D; and (c) adding the cost value of the designated Special Items.

"Current Accounting Period" means the Accounting Period for which the 7-Eleven Charge and Advertising is being calculated. "Current Deposit" means all Receipts obtained during the immediately preceding Collection Period and accounted for by the proper completion of the most recent 7-Eleven Cash Report relating to those Receipts.

"Current Period Gross Profit" means the Gross Profit from the operation of the Store for the Current Accounting Period.

"Down Payment" means the initial amount you actually pay us related to the operation of the Store as stated in Exhibit D. The Down Payment is separate and apart from the Franchise Fee.

"Effective Date" means the date you first begin operating the Store for business under this Agreement. "Electronic Invoice" means an electronic invoice or other electronic or online billing systems invoice.

"Expiration Date" means fifteen (15) years from the Effective Date.

"Final Inventory" means the Inventory of the Store that you agree to transfer to us or a third-party that we designate upon the expiration or termination of this Agreement in accordance with Paragraph 28(a)(2) of this Agreement, excluding any portion of the Inventory which, in our sole and reasonable opinion, is of a type, quantity, quality, or variety that is not consistent with the 7-Eleven Image or standards.

"Financial Summaries" means summaries of financial information for the Store that we prepare from the Bookkeeping Records in the form of income statements, balance sheets, reports reflecting credits and debits to your Open Account, inventory records and other records and reports relating to Store income, expenses, profits and losses, assets and liabilities. The Financial Summaries are prepared in the manner we deem appropriate and are prepared for each Accounting Period.

"Foodservice" means our system for retailing a menu of prepared food products and related items, with such changes approved and adopted by us from time to time.

"Foodservice Facility" means the area or areas of the Store and related 7-Eleven Equipment from time to time used for the Foodservice operation.

"Franchise Fee" means the initial amount that you agree to pay to us, as set forth in Exhibit D, in consideration for the grant of the 7-Eleven Store franchise.

"Franchisee" means the person(s) named as the Franchisee on the signature page and signing this Agreement as the Franchisee (or subsequently added as a "Franchisee" in a writing signed by each of the parties). If there is more than one Franchisee, they will be jointly and severally liable for the obligations of the "Franchisee" under this Agreement.

"Fresh Food" means perishable food products offered in 7-Eleven Stores, including sandwiches, roller grill items, baked goods, salads, foods served or taken hot, dairy (including milk, flavored milk, and yogurt), bread, and any other similar perishable food product as reasonably determined by us; provided, however, that any "Fresh Food" cannot have a shelf life of more than two (2) weeks, unless through technology or other means the freshness of the product can be extended past two (2) weeks.

"Grand Opening Fee" means a one-time payment in the amount set forth in Exhibit D to cover the cost of various events and grand opening activities promoting the franchising of the store to you. If the actual cost of the events and other expenses incurred in connection with the grand opening activities for the Store is less than the Grand Opening Fee you paid, we will refund the difference to you through a credit to your Open Account. The Grand Opening Fee is separate and apart from the Franchise Fee.

"Gross Profit" means Net Sales less Cost of Goods Sold.

"HVAC Equipment" means the heating, ventilation and air conditioning unit and related equipment, duct work, filters and refrigerant gas for the air conditioning unit, but does not include water heaters, equipment and refrigerant gases for refrigerated vaults and cases, and other equipment used in connection with the sale of Inventory from the Store.

"Interim Financial Summaries" means Financial Summaries that we prepare during, but not at the end of, any Accounting Period. All components of Interim Financial Summaries will be prorated based on the number of days during the Accounting Period for which such Interim Financial Summaries are prepared.

"Internet" means a global computer-based communications network.

"Inventory" means all merchandise for sale from the Store, including deposit bottles, Special Items, and consigned merchandise (other than consigned gasoline).

"Inventory Overage" means the amount by which the retail value of the Inventory as reflected by an Audit is greater than Retail Book Inventory.

"Inventory Shortage" means the amount by which the retail value of the Inventory as reflected by an Audit is less than the Retail Book Inventory.

"Inventory Variation" means any Inventory Overage or Inventory Shortage, adjusted from retail value to cost as specified in Exhibit D. Inventory Variation is debited or credited, as applicable, to Operating Expenses.

"Lease" means our lease to you of the Store and adjoining property as described in Exhibit A, and, separately, the 7-Eleven Equipment. Except as otherwise provided in this Agreement, if an allocation of the 7-Eleven Charge to the lease of 7-Eleven Equipment is required by law or ordinance, or for taxation purposes, the amount of the 7-Eleven Charge allocable to the lease of the 7-Eleven Equipment will be equal to the monthly straight line depreciation of the 7-Eleven Equipment, unless provided otherwise elsewhere in this Agreement.

"Leasehold Rights" means our rights to possession of the Store under any pre-existing or subsequent lease of the Store, whether pursuant to the current term of a lease, an option we exercise, or our re-negotiation of the lease. We have no obligation to exercise any options or other contractual rights, or otherwise enter into any agreement for the purpose of retaining Leasehold Rights.

"Maintenance Contracts" means contracts that you are required to obtain with reputable firms for maintenance and repair of the Store and 7-Eleven Equipment and, if we consider it appropriate or necessary, for the landscaped areas outside the Store as provided in Paragraph 20(b).

"Market Basket Basis" means a vendor's standard product mix that meets our Stores' purchase needs (excluding Proprietary Products), and is sold under terms that include a balanced comparison of payment terms and methods, in-store services, product mix, service area, frequency of delivery and delivery windows.

"Material Breach" means those breaches of this Agreement specifically set forth in Paragraph 26 or a breach of any amendment to this Agreement.

"Minimum Net Worth" means the minimum amount of Net Worth that you agree to maintain in accordance with Paragraph 13(d).

"Net Sales" means the total value charged to customers and received by the Store for the sale of Inventory and all other products and services sold, except (a) sales tax and (b) the value of those products and services for which you earn a commission or fee, provided that Net Sales will include the value of such commissions or fees but will not include the value of commissions that you receive for the sale of gasoline.

"Net Worth" means the difference between the Store's total assets and the Store's total liabilities, all of which are as reflected on the balance sheet that we prepare for the Store each Accounting Period as derived from the Bookkeeping Records.

"Open Account" means an account that we agree to establish and maintain for you as part of the Bookkeeping Records. References to debits (charges) to the Open Account in this Agreement mean increases in the amounts you owe us (for example, when we pay a vendor's invoice on your behalf the Open Account is debited or charged) and credits to the Open Account mean decreases in the amounts you owe us (for example, when Receipts are deposited

in the Bank, such amount is credited to the Open Account).

"Operating Credit" means a monthly credit in the amount set forth in Exhibit D that we will credit to your Open Account at the end of each of the first 60 Accounting Periods following the Effective Date.

"Operating Expenses" means the expenses (or credits) you are required to pay and incur in operating the Store for: (a)Inventory Variation; (b) Cash Variation; (c) maintenance, repairs, replacements, laundry expense, and janitorial services; (d) telephone; (e) Store supplies, including grocery bags and other Store-use items; (f) governmental fees and others fees or costs for licenses, permits, and bonds; (g) interest; (h) returned checks; (i) inventory and business taxes; (j) bad merchandise caused by you or your employees; (k) Advertising Fees and other advertising; and (l) other miscellaneous expenditures which we (in our reasonable judgment and regardless of the classification by you or the Internal Revenue Service) determine to be Operating Expenses.

"Proprietary Products" means products or services we develop or designate which are: (i) unique to us because of their (a) ingredients, (b) formulas, (c) manufacturing or distribution processes, or the manner in which they are presented or marketed to consumers; and (ii) which we support and control through (a) trademarks and/or packaging that bears one or more trademarks, any of which are owned by or licensed to us, (b) copyrights, (c) quality control, and/or (d) advertising.. The currently required Proprietary Products are listed on Exhibit G to this Agreement.

"Purchases" means all your purchases of Inventory for sale from the Store.

"Reasonable and Representative Quantity" means the minimum number of units for each SKU that you are required to carry as specified by us from time to time. After the initial order of any particular product, such quantity may be adjusted upon the mutual agreement by you and our local representative based on information from sales of the initial Inventory of such product using the 7-Eleven Store Information System.

"Receipts" means all sales proceeds (whether cash, check, credit instrument, or other evidence of receipt), commission revenues on items for which you earn a commission (e.g., lottery tickets and money order blanks), discounts or allowances you receive, and miscellaneous income (including rentals, royalties, fees, commissions and amounts you receive from on-site currency operated machines) and the value of premiums received from your operation of the Store. (Receipts from on-site currency operated machines are considered received at the time the proceeds are collected from the machine).

"Recommended Vendor(s)" are those Bona Fide Suppliers described in Paragraph 15(h) and which are listed on the 7-Eleven Intranet. The list of Recommended Vendors may be changed from time to time.

"Recommended Vendor Purchase Requirement" means you agree to purchase at least eighty-five percent (85%) of your total Purchases and, separately, eighty-five percent (85%) of your cigarette purchases, both computed monthly at cost, from Recommended Vendors. No purchase will be credited towards your Recommended Vendor Purchase Requirement unless the purchase is from a Recommended Vendor we have approved and your purchase was made from such Recommended Vendor in its capacity as a Recommended Vendor which includes compliance with our requirements for Recommended Vendors, including the recommended method of distribution. The cost value used to calculate the percent of Purchases and cigarette purchases from Recommended Vendors will only include cost as reflected on vendor invoices. Cost for purposes of calculating this requirement will exclude allowances, rebates and discounts not reflected on vendor invoices. In order to count towards your Recommended Vendor Purchase Requirement, the products must be ordered and paid for through our recommended method for ordering and paying for that vendor. Notwithstanding the above, your Purchases of products from non-Recommended Vendors will be deemed to be purchases from Recommended Vendors if you provide us with written substantiation that: (i) you ordered a product carried by a Recommended Vendor and were advised in writing by that Recommended Vendor that such product was out of stock; or (ii) you purchased products or services from a non-Recommended Vendor that were also available from a Recommended Vendor, and the non-Recommended Vendor provided written evidence of a bona fide offer to sell on a Market Basket Basis to all 7-Eleven stores in the geographic area serviced by the

Recommended Vendor all products or services that are available from the Recommended Vendor, on a Market Basket Basis, at a lower cost than the Recommended Vendor. For example, if a Recommended Vendor has made a bona fide offer to sell a group of products or services to all 7-Eleven stores in the Recommended Vendor's service area at specific prices, the non-Recommended Vendor must make a similar bona fide offer to sell all products that are available from the Recommended Vendor, on a Market Basket Basis to all 7-Eleven stores in the same geographic area, at a lower cost than the Recommended Vendor.

"Related Trademarks" means the trademarks, service marks, trade names, trade dress and other trade indicia, except for the Service Mark, which we may authorize you to use from time to time as part of the 7-Eleven System. "Related Trademarks" also includes all other combinations of the word or numeral "7" and the word or numeral "Eleven," in any language, other than those comprising the Service Mark. For example only, Related Trademarks include the trademarks BIG GULP and BIG BITE, as well as the distinctive trade dress of 7-Eleven Stores.

"Retail Book Inventory" means the book Inventory maintained as part of the Bookkeeping Records which reflects the retail value of the Inventory. We will initially determine the Retail Book Inventory by an Audit of the initial Inventory. After that, we will adjust the Retail Book Inventory by: (a) adding the retail value (based on your then-current retail selling prices) of subsequent Purchases (other than gasoline); (b) subtracting Net Sales of items reflected in the Retail Book Inventory; (c) adding or subtracting the retail value of all retail selling price increases or decreases of items reflected in the Retail Book Inventory, as reported by you to us, or determined from surveys of the Inventory by us; (d) subtracting the included retail value of any merchandise used as Store supplies and out-of-date date-coded merchandise or merchandise which is damaged or deteriorated as reported by you to us and verified by us; and (e) subtracting any Inventory Shortage or adding any Inventory Overage. We will determine the Retail Book Inventory at expiration or termination of this Agreement by an Audit we conduct. We will appropriately adjust the Retail Book Inventory to reflect the results of each binding Audit. For the initial Audit and the Audit on expiration or termination, we will determine the retail value of the Inventory at our then-current suggested retail selling prices. For any other Audit, we will determine the retail value of the Inventory at your then-current retail selling prices.

"Retail Method" means a method of inventory valuation whereby inventory transactions and the perpetual inventory records are maintained using retail values and the total retail value of inventory is converted to cost using a cost complement percentage. For purposes of this Agreement, the percentage to convert retail value to cost value is as set forth in Exhibit D.

"Robbery" means the theft of Receipts and/or Cash Register Fund (other than a Safe Robbery), Inventory, or Store supplies from you, your agents or employees by acts or threat of violence in the Store; while Receipts and/or Cash Register Fund are being transported directly from the Store to the Bank; between two (2) or more 7-Eleven Stores franchised by you while in route to the Bank and in the presence of you, your agents or employees, if not committed by you or your agents or employees.

"Safe Burglary" means the theft of Receipts or Cash Register Fund from a vault, safe, or security drop box in the Store and approved by us during a period of time when the Store is closed as permitted by this Agreement and when all doors of the Store and of the vault, safe, or security drop box are closed and locked and entry is by actual force evidenced by visible marks made by tools, explosives, electricity, or chemicals if not committed by you or your agents or employees.

"Safe Robbery" means the theft of Receipts from a vault, safe, security drop box, or vending tubes in a safe in the Store and approved by us by acts or threat of violence committed in you presence or the presence of your agents or employees, if not committed by you or your agents or employees.

"Security Agreement" means a security agreement substantially in the form attached to this Agreement as Exhibit I. "Service Mark" means the service mark logo and design registered in the United States Patent and Trademark Office (as Registration No. 920,897) and the 7-Eleven service mark registered in the United States Patent and

Trademark Office (as Registration No. 798,036).

"7-ELEVEN," "7-Eleven," "we", "us", and "our" means 7-Eleven, Inc., a Texas corporation.

"7-Eleven Charge" means an amount equal to the percentage of Gross Profit specified in Exhibit D.

"7-Eleven Equipment" means all pieces of equipment and related items, whether mechanical, electronic or otherwise, leased or otherwise provided by us to you, including the 7-Eleven Store Information System and any other equipment provided by third parties.

"7-Eleven Foodservice Standards" means mandatory and suggested quality, foodservice and other reasonable operating standards as may from time to time be established by us and set out in the Operations Manual.

"7-Eleven Image" means the acceptance, reputation and goodwill achieved by us and our franchisees in the U.S. and elsewhere that is represented by the Service Mark, and the Related Trademarks for 7-Eleven Stores operated pursuant to the 7-Eleven System and the products and services offered in them.

"7-Eleven Intranet" is our restricted global computer-based communications network.

"7-Eleven Operations Manual" means our confidential operations support guide containing, among other things, required and suggested operating standards and procedures with respect to the 7-Eleven System and 7-Eleven Image, and training and informational material related to the operation of a 7-Eleven Store, including any additions to, deletions from or revisions of the 7-Eleven Operations Manual. We may provide the 7-Eleven Operations Manual on-line or through any other means we deem appropriate. The 7-Eleven Operations Manual will also include such other printed or electronic operating procedures and programs that we designate from time to time.

"7-Eleven Store Information System" means the proprietary electronic store operations system that provides for scanning, ordering and completing other 7-Eleven Store operations related tasks. The 7-Eleven Store Information System includes POS scanners, computers and any other hardware we use and all software associated with it, including any replacement or modified computer or other electronic system used in connection with 7-Eleven Store operations.

"7-Eleven System" means the system for the fixturization, equipping (including the development and use of computer information systems hardware and software), layout, merchandising, promotion (sometimes through products or services consisting of, including or identified by trademarks, service marks, trade names, trade dress symbols, other trade indicia, copyrightable works, including advertising owned or licensed by us), and operation of extended-hour retail stores operated by us or our franchisees in the U.S. and elsewhere an-d identified by the Service Mark and the Related Trademarks. The 7-Eleven System provides beverages, non-food merchandise, specialty items, various services, take-out foods, dairy products and groceries, and emphasizes convenience to the customer. We have developed the 7-Eleven System and are continually refining, modifying and updating the System based on experience and new developments to meet and serve the preferences of the customer. The distinguishing characteristics of the 7-Eleven System include use of the Service Mark and Related Trademarks, distinctive exterior and interior design, decor, color scheme, and furnishings; standards, specifications, policies and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs, all of which may be changed, deleted, improved, and further developed by us from time to time.

"SKU" means stockkeeping unit, the common understanding for individual items of merchandise, each with a unique Universal Product Code.

"Special Items" means the containers, ingredients, condiments, and other items used or furnished in connection with the preparation or sale of a specific product and so designated by us. We reserve the right to determine which

Special Items will be included in the monthly Inventory. All Special Items will be inventoried and accounted for upon termination or expiration of this Agreement.

"Store" means the 7-Eleven convenience store described on Exhibit A.

"System Transaction Amounts" means amounts that vendors or others pay us or third parties for the use of the 7-Eleven Store Information System or data collected by the 7-Eleven Store Information System or any replacement or modified computer information system used in connection with Store operations. Where the third party is a Recommended Vendor, we will obtain System Transaction Amounts only if such vendor represents to us in writing that (a) the vendor will not increase the cost of services and products to 7-Eleven Stores to recoup the System Transaction Amounts paid, and (b) the vendor would not apply the System Transaction Amounts to lower the cost of goods for services and products sold to 7-Eleven Stores.

"Term" means the initial term of this Agreement as set forth in Paragraph 9.

"Trade Secrets" means the 7-Eleven Operations Manual ; the 7-Eleven System; all manuals, directives, forms, information and materials included in the 7-Eleven System in any form, whether electronic or otherwise. The Trade Secrets are restricted proprietary information and are our sole property. The Trade Secrets are exclusively for our benefit and the benefit of our franchisees.

"Transferring Franchisee" means a franchisee who is executing a franchise agreement as a result of choosing a Transfer (as defined in Paragraph 25 of this Agreement) under the provisions of a 7-Eleven Franchise Agreement or an amendment to a 7-Eleven Franchise Agreement.

"24-Hour Operation" means your operation of the Store 24 hours a day, 7 days a week, 365 days a year.

"Wholesale Vendor" means a Bona Fide Supplier who regularly supplies merchandise or provides services to convenience or similar stores.

"Withdrawal Notice" means the notice that we agree to provide you pursuant to Paragraph 26(d) if we determine to cease operation of all 7-Eleven Stores in the geographic market area in which your Store is located.

FRANCHISEE

By ____________________ By ____________________
Sung Hun Choe

Date 12-27-18 Date ____________________

By ____________________ By ____________________

Date ____________________ Date ____________________

7-ELEVEN, INC.

By ____________________
Arron B. Yount

Date 12/31/18

EXHIBIT F

SURVIVORSHIP

7-ELEVEN STORE NO. 2367 - 16981C

Notwithstanding anything in the Franchise Agreement or the Exhibits to the Franchise Agreement to the contrary:

1. As used in this Survivorship Agreement, "Death of the Franchisee" means the death of the individual Franchisee, if there is only one Franchisee or, if there is more than one Franchisee under the Franchise Agreement, the "simultaneous death of all the Franchisees" as defined below. If a Death of the Franchisee occurs, we may operate the Store for the benefit of the Franchisee's estate from the period beginning on the Death of the Franchisee and ending on the earliest of the following events:

(a) The sale of the franchise by the estate and mutual termination of the Franchise Agreement in accordance with the terms of this Survivorship Agreement and the Franchise Agreement;

(b) The Effective Date of a new 7-Eleven Store Franchise Agreement with a designated individual as provided in this Survivorship Agreement; or,

(c) The expiration of 30 days, or any longer notice period provided in the Franchise Agreement. If any of these events occur, the Franchise Agreement will terminate as provided in this Survivorship Agreement. "Simultaneous death of all the Franchisees" means the death, within a 72 consecutive hour period (whether or not the deaths arise from the same casualty or occurrence) of all the individuals who executed the Franchise Agreement and/or were subsequently added as "Franchisee(s)" in a writing signed by the parties.

The "Notice Period" is the period beginning with the Death of the Franchisee and ending upon the occurrence of one of the above referenced events. If a Death of the Franchisee occurs, then for any Accounting Period during the Notice Period, we will not charge the Open Account for Inventory Variation, payroll or payroll taxes (including your draw amount) an amount more than the average experience of the Store for the category in question for the three calendar months before the Death of the Franchisee (or any shorter period the Franchise Agreement was in effect). If we elect to take possession of and continue operating the Store, then, in addition to all other fees and payments owed under this Agreement on account of the Store's operation, we may charge you a reasonable management fee, not to exceed five percent (5%) of the Store's Gross Profits, plus any out-of-pocket expenses incurred in connection with the Store's management.

On behalf of yourself, your heirs, and your legal representatives, you hereby consent to our operating the Store pursuant to the terms of Paragraph 26(f) of the Franchise Agreement, and agree to release and indemnify us from and against any liability arising in connection with our operation of the Store pursuant to Paragraph 26(f) of the Franchise Agreement.

2. You may designate in writing and notify us of (pursuant to the notice provision in the Franchise Agreement) up to three individuals, listed alternatively and in order of preference, whom you believe qualified to franchise the Store after the Death of the Franchisee and each of whom individually would like the opportunity to do so. You acknowledge and agree that we will offer the opportunity to franchise the Store to one individual (and his or her spouse) only, and that we will make this offer to one individual at a time, in accordance with the order in which you designated the individuals on the notice you provided to us. To be effective, the notice of designation must be either personally delivered or postmarked not later than one day before the date of the Death of the Franchisee. You may change the designation in writing to us, effective upon receipt, up to the day before the date of the Death of the Franchisee.

If you have designated individuals in this way, then, after the Death of the Franchisee, we agree to promptly attempt to locate and arrange an interview with the designated individual and we will advise the estate whether or not that designated individual has been located and is qualified in accordance with our then-current qualification procedures. If more than one individual is designated and the first designated individual cannot be reasonably located, is not qualified under our then-current qualification procedures or is not interested in obtaining a franchise for the Store, we agree to attempt to locate and determine the qualifications and interest of the second designated individual, and likewise for the third individual, if necessary, and we will advise the estate accordingly.

If, before the Notice Period expires, one of the designated individuals qualifies and wishes to franchise the Store; the estate agrees with us to mutually terminate the Franchise Agreement; the estate waives (in a form satisfactory to us) any claim it may have to sell the franchise; the estate pays or makes arrangements satisfactory to us for payment of any amount due us under the Franchise Agreement; and, if the Franchisee is a corporation, the designated individual acquires ownership or control of all of the authorized, issued and outstanding shares of the Franchisee corporation, then we agree to sign a new 7-Eleven Store Franchise Agreement for the Store in the then-current form with the designated individual. In addition, if the Franchisee is a corporation, after the designated individual has acquired ownership or control of all of the authorized, issued and outstanding shares of the Franchisee corporation and signed a new 7-Eleven Store Franchise Agreement for the Store in the then-current form, we will have the new 7-Eleven Store Franchise Agreement assigned to the former Franchisee corporation or another corporation named by the designated individual, if all our then-current conditions for assignment have been satisfied. We agree not to charge any Franchise Fee. There will be no change in the financial terms from those in the Franchise Agreement until the expiration date of the original Franchise Agreement if it had not terminated earlier. At the expiration date of the original Franchise Agreement, the financial terms in the new 7-Eleven Store Franchise Agreement executed by the designated individual will become effective for the remainder of the term of the then-effective Franchise Agreement.

3. If, before the Notice Period expires, neither of the first two events specified in Paragraph 1 (a) and (b) above occurs; and the estate delivers to us a written request indicating that it desires to arrange a sale of the franchise and has made and will continue to make good faith efforts to find a qualified purchaser and the estate pays or makes arrangements satisfactory to us for the payment of any amount due us under the Franchise Agreement, then we agree to give the estate the opportunity to arrange a sale of the franchise for a total of 120 days from the Death of the Franchisee (including the Notice Period). We agree not to refranchise the Store during that time unless the estate waives in writing any claim it may have to sell the franchise, even though the Franchise Agreement has terminated. However, from the 31st through the 120th day, we will operate the Store for our benefit alone.

4. One of our officers must review and approve any arrangement between us and the estate, including application of the terms of this Survivorship Agreement, before the arrangement can be implemented.

5. As consideration of our allowing you to designate a successor to your interest, and as a condition before we agree to be bound by the terms of this Survivorship Agreement, you agree with us:

(a) That notwithstanding any probate or estate administration proceedings involving you or your state, or disputes by, among or between your designees, heirs, legatees, beneficiaries, successors in interest or the like, the time limits established by the terms of this Survivorship Agreement will control and govern our obligations and the rights of any party arising from the terms of this Survivorship Agreement, and

(b) That if a dispute arises concerning the disposition of the franchise pursuant to this Survivorship Agreement and/or the Franchise Agreement, and the dispute involves us or our rights or obligations, then any expenses we reasonably incur in that dispute, including attorneys' fees and court costs, will either be borne by the Open Account or your estate, or both (at our option).

6. You agree that, if the Franchisee operates more than one (1) 7-Eleven Store, the survivorship rights contained in this Survivorship Agreement will apply to only one (1) of Franchisee's 7-Eleven Stores, notwithstanding the fact that an agreement the same as or similar to this Survivorship Agreement may have been signed in connection with the execution of 7-Eleven Store Franchise Agreements for each of Franchisee's 7-Eleven Stores.

Except for terms defined in this Survivorship Agreement, the terms used in this Survivorship Agreement will have the meanings defined in the Franchise Agreement.

FRANCHISEE

By ______________________
Sung Hun Choe

Date 12-27-18

By ______________________

Date ______________________

By ______________________

Date ______________________

By ______________________

Date ______________________

7-ELEVEN, INC.

By ______________________
Arron B. Yount

Date 12/31/18

# EXHIBIT G

## REQUIRED PROPRIETARY PRODUCTS

Following is a list of the Proprietary Products that you are required to carry in the Store at all times. We may delete any of these items or add any new items at any time upon reasonable notice.

| Product | Description and Presentation |
|---|---|
| SLURPEE®: Semi-Frozen Carbonated Beverage | Frozen carbonated beverage, prepared with a variety of high-quality syrups, properly mixed, and served in standardized, trademarked cups. |
| SLURPEE™: Products | Candy, cups, straws, clothing, gum, frozen treats and other products prepared using 7-Eleven approved specifications and packaged using SLURPEE® Marks. |
| GULP®, BIG GULP®, SUPER BIG GULP®, DOUBLE GULP®: Beverages | Fountain soft drink beverages, prepared with a variety of high-quality syrups, properly mixed, and served in standardized, trademarked cups and mugs of various sizes. |
| 7-ELEVEN®: Coffee, Cappuccino, Hot Chocolate, Iced Coffee, Iced Tea<br><br>7-ELEVEN CHILLERS®: Iced Coffee, Iced Lattes | Fresh brewed coffee prepared with the 7-Eleven regionally approved coffee blend, and proprietary cappuccino, hot chocolate and iced coffee and iced tea products prepared using 7-Eleven approved specifications, all served in standardized, trademarked beverage cups of various designs and sizes. |
| BIG BITE®, ¼ LB BIG BITE®, BIGGEST BIG BITE®: Hot Dog Sandwiches | High quality, all-beef hot dog, prepared using spice mix approved by us, offered in both 8:1 lb. and 1/4 lb. sizes, and served in standardized, trademarked hot dog containers. |
| 7-ELEVEN GO-GO TAQUITOS®: Snack Product | High quality line of Mexican snacking products, with proprietary fillings wrapped inside a tortilla, served from the grill in a standardized, trademarked bag. |
| 7-ELEVEN®: Prepaid Cards and Stored Value Cards | Prepaid long distance, wireless, gift cards, gaming cards, and reloadable debit and stored value products with trademarked 7-ELEVEN® identification and packaging that is designated as part of the 7-Eleven Prepaid Card or Stored Value Card Programs. |
| 7-ELEVEN® Nacho Chips | High quality nacho chips served in standardized, trademarked Nacho trays. |
| Fresh Bakery Products | High quality, proprietary and other fresh baked goods delivered through the CDC. |
| 7-SELECT™: Private brand packaged bakery, candy, snacks, beverages, paper products and other products | High quality, proprietary line of packaged bakery, candy, snacks, beverages and paper products that are prepared or manufactured using 7-Eleven approved specifications and sold in 7-SELECT™ trademarked packaging. The 7-SELECT™ line of products may be expanded to include additional categories of products. |

| Product | Description and Presentation |
|---|---|
| 7-ELEVEN FRESH TO GO®: Food Products | High quality, proprietary recipe, FRESH TO GO branded sandwiches, entrees, and other commissary produced products, displayed in standardized and trademarked packaging. |
| Yosemite Road®: Bottled Wine (Mark registered to a third party who makes the product exclusively for 7-Eleven) | High quality bottled wine and wine accessories that are sold in proprietary packaging that is exclusive to 7-Eleven. |
| Hot Foods Products | High quality, proprietary hot foods that are prepared or manufactured using 7-Eleven approved specifications, are heated in the store using specially designed equipment, and sold in trademarked proprietary containers that are exclusive to 7-Eleven. These products may currently include items such as pizza, chicken wings, potato wedges, Melt sandwiches, chicken tenders, chicken dippers, chicken sandwiches, mini tacos, mozzarella sticks and breakfast sandwiches, but may be expanded to include other products. |

* ™ indicates a trademark

FRANCHISEE

By [signature] By ____________________

Sung Hun Choe

Date 12.27.18 Date ____________________

By ____________________ By ____________________

Date ____________________ Date ____________________

7-ELEVEN, INC.

By [signature]

Arron B. Yount

Date 12/31/18

EXHIBIT H

# RELEASE OF CLAIMS AND TERMINATION

1. The 7-Eleven Store Franchise Agreement between 7-Eleven, Inc. ("we," "us", "our" or "7-Eleven") and the undersigned parties ("you") dated ____________________, as amended (the "Agreement") and which covered 7-Eleven Store No. _________________ (the "Store") is hereby terminated effective _____ a.m./p.m. on ____________________, 20_______.

2. Except as specifically provided below, you and we, on our own behalves and on behalf of our respective current and former agents, employees, representatives, attorneys, and successors and assigns, hereby release, acquit and discharge each other and our respective current and former agents, principals, officers, directors, shareholders, employees, representatives, attorneys, parents, affiliates, subsidiaries, divisions, and successors and assigns, of and from any and all manner of obligation, debt, liability, tort, covenant, contract, agreement, undertaking, and account, and any and all claims or causes of action that either of us had, have, or may have, known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual, liquidated or unliquidated, including, without limitation, any and all claims or causes of action arising under or related to the Agreement or any agreement entered into in connection therewith, any and all claims arising under or related to the execution, operation under or termination of the Agreement or any other agreement relating to the Store, any and all contract, employment, and wage and hour claims, and any and all claims or causes of action arising under or in connection with any applicable state franchise disclosure or relationship laws or regulations. You and we intend for this release to be construed as broadly as permitted by law.

3. If you are in California, you agree that the release contained in Paragraph 2 includes, without limitation, any claim that you were improperly classified as an independent contractor, any claim of wages due for your services rendered in executing or operating under the Agreement, any claim for reimbursement of expenses incurred in connection with executing or operating under the Agreement, any claims that have been or reasonably could have been raised by you or anyone acting on your behalf in the action entitled Haitayan, et al. v. 7-Eleven, Inc., Case No. CV 17-7454-JFW, 2018 WL 1626248 (C.D. Cal. Mar. 14, 2018) (the "Haitayan Lawsuit"), any claims regarding your services or other actions under any applicable IWC Wage Order or the California Labor Code, Business & Professions Code section 17200, et seq. and/or the Private Attorneys General Act seeking penalties or any other relief in connection with or relating to the Agreement or the operation of the Store. You further represent that (a) you are aware of the Haitayan Lawsuit on appeal with the United States Court of Appeals for the Ninth Circuit; (b) you are aware that this release will release claims that were or could have been brought in the Haitayan Lawsuit; (c) you are aware plaintiffs in the Haitayan Lawsuit are represented by Shannon Liss-Riordan, Esq. of Lichten & Liss Riordan, P.C., 729 Boylston Street, Suite 2000, Boston, MA 02116 and other legal counsel; (d) you have had an opportunity to contact Ms. Liss-Riordan or such other legal counsel regarding the Haitayan Lawsuit prior to signing this release; and (e) in signing this release, you are not relying on any representations regarding the Haitayan Lawsuit made by 7-Eleven

4. If you are in Massachusetts, you agree that the release contained in Paragraph 2 includes, without limitation, all claims under the Massachusetts Wage Act, G.L. c. 149 § 148, Massachusetts Independent Contract Statute, G.L. c. 149 § 148B, the Massachusetts Minimum Wage Act, G.L. c. 151, § 1, the Massachusetts Overtime Statute, G.L. c. 151, § 1A, Massachusetts Tips Law, G.L. c. 149 § 152A, and any other claim that can be brought pursuant to G.L. c. 149, § 150, c. 151 § 1B, or G.L. c. 151 § 20, or any similar statute. You further represent that (a) you are aware of the putative class action captioned Patel et al. v. 7-Eleven, Inc., et al., Case No. 1:17-cv-11414-NMG (the "Patel Lawsuit") pending in the federal District Court for the District of Massachusetts; (b) you are aware that this release will release claims that could be brought in the Patel Lawsuit; (c) you are aware that plaintiffs in the Patel Lawsuit are represented by Shannon

Liss-Riordan, Esq. of Lichten & Liss Riordan, P.C., 729 Boylston Street, Suite 2000, Boston, MA 02116; (d) you have had an opportunity to contact Ms. Liss-Riordan regarding the Patel Lawsuit prior to signing this release; and (e) in signing this release, you are not relying on any representations regarding the Patel Lawsuit made by 7-Eleven.

5. You intend the release contained herein to acquit and forever fully discharge us, any parent of ours and any of our or our parent's direct or indirect subsidiaries, divisions or Affiliates and our, its and their respective officers, directors, shareholders, partners, agents, employees, heirs, legal representatives, successors and assigns.

6. If you are in California, the parties expressly waive and relinquish all rights and benefits which either may now have or in the future have under and by virtue of California Civil Code Section 1542. The parties do so understanding the significance and consequence of such specific waiver. Section 1542 provides that "[a] general release does not extend to claims which the creditor does not know or suspect exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." For the purpose of implementing a general release and discharge as described in Paragraph 2 above, the parties expressly acknowledge that this Release of Claims and Termination Agreement is intended to include in its effect all claims described in Paragraph 2 above which the parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Release of Claims and Termination Agreement contemplates the extinguishment of any such claims.

7. You and we represent and warrant that the execution of this Release of Claims and Termination Agreement is free and voluntary, and that no inducements, threats, representations or influences of any kind were made or exerted by or on behalf of either party. You acknowledge that you have had adequate opportunity to review this release with an attorney of your choice.

8. This release will be binding upon you and us and upon your and our respective heirs, legal representatives, successors and assigns. This release is intended to be mutual and reciprocal, and it will be effective against one party only if it is effective against both parties. You and we acknowledge that this Release of Claims and Termination Agreement will be a complete defense to any claim released under the terms of Paragraph 2.

9. You and we each represent and warrant to the other that we and you have not assigned and will not assign to any other party any of the claims released by this Release of Claims and Termination Agreement.

10. NOTWITHSTANDING ANY OF THE FOREGOING, THIS RELEASE DOES NOT INCLUDE any amounts (1) debited or credited to you after the date of this Release of Claims and Termination Agreement, or (2) owing to either party (the "Final Settlement") as reflected on the final Financial Summaries prepared by us. You acknowledge that all Financial Summaries prepared to the date of this Release of Claims and Termination Agreement are true and correct and that this release includes all claims affecting the figures stated in such Financial Summaries. Your endorsement of a Final Settlement check delivered to you after the preparation of the final Financial Summaries, or other acceptance of funds tendered by us, acknowledges your release of all claims affecting the figures stated on your final Financial Summaries. You acknowledge that your relationship with 7-Eleven under the Agreement is that of a franchisee and independent contractor and that you were not employed by 7-Eleven during the term of the Agreement.

11. FURTHER NOTWITHSTANDING ANY OF THE FOREGOING, this release does not include (1) any claim that you may have against any person or entity other than us, our parent, subsidiary or Affiliated entities, and their respective officers, directors and employees; (2) any indemnity claim that you may have against us pursuant to the indemnification provisions of the Franchise Agreement when you are sued by a third party for acts or omissions occurring during your operation of the Store; (3) any rights that you have

to payments from us determined under Exhibit J to the Agreement, provided that you executed a Store Franchise Agreement edition 04/2004 or later; and (4) any outstanding promissory notes you have signed that are payable to us.

12. FURTHER NOTWITHSTANDING ANY OF THE FOREGOING, IF YOU ARE A MARYLAND FRANCHISEE, THIS RELEASE DOES NOT INCLUDE ANY CLAIMS PERTAINING OUR ALLEGED FAILURE TO COMPLY WITH THE MARYLAND FRANCHISE REGISTRATION AND DISCLOSURE LAW.

FRANCHISEE

______________________________

By ______________________________ By ______________________________

______________________________ ______________________________

EXAMPLE ONLY

Date ______________________________ Date ______________________________

By ______________________________ By ______________________________

______________________________ ______________________________

Date ______________________________ Date ______________________________

7-ELEVEN, INC.

DO NOT SIGN

By ______________________________

______________________________

Date ______________________________

# EXHIBIT I

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "**Security Agreement**") is executed by the undersigned debtor Franchisee(s) jointly and severally if more than one ( such debtor(s) are referred to individually or collectively as "you" or "your"), to and for the benefit of 7-Eleven, Inc. ("we", "us" or "our").

## RECITALS

A. Pursuant to a Store Franchise Agreement, (the "**Franchise Agreement**"), between you and us, we have, among other things, agreed to make loans and other financial accommodations to you upon the terms and subject to the conditions set forth in the Franchise Agreement.

B. Our obligation to make such loans and other financial accommodations to you under the Franchise Agreement is subject, among other conditions, to receipt by us of this Security Agreement, duly executed by you.

## AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, you agree as follows:

1. **Definitions and Interpretation**. When used in this Security Agreement and the Attachments to this Security Agreement, (a) the terms Equipment, Fixtures, Goods, Inventory, and Proceeds, have the respective meanings assigned to them in the UCC (as defined below); (b) capitalized terms which are not otherwise defined in this Security Agreement have the respective meanings assigned to them in the Franchise Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"**Collateral**" means, with respect to you, all of your property and rights in which a security interest is granted under this Security Agreement.

"**Event of Default**" means (i) a Material Breach; (ii) your failure to perform or observe any term, promise, condition or obligation contained in this Security Agreement; or (iii) your breach of any representation or warranty made by you to us in or in connection with the Store, the Franchise Agreement or this Security Agreement. "Obligations" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by you to us of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or arising, in the future pursuant to the terms of the Franchise Agreement or any other agreement by or among you and us, and/or modification, renewal, or extensions of any of the foregoing, including all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to and payable by you under this Security Agreement or under the Franchise Agreement or any other agreement by or among you and us, and including the Open Account Balance and any outstanding Excess Investment Draw, Monthly Draw or 7-Eleven Charge, or rentals due under any Lease.

"**Store**" means 7-Eleven Store No. 2367 - 16981C located at 801 Broadway, King City, CA 93930-3303.

"**UCC**" means the Uniform Commercial Code as in effect in the State of California on the date of this Security Agreement, as may be amended or modified from time.

2. **Grant of Security Interest.** As security for the Obligations, you pledge and assign to us and

grant to us a continuing security interest in and lien on, all of the present and hereafter acquired Goods (including Equipment, Fixtures and Inventory) held or maintained at the Store or otherwise used in the ownership or operation of the Store and all Proceeds thereof, and all present and hereafter acquired rights, title and interest relating to the Store, including, but not limited to, all premium and going concern value, if any, of the Store, and your right, if any, to effect a premium sale, and all proceeds thereof, whether now owned, or acquired in the future or arising, and wherever located, including those types of property described on Attachment 1 to this Security Agreement.

3. **Representations and Warranties.** You represent and warrant to us that:

(a) We have (or in the case of after acquired Collateral, at the time you acquire rights in the Collateral, will have) a first priority perfected security interest in the Collateral.

(b) Your chief executive office and principal place of business are as set forth on Attachment 2 to this Security Agreement, and each other location where you maintain a place of business is also set forth on Attachment 2 to this Security Agreement.

**[USE FOR ENTITY FRANCHISEE:** (c) You are a __________________, duly organized, validly existing and in good standing under the laws of the state set forth on Attachment 2 to this Security Agreement, and are a "registered organization" (as such term is defined in the UCC) in such state.]

**[USE FOR INDIVIDUAL FRANCHISEE:** (c) You are an individual located in California____________.]

(d) You are duly qualified, licensed to do business and in good standing in all jurisdictions in which such qualification or licensing is required.

(e) Your exact legal name is as set forth on the signature pages of this Agreement, and during the five years preceding the date of this Security Agreement you have not been known by any different legal name nor have you been the subject of any merger or other corporate reorganization.

4. **Covenants**. You agree to:

(a) Perform all acts that may be necessary to maintain, continue, preserve, protect and perfect the Collateral, the security interest granted to us in the Collateral and the first perfected priority of such security interest.

(b) Not use or permit any Collateral to be used in violation of any provision of the Franchise Agreement or this Security Agreement.

(c) Pay promptly when due all taxes and other governmental charges, all liens and all other charges now or imposed in the future upon or affecting any Collateral.

(d) Without 30 days' prior written notice to us, not (i) change your name or place of business (or, if you have more than one place of business, your chief executive office), (ii) keep Collateral consisting of Equipment at any location other than the Store; or (iii) adopt a plan of conversion or reorganize under the laws of a state other than your state of organization as set forth on Attachment 2 to this Security Agreement.

(e) If we give value to enable you to acquire rights in or the use of any Collateral, use such value for such purpose.

(f) Take other action we reasonably request to insure the attachment, perfection and first priority of, and our ability to enforce, the security interests in all of the Collateral.

(g) Keep separate, accurate and complete records of the Collateral and must provide us with such records and such other reports and information relating to the Collateral as we may reasonably request from time to time.

(h) Not sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest in such Collateral except as expressly permitted in the Franchise Agreement and you agree to keep the Collateral free of all liens.

(i) Comply with all material legal requirements applicable to you which relate to the production, possession, operation, maintenance and control of the Collateral and operation of the Store (including the Fair Labor Standards Act).

5. **Authorized Action by Agent**. You irrevocably appoint us as your attorney in fact and agree that we may, on or after an Event of Default, perform (but we will not be obligated to and will incur no liability to you or any third party for failure to so perform) any act which you are obligated by this Security Agreement to perform, and to exercise such rights and powers as you might exercise with respect to the Collateral. You acknowledge and agree that this Security Agreement is an "authenticated record" for purposes of UCC Articles 9.509(a) and (b), and you authorize the filing by us of UCC financing statements naming you as the "debtor(s)" in such financing statements.

6. **Default and Remedies**. In addition to all other rights and remedies granted us by this Security Agreement, the Franchise Agreement, the UCC and other applicable law, we may, upon the occurrence and during the continuance of an Event of Default, exercise any one or more of the following rights and remedies: (a) foreclose or otherwise enforce our security interests in any or all Collateral in any manner permitted by applicable law, the Franchise Agreement or this Security Agreement; (b) sell or otherwise dispose of any or all Collateral at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery, on such terms and in such manner as we may determine; (c) require you to assemble the Collateral and make it available to us at a place to be designated by us; (d) enter onto any property where any Collateral is located and take possession of such Collateral with or without judicial process; and (e) prior to the disposition of the Collateral, store, process, repair or recondition any Collateral consisting of Goods, or otherwise prepare and preserve Collateral for disposition in any manner and to the extent we deem appropriate. You agree that 10 days' notice of any intended sale or disposition of any Collateral is reasonable. We will have no duty as to collection or protection of the Collateral or any income on such Collateral, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining to prior parties beyond, in the case of any Collateral in our possession, the same safe custody of such Collateral to the extent afforded to our property. All of our rights and remedies whether or not granted under this Security Agreement will be cumulative and may be exercised singularly or concurrently.

7. **Miscellaneous**.

(a) **Notices**. All notices, requests, demands, consents, instructions or other communications to or upon you or us under this Security Agreement must be in writing and must be delivered in accordance with the terms and provisions of Paragraph 31(e) of the Franchise Agreement.

(b) **Waivers; Amendments.** Any term, promise, agreement or condition of this Security Agreement may be amended or waived if such amendment or waiver is in writing and is signed by you and us. No failure or delay by us in exercising any right under this Security Agreement will operate as a waiver of such right or of any other right nor will any single or partial exercise of any such right preclude any other further exercise of such right or of any other right. Unless otherwise specified in any such waiver or consent, a waiver or consent given under this Security Agreement will be effective only in the specific instance and for the specific purpose for which given.

(c) **Successors and Assignments.** This Security Agreement will be binding upon and inure to our benefit and your benefit and to the benefit of our respective successors and assigns, including all persons and entities that become bound by this Security Agreement; provided, however, that you may sell, assign and delegate your respective rights and obligations under this Security Agreement only as permitted by the Franchise Agreement. We may disclose this Security Agreement, the Franchise Agreement and any financial or other information relating to you to any assignee or potential assignee.

(d) **JURY TRIAL**. YOU AND WE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY AS TO ANY ISSUE RELATING TO THIS SECURITY AGREEMENT IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT.

(e) **Cumulative Rights, Etc.** Our rights, powers and remedies under this Security Agreement will be in addition to all rights, powers and remedies given to us by applicable law, the Franchise Agreement or any other agreement, all of which rights, powers, and remedies will be cumulative and may be exercised successively or concurrently without impairing our rights under this Security Agreement. You waive any right to require us to proceed against any person or to exhaust any Collateral or to pursue any remedy in our power.

(f) **Governing Law, Construction.** This Security Agreement will be governed by and construed according to the laws of the state in which you are located from time to time in effect except to the extent preempted by United States federal law. It is expressly stipulated and agreed to be your intent and our intent at all times to comply with applicable law governing the highest lawful rate or amount of interest payable on the Obligations. If the applicable law is ever judicially interpreted so as to render usurious any amount called for under the Franchise Agreement, or contracted for, charged, taken, reserved or received with respect to the Obligations, or if our exercise of our remedies under this Security Agreement or the Franchise Agreement or if any payment by you results in you having paid any interest in excess of that permitted by applicable law, then it is your and our express intent that all excess amounts previously collected by us be credited on the principal balance of the Obligations (or, if the Obligations have been or would be paid in full, refunded to you), and the provisions of the Franchise Agreement immediately be deemed reformed and the amounts collectible thereafter under this Security Agreement and under the Franchise Agreement reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for under this Security Agreement or under the Franchise Agreement. All sums paid or agreed to be paid to us for the use, forbearance or detention of the Obligations will, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Obligations until payment in full so that the rate or amount of interest on account of the Obligations does not exceed the usury ceiling from time to time in effect and applicable to the Obligations for so long as the Obligations are outstanding.

(g) **Conflicting Provisions.** To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and the terms of the Franchise Agreement, the terms of the Franchise Agreement will govern.

(h) **Counterparts**. This Security Agreement may be executed in any number of identical counterparts, any set of which signed by all the parties to this Security Agreement will be deemed to constitute a complete, executed original for all purposes.

IN WITNESS WHEREOF, you have caused this Security Agreement to be executed as of the last date set forth below.

**FRANCHISEE**

| | |
|---|---|
| By ____________ Sung Hun Choe | By ____________ |
| Date 12.27.18 | Date ____________ |
| By ____________ | By ____________ |
| Date ____________ | Date ____________ |

**7-ELEVEN, INC.**

By ____________
Arron B. Yount

Date 12/31/18

# ATTACHMENT 1
## TO SECURITY AGREEMENT

All Goods (including Equipment, Fixtures and Inventory) held or maintained on the Store or otherwise used in the ownership or operation of the Store, including money order blanks, bank drafts and store supplies, and all embedded software, accessions, additions, attachments, improvements, substitutions and replacements to such Goods and for such Goods;

All premium or going concern value of the franchise interest in the Store;

All licenses and permits used in connection with the operation of the Store; and

All proceeds of the foregoing (including whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, returned, substituted or otherwise disposed of, whether such disposition is voluntary or involuntary, including rights to payment and return premiums and insurance proceeds under insurance with respect to any Collateral, and all rights to payment with respect to any cause of action affecting or relating to the Collateral).

ATTACHMENT 2
<u>TO SECURITY AGREEMENT</u>

[Complete for each Franchisee]

Exact Legal Name: Sung Hun Choe

State or Organization: California

Type of Organization:

Place of Business (or, if more than one, the Chief Executive Office):

801 Broadway, King City, CA 93930-3303

# EXHIBIT J

## Procedures for Selection of Third Party Reviewer and for Reviewing Vendor Negotiating Practices

### A. Qualifications and Selection of Franchisee Selection Committee Members:

1. Qualifications. The "Franchisee Selection Committee" will be made up of five franchisees who, at the time of their selection and at all times during the Committee's deliberations, (i) are current 7-Eleven franchisees; (ii) are not in breach of their 7-Eleven franchise agreement; (iii) are local Franchise Owners Association Presidents, but not officers of any national 7-Eleven franchisee association or coalition of associations; (iv) agree to serve voluntarily, and (v) agree to be bound by this Exhibit J, including the dispute resolution procedures set forth in Section C. The Franchisee Selection Committee will select the Third Party Reviewer as provided in Section B. below and will be a party to any dispute resolution proceedings contemplated by Section D. below

2. Member Replacement. Any Franchisee Selection Committee member who (i) resigns or (ii) no longer meets the qualifications set forth in Section A.1(i)-(iv) above, will, as of the date of such occurrence, no longer be a member of the Franchisee Selection Committee. We will advise the Franchisee Selection Committee of the occurrence of Section A.3.(i) or (ii) above, within a reasonable time after we learn of it. The remaining members of the Franchisee Selection Committee, will promptly select a replacement member, provided that we may select a replacement member if the remaining members of the Franchisee Selection Committee have not acted within 45 days after one or more members becoming ineligible to act as a member of the Franchisee Selection Committee.

3. Costs. Except for the $75,000 per calendar year (adjusted based upon the consumer price index, for each year after 2004) that we will provide pursuant to Paragraph 15(k) for the costs associated with the selection of the Third Party Reviewer and for such Third Party Reviewer to conduct the review contemplated by Paragraph 15(k) and this Exhibit J and related costs, the Franchisee Selection Committee shall bear all costs and expenses incurred by it relating to the review and any other actions contemplated by Paragraph 15(k) and this Exhibit J.

### B. Qualifications and Selection of Third Party Reviewer:

The selection of the Third Party Reviewer described in Paragraph 15(k) of the Franchise Agreement will be made by the Franchisee Selection Committee, as set out in Section A.1. above, within 90 days after the first day of each calendar year during the term of the Franchise Agreement. The Third Party Reviewer (i) should be an individual or entity that has experience in reviewing and identifying discounts and allowances provided by manufacturers and other vendors to retail companies; (ii) will not be disqualified solely based on the fact that such individual or entity has been engaged by us to review discounts and allowances obtained by or available to us outside of the context of the review contemplated by this Exhibit J; (iii) may (but need not) continue to be selected in subsequent years; and (iv) must agree to be bound by this Exhibit J, including the dispute resolution procedures set forth in Section D. The Franchisee Selection Committee shall notify us in writing promptly upon the selection of a Third Party Reviewer, and the notice shall include a statement explaining how the Third Party Reviewer satisfies each of the qualifications set forth above.

### C. Procedures for and Scope of Review of Vendor Negotiating Practices and Treatment of Discounts and Allowances:

1. Vendor Agreements. Within 60 days after the beginning of each calendar year during the

Term of the Franchise Agreement, we will provide to the Franchisee Selection Committee a list of all Vendor agreements (including maintenance vendors recommended by us) entered into during the immediately preceding calendar year. Promptly following the selection of the Third Party Reviewer, the Franchisee Selection Committee shall identify to us in writing any such Vendor agreements which it wishes the Third Party Reviewer to review. The Third Party Reviewer may continue to review any Vendor agreements that continue from year to year for the years they are operative, as outlined above. The Third Party Reviewer will be entitled to obtain the total amount paid to us by any Vendor whose agreement it is reviewing including verifying with the Vendor the total amount paid, if it desires.

2. Confidentiality. Before reviewing any Vendor agreement under which we are required to maintain the confidentiality of the terms of such agreement, the Third Party Reviewer and each member of the Franchisee Selection Committee must sign a confidentiality agreement in the form that we require. The Third Party Reviewer will then be given access to the subject Vendor agreement and, if requested, to our personnel who were directly involved in the negotiation of the agreement which is the subject of the review. The review of all Vendor agreements identified by the Franchisee Selection Committee must be completed within 145 days after the date on which the Third Party Reviewer is selected each year.

3. Scope of Review. In conducting its review of the Vendor agreements identified as set forth above, the sole question before the Third Party Reviewer shall be whether we satisfied our obligations under Paragraph 15(j)(1) and (2) of the Franchise Agreement. In order to determine whether we met our obligations under Paragraph 15(j)(1), the Third Party Reviewer and, if applicable, the Arbitrator under Section D, (i) shall be directed to consider the limitations, restrictions and conditions placed on the discount, allowance or other opportunity for price adjustment by the Vendor and (ii) shall take into consideration whether the nature and requirements of a particular Vendor's offer of a lower cost of products and services is consistent with our business concept and strategies. The Third Party Reviewer may also review and report the actions we took to meet the requirements for dealing with Vendors listed in the definition of System Transaction Amounts in Exhibit E.

**D. Dispute Resolution Procedures:**

**1. LIMITATIONS PERIOD. ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO OUR OBLIGATIONS UNDER PARAGRAPHS 15(j) AND (k) OR THE REVIEW CONDUCTED UNDER THIS EXHIBIT J WILL BE BARRED UNLESS AN ACTION IS COMMENCED UNDER THESE DISPUTE RESOLUTION PROCEDURES WITHIN THE CALENDAR YEAR IMMEDIATELY FOLLOWING THE CALENDAR YEAR IN WHICH THE THIRD PARTY REVIEWER CONDUCTED THE REVIEW AT ISSUE.**

2. Negotiation. In the event the Third Party Reviewer reasonably believes that we did not meet our obligations under Paragraph 15(j) (1) or (2) of the Franchise Agreement, then the Third Party Reviewer shall so advise our legal department and the head of our merchandising department and the Franchisee Selection Committee. The Franchisee Selection Committee and the head of our merchandising department (or his or her designee) shall endeavor in good faith to resolve any such disputes within 30 days following the date on which it is referred to them. If, after such 30 day period, the Franchisee Selection Committee reasonably believes that we have failed to meet our obligations under Paragraph 15(j) (1) or (2) of the Franchise Agreement and have not taken or agreed to take action to remedy such failure, then the Franchisee Selection Committee may bring a claim against us under the procedures set out in Section D.3. below. You agree that this procedure shall be your sole remedy for any breach or alleged breach of Paragraphs 15(j) and (k).

3. Non-Binding Mediation. Any claim arising under Paragraph 15(j) (1) or (2), Paragraph 15

(k) and/or Exhibit J to the Franchise Agreement not resolved under Section D.2. of this Exhibit J shall be submitted to non-binding mediation in accordance with the procedures set forth in Paragraph 29 of the Franchise Agreement, except that the mediator's fees and expenses and the fees charged by the American Arbitration Association (or any other organization used for the mediation), will be shared by the Franchisee Selection Committee and us, with one-half of those expenses and fees being paid by us and one-half of those expenses and fees being paid by the Franchisee Selection Committee. We and the Franchisee Selection Committee will be responsible for our respective expenses incurred in connection with the mediation. You and we agree that good faith participation in this mediation procedure is obligatory. If the dispute cannot be finally resolved through mediation within 30 days after the mediation demand is made, the dispute shall be submitted for binding arbitration by the Franchisee Selection Committee, or by us, upon demand of either party, to the American Arbitration Association in accordance with Section D.4. of this Exhibit J.

4. <u>Arbitration</u>.

a. The arbitration proceedings will be conducted by one arbitrator ("Arbitrator"), and, except as this subsection otherwise provides, according to the then-current commercial arbitration rules of the American Arbitration Association. Unless otherwise agreed by the Franchisee Selection Committee and us, the Arbitrator will be an individual who has experience in the availability and use of product and service discounts and allowances provided by vendors in the retail industry. All proceedings will be conducted at a suitable location chosen by the Arbitrator in the city where our principal business address is then located. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the Arbitrator's award may be entered in any court of competent jurisdiction.

b. Within a reasonable time after the issuance of a final arbitrator's award that is not subject to appeal or final judgment of a court of competent jurisdiction enforcing an arbitrator's award and awarding an amount to be paid to franchisees under this procedure, we will pay that award by crediting to your Open Account an amount equal to your allocable share of the award based on your purchases of the Vendor's products or services. If purchase data is unavailable, we will estimate payments based upon the best available data. For franchisees that have left the system, we will mail the payments to their last known address. We will pay out the entire award to franchisees, and you agree that our determination regarding payment will be final and that you have no right to, and waive, any contest with respect to the determination of the amounts to be paid.

c. <u>Limitation on Damages</u>.

(i) You and we agree that the Arbitrator will be instructed by the parties to the arbitration that:

- with respect to a finding that we failed to meet our obligations under Paragraph 15(j)(1) or under the definition of System Transaction Amounts in Exhibit E, no damages, including money damages, specific performance, injunctive relief, or attorneys' fees and costs, may be awarded;

- with respect to a finding that we failed to satisfy our obligations under Paragraph 15 (j) (2), the damages that can be awarded to you are limited to an amount equal to the amount of the discount or allowance attributable to your purchases of the goods or services on which the allowance was given multiplied by the percentage equal to the difference between 100% and the percentage used to calculate the 7-Eleven Charge for the year in question.

(ii) In addition and notwithstanding anything to the contrary herein, the Arbitrator may not award any punitive or exemplary damages against either party under any circumstances. We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or the Franchise Agreement (including this Exhibit J), whichever expires earlier.

d. Arbitration Costs. The Arbitrator's fees and expenses and the fees charged by American Arbitration Association (or any other organization used for the arbitration) will be shared by the Franchisee Selection Committee and us, with one-half of those expenses and fees being paid by us and one-half of those expenses and fees being paid by the Franchisee Selection Committee. We and the Franchisee Selection Committee will be responsible for our respective expenses incurred in connection with the arbitration.

e. Acknowledgements Regarding Arbitration. The parties acknowledge that any dispute arising out of or related to a violation or alleged violation of Paragraph 15(j) or arising out of or related to Paragraph 15(k) or Exhibit J is solely between you and us, that no Vendor will be a necessary party to any such dispute, and that you will have no remedy against any Vendor for a violation of Paragraph 15(j). The parties further acknowledge that the provisions of Section D.4 will continue in full force and effect subsequent to and notwithstanding the Franchise Agreement's expiration or termination.

FRANCHISEE

By [signature] By ____________

Sung Hun Choe

Date 12.27.18 Date ____________

By ____________ By ____________

Date ____________ Date ____________

7-ELEVEN, INC.

By [signature]

Arron B. Yount

Date 12/31/18

AUTOMATED TELLER MACHINE AMENDMENT

THIS AUTOMATED TELLER MACHINE AMENDMENT (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment.

BACKGROUND INFORMATION:

You and we signed a 7-Eleven Franchise Agreement (the "Agreement") covering 7-Eleven Store No. 2367 - 16981C (the "Store"); and

We have arranged with an ATM service provider (the "ATM Operator"), through a formal agreement (the "ATM Agreement"), to install, maintain, and operate a network of automated teller machines ("ATM"), and other equipment, fixtures, furnishings and signage affixed to the ATMs or provided pursuant to the ATM Agreement (together, the "ATM Facility"), owned or leased by ATM Operator, in our corporate and franchised stores; and

We and ATM Operator, and you, as an independent contractor, desire to have an ATM Facility installed in the Store in order to offer automated teller services to 7-Eleven customers pursuant to, and in accordance with, the terms and conditions of this; and

You and we desire to amend the Agreement to describe the terms and conditions for the installation, maintenance, operation, use, replacement and removal of the ATM Facility.

The parties agree as follows:

(1) CONSENTS. You will cooperate fully with us in our efforts to obtain all consents or waivers from all persons or entities we deem necessary to install, relocate, maintain, operate and replace an ATM Facility in the Store, to remodel the Store to accommodate the ATM Facility, or to remove the ATM Facility upon the termination of this Amendment. Subject to obtaining such consents, you agree to the installation and, if applicable, the remodeling of the Store to accommodate the ATM Facility, and the relocation of an ATM Facility within the Store at a location we designate (after consultation with you), including any changes in merchandise or equipment layout which may be required as a result of the relocation. You must make available any space in the Store and in the Store's parking area that we determine is necessary to install, relocate, maintain, operate, replace or remove the ATM Facility.

(2) COMPENSATION. We will credit your Open Account at the end of each Accounting Period with the fees that ATM Operator pays us for financial services that are performed by the ATM in the Store. These fees, and all payments made to you pursuant to this ATM Amendment, which constitute Receipts, shall be subject to the 7-Eleven Charge pursuant to the terms of the Agreement. Such fees and the terms pertaining to their adjustments, if any, are set forth on Exhibit I to this ATM Amendment, which is incorporated into this ATM Amendment for all purposes. Except as provided in Exhibit I, you acknowledge and agree that any sum the ATM Operator pays us is intended to reimburse us for expenses we incurred for the installation, maintenance, operation, use, or removal of the ATM Facility will not be part of said fees and will not be defined as Receipts under the Agreement, nor credited to your Open Account.

We and you agree that ATM Operator will not be obligated to make any payment directly to you in connection with the installation, maintenance or operation of the ATM in the Store or its removal.

(3) EQUIPMENT. ATM Operator will retain all ownership or leasehold interests and rights to the ATM. ATM Operator may replace the ATM or any component, capability or function of the ATM at any time during the term of the ATM Agreement. You must not cause to be filed, or grant permission of the filing of, any lien or other encumbrance upon the ATM, and you agree that the ATM is personal property, and is not, and will not become, a fixture. You must comply with our security policies in connection with the ATM, including immediately reporting to us, ATM Operator, and the local police the efforts of any party to injure, vandalize, break into, tamper with, or damage the ATM, and you must fully cooperate in any investigation with respect to such efforts.

(4) MAINTENANCE OF THE ATM. The terms and conditions of the Agreement notwithstanding, you are not responsible for the maintenance, repair, or replacement of the ATM unless caused, directly or indirectly, by your breach of this Amendment or the Agreement or the negligent or intentional acts or omissions of you or your agents or employees. We will provide you with information regarding ATM Operator's network control, service agents or subcontractors responsible for service to the ATM. Any agent or employee of ATM Operator must have access to the Store and the ATM during the hours the Store is open for business to install, maintain, replace, operate, and, upon termination or expiration of this Amendment, remove the ATM from the Store. You must maintain the space surrounding the ATM in a neat and orderly condition and keep such space free of obstructions. You must not use the ATM area for storage or as a sales area. You must promptly notify ATM Operator of any service interruption, malfunction, or other problem with, or damage to, the ATM. We will supply you with the training and information that we deem necessary for such notification.

(5) PROMOTION. Any of our agents or employees or any of ATM Operator's agents or employees must have access to the Store during the hours the Store is open for business to put signage at the Store, advertising the presence of the ATM in the Store. The signage will be put in the Store only with our prior consent. We will provide you with all decals, digital displays, signage and other promotional materials we deem necessary to promote the ATM in the Store. Such promotional material must be continuously and prominently displayed in the Store in the manner for which it was designed. You must not otherwise utilize or display any name, logo, or trademark used or registered in connection with the ATM or the ATM Operator.

(6) TERM. This Amendment will be effective from the later of July 20, 2017 or the Effective Date of the Franchise Agreement. This Amendment will terminate on the earlier of: (i) the date the ATM Agreement expires or terminates, in whole or in part, as it applies to the Store; (ii) the date that ATM Operator declines to install or elects to remove the ATM Facility; (iii) the date the Agreement expires or terminates; or (iv) the date this Amendment terminates in accordance with its terms. The ATM Agreement is scheduled to expire on July 20, 2024, unless earlier terminated, and may be extended at our sole discretion. We will notify you of the termination or expiration of this Amendment in accordance with the terms of the ATM Agreement. If we make arrangements with a different ATM Operator for the same or other financial services, we may require you to sign a new ATM Amendment, or other financial services agreement as a replacement for this Amendment.

(7) TERMINATION OF AMENDMENT. We may immediately terminate this Amendment upon 3 Business Days notice to you if you fail to comply with any term or condition of this Amendment and you fail to cure or cease such non-compliance within the 3 Business Day Period or in the event the ATM Operator elects to remove the ATM Facility. Upon the termination or expiration of this Amendment, you must return all promotional, training, and miscellaneous materials provided pursuant to the terms of this Amendment, and we (or our agents ) and ATM Operator (or its agents) will have the right to enter the Store and its surrounding premises for the purpose of removing the ATM from the Store. You must fully cooperate with our representatives or the representatives of ATM Operator regarding such removal. Any expense associated with the removal

of the ATM will be borne by us or ATM Operator unless such removal is a result of the termination of this Amendment due to your breach of the ATM Amendment, in which case you will be responsible for all direct expenses related to the removal of the ATM.

(8) TRAINING. We or our agents, in conjunction with ATM Operator, will provide you with the training we deem necessary for instructing 7-Eleven customers to operate the ATM.

(9) INDEMNITY. You must, to the extent consistent with the ATM Agreement and the Agreement, indemnify, defend and hold ATM Operator and its respective officers, directors, shareholders, agents, employees, affiliates and assigns harmless from all losses, claims, damages, liabilities or expenses (including reasonable attorney's fees) of any kind or nature arising from your normal operation of the Store; except such claims, demands or liabilities which arise from or are related to the negligence or other wrongful conduct of third parties, or the wrongful conduct or breach of the ATM Agreement by ATM Operator, its employees, agents and subcontractors. You agree to indemnify us for all claims arising directly or indirectly from your breach of this Amendment, notwithstanding the terms and conditions of the Agreement and Exhibit C to the Agreement to the contrary.

(10) NOTICES. Unless otherwise provided in this ATM Amendment, any notices, when required or permitted under this ATM Amendment, must be delivered as provided for in the Agreement.

(11) DEFINITIONS. Unless otherwise defined in this Amendment, the terms used in this Amendment will have the meanings set forth in the Agreement.

(12) COMPLIANCE WITH LAW. You must comply with all federal, state, and local laws, regulations, rules, and ordinances applicable to the operation of the ATM in the Store.

(13) SEVERABILITY. The parties agree that if any provision of this Amendment is determined to be void by any court or tribunal of competent jurisdiction, then such a determination will not affect any other provision of this Amendment, all of which provisions will remain in effect and, if the provision is capable of 2 constructions, one of which would render it void and the other of which would render it valid, then the provision will have the meaning which renders it valid.

(14) CONFIDENTIALITY. The parties agree not to disclose the financial terms of this Amendment directly or indirectly to any third party

You and we have signed this Amendment as of the last date set forth below.

FRANCHISEE

_______________________________

By _______________________________ By _______________________________

Sung Hun Choe _______________________________

Date 12.27.18 Date _______________________________

By _______________________________ By _______________________________

_______________________________ _______________________________

Date _______________________________ Date _______________________________

7-ELEVEN, INC.

By _______________________________

Arron B. Yount

Date 12/31/18

EXHIBIT I

FEES

Beginning with the first month that the ATM Facility is operational, we will credit your Open Account with the following fees, provided such fees are paid to us, on or before the last day of the Accounting Period during which we receive such fees:

| Type of Revenue Received by ATM Operator | Percentage of ATM Operator Revenue Paid to 7-Eleven |
|---|---|
| Surcharge Fee for withdrawal transaction | 60.5% |
| Interchange Fee for withdrawal transaction through Surcharge-Free Network | 60.5% |
| Branding Fees, Advertising Income | 60.5% |

During the Term of the Agreement, if as of the first of any calendar month of the ATM operation by ATM Operator, the Wall Street Journal Prime ("WSJP") interest rate increases above 4.75%, the percentage of revenue share described above shall be reduced by 13.5 basis points (0.135%) for each incremental 5 basis points (0.05%) increase of the WSJP rate in excess of 4.75% as of the first of that calendar month.

For example:

| If the WSJP rate increases to 5.00%, then: | |
|---|---|
| Type of Revenue Received by ATM Operator | Percentage of ATM Operator Revenue Paid to 7-Eleven |
| Surcharge Fee for withdrawal transaction | 59.825% |
| Interchange Fee for withdrawal transaction through Surcharge-Free Network | 59.825% |
| Branding Fees, Advertising Income | 59.825% |

For purposes of this Amendment, "Transaction" or "ATM Transaction" will mean (i) cash withdrawal from a checking or savings account; (ii) balance inquiry; (iii) account transfer, (iv) credit and/or debit card cash advance; and (v) transaction denials. Additionally, the following terms are defined as follows:

- Advertising Income shall mean any fees paid to provide promotional or advertising content on the receipt or screens on any ATM Facility
- Branding Fees shall mean fees paid by Financial Institutions to brand an ATM Facility with their logo and/or trademark.
- Interchange Fee shall mean net fees paid to ATM Operator from the ATM user's card-issuing bank through networks and processors for any transactions through a Surcharge-Free or Non Surcharge-Free Network.
- Surcharge Fee shall mean a cash withdrawal fee charged to the ATM user by ATM Operator for processing a transaction.
- Surcharge-Free Network shall mean a network of Financial Institutions which belong to one network that provides Surcharge-Free Network Transactions.
- Surcharge-Free Network Transaction shall mean a transaction through a Surcharge-Free Network which does not charge a surcharge.

In addition, we will credit your Open Account with any payments made by ATM Operator to us representing the Store, based on ATM Operator's failure to achieve certain service levels for the ATMs, all as more fully set forth in the ATM Agreement.

We may change the amount or the method of calculating any of the fees designated in this Exhibit at any time in our sole discretion. Such changes will be effective 30 days after written notification to you of such changes.

# AGREEMENT
("Agreement")

On this 27 day of DEC 2018, Western Union Financial Services, Inc., a Colorado corporation, ("WUNA") and Sung Hun Choe ("Franchisee") having a principal office at 801 Broadway, King City, CA 93930-3303 agree as follows:

## STATEMENT OF PURPOSE

A. WUNA and 7-Eleven, Inc. entered into a Western Union Agency Agreement effective April 22, 2011 (the "Agency Agreement").

B. Franchisee desires to offer Western Union Money Orders ("Money Orders") for sale to his/her customers.

C. Franchisee may also desire to offer "Western Union Stored Value Services" as defined, described and set forth in "Exhibit B for Western Union Stored Value Services," attached hereto.

D. Franchisee may accept and agree to the terms of Exhibit B, and therefore offer the Western Union Stored Value Services, by initialing in the box contained in the signatory field of this Agreement.

E. Franchisee must fully complete the "Franchisee Application Package" attached hereto as Exhibit C, prior to the execution of this Agreement.

F. WUNA has agreed, subject to the terms and conditions of this Agreement, to permit Franchisee to offer Money Orders and, if applicable, Western Union Stored Value Services as set forth in Exhibit B, for sale to his/her customers.

NOW THEREFORE, in consideration of the foregoing premises and of the mutual covenants and conditions hereinafter set forth, the parties agree as follows:

1. Trust Relationship. (a) As of the date first written above, WUNA appoints Franchisee as its agent and trustee for the limited purpose of being authorized sell Money Orders and the Western Union Stored Value Services (if applicable) and to hold the Trust Funds in accordance with the provisions of this Agreement and applicable law, including those state laws set forth in Exhibit E "State Schedules" as may be amended from time-to time. The parties agree that: (i) the agency granted pursuant to this Section 1(a) is for the limited purpose of holding and selling Money Orders and the Western Union Stored Value Services (if applicable) and collecting the Trust Funds (in an amount equal to:(A) the dollar amount imprinted on any Money Orders used and sold by Franchisee, and (B) all funds received by Franchisee in connection with the provision of the Western Union Stored Value Services, if applicable (collectively, "Trust Funds")); and (ii) except as set forth in previous sentence, the relationship between WUNA and Franchisee is that of independent contractors. (b) Franchisee shall be a trustee for WUNA and act in a fiduciary capacity for the benefit of WUNA with respect to any Money Orders, Stored Value Packages (as defined in Exhibit B, if applicable) and Trust Funds. Franchisee shall hold the Money Orders, Stored Value Packages (if applicable) and Trust Funds in its possession in trust for the benefit of WUNA and shall maintain and account for the Trust Funds separate and apart from all other funds and monies of Franchisee. All actions taken by Franchisee with respect to the Trust Funds shall be in accordance with maintaining the character of a trust pursuant to applicable state and Federal law. Without limiting the generality of the foregoing, all cash in kind held by Franchisee and the balance in all bank and other accounts into which the Trust Funds may have been deposited and commingled with other funds, shall constitute Trust Funds to the extent of the amount of all Trust Funds deposited or contained therein after the date hereof and not paid over to WUNA. Franchisee shall not acquire by operation of this Agreement or otherwise, any right, title or interest of any kind in the Money Orders, Stored Value Packages (if applicable) or Trust Funds. All Money Orders, Stored Value Packages (if applicable) and Trust Funds remain the sole and exclusive property of WUNA. Franchisee acknowledges and agrees that the imposition of the requirements contained in this Section 1(b) constitute action (as such term is used in 11 U.S.C. § 541(b)(5)) taken by WUNA to require compliance with the commingling prohibition. (c) It is expressly understood that Franchisee does not, by operation of this Agreement, acquire any right, title or equitable interest in the Money Order, Stored Value Packages (if applicable), or the Trust Funds.

2. Sales and Remittance Procedures. Franchisee shall sell the Money Orders and Western Union Stored Value Services (if applicable) and remit the Trust Funds in accordance with this Agreement and the Money Order Amendment signed by 7-Eleven, Inc. ("7-Eleven") and Franchisee which is annexed hereto as Exhibit A and made a part hereof ("Exhibit A").

3. Policies and Procedures. Franchisee shall comply with any and all policies and procedures provided by 7-Eleven and WUNA, as the same may be amended or replaced from time to time, for the reporting, handling, safe keeping, record keeping, processing, sale and use of the Western Union Stored Value Services (if applicable), Stored Value Packages (if applicable), all Money Orders and Trust Funds. A copy of WUNA's policies and procedures as of the Effective Date are set forth in Exhibit D. Franchisee agrees that WUNA may disclose to 7-Eleven from time to time information that WUNA deems reasonably necessary relating to the sale or use of Money Orders, or Western Union Stored Value Services (if applicable) by Franchisee.

4. Compliance with Law. Franchisee shall comply with all Federal, state and local laws, regulations, rules and ordinances applicable to the sale and use of the Western Union Stored Value Services (if applicable), Stored Value Packages (if applicable), Money Orders and Franchisee's performance of this Agreement. To the extent that this Agreement contains more restrictive requirements than such statutes or regulations, this Agreement shall control.

5. Compliance Information. With regard to Franchisee, and on behalf of Franchisee's officers, principals and all other Franchisee employees and/or representatives with managerial oversight and/or responsibility for Franchisee locations offering the Money Orders or Western Union Stored Value Services, Franchisee represents and warrants, to Franchisee's knowledge and without additional investigation, that: (a) all information disclosed to WUNA in connection with the Franchisee Application Package is true, accurate, and complete; (b) none of them has been convicted of any felony that has not been disclosed to WUNA, in writing, prior to the Effective Date; (c) none of them has been charged with or convicted of (or pleaded guilty or no contest to) any criminal act constituting, involving or relating to: fraud; embezzlement; theft; money laundering; the financing of terrorism or terrorist organizations; the importation of undocumented aliens; receipt of stolen property; or the possession, use, manufacture or distribution of any narcotic or other controlled substance. This representation and warranty shall be deemed an ongoing representation and warranty from Franchisee. Franchisee shall provide notice to WUNA within forty-eight hours after any of the foregoing representations or warranties shall cease to be true at any time during the term of this Agreement.

6. Safekeeping and Liability for Loss. Franchisee shall take such measures to safeguard and protect all unsold Money Orders and Stored Value Packages (if applicable) and all Trust Funds as a prudent person would take to safeguard and protect a like amount of his or her own cash.

7. Payment for Money Orders. Franchisee shall accept only cash or debit cards in payment for Money Orders and Western Union Stored Value Services (if applicable). Anything to the contrary notwithstanding, if Franchisee fails to strictly comply with the preceding sentence and accepts any other form of payment, then such acceptance shall be at Franchisee's sole and exclusive risk. The consumer fee collected for any non-cash sale shall not exceed the consumer fee collected for cash Money Order sales. Unless otherwise agreed in writing by 7-Eleven and WUNA, the face value of each Money Order issued by Franchisee shall not exceed $500.

8. Bailment. (a) WUNA has or agrees to furnish or cause to be furnished to Franchisee a device for storing and imprinting Money Orders and an associated input device (collectively, a "Machine") for Franchisee's use in connection with the sale and use of Money Orders. Franchisee shall only use the Machine to print Money Orders and for such other uses as WUNA or its affiliates may specify in writing from time to time. Franchisee shall have and shall assume the exclusive care, custody, and control of the Machines. Franchisee shall ensure that Machine is secure to the reasonable satisfaction of WUNA. Franchisee shall safeguard and use the Machine located in a careful and proper manner and shall comply with and conform to all laws and regulations applicable to such Machines, Franchisee's business, and the sale of Money Orders. Franchisee shall not permit any abuse, deterioration, wreckage, dilapidation, or waste of any Machine. Franchisee shall operate the Machines in accordance with all applicable operating instructions and procedures provided by WUNA. Subject to the terms and conditions of this Agreement, Franchisee shall be entitled to possess, use and operate the Machine at any time during the Agreement term for such purposes and functions. (b) This Agreement creates a bailment solely for temporary possession and use of the Machine and no other right, title, or interest in or to the Machine shall hereby pass to Franchisee. Franchisee shall have no lien or charge upon, or ownership interest in, the Machine. Franchisee shall cooperate with WUNA and shall execute and deliver any further documents, instruments and certificates as WUNA may reasonably deem necessary or convenient to protect the title and interests of WUNA in the Machine. Franchisee shall keep the Machine free and clear from any and all claims, liens, and encumbrances, except claims, liens or encumbrances

arising from acts or omissions of WUNA. Franchisee shall not remove any label affixed to any Machine that states that the Machine is owned by WUNA. In order to protect WUNA's trade secrets, except as permitted by applicable law, Franchisee shall not reverse engineer, decompile, copy, modify, create derivative works of, transfer, sell, publish or disclose the software contained in the Machines provided by WUNA.

9. THIS IS A SERVICES AGREEMENT. WUNA MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ANY EQUIPMENT, SOFTWARE OR OTHER ITEMS PROVIDED UNDER THIS AGREEMENT, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY, AND ANY IMPLIED WARRANTY OF NON-INFRINGEMENT. THE MO EQUIPMENT, AND OTHER ITEMS PROVIDED UNDER THIS AGREEMENT BY WUNA ARE PROVIDED TO FRANCHISEE "AS IS" WITH ALL FAULTS.

10. Limitation of Liability. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, WUNA'S CUMULATIVE AGGREGATE MONETARY LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE LESSER OF: (a) FIVE THOUSAND DOLLARS; OR (b) THE ACTUAL DIRECT DAMAGES SUFFERED BY FRANCHISEE.

11. Disclaimer of Damages. IN NO EVENT SHALL WUNA, ITS AFFILIATES, OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE LIABLE TO FRANCHISEE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR EXEMPLARY, PUNITIVE, SPECIAL, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER OR NOT WUNA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

12. Term of Agreement. The term of this Agreement shall be for a period of one year after the date hereof ("Initial Term"), and upon expiration of the Initial Term shall be automatically renewed for additional periods each equal to the Initial Term unless earlier terminated at any time, by the happening of any of the following events: (a) the expiration or termination of the Agency Agreement; (b) the expiration or termination of Franchisee's agreement with 7-Eleven; (c) the expiration or termination of Exhibit A; or (d) either party's receipt of written notice of termination to the other party thirty (30) days prior to the desired termination date. During such thirty (30) day period, the terms and provisions of this Agreement shall remain in full force and effect.

13. Termination/Suspension. (a) If there is a material adverse change in the financial condition of Franchisee or Franchisee performs, voluntarily or involuntarily, any of the recognized acts of bankruptcy or insolvency, then WUNA may, in WUNA's sole discretion, immediately terminate this Agreement and/or suspend Franchisee's rights to sell Money Orders and/or the Western Union Stored Value Services (if applicable). (b) WUNA may immediately suspend or terminate this Agreement for Franchisee's failure to comply with any term or condition of this Agreement and/or for 7-Eleven's failure to comply with the Agency Agreement. (c) WUNA may immediately terminate this Agreement and require Franchisee to return the Machines to WUNA if the Machines become subject to a claim that they infringe or violate the rights of a third party. (d) In the event of termination for any cause, Franchisee shall immediately remit to 7-Eleven the Trust Funds received by Franchisee from the sale or use of Money Orders and/or Western Union Stored Value Services. Franchisee shall also return all unsold and unused Money Orders, Stored Value Packages (if applicable) and any equipment, Machines, display material or other property furnished to Franchisee by 7-Eleven and/or UNA with respect thereto. WUNA reserves the right to take possession from Franchisee of any unsold Money Orders, and Stored Value Packages, and all Trust Funds and/or Machines if 7-Eleven is unable to do so. All such Trust Funds, Money Orders and Stored Value Packages shall, until remitted to 7-Eleven or WUNA, continue to be held in trust by Franchisee for WUNA.

14. Assignment. This Agreement, or any of the rights hereunder, including any payments due, may not be assigned by Franchisee by operation of law or otherwise without the prior written consent of WUNA. The parties hereto agree that WUNA may assign any or all of its rights or delegate any of its obligations under this Agreement without the consent of Franchisee and Franchisee hereby agrees that any such assignee may issue money orders in a new name. Additionally, WUNA may designate any other person or entity as its agent to perform or render assistance to WUNA in the performance of the services to be provided by WUNA hereunder.

15. Law Governing. This Agreement shall be construed and enforced in accordance with, and shall be governed by the laws of the state of New York without regard to such state's conflict of law provisions.

16. Survival. Sections 1, 3, 4, 7, 8, 10, 11, 13 and 15 through 18 shall survive the expiration or termination of this Agreement.

17. Entire Agreement. This Agreement, including the Franchisee Application Package and all other documents referenced and/or otherwise incorporated herein, constitutes the entire and sole agreement between the undersigned parties with respect to the subject matter herein. Prior agreements between the parties, if any, are terminated immediately. This Agreement supersedes all prior understandings, arrangements or agreements between the parties hereto not contained in this Agreement, all of which are merged herein, including any prior agreements with respect to Franchisee's sale of Money Orders or the Western Union Stored Value Services (if applicable). No modification, renewal, extension or waiver of any of the provision of this Agreement (other than the policies and procedures) supplied by WUNA and/or 7-Eleven shall be binding upon either party unless made in writing and signed by the parties to be bound.

18. Notice. Any notices required or permitted hereunder to WUNA shall be sent by certified mail, to Western Union, 12500 East Belford Avenue, Englewood, Colorado 80112, Attention: President, with a copy to General Counsel at the same address. All notices required or permitted to Franchisee hereunder shall be sent by certified mail to the address set forth above. Either party may change the address to which notices are to be sent by written notice to the other party. All such notices if communicated as set forth above shall be effective when received.

IN WITNESS WHEREOF, the parties have caused their authorized representatives to sign this Agreement as of the day and year first above written.

Franchisee

By: [signature]

Print Name: Sung Hun Choe

[initials] Initial Here to Offer Western Union Stored Value Services.

(If initialed by Franchisee, Exhibit B Shall Apply)

FOR WESTERN UNION USE ONLY

WESTERN UNION FINANCIAL SERVICES, INC.

Signature: ______________________________

(Authorized Representative)

Name: ____________________________________________________

(Print) (Title)

Western Union Services to be Offered by Agent:

_____ Western Union Money Order Services

_____ Western Union Stored Value Services

Effective Date: ______________________________

# EXHIBIT A
# MONEY ORDER AMENDMENT

THIS MONEY ORDER AMENDMENT ("Amendment") is signed by the undersigned Franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment;

BACKGROUND INFORMATION

You and we signed a 7-Eleven Franchise Agreement (the "Agreement") covering 7-Eleven Store No. 2367 - 16981C (the "Store");

We and Western Union Financial Services, Inc. ("Western Union") signed an agency agreement that allows us and our franchisees to sell Western Union® money orders ("Money Orders") in 7-Eleven Stores, and to provide certain services and materials related to the sale of Money Orders (the "Money Order Agreement");

You are required to sell Money Orders as a Required Category under the Agreement and shall sell Money Orders to your customers under this Amendment and any agreement between you and Western Union; and

You and we desire to amend the Agreement to allow you to sell Money Orders in your Store.

The parties agree as follows:

(1) You will execute the Agreement between you and Western Union (the "Western Union Agreement") and fully complete the Franchise Application Package ("Application Package"), which Western Union Agreement and Application Package is attached hereto.

(2) You will use your best efforts to promote and sell Money Orders in the Store at all times. You must use the Money Orders only for retail sale to your customers, however you may use them to pay vendors or to pay Operating Expenses provided that you properly report and account for such use of money orders. You may not use Money Orders to pay any personal expenses including, but not limited to, payments for mortgages/leases, utilities, car payments, etc. and Money Orders shall not be deposited in lieu of the actual Receipts from the operation of the Store.

(3) You will accept only cash or debit cards in payment for Money Orders.

(4) You will report daily the sale of all Money Orders, and deposit daily all proceeds from the sale of Money Orders, in the same manner that you deposit all other receipts under the Agreement. The Money Order proceeds, for purposes of the Agreement only, will be defined as Receipts.

(5) Western Union will deliver blank Money Orders to you.

(6) We will provide you with all equipment necessary to sell Money Orders and all decals and other point-of-sale promotional materials we deem necessary. You must prominently display the promotional materials in the Store as they were designed to be used. You will not otherwise use or display the name, logo, or trademark of Western Union or any other business name, trade name or trademark owned or controlled by Western Union, its corporate parents or affiliates.

(7) We will charge your Cost of Goods Sold account the amount described in the table below as consideration for the blank Money Orders and all related services and materials provided by Western Union:

| Applicable Time Period | Applicable Money Order Fee |
|---|---|
| September 1, 2011 – April 22, 2012 | $0.09 per Money Order |
| April 23, 2012 – April 22, 2013 | $0.10 per Money Order |
| April 23, 2013 – April 22, 2014 | $0.11 per Money Order |
| April 23, 2014 – April 22, 2015 | $0.12 per Money Order |
| April 23, 2015 – April 22, 2016 | $0.13 per Money Order |
| Thereafter, the Money Order Fee shall increase by $0.01 for each Renewal Term | |

Additionally, we may charge your Cost of Goods Sold account $0.013 per Money Order which amount covers, among other things, the maintenance of all Money Order equipment and a loss reserve ("Loss Reserve") that we provide. We may adjust the $0.013 charge at any time to reflect any increase or decrease in our actual loss experience for all franchised 7-Eleven Stores for maintaining the Loss Reserve, our projected charges to the Loss Reserve, and any increase in general and administrative expenses related to the Money Order program. Any surplus or deficit in the Loss Reserve at the end of the calendar year will be carried forward into the Loss Reserve for the following year and considered in any redetermination of the charge per Money Order for that year. We will keep all interest on funds maintained in the Loss Reserve.

(8) Any losses directly resulting from the loss of Money Orders, whether by burglary, robbery, employee malfeasance, mysterious disappearance, or otherwise, will be charged to the Loss Reserve, as long as you have complied with the terms and conditions of this Amendment and no breach of this Amendment, resulted, directly or indirectly, in the loss. You (or a representative you designate) must report any loss to the 7-Eleven Market Manager (or a representative the Market Manager designates) by the morning of the next business day. Any loss which is the direct or indirect result of any breach of this Money Order Amendment will be charged to your Open Account and will not be covered by the Loss Reserve. Any loss resulting from the payment by Western Union on any raised or counterfeited Money Order will be borne by Western Union unless Western Union can provide satisfactory evidence that such Money Order was raised or counterfeited by you or your employees. If there is satisfactory evidence that a Money Order was raised or counterfeited by your employees, any loss resulting directly from the raising or counterfeiting will be charged to the Loss Reserve.

(9) You must comply with all procedures required by us and the Policies and Procedures provided by Western Union, as may be amended from time to time, for the reporting, handling, safe keeping, processing, and sale of all Money Orders. The current Policies and Procedures of Western Union are attached hereto for your reference. You must take all measures to safeguard and protect all unsold Money Orders and all proceeds that a prudent person would take to safeguard and protect a like amount of his/her own cash. We will give you instructions and/or training as we deem necessary for complying with these procedures.

(10) You (or a representative you designate) must request a stop payment on a Money Order that is known to be stolen, by notifying one of our representatives or a Western Union representative (as we direct) by the morning of the next business day following the theft of the Money Order. Notification may be by telephone or in person and must be confirmed in writing, by providing any reports required by us or Western Union, as soon after the theft as is reasonably possible. You must also comply with all additional procedures established by us or Western Union to stop payment on Money Orders. Failure to timely notify us or Western Union of the theft or suspected theft of a Money Order, which prevents the timely placement of a stop payment on that Money Order by us or Western Union, will result in a charge to your Open Account for any amount for which we are responsible in connection with the Money Order.

(11) You must fully cooperate with us and Western Union in any investigation conducted relating to any lost, stolen, missing, altered, raised, or counterfeited Money Order and must fill out all reports required in connection with any investigation.

(12) This Money Order Amendment will continue to apply until the earlier of: (i) the date the Money Order Agreement expires or terminates (unless the Money Order Agreement is extended or replaced with a new money order program); (ii) the date the Agreement terminates or expires; (iii) the date any agreement between you and Western Union terminates or expires; or (iv) the date this Amendment terminates or expires by its terms.

(13) We may terminate this Money Order Amendment with or without cause upon 90 days' prior written notice to you. The terms and provisions of this Amendment will continue to apply during the 90 day notice period.

(14) We may immediately terminate this Amendment if you fail to comply with any term or condition of this Amendment or if your financial stability and circumstances create a substantial credit risk for Western Union and/or us, as we or Western Union determine in our sole discretion.

(15) When this Amendment terminates or expires, you must immediately return all unsold Money Orders and any equipment and related promotional and miscellaneous materials we provide under this Amendment, and otherwise

comply with any and all procedures we establish covering the expiration or termination of this Amendment. Your failure to comply with the terms of this Paragraph will constitute a Material Breach of the Agreement.

(16) If the Agreement is terminated or expires, we will charge your Open Account the maximum face amount for each Money Order not immediately returned to us or reported as either sold, missing, or stolen. We will credit your Open Account with the difference between the face value of such Money Order and the maximum face amount charged for each such Money Order when it is received and paid upon by Western Union prior to the delivery of the final Financial Summaries. If the Money Order has not been presented within 3 months of delivery of the final Financial Summaries, you will receive a check for the charges in addition to the difference between the charge and the face amount of any Money Order presented during the 3 months.

(17) You must comply with all federal, state, and local laws, regulations, rules, and ordinances applicable to the sale of Money Orders and your performance of the terms and conditions of this Amendment.

You may not contract with any other financial service vendor to sell money orders in your Store without our consent.

In all other respects the Agreement is ratified and reaffirmed.

The terms in this Amendment and its Exhibits, if any, will have the meanings defined in the Agreement.

You and we have signed this Amendment as of the last date set forth below.

FRANCHISEE

| | |
|---|---|
| By ____________ | By ____________ |
| Sung Hun Choe | ____________ |
| Date 12-27-18 | Date ____________ |
| By ____________ | By ____________ |
| ____________ | ____________ |
| Date ____________ | Date ____________ |

7-ELEVEN, INC.

By ____________

Arron B. Yount

Date 12/31/18

**Exhibit B**
**Western Union® Stored Value Services**
**(7-11 Franchisees)**

**1A. Stored Value Services.**
1A.1 Beginning on the date on which the Stored Value Services are available at Franchisee locations and continuing during the Initial Term, Franchisee shall offer the Western Union branded prepaid cards (the "WU Prepaid Card") and other such stored value products or services that WUNA may introduce from time to time (collectively "the Stored Value Services"). The WU Prepaid Card is a WUNA-branded package containing a Visa® or MasterCard® prepaid card, which can be loaded and reloaded at participating WUNA Agent locations (the "Stored Value Package"). The Stored Value Package also contains instructions for the consumer to activate the WU Prepaid Card. Each WU Prepaid Card shall be activated after (i) the consumer has tendered the principal amount and fee for the WU Prepaid Card at a Franchisee Location and (ii) the consumer follows the instructions listed in the Stored Value Package. As used herein, "Stored Value Services" means the receipt of funds by Franchisee for transmission and disbursement for a fee.
1A.2 Franchisee agrees that it shall only obtain the Stored Value Packages and the equipment necessary for Franchisee to offer the Services ("Service Equipment") from the designated provider as chosen by WUNA and 7-ELEVEN.
**2A. Procedures.**
2A.1 WUNA shall provide Franchisee and Franchisee's designated employees with reasonable training in the provision of the Stored Value Services as WUNA and 7-ELEVEN deem necessary.
2A.2 Franchisee agrees that (a) Franchisee shall not market or label the Stored Value Packages as gift cards or gift certificates; (b) Franchisee shall hang the Stored Value Packages separately from all gift card products; (c) there shall be no gift card labeling near or around the Stored Value Packages; and (d) 7-Eleven shall hang and otherwise present and market the Stored Value Packages with other stored value cards similar to the Stored Value Cards offered by 7-Eleven. Prohibited gift card marketing and/or labeling shall include, but are not limited to, the word "gift" or other synonymous words or images of a gift or a present. In the event that there are concerns with space, the gift card products can be hanging on the same rack as the Stored Value Packages, provided that (i) one side of the rack is for gift card products, (ii) the other side is for the Stored Value Packages; and (iii) both sides of the rack have equally prominent signage.
2A.3 Franchisee shall collect the face value or load amount of each Stored Value Service sold. Franchisee shall also collect a service fee for each Stored Value Service in an amount specified by WUNA (the "Consumer Send Fee") to Franchisee in writing from time to time, with as much advance notice as is reasonably practicable. Franchisee shall collect and remit all applicable sales taxes or other similar taxes or fees required by local, state or federal law, rule, or regulation. Franchisee shall accept only cash in payment for the Stored Value Service. Franchisee's acceptance of any form of payment for the Service other than cash shall be at Franchisee's sole and exclusive risk. All funds received by Franchisee in connection with the provision of the Stored Value Services shall be deemed to be Trust Funds and subject to all obligations related thereto.
2A.4 Franchisee agrees that WUNA shall be entitled, in its sole discretion, to brand the Stored Value Service under any business name, trade name or trademark designated by WUNA; provided, however, that WUNA shall not brand the Stored Value Services with a brand that is a competitor of 7-ELEVEN.
2A.5 Franchisee shall not provide any refunds to consumers for the Stored Value Service. Franchisee shall direct any consumer that requests a refund to a toll-free number to be provided by WUNA.
2A.6 Franchisee agrees that Franchisee shall not move or transfer Stored Value Package inventory between Franchisee locations.
2A.7 Franchisee agrees that WUNA may establish, from time to time and in WUNA's sole discretion, both daily and single transaction limits relating to the number and principal amount of Stored Value Service transactions that may be conducted at each of Franchisee's locations. WUNA reserves the right to temporarily suspend the Stored Value Services at any location if Franchisee exceeds a daily limit established by WUNA.
2A.8 Franchisee shall not advertise, solicit, or negotiate any of the Stored Value Services in any language other than English or Spanish, without the prior written approval of WUNA.

2A.9 WUNA shall coordinate with WUNA's designated provider concerning the supply of Stored Value Packages to be sold at Franchisee locations.

**3A. Trust Relationship; Liability for Loss.**

3A.1 As of the Effective Date, WUNA appoints Franchisee as its delegate and trustee for the limited purposes of offering the Stored Value Services for sale to the public.

Within 24 hours after any unused Stored Value Packages provided hereunder have been lost, stolen, destroyed, damaged, misappropriated, seized or forfeited, Franchisee shall notify WUNA of the serial numbers of such Stored Value Packages. However, such notice does not relieve Franchisee of its liability as provided herein.

**4A. Remittance of Trust Funds From the Sale of Stored Value Services.** Franchisee shall sell the Stored Value Services and remit the Trust Funds in accordance with this Agreement and the Money Order Amendment.

**5A. WUNA Marketing Obligations.** WUNA agrees to provide, or have its designated provider provide, Franchisee with Point of Sale marketing materials regarding the Stored Value Services, ("POS Materials") as deemed necessary and as designed and produced by WUNA, or its designated provider, in its sole discretion, for use by Franchisee at its locations. . The placement of such items in Franchisee's retail locations shall be mutually agreed upon by the parties.

**6A. Termination Responsibilities.**

6A.1 Immediately upon expiration or termination of Exhibit B or the Agreement, or upon the closure of a location, with respect to that location, Franchisee shall comply with Section 11 of the Agreement with regard to the Stored Value Services and Stored Value Packages, as applicable.

**7A. Discontinuation and Modification of Services.** WUNA may discontinue or modify the Stored Value Service in its sole discretion, WUNA may terminate or amend this Exhibit B as it concerns such discontinued or modified Stored Value Service. WUNA shall use commercially reasonable efforts to notify Franchisee at least 30 days prior to such termination or amendment. In addition to any other termination rights either party has under the Agreement, whether during or after the Initial Term, each party may immediately terminate this Exhibit B or, in the case of WUNA, suspend Agent's ability to offer the Stored Value Services, in the event that (a) there is enactment of legislation or a determination by a judicial or administrative authority that WUNA's, 7-Eleven's or WUNA's designated provider's involvement in the activities described herein is prohibited, (b)WUNA's designated provider terminates its agreement with 7-Eleven or WUNA, or (c) legal or regulatory requirements imposed upon WUNA or 7-Eleven in connection with the Stored Value Services make continued operation or use of the Stored Value Services by WUNA or 7-Eleven unprofitable.

Exhibit C

**WESTERN UNION NORTH AMERICA**

**AGENT APPLICATION FOR 7-ELEVEN FRANCHISEES**

---

All questions must be answered fully in order for this application to be processed.

**AGENT INFORMATION ("AGENT")**

☐ New Agent ☐ Add-On Agent ☐ Change of Ownership ☐ Renewal

Legal Name: Sung Hun Choe

Doing Business As (d/b/a): 7-Eleven # 2367 - 16981C

Mailing Address: 801 Broadway

Telephone Number: (831) 385-5164

City: King City State: CA Zip: 93930-

Fax Number: ____

Contact Name: Sung Hun Choe

Email Address: [redacted]ail.com

Form of Organization: ☐ Corporation ☐ Limited Liability Company ☐ Sole Proprietorship ☐ Partnership ☐ Limited Partnership ☐ Other

State of Incorporation/Registration: California

Date of Incorporation/Registration: ____

Federal Tax ID No (9 digits): [redacted]

Time in Business: ____

Business Type: ☒ 7-Eleven Convenience Store ☐ Other (describe) ____

Existing relationship with WUNA: Money Order

**Existing Agent/Network #:** ____

☒ Domestic ☐ Global ☐ a specific region (region) ____ ☐ a specific country (country) ____

## AGENT BACKGROUND INFORMATION

**(Answer all questions)**

1. Has Agent (i.e., the sole proprietorship, partnership, or corporation) or any owner (other than a shareholder of a publicly-traded corporation), officer, director, compliance officer, or general partner of Agent ever been charged with or convicted of any misdemeanor and/or felony under state, federal or foreign law or are any of the above currently under investigation for any violation under state, federal or foreign law?
   ____ Yes ✓ No **(If yes, attach explanation.)**

2. Has Agent (i.e., the sole proprietorship, partnership, or corporation) or any owner, officer, director or general partner of Agent ever had a prior business relationship with Western Union Financial Services, Inc. or any of its affiliates?
   ____ Yes ✓ No **(If yes, attach explanation.)**

3. Has Agent or any owner ever been bankrupt, refused borrowing, or are there current outstanding liens or judgments or civil actions pending?
   ____ Yes ✓ No **(If yes, attach explanation.)**

4. Has Agent or any owner of Agent ever had a state-issued regulatory or business license suspended or revoked?
   ____ Yes ✓ No **(If yes, attach explanation.)**

5. Has any state or federal authority ever brought a regulatory enforcement action or is such an enforcement action currently pending against Agent, including enforcement actions related to violations of the Bank Secrecy Act or other anti-money laundering statutes?
   ____ Yes ✓ No **(If yes, attach an explanation detailing when, by which authority, the nature of the violation(s), and the disposition.)**

6. Has any money transfer company, bill payment company or issuer of payment instruments terminated its relationship with Agent? If so, which company and why?
   ____ Yes ✓ No **(If yes, attach explanation detailing which company and why.)**

7. Has any account of Agent at any bank been closed at the request of the bank in the last five years?
   ____ Yes ✓ No **(If yes, attach explanation detailing when and why.)**

8. Is Agent a money services business ("MSB") subject to registration (i.e., check casher, currency dealer or exchanger, seller, redeemer or issuer of money orders or travelers checks, a money transmitter or another financial institution subject to the Bank Secrecy Act)?

____ Yes __✓__ No **(If yes, include a copy of Agent's FinCEN registration or registration receipt with this Application.)**

If Yes, has Agent adopted and implemented an anti-money laundering compliance program?

____ Yes __✓__ No **(If yes, attach explanation with this Application for the Credit Department.)**

9. Does Agent accept, transmit, or pay-out funds for gaming purposes or to pay gaming related debt?

____ Yes __✓__ No **(If yes, attach explanation listing Agent's gaming licenses.)**

10. If Agent's business name or principal business address has changed in the last three (3) years, provide the previous three years' business name(s) and address(es).

______________________________________________________________

______________________________________________________________

______________________________________________________________

All statements contained in this application and in the financial statements and other documentation submitted in support of this application are true and correct. Permission and authorization is hereby granted to Western Union Financial Services, Inc., 7-Eleven, Inc., and its and their affiliates and representatives ( "WUNA" and "7-Eleven," respectively) as well as to prior employers, trade references, Dun & Bradstreet, banks, consumer credit services, consumer reporting agencies and state and federal government representatives, without regard to whether they are listed herein, to verify, receive, exchange, and obtain business and/or personal credit and other information including, without limitation criminal background checks, as part of this application or at any time thereafter in connection with the ongoing Agent evaluation process, review of Money Transfer and Money Order activity and/or collection of any obligation arising from the Money Transfer and Money Order business relationship, including any related guaranties or any services offered by WUNA. The undersigned further agree that neither WUNA, 7-Eleven nor anyone who has furnished WUNA and/or 7-Eleven any information concerning Agent or the undersigned owners and/or principals of Agent shall be responsible for any losses or damages Agent or the undersigned owners or principals of Agent may claim as resulting from said verification, receipt, exchange, or obtaining business and/or personal credit or other business and/or personal information. WUNA reserves the right in its sole and absolute discretion to reject Agent's application to become a WUNA Agent. Such rejection shall be without penalty of any type or kind to WUNA. Under penalty of perjury, the undersigned certify that: (i) the federal taxpayer identification number shown on this application as Agent's Federal Tax ID Number is the correct taxpayer identification number of Agent (or Agent is waiting for a number to be issued to Agent), and (ii) Agent is not subject to backup withholding because either Agent is exempt from backup withholding, or Agent has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of failure to report all interest or dividends, or the IRS has notified Agent that it is no longer subject to backup withholding.

**All owners and principals must sign (attach additional pages if necessary):**

Signature: [signature]
Print Name: Sung Hun Choe Date: 12-27-18
Home Street Address [redacted]
Carmel valley CA ~~93923~~ 93924
Home Phone Number: [redacted]
Social Security Number: [redacted]
Date of Birth: [redacted]
Marital Status: married
Percent of Ownership: ______ (Ownership must total 100%)

Signature: ______
Print Name: ______ Date: ______
Home Street Address: ______
Home Phone Number: ______
Social Security Number: ______
Date of Birth: ______
Marital Status: ______
Percent of Ownership: ______ (Ownership must total 100%)

Signature: ______
Print Name: ______ Date: ______
Home Street Address: ______
Home Phone Number: ______
Social Security Number: ______
Date of Birth: ______
Marital Status: ______
Percent of Ownership: ______ (Ownership must total 100%)

Signature: ______
Print Name: ______ Date: ______
Home Street Address: ______
Home Phone Number: ______
Social Security Number: ______
Date of Birth: ______
Marital Status: ______
Percent of Ownership: ______ (Ownership must total 100%)

**Prospective Agents must also sign in their legal capacity as an entity:**

Prospective Agent's Legal Name (not dba): Sung Hun Choe
Authorized Signature: [signature]
Print Name of Authorized Signatory: Sung Hun Choe Date 12-27-18
Business Street Address: 801 Broadway
King City, CA 93930-3303

**AGENT LOCATION(S), HOURS OF OPERATION**
**[MUST BE COMPLETED FOR EACH LOCATION]**

1. ☐ New Agent ☐ Add-On Agent ☐ Change of Ownership (Previous Agent # __________) ☐ Renewal (Existing Agent # ________)

Business Name: 7-Eleven # 2367 - 16981C

Address: 801 Broadway

City/State/Zip King City, CA 93930-3303

Contact Name: Sung Hun Choe

Telephone Number: (831) 385-5164 Fax Number:

Minimum Cash Payout for Money Transfers (encashment amount): N/A

| *Hours of Operation: | | | | |
|---|---|---|---|---|
| | Mon.: | 24 Hours | Fri.: | 24 Hours |
| | Tue.: | 24 Hours | Sat.: | 24 Hours |
| | Wed.: | 24 Hours | Sun.: | 24 Hours |
| | Thu.: | 24 Hours | Hol.: | 24 Hours |

2. ☐ New Agent ☐ Add-On Agent ☐ Change of Ownership (Previous Agent # __________) ☐ Renewal (Existing Agent # ________)

Business Name: ______________________________

Address: ______________________________

City/State/Zip ______________________________

Contact Name: ______________________________

Telephone Number: ______________ Fax Number: ______________

Minimum Cash Payout for Money Transfers (enchashment amount): __________

| *Hours of Operation: | | | | |
|---|---|---|---|---|
| | Mon.: | ________ | Fri.: | ________ |
| | Tue.: | ________ | Sat.: | ________ |
| | Wed.: | ________ | Sun.: | ________ |
| | Thu.: | ________ | Hol.: | ________ |

*If circumstances interfere with Agent's hours of operation at any location, Agent shall inform WUNA by telephone of the nature and expected duration of such interference and the temporary hours of operation at least five days in advance, circumstances permitting, or in any event as soon as reasonably practicable.

[Please use additional sheets if necessary

# Western Union Compliance Acknowledgement

Company Name (Full Legal Name):
7-Eleven # 2367 - 16981C

City / State or Province / Zip Code or Postal Code:
King City, CA 93930-3303

If you are accepted to be a Western Union Money Transfer and/or Money Order Agent for Western Union Financial Services, Inc. ("Western Union"), your company will be required to establish an Anti-Money Laundering Compliance Program. Your program must include the following elements:

1. Your company must appoint an employee as Compliance Officer to oversee your program.
   a. The Compliance Officer will be responsible to: (i) establish company wide policies and procedures, (ii) provide for employee compliance training, (iii) monitor compliance, (iv) provide for proper record keeping, (v) fulfill any other duties required by law or Western Union policy, (vi) and serve as the primary contact between the company and Western Union or the U.S. / State Government concerning compliance matters.
   b. In preparation for Western Union training and to begin with the establishment of a Compliance Program, please provide Compliance Officer information below:

**Compliance Officer Name:** Sung choe **Job Title:** Franchisee

**Address (Street, City, State/Zip):** [redacted]
CARMEL valley, CA 93924

**Phone:** [redacted] **Fax** ______

2. If your company has a chain of locations, then in addition to a company Compliance Officer, an employee must be designated at each site as On-site Compliance Delegate to assist the Compliance Officer in implementing your company's compliance program.
   a. The On-site Compliance Delegate will be the location contact for Western Union and U.S. / State Government concerning site-specific compliance matters.
   b. If you represent a chain you will be asked to provide specific On-Site Compliance Delegate information for each site.
3. Western Union will provide each location with compliance training and various compliance-related materials as resources for building a compliance program. After training, your company must document that a compliance program is in place to monitor, track, and ensure compliance with all governmental laws in your geography, including but not limited to the provisions of the USA PATRIOT Act of 2001, the Bank Secrecy Act and/or Western Union policy including the following:
   a. Filing of Currency Transaction Reports for any cash transaction or series of transactions by single consumer in a single day greater than $10,000.
   b. Identifying and reporting of transactions and/or a series of transactions by a single consumer in a single day that amount to $2,000 or more AND are suspicious.
   c. Insuring that proper identification and information is collected on same day money order sales of any individual totaling $3,000 or more (Money Order Log).
   d. Insuring that proper identification and information is recorded on same day money transfer sales to any individual totaling $3,000 or more.
   e. Meeting record retention requirements.
   f. Maintaining a plan to provide and document on-going employee compliance training.
4. After acceptance as a Western Union Agent and activation your company must agree to provide full cooperation with governmental audits or Western Union compliance program reviews.

You must agree to the information in this Western Union Compliance Acknowledgement as a precondition to your ability to be considered as a candidate to become a Western Union Agent. Western Union in its sole discretion reserves the right to reject and/or decline your application for any reason

Acknowledgement and Acceptance:

**(The person who executed the Agency Agreement must sign this document – any other signature will not be accepted)**

X ______________________________

Date: 12.27.18

**Print Name and Title:** Sung Hun Choe

## EXHIBIT D
## WUNA'S POLICIES AND PROCEDURES

**<u>Policies</u>. Western Union Financial Services, Inc. ("WUNA") issues Western Union Money Orders ("Money Order(s)"). These Policies and Procedures as modified, updated and amended by WUNA from time to time (collectively, the "Policies") apply to the sale of Money Orders and the holding of monies generated from the sale of Money Orders ("Trust Funds").**

<u>Agreement</u>. WUNA enters into written agreements with third parties (cach a, "Participant") pursuant to which a Participant may engage in the sale of Money Orders and the holding of Trust Funds. Each such written agreement is an "Agreement". Each Participant is an agent and trustee of WUNA for the limited purpose of being authorized to hold and sell Money Orders and Trust Funds in accordance with the Agreement and the Policies. Except as specifically permitted in the Agreement, no rights or obligations, including any payments due, may be assigned or delegated by operation of law or otherwise by Participant and any attempt to do so shall be ineffective and void.

1. <u>Independent Contractors</u>. The agency granted pursuant to these Policies is for the limited purpose of holding and selling Money Orders and collecting the Trust Funds (in an amount equal to the dollar amount imprinted on any Money Orders used and sold by Participant). IPSWUNA and Participant are independent contractors, except as expressly set forth to the contrary in these Policies.

2. <u>Trust</u>. Participant shall be a trustee for WUNA and act in a fiduciary capacity for the benefit of IPSWUNA with respect to any Money Orders and Trust Funds. Participant shall hold the Money Orders and Trust Funds in its or their possession in trust for the benefit of WUNA and shall maintain and account for the Trust Funds separate and apart from all other funds and monies. All actions taken by Participant with respect to the Trust Funds shall be in accordance with maintaining the character of a trust pursuant to applicable state and Federal law. Without limiting the generality of the foregoing, all cash in kind held by Participant and the balance in all bank and other accounts into which the Trust Funds may have been deposited and commingled with other funds, shall constitute Trust Funds to the extent of the amount of all Trust Funds deposited or contained therein after the date hereof and not paid over to WUNA. Participant shall not acquire by operation of these Policies, the Agreement or otherwise, any right, title or interest of any kind in the Money Orders or Trust Funds. All Money Orders and Trust Funds remain the sole and exclusive property of WUNA. Participant acknowledges and agrees that the imposition of the requirements contained in this <u>Paragraph 2</u> constitutes action (as such term is used in 11 U.S.C. § 541(b)(5)) taken by WUNA to require compliance with the commingling prohibition. It is expressly understood that Participant does not, by operation of these Policies, the Agreement or otherwise acquire any right, title or equitable interest in the Money Order or the Trust Funds.

3. <u>Remittance</u>. Participant shall sell the Money Orders and remit Trust Funds in accordance with the Agreement, these Policies and, if applicable, Participant's agreements with 7-Eleven, Inc ("7-Eleven").

4. <u>Process</u>. Participant shall comply with any and all Policies provided by IPSWUNA, as the

same may be amended or replaced from time to time, for the reporting, handling, safe keeping, record keeping, processing, sale and use of all Money Orders and Trust Funds. Participant agrees that WUNA may disclose to 7-Eleven from time to time information that WUNA deems reasonably necessary relating to the sale or use of Money Orders by Participant. In addition, within 24 hours after unsold Money Orders or Machines (as hereinafter defined) provided hereunder have been stolen due to an armed robbery or burglary, Participant shall: (a) notify WUNA of the loss and of the serial numbers of such Money Orders or Machines by telephoning the Customer Service Center, at (800-444-4670) (which notification shall be confirmed in writing via facsimile to (720 332-0280), each such telephonc number being subject to change upon notification to Participant by WUNA; and (b) report such armed robbery or burglary to the proper governmental authorities. In addition, Participant shall provide such cooperation as may be requested by such governmental authorities.

5. Compliance. Participant shall comply with all Federal, state and local laws, regulations, rules and ordinances applicable to the sale and use of Money Orders and the performance of its or their Agreements with WUNA. To the extent that the Agreement between WUNA and Participant contains more restrictive requirements than such statutes or regulations, such written agreements shall control.

6. Protection. Participant shall take such measures to safeguard and protect all unsold Money Orders and all Trust Funds as a prudent person would take to safeguard and protect a like amount of his or her own cash.

7. Payment. Participant shall accept only cash or debit cards in payment for Money Orders. Anything to the contrary notwithstanding, if Participant fails to strictly comply with the preceding sentence and accepts any other form of payment, then such acceptance shall be at its or their sole and exclusive risk. The consumer fee collected for any non-cash sale shall not exceed the consumer fee collected for cash Money Order sales. Unless otherwise agreed in writing by WUNA, the face value of each Money Order issued shall not exceed $500.

8. Machine(s). WUNA has or will furnish or cause to be furnished to Participant a device for storing and imprinting Money Orders and an associated input device (a "Machine") for Participant's use in connection with the sale and use of Money Orders. Participant shall only use the Machine to store and print Money Orders and for such other uses as WUNA or it's affiliates may specify in writing from time to time. Participant shall have and shall assume the exclusive care, custody, and control of the Machines. Participant shall ensure that each Machine is secure to the reasonable satisfaction of WUNA. Participant shall safeguard and use the Machines in a careful and proper manner and shall comply with and conform to all laws and regulations applicable to such Machines, Participant's business, and the sale of Money Orders. Participant shall not permit any abuse, deterioration, wreckage, dilapidation, or waste of any Machine. Participant shall operate the Machines in accordance with all applicable operating instructions and procedures provided by WUNA. Subject to these Policies and the applicable terms of the Agreement, Participant shall be entitled to possess, use and operate the Machine at any time during the term of the Agreement for such purposes and functions.

9. Bailment. These Policies and the Agreement creates a bailment solely for temporary possession and use of the Machine and no other right, title, or interest in or to the Machine shall hereby pass to Participant. Participant shall have no lien or charge upon, or ownership interest in, the Machine. Participant shall cooperate with WUNA and shall execute and deliver any further documents, instruments and certificates as WUNA may reasonably deem necessary or convenient to protect the title and interests of WUNA in the Machine. Participant shall keep the Machine free and clear from any and all claims, liens, and encumbrances, except claims, liens or encumbrances arising from acts or omissions of WUNA. Participant shall not remove any label affixed to any Machine that states that the Machine is owned by WUNA. In order to protect WUNA's trade secrets, except as permitted by applicable law, Participant shall not reverse engineer, decompile, copy, modify, create derivative works of, transfer, sell, publish or disclose the software contained in the Machines provided by WUNA.

10. LIMITATION OF LIABILITY. ANYTHING TO THE CONTRARY NOTWITHSTANDING: (a) WUNA'S CUMULATIVE AGGREGATE MONETARY LIABILITY SHALL BE LIMITED AS SPECIFIED IN THE AGREEMENT; AND (b) IN THE ABSENCE OF ANY LIMITATION ON WUNA'S LIABILITY IN THE AGREEMENT, WUNA'S CUMULATIVE AGGREGATE MONETARY LIABILITY SHALL BE LIMITED TO FIVE THOUSAND DOLLARS.

11. DISCLAIMER OF DAMAGES. IN NO EVENT SHALL WUNA, ITS AFFILIATES, OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR EXEMPLARY, PUNITIVE, SPECIAL, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER OR NOT WUNA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

12. Suspension/Termination. WUNA may immediately suspend and/or terminate Participant's right to sell Money Orders and to hold Trust Funds for: (a) Participant's failure to comply with any term or condition of the Agreement and/or the Policies; or (b) 7-Eleven's or a successor's failure to comply with that certain Western Union Agency Agreement by and between WUNA and 7-Eleven, dated as of April 22, 2011. WUNA may immediately terminate the Agreement and require Participant to return the Machines to WUNA if the Machines become subject to a claim that they infringe or violate the rights of a third party. In the event of termination for any cause, Participant shall immediately remit to WUNA or a person specified in the Agreement the Trust Funds received by Participant from the sale or use of Money Orders. Participant shall also return all unsold and unused Money Orders and any equipment (including the Machine), display material or other property furnished to Participant with respect thereto. WUNA reserves its right to take possession from Participant of any unsold Money Orders and Trust Funds. All such Trust Funds and Money Orders shall, until remitted to a person specified in the Agreement or WUNA, continue to be held in trust by Participant for WUNA.

# Exhibit E
# State Regulations

**ARKANSAS, CALIFORNIA, HAWAII, IDAHO, INDIANA, KENTUCKY, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW YORK, NORTH CAROLINA, NORTH DAKOTA, OREGON, TENNESSEE, TEXAS, WYOMING**

Agent is under a duty to act only as authorized under this Agreement. Agent and WUNA are subject to supervision, regulation and disciplinary action, including but not limited to termination of the Agreement, by or at the direction of the Director (as defined below). Agent hereby consents to the Director's inspection of the books and records of Agent, with or without prior written notice to WUNA or Agent. As used in this Section 15, "Director" means the following for each of the states listed below:

Arkansas – Arkansas Securities Commissioner
California – Commissioner of Financial Institutions
Idaho – Director of the Idaho Department of Finance
Hawaii – Hawaii Commissioner of Financial Institutions
Indiana – Director of Indiana Department of Financial Institutions
Kentucky – Executive Director of the Kentucky Office of Financial Institutions
Maine – Director of Office of Consumer Credit Regulation within the Department of Professional and Financial Regulation
Maryland – Bank Commissioner of the Department of Licensing and Regulation
Michigan – Commissioner of the Office of Financial and Insurance Services
Minnesota – Commissioner of Commerce
New York – Superintendent of Banking of the State of New York
North Carolina – Commissioner of Banks of the State of North Carolina
North Dakota – Commissioner of the Department of Financial Institutions
Oregon – Director of the Department of Consumer and Business Services
Tennessee – Tennessee Commissioner of Financial Institutions
Texas – Texas Commissioner of Banking
Wyoming – State Banking Commissioner

**ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, IDAHO, ILLINOIS, INDIANA, IOWA, KENTUCKY, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, VERMONT, WASHINGTON, TEXAS**

Agent will perform all Services in compliance with the Act (as defined below) and any rules, regulations or orders issued thereunder, as amended from time to time. As used in this Section 15, "the Act" means the following for each of the states listed below:

Alaska – Alaska Uniform Money Services Act, Chapter 55 of Title 6 of the Alaska Statutes
Arkansas – Arkansas Uniform Money Services Act, Arkansas Code, Title 23, Chapter 55
California – Division 16 of the California Payment Instruments Law, including but not limited to Article 2 and Article 3 of Chapter 6 thereof, and all applicable provisions of Chapter 14 of the California Financial Code relating to the Transmission of Money Abroad
District of Columbia – Money Transmissions Law, Chapter 10 of Title 26 of the District of Columbia Code
Idaho – Chapter 29 of Title 26 of the Idaho Code
Illinois – the laws of the State of Illinois and the United States, including without limitation, Illinois Transmitters of Money Act, 205 Illinois Compiled Statutes Section 657
Indiana – Indiana Code Section 28-8-4-1 through Section 28-8-4-53
Iowa – Iowa Uniform Money Services Act, Chapter 533C of the Iowa Code
Kentucky – Kentucky Revised Statutes Chapter 286
Maryland – Maryland Money Transmission Act, Md. Code Ann., Fin. Inst. Sections 12-401 to 12-431
Michigan – Michigan Money Transmission Services Act, Act 250 of 2006, Michigan Compiled Laws Section 487
Minnesota – Minnesota Statutes Annotated Chapter 53B.21
New Jersey – New Jersey Money Transmitters Act, New Jersey Statutes, Title 17, Chapter 15C
Vermont – Chapter 79, Title 8 of the Vermont Statutes
Washington – Washington Uniform Money Services Act, Revised Code of Washington, Title 19, Chapter 19.230
Texas – All applicable state and federal laws rules and regulations pertaining to money transmission, including Chapter 151 of the Texas Finance Code, relevant provisions of the Bank Secrecy Act and USA PATRIOT Act, and Chapter 271 of the Texas Finance Code, and regulations of the State of Texas, including, but not limited to, the posting of the following notice to consumers as required under Title 7, Section 33.51(d)(1) of the Texas Administrative Code:

"Complaints concerning money transmission activities of Company should be directed to:

For **Money Transfer Complaints:**
Western Union Financial Services, Inc.
P.O. Box 4430, Bridgeton, Missouri 63044
For Customer Service, please call:
1-800-325-6000

For **Money Order Complaints:**
Western Union Financial Services, Inc.
P.O. Box 7030, Englewood, Colorado 80155-7030
For Customer Services, please call: 1-800-999-9660

If, after contacting Company, you still have an unresolved complaint regarding the company's money transmission activity, then please direct your complaint to:

Texas Department of Banking
2601 North Lamar Boulevard
Austin, Texas 78705
1-877-276-5554 (toll free)
www.banking.state.tx.us"

**CALIFORNIA**
Agent shall make and keep accounts, correspondence, memoranda, papers, books and other records which the California Commissioner of Financial Institutions by regulation or order requires, and Agent shall preserve such records for the time specified by such regulation or order. This Agreement is conditioned on Agent receiving approval from the State of California to operate as a money transfer agent in that state and shall not take effect unless and until such approval is received. In the event such approval is denied, this Agreement shall be null and void. In the event such approval is subsequently revoked, WUNA shall have the right to terminate this Agreement upon five days' written notice, any other provision of this Agreement notwithstanding.

**HAWAII**
Agent hereby certifies that it is in compliance, and shall comply, with the recordkeeping and reporting requirements under Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering.

**KENTUCKY**
Pursuant to the laws of the State of Kentucky, WUNA hereby provides Agent with the following information: WUNA is required to comply with applicable federal and state law.

**MAINE**
Agent is prohibited from providing the Services to anyone under the age of 18 years.

**MICHIGAN**
In the event WUNA's license is suspended or revoked, the Commissioner shall notify WUNA and order WUNA to send a notice to its Agents directing them to cease providing money transmission services on behalf of WUNA, and the Agents shall immediately cease providing money transmission services as an Agent of WUNA. Agent shall not make any fraudulent or false statement or misrepresentation to a consumer or WUNA or to the Commissioner.

**NEW YORK**
Agent is prohibited from acting on behalf of the consumer as a courier for the transmission of money, and no Money Order sold may be retained by Agent or any subagent of WUNA. All Money Orders sold must be given by the Agent and any subagent of WUNA to the purchasers of the instruments for their own delivery to the beneficiary. Agent shall not sell any Money Order or money transmission instruments in New York State pursuant to this Agreement unless the name "Western Union Financial Services, Inc." clearly appears on the face of the instrument.

**NORTH CAROLINA**
WUNA shall issue a certificate of authority for each WUNA Service offered at each location at which it conducts licensed activities in North Carolina through authorized delegates such as Agent. The certificate(s) shall be posted in public view at each location of Agent in North Carolina and shall state as follows: "Money transmission on behalf of Western Union Financial

Services, Inc. is conducted at this location pursuant to the Money Transmitters Act."

**TEXAS**

Agent hereby certifies that it is familiar with and agrees to fully comply with all applicable state and federal laws, rules, and regulations pertaining to money transmission, including Chapter 151 of the Texas Finance Code and rules adopted thereunder, relevant provisions of the Bank Secrecy Act and the USA PATRIOT Act, and Chapter 271 of the Texas Finance Code. Agent agrees to prepare and maintain all records as required by Chapter 151 of the Texas Finance Code or any rule adopted thereunder or as reasonably requested by the Texas Commissioner of Banking. Agent acknowledges that Company, as a license holder under Chapter 151 of the Texas Finance Code, is subject to regulation by the Texas Commissioner of Banking and that, as part of that regulation, the Commissioner may suspend or revoke an authorized delegate designation or require Company to terminate an authorized delegate designation. Agent acknowledges receipt of the WUNA written policies and procedures applicable to Agent's compliance with applicable state and federal laws. Agent acknowledges that it has been provided the website address through which Agent can access Chapter 151 of the Texas Finance Code and rules adopted pursuant to said chapter (www.banking.state.tx.us) and the Bank Secrecy Act and the USA PATRIOT Act (www.msb.gov and www.fincen.gov), and Chapter 271 of the Texas Finance Code (www.banking.state.tx.us).

# CREDIT CARD AMENDMENT

THIS CREDIT CARD AMENDMENT (the "Amendment") is signed by the undersigned Franchisee(s) ("you" and "your") and 7-Eleven, Inc. ("we", "us", and "our") as of the date stated in the last paragraph of this Agreement.

## BACKGROUND INFORMATION

A. You and we signed a 7-Eleven Franchise Agreement (the "Franchise Amendment"), covering 7 Eleven Store No. 2367 - 16981C (the "Store");

B. We have arranged with credit card processing companies to make credit card charge services available to us ("Arrangement");

C. Under the Arrangement, we are able to make credit card charge services available to you; and

D. You and we will amend the Franchise Agreement to permit you to transact business with customers of the Store who desire to make purchases with Visa, MasterCard or Discover, American Express or other similar payment cards such as debit cards, fleet cards, proprietary cards (the Visa, the MasterCard, the Discover, the American Express or other similar payment cards referred to collectively in this Card Amendment as the "Credit Cards" and are sometimes referred to individually in this Card Amendment as the "Credit Card").

The parties agree as follows:

1. This Amendment supersedes and replaces all other agreements, if any, between you and us relating to the acceptance of Credit Cards at the 7 Eleven Store.

2. By accepting the Credit Cards under this Amendment, you agree to comply with the terms and conditions of the Credit Card Guide and Regulations which may be amended from time to time (the "Credit Card Guide and Regulations"), to the extent such terms and conditions apply to you, this Amendment, the Franchise Agreement and all procedures we establish from time to time. We will give you the most recent copy of the Credit Card Guide and Regulations. If any term(s) or condition(s) of the Credit Card Guide and Regulations at any time conflicts with any term(s) or condition(s) of this Card Amendment, the Franchise Agreement or any procedures we establish, the term(s) or condition(s) of this Amendment, the Franchise Agreement and the procedures we established will control. If there is any conflict between this Amendment and the procedures we establish, this Amendment will control. If there is any conflict between this Amendment or the procedures we establish and the Franchise Agreement, the Franchise Agreement will control.

3. You agree to accept the Credit Cards for the retail purchase of merchandise (excluding gasoline, except as provided in this Amendment) and services by customers using the Credit Cards (the "Cardholders").

4. If you sell Consigned Gasoline (as defined in the Consigned Gasoline Amendment between you and us) at the Store, we authorize you to, and you agree to, accept the Credit Cards for the retail purchase of Consigned Gasoline. Notwithstanding anything in this Amendment to the contrary, we may terminate your ability to accept Credit Cards for purchases of Consigned Gasoline at any time by giving you written notice of such termination.

5. The word "gasoline" is used in this Amendment, as in the Franchise Agreement, to mean all types of motor fuels that we, in our sole discretion, may decide to offer for sale from the Gasoline Sales Area (defined in this Card Amendment as in the Franchise Agreement), including, but not limited to, gasoline, blends of gasoline and alcohol, and diesel fuel.

6. You agree to:

(i) accept the Credit Cards for all lawful and appropriate sales of Credit Card authorized merchandise and services in the Store that customers desire to make;

(ii) accept the Credit Cards for only lawful and appropriate sales of Credit Card authorized Consigned Gasoline (if Consigned Gasoline is sold at the Store);

(iii) attempt to resolve disputes with the Cardholders regarding the use of the Credit Cards, to the extent proper and necessary;

(iv) not impose a minimum sales dollar amount on Credit Card sales.

(v) indemnify us from all claims or losses arising out of your failure to comply with this Agreement;

(vi) properly complete and submit all copies of manually prepared Credit Card sales slips (the "Manual Sales Slips") as required, including, but not limited to, the merchant copy, with the Cash Report; and

(vii) assign to us the Manual Sales Slips.

7. You must retain appropriate copies of all Manual Sales Slips (which will constitute "Receipts," as defined in the Franchise Agreement) from customer purchases made using the Credit Cards and attach them to your Cash Report, and otherwise handle and account for them as required by the Daily Cash Report Procedures for Store Operations we establish and amend in our sole discretion. There is no requirement to maintain copies of sales receipts of electronically processed transactions where no Manual Sales Slip is required.

8. You agree to pay us a fee (the "Credit Card Fee") for each Credit Card authorized sale of merchandise and services processed under this Amendment, unless otherwise specified in this Amendment. The Credit Card Fee will be the amount stated in Exhibit A of this Amendment. We have agreed to share the Credit Card Fee based on your 7-Eleven Charge, so you will actually pay to us a Credit Card Fee each Accounting Period according to the following mathematical equation:

| | | | | |
|---|---|---|---|---|
| Credit Card Fee Actually Paid by You | = | Credit Card Fee | X | (100% - the 7-Eleven Charge under the Franchise Agreement) |

At the end of each Accounting Period, we will charge the Credit Card Fee to your Credit Card Expense Account (or another appropriate account) that we maintain for you under the Franchise Agreement, all in accordance with the 7-Eleven System. The Credit Card Fee may include transactions fees, interchange fees, monthly association assessments, or other costs we incur in processing credit card transactions. We may change the Credit Card Fee or any of its components at any time in our sole discretion by giving you 30 days prior written notice.

9. In addition to the Credit Card Fee, you agree to pay to us a fee (the "System Fee") each Accounting Period to activate your access to the Network and for using the Credit Card Equipment. We have agreed to share the System Fee in the same manner that we share the Credit Card Fee. We will charge the System Fee during each applicable Accounting Period to your Credit Card Expense Account (or another appropriate account) in the Open Account. We may change the System Fee at any time in our sole discretion by giving you 30 days written notice. We are currently not charging this System Fee to any franchisee. We will notify you if we intend to resume charging these fees and the amount of such fees. We may change the System Fee or any of its components at any time in our sole discretion by giving you 30 days prior written notice.

10. We may change the Credit Cards at any time in our sole discretion by giving you 30 days written notice. You agree to accept all types of Credit Cards we provide as they may be changed from time to time.

11. You will not be required to pay any additional Credit Card Fee under this Card Amendment for any reconciliation and/or summary reports (monthly statements relative to the 7-Eleven Store and Credit Card activity there) that may be provided pursuant to the Arrangement, for any warning bulletins regarding invalid Credit Card numbers that may be provided pursuant to the Arrangement, for use of the toll free telephone number for authorizations for purchases where the amount is above the Authorization Amount (as defined in Section 12 of this Card Amendment), or for expenses related to charge/credit supplies.

12. You agree to be, and will be, charged back by charge to the Open Account for any Credit Card purchases that are not properly accepted, processed, handled, authorized and if applicable, supported by legible Manual Sales Slips, all in accordance with this Card Amendment, and for which the issuer of the card charges back pursuant to the Arrangement.

13. We may install, or cause to be installed, equipment relating to the acceptance of the Credit Cards (the "Credit Card Equipment"), on and across the property leased to you under the Franchise Agreement and in the 7-Eleven Store in any areas we consider appropriate in our sole discretion. We, from time to time and in our sole discretion, may replace, delete or add to the Credit Card Equipment. We, from time to time, may utilize any additional areas in our sole discretion that are necessary to install, maintain, repair and operate the Credit Card Equipment. You agree to cooperate fully with us in obtaining all consents that may be required to install, maintain, repair or operate the Credit Card Equipment. We may prepare a list of the Credit Card Equipment periodically to be dated and initialed by the parties for verification.

14. You agree to properly safeguard the Credit Card Equipment until the Credit Card Equipment is returned to us.

15. You agree to operate the Credit Card Equipment as a service incidental to the business of the 7-Eleven Store.

16. We will be responsible, at our expense, for all utilities used at the Store in connection with the Credit Card Equipment and all taxes relating to the Credit Card Equipment. If any of the Credit Card Equipment malfunctions or fails to provide the information provided under the System, you must immediately contact our local market office.

17. This Amendment will remain in full force and effect, and its term will be, until the earlier of: (i) the expiration or termination of the Franchise Agreement for any reason, (ii) the expiration or termination of this Amendment, (iii) the expiration or termination of the Arrangement unless we arrange for an alternative arrangement and elect to continue this Amendment, or (iv) 30 days prior written notification of termination by us for any reason, unless sooner terminated as provided below. If we determine that you or your agents, representatives or employees fail to abide by the Credit Card Rules and Regulations or any rules or guidelines we establish, or otherwise fail to comply with the requirements of this Amendment, we will have the right, at any time, to terminate this Amendment upon written notice to you.

Upon expiration or termination of the Amendment, the Credit Card Fee and System Fee will be prorated to the effective date of termination. In addition, we or any of our agents, representatives or employees may enter the Store during operating hours to remove any Credit Card Equipment. Additionally, you agree, upon request, to turn over immediately to us (i) all unprocessed charge slips, (ii) any of the Credit Card Equipment not removed by us, (iii) all material provided to you pursuant to this Amendment, and (iv) for processing, all Manual Sales Slips that have been used for purchases, and you must cease accepting the Credit Cards.

18. If you include a reference to the acceptance of any specific credit cards at the Store in any advertising for the Store, such advertising must include a reference to each of the credit cards that are accepted at the Store.

19. The Franchise Agreement, as amended or supplemented by this Amendment, will remain in full force and effect.

20. This Amendment and the writings and documents incorporated into this Amendment by reference comprise the entire agreement between the parties regarding Credit Card transactions. No representation or statement regarding Credit Card transactions not expressly contained in this Amendment or incorporated into this Amendment by reference will be binding upon you or us as a warranty or otherwise. This Amendment may be amended or supplemented only by a writing executed by duly authorized representatives of the parties.

The words or terms used in this Amendment will have the meanings set forth in the Franchise Agreement unless otherwise defined in this Amendment, in which case the words or terms will have the meanings set forth in this Amendment.

You and we have signed this Amendment effective as of the last date set forth below.

FRANCHISEE

By ______ By ______

Sung Hun Choe

Date 12-27, 18 Date ______

By ______ By ______

Date ______ Date ______

7-ELEVEN, INC.

By ______

Arron B. Yount

Date 12/31/18

EXHIBIT A
CREDIT CARD AMENDMENT
CREDIT CARD FEE CALCULATION

The Credit Card Fee for each card type (Visa, MasterCard, American Express, Discover, WEX, Voyager or Debit cards) will be calculated separately each month, using the following method:

Credit Card Fee for each month (by card type) = (Credit Card Fee Percentage x monthly merchandise credit card sales) + (Fixed Fee x the number of applicable monthly transactions)

<u>EXAMPLE OF CREDIT CARD FEE CALCULATION</u>

Credit Card Fee Percentage Calculation

All merchandise-related credit card fees for the quarter are totaled for all 7-Eleven stores and labeled 'Quarterly Credit Card Fees'.

All merchandise related credit card sales minus returns for the quarter are totaled for all 7-Eleven stores and labeled 'Quarterly Total Sales'.

Fixed Fees = Fixed Fee rate x transaction count for the quarter

Credit Card Fee Percentage (by card type) = (Quarterly Credit Card Fees – Fixed Fees) divided by Quarterly Total Sales

Credit Card Fee example for MasterCard

Applicable credit card fees for the quarter (all stores) = $3.79 million

Merchandise credit card sales minus returns for the quarter (all stores) = $161.6 million

MasterCard merchandise transactions = 10.79 million

Fixed Fee Rate = $0.10 per transaction

Fixed Fees = $0.10 x 10.79 million transactions = $1.08 million

Credit Card Fee Percentage = ($3.79 million - $1.08 million) divided by $161.6 million = 1.67%
(Percentage will be rounded to the nearest .01%)

Overall Rate = 1.67% + $0.10 per transaction

Credit Card Fee Calculation

The actual Credit Card Fee is calculated for each individual card transaction.

Sales amount = $12.00
Transaction count = 1

Credit Card Fee = (1.67% x $12.00) + ($0.10 x 1) = $0.30

This calculation is applied to each transaction for each card type and the combined total is multiplied by (100% - the 7-Eleven Charge under the franchise agreement) to arrive at your total monthly Credit Card Fee.

We may change the way we calculate the Credit Card Fee Percentages or the Fixed Fee amount at any time, and such changes will be effective 30 days after written notice to you.

SECURITY SYSTEM AND MONITORING AMENDMENT

7-Eleven, Inc. ("SEI") has contracted with Tyco Integrated Security LLC ("Tyco") to provide electronic security equipment (the "Equipment") to your franchised 7-Eleven Store No. 2367 - 16981C (the "Store"). Such equipment is "7-Eleven Equipment" under the terms of your franchise agreement (the "Franchise Agreement"). This "Security System and Monitoring Amendment" ("Amendment") to your Franchise Agreement sets forth terms and conditions with respect to the Equipment.

TERMS AND CONDITIONS

1. Term of Amendment. This Amendment, which is being presented to all U.S.-based Franchisees of the 7-Eleven franchise system, supersedes and replaces all prior versions of the Security System and Monitoring Amendment and will terminate only upon the termination or expiration of the Franchise Agreement. SEI may, at its sole election, enter into a new agreement with a third-party security system provider. In the event of a change in provider, this Amendment will remain in effect until such time as it terminates or expires in accordance with the first sentence of this paragraph. This Amendment may also be renewed or extended in SEI's sole discretion.

2. Monitoring Charges. You agree to pay a monthly "Monitoring Service Charge" of $10.00. SEI will charge the amount to your Open Account in accordance with the terms of the Agreement. The Monitoring Service Charge amount may change from time to time.

3. Maintenance Charges. You agree to pay the current monthly "Maintenance Charge" based on the CCTV system in your store. Stores with ClickIt DVRs agree to pay $25.00 monthly. Stores with Digiop DVRs agree to pay $35.00 monthly. SEI will charge the amount to your Open Account in accordance with the terms of the Agreement. The Maintenance Charge amount may change from time to time.

4. Franchisee Obligations. You agree to:

(a) promptly notify SEI upon detecting any defects in the Equipment.

(b) not damage, interfere with, or impair in any way the operation of the Equipment.

(c) cooperate fully with SEI to obtain any consents or waivers from all persons or entities having an interest in the Store to install, maintain and operate the Equipment.

(d) not remove, disable or disconnect the Equipment or any of its functions in any way without SEI's prior written approval.

(e) allow SEI or Tyco (or Tyco's designee) to install the Equipment in your Store at a location designated by SEI and allow any changes in merchandise or equipment layout necessary to install the Equipment and allow access to the Equipment for its maintenance and operation.

(f) provide SEI physical on-site access to the Equipment at any time and for any period of time during the times in which the Store is required to be open, consistent with and in accordance with your obligations with respect to all 7-Eleven Equipment under the Agreement.

(g) cooperate with SEI and with any law enforcement authorities or investigators regarding any robbery or other criminal incident, or potential robbery or other criminal incident.

5. SEI's Access and Use of Equipment

(a) As used herein, the phrase "remote recording" refers to all historical images sourced from the Equipment other than images being viewed in real time. SEI will view and use remote recordings, if any, of Store activities solely for (1) training purposes; and (2) investigations of (i) potential criminal or fraudulent activities (e.g. robberies, burglaries, theft, misappropriation); or (ii) personal injuries or other safety-related incidents. If SEI seeks to use a remote recording for training purposes, SEI shall, first, obtain your prior, written approval.

(b) As used herein, the phrase "live, remote-access viewing" refers to all images sourced from the Equipment in real time, but does not include the "live view" that is unavoidably visible for approximately 30 seconds whenever a SEI employee logs into the system to request historical remote recordings pursuant to Paragraph 5(a). SEI will not use the Equipment for live, remote-access viewing of Store activities except (1) for training purposes; and (2) to assist law enforcement in responding to criminal activities (e.g. a homicide that has just occurred in or near the store). If SEI seeks to use the live, remote-access viewing features of the Equipment for training purposes, SEI shall, first, obtain your prior, written approval.

6. Franchisee's Access and Use of Equipment. SEI will, to the extent technically feasible with the Equipment installed in the Store either presently or in the future, provide you, the Store manager, and a single additional designee of yours with the ability to conduct remote-access viewing of remote recordings of historical recordings of Store activities, to the extent that SEI has retained possession of the requested recording(s) as of the date of your request. (Note that SEI purges its remote recordings at regular intervals.) At present, you will be able to access remote recordings via your personal computer typically within five minutes of the time the Store's activities have been recorded.

7. SEI Investigations.

(a) If, in the course of an investigation into potential fraud, theft, or other criminal activity occurring at the Store, SEI determines that you had no knowledge of or involvement in or such activities, SEI will inform you, in writing, about said activities and of SEI's determination that you had no knowledge of or involvement in or such activities, within 14 days of such determination.

(b) If SEI determines that you had no knowledge of or involvement in any losses arising from activities that are subject to an investigation in which SEI has used remote recordings or live, remote-access viewing, SEI will not seek reimbursement from you to the extent that such losses arose (1) after SEI initiated the investigation; or (2) more than nine months before SEI initiated the investigation.

8. Compliance with Law. SEI agrees to comply with all federal, state, and local laws and regulations applicable to live, remote-access viewing and/or remote recording and viewing of Store activities. SEI agrees that any live and/or remote recording obtained by SEI other than in accordance with the terms of this Agreement and applicable federal, state, and local laws, shall not be used against you for purposes of asserting claims against you or issuing notice(s) of default and/or breach to you.

9. Governmental Fines or Penalties. You agree that any governmental fine or penalty imposed upon the Store due to false alarms in connection with the Equipment, or misuse of the System, will be your sole responsibility.

10. Franchisee's Release. You, by and through and your authorized representative(s), for yourself and your successors and assigns, do hereby agree that all claims, demands, rights, duties, guarantees, obligations, debits, dues, sums of money, accounts, covenants, contracts, controversies, agreements, promises, torts, judgments, executions, liabilities, damages, injunctions, assignments, suits or causes of action (collectively, the "claims") in any

way related to the Equipment, including but not limited to any privacy-related claims, claims that 7-Eleven must obtain consent prior to viewing recorded video footage, and claims relating to any charges for the Equipment and any monitoring and maintenance thereof, however, or wherever arising, whether known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual, liquidated or unliquidated, which have arisen or which might or could arise under federal, state, or local law, existing or arising at any time before or at the time of your execution of this Amendment, are hereby satisfied, acquitted, discharged, and released by you, it being your express intention that this release be as broad as permitted by law.

11. Waiver of Section 1542. The release set forth in Paragraph 10 of this Amendment expressly and specifically extends to any and all claims, whether or not known, claimed, or suspected by the person giving the release. You represent and agree that you individually have read and fully understand California Civil Code § 1542, which provides the following:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOW BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Understanding the language of California Civil Code § 1542 and being fully apprised of the legal import thereof, you nonetheless expressly and specifically waive any and all rights and benefits conferred on you by California Civil Code § 1542 and by any other similar law of any jurisdiction.

You and SEI have signed this Amendment as of the last date set forth below.

FRANCHISEE

By ______________________

Sung Hun Choe

Date 12-27-18

By ______________________

______________________

Date ______________________

By ______________________

______________________

Date ______________________

By ______________________

______________________

Date ______________________

7-ELEVEN, INC.

By ______________________

Arron B. Yount

Date 12/31/18

MAR[illegible]T/STORE # 2367 - 16981C

# 7-ELEVEN CLEANING CHEMICAL SYSTEM AMENDMENT

Franchisee(s) ("you" or "your") have discussed the advantages of the 7-Eleven Cleaning Chemical System with 7-Eleven, Inc. ("we" or "our"), and we have agreed to install the necessary 7-Eleven equipment (the "Equipment") in your store. You acknowledge that the Equipment will operate properly only with compatible 7-Eleven chemicals. You have agreed to use only approved chemicals with the 7-Eleven Equipment, in consideration for our installation of the Equipment.

Please sign below to indicate your agreement to use the Equipment and to use only 7-Eleven approved chemicals with the Equipment.

You acknowledge the advantages of the Equipment and agree to use the Equipment for its intended sanitation purposes and to use only 7-Eleven approved chemicals with the Equipment. We have agreed to install the 7-Eleven Equipment at our sole expense in consideration for this agreement.

You and we have signed this Amendment as of the last date set forth below.

FRANCHISEE

By [signature] | By

Sung Hun Choe

Date 12-27-18 | Date

By | By

Date | Date

7-ELEVEN, INC.

By [signature]

Arron B. Yount

Date 12/31/18

# RELEASE OF INFORMATION

I am the current 7-Eleven Franchisee for Store 2367 - 16981C located at 801 Broadway, King City, CA 93930-3303 (the "Store"). With the execution of this Release, I hereby authorize and direct you to release to 7-Eleven, Inc. ("7-Eleven") at Ops Support Admin., 3200 Hackberry Rd, Irving, TX 75063-0131, a copy of any agreements between your company/agency and myself and all financial information and other information connected with the Store including, but not limited to, all purchase-related financial information and related documentation, all commission revenue and related documentation, and all allowance, premium or bonus revenue information and related documentation that may be requested by 7-Eleven. Further, I hereby authorize 7-Eleven to contact you directly on my behalf, for the purpose of immediately obtaining from you any information pertaining to the Store. This Release shall be effective immediately and is intended to be as broad as possible.

FRANCHISEE

By ____________________

Sung Hun Choe

Date 12.27.18

By ____________________

Date ____________________

By ____________________

Date ____________________

By ____________________

Date ____________________

7-ELEVEN, INC.

By ____________________

Arron B. Yount

Date 12/31/18

Form 4400854 1/04 Uniform
Release of Vendor

# MICROSOFT AMENDMENT

The undersigned franchisee ("you" or "your") acknowledges that MSLI, GP ("Microsoft") and 7-Eleven, Inc. ("we", "us" or "our") have entered into Microsoft Select Enrollment (the "agreement"), under which you desire to run certain Microsoft products installed in computers owned by us and provided to you by us under lease. As used in this Participation Agreement, the term to "run" a product means to use, access, display, run or otherwise interact with it. You acknowledge that your right to run a copy of any version of any product licensed to us under the agreement is governed by the applicable product use rights for the product and version licensed to customer as of the date you first run that copy. Such product use rights will be made available to you by us, or by publication at a designated site on the World Wide Web, or by some other means. Microsoft does not transfer any ownership rights in any licensed product and it reserves all rights not expressly granted.

I. Acknowledgment and Agreement. You acknowledge that you have received a copy of the product use rights applicable to the products acquired under the above-referenced agreement; you have read and understood the terms and conditions as they relate to your obligations; and you agree to be bound by such terms and conditions, as well as to the following provisions:

a. Restrictions on use. You may not:

- Make copies of a product yourself, but must instead have such copies made for you by the customer or their representative;
- Separate the components of a product made up of multiple components by running them on different computers, by upgrading or downgrading them at different times, or by transferring them separately, except as otherwise provided in the product use rights;
- Rent, lease, lend or host products without the express written consent of Microsoft;
- Reverse engineer, de-compile or disassemble products, except to the extent expressly permitted by applicable law despite this limitation;
- Transfer licenses to, or sublicense, products to the U.S. Government.

You acknowledge that products licensed to us under the agreement are of U.S. origin. You agree to comply with all applicable international and national laws that apply to these products, including the U.S. Export Administration Regulations, as well as end-user, end-use and country destination restrictions issued by U.S. and other governments. For additional information on exporting Microsoft products, see http://www.microsoft.com/exporting/.

b. Limited product warranty. Microsoft warrants that each version of a commercial product will perform substantially in accordance with its user documentation. This warranty is valid for a period of 90 days from the date you first run a copy of the version. Any warranties imposed by law concerning the products are limited to the same 90-day period. This warranty does not apply to components of products which you are permitted to redistribute under applicable product use rights, or if failure of the product has resulted from accident, abuse or misapplication. If you notify Microsoft within the warranty period that a product does not meet this warranty, then Microsoft will, at its option, either (i) return the price paid for the product or (ii) repair or replace the product. This is your exclusive remedy for any failure of any commercial product to function as described in this paragraph.

c. Free and beta products. Free and beta products, if any, are provided "as-is," without any warranties.

d. NO OTHER WARRANTIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, MICROSOFT DISCLAIMS ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED OR STATUTORY, OTHER THAN THOSE IDENTIFIED EXPRESSLY IN THIS SECTION, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE PRODUCTS AND RELATED MATERIALS.

e. Limitation of liability. There may be situations in which you have a right to claim damages or payment from Microsoft. Except as otherwise specifically provided in this paragraph, whatever the legal basis for your claim, Microsoft's liability will be limited, to the maximum extent permitted by applicable law, to direct damages up to the amount you have paid for the product giving rise to the claim. In the case of free product, or code you are authorized to redistribute to third parties without separate payment to Microsoft, Microsoft's total liability to you will not exceed U.S. $5,000, or its equivalent in local currency.

f. No liability for certain damages. To the maximum extent permitted by applicable law, neither you, your affiliates or suppliers, nor Microsoft, its affiliates or suppliers will be liable for any indirect damages (including, without limitation, consequential, special or incidental damages, damages for loss of profits or revenues, business interruption, or loss of business information) arising in connection with any agreement, product or service, even if advised of the possibility of such damages or if such possibility was reasonably foreseeable.

g. Application. The limitations on and exclusions of liability for damages set forth in this Participation Agreement apply regardless of whether the liability is based on breach of contract, tort (including negligence), strict liability, breach of warranties, or any other legal theory.

h. Verifying compliance. You must keep records relating to the products you run. Microsoft has the right to verify compliance with these terms and any applicable product use rights, at its expense, during the term of the agreement and for a period of one year after the agreement. To do so, Microsoft will engage an independent accountant from a nationally recognized public accounting firm, which will be subject to a confidentiality obligation. Verification will take place upon not fewer than 15 days notice, during normal business hours and in a manner that does not interfere unreasonably with your operations. As an alternative, Microsoft may require you to accurately complete its self-audit questionnaire relating to the products you use. If verification or self-audit reveals unlicensed use of products, you must promptly order sufficient licenses to permit all product usage disclosed. If material unlicensed use is found (license shortage of 5% or more), you must reimburse Microsoft for the costs it has incurred in verification and acquire the necessary additional licenses as single retail licenses within 30 days. If Microsoft undertakes such verification and does not find material unlicensed use of products, it will not undertake another such verification for at least one year. Microsoft and its auditors will use the information obtained in compliance verification only to enforce its rights and to determine whether you are in compliance with these terms and the product use rights. By invoking the rights and procedures described above, Microsoft does not waive its rights to enforce these terms or the product use rights, or to protect its intellectual property by any other means permitted by law.

Your violation of the above-referenced terms and conditions will be deemed to be a breach of this Participation Agreement and will be grounds for immediate termination of all rights granted under this Participation Agreement.

You and we have signed this Amendment as of the last date set forth below.

FRANCHISEE

_______________________

By _______________________

Sung Hun Choe

Date 12-27-18

By _______________________

_______________________

Date _______________________

By _______________________

_______________________

Date _______________________

By _______________________

_______________________

Date _______________________

7-ELEVEN, INC.

By _______________________

Arron B. Yount

Date 12/31/18

MARKET/STORE # -

**NOTICE OF DESIGNATION OF SUCCESSOR FRANCHISEE**

The 7-Eleven Franchise Agreement (the "Agreement"), between 7-Eleven, Inc. ("we", "us", or "our ") and the undersigned Franchisee ("you", or "your"), for 7-Eleven Store No. - 29737 (the "Store"), allows you to designate individuals that can attempt to qualify as franchisees pursuant to the provisions in the survivorship Exhibit to your Agreement. In connection with the survivorship provisions, you designate the following named individual(s), subject to his or her meeting our qualification requirements, in accordance with our then current qualification procedures, as your successor to the franchise covering the Store:

**FIRST DESIGNEE:** RELATIONSHIP TO THE UNDERSIGNED: wife
PRINT NAME: [redacted]
MAILING ADDRESS [redacted] CARMEL VALLEY CA 93924

**SECOND DESIGNEE:** RELATIONSHIP TO THE UNDERSIGNED: ____
(If First Designee is not qualified, as determined in our sole discretion, cannot reasonably be located, or does not wish to have the opportunity to franchise the Store):
PRINT NAME: ____
MAILING ADDRESS: ____

**THIRD DESIGNEE:** RELATIONSHIP TO THE UNDERSIGNED: ____
(If First and Second Designees are not qualified, as determined in our sole discretion, cannot reasonably be located, or do not wish to have the opportunity to franchise the Store):
PRINT NAME: ____
MAILING ADDRESS: ____

You understand that you may revoke any of the designations at any time, and from time to time, by filing with us a new designation or revocation in writing, and that receipt of instruction from either of you is effective to notify us of such new designation or revocation. You revoke all prior designations, if any, which you have made. If you operate more than one 7-Eleven Franchise, you understand that your designee will not be able to qualify for more than one franchise (unless the designee is currently a 7-Eleven Franchisee and qualifies as a multiple Franchisee).

**FRANCHISEE**

By Sung Cho

Date 12-26-18

By ____

Date ____

By ____

Date ____

By ____

Date ____

Form 4400212 6/05 Uniform
Designation of Successor

Scanned with CamScanner

# NOTICE OF DESIGNATION OF SUCCESSOR FRANCHISEE

The 7-Eleven Franchise Agreement (the "Agreement"), between 7-Eleven, Inc. ("we", "us", or "our ") and the undersigned Franchisee ("you", or "your"), for 7-Eleven Store No. 2367 - 16981C (the "Store"), allows you to designate individuals that can attempt to qualify as franchisees pursuant to the provisions in the survivorship Exhibit to your Agreement. In connection with the survivorship provisions, you designate the following named individual(s), subject to his or her meeting our qualification requirements, in accordance with our then current qualification procedures, as your successor to the franchise covering the Store:

FIRST DESIGNEE: RELATIONSHIP TO THE UNDERSIGNED: ____________________
PRINT NAME: ____________________
MAILING ADDRESS: ____________________

SECOND DESIGNEE: RELATIONSHIP TO THE UNDERSIGNED: ____________________
(If First Designee is not qualified, as determined in our sole discretion, cannot reasonably be located, or does not wish to have the opportunity to franchise the Store):
PRINT NAME: ____________________
MAILING ADDRESS: ____________________

THIRD DESIGNEE: RELATIONSHIP TO THE UNDERSIGNED: ____________________
(If First and Second Designees are not qualified, as determined in our sole discretion, cannot reasonably be located, or do not wish to have the opportunity to franchise the Store):
PRINT NAME: ____________________
MAILING ADDRESS: ____________________

You understand that you may revoke any of the designations at any time, and from time to time, by filing with us a new designation or revocation in writing, and that receipt of instruction from either of you is effective to notify us of such new designation or revocation. You revoke all prior designations, if any, which you have made. If you operate more than one 7-Eleven Franchise, you understand that your designee will not be able to qualify for more than one franchise (unless the designee is currently a 7-Eleven Franchisee and qualifies as a multiple Franchisee).

FRANCHISEE

____________________

By ____________________ By ____________________

Sung Hun Choe ____________________

Date ____________________ Date ____________________

By ____________________ By ____________________

____________________ ____________________

Date ____________________ Date ____________________

Dear Sung Hun Choe,

Thank you for requesting a 2019 Franchise Agreement. We're excited you're continuing the journey with us! In accordance with your request we received on 12/11/18, we have created a 2019 Franchise Agreement package for your store, store 2367 - 16981C.

Your agreement package may include an additional amendment outlining, among other things, a temporary 7-Eleven Charge revision which you selected on the request form (i.e. Rate Lock current GGPS calculation until end of 2029, or 50/50 7-Eleven Charge for 5-year term (for '04 Agreements)). Please carefully review any included amendment and make sure you received the amendment you requested and want to sign.

To execute:

1. Review the enclosed agreement – a hard copy of this agreement will also be delivered at the store.
2. If you find errors, such as your name is misspelled or the store number or letter code is wrong, please email the Franchise Management Team at GM-FranchiseManagement@7-11.com. We will fix errors and send you a new copy to review.
3. If there are no errors in the agreement, we recommend that you review the agreement with your accountant, lawyer or financial advisor.
4. When ready, please contact your MM or FC for a schedule of Signing Open House events. Select the event date that best fits your schedule.
5. At the Open House event, the Ops team and the Sales team will have two copies of your agreement, and they will walk you through the process of signing the agreement.
6. If you are co-signing with another Franchisee, both of your signatures are required.
7. You will also receive documents for you to designate the insurance carrier and payroll provider of your choice. If you select a preferred provider option for insurance and/or payroll, the providers will contact you with coverage information/documents. If you choose to use a different insurance carrier, 7-Eleven will need proof of coverage from you before the agreement can be made effective.
8. A final copy of the fully executed agreement will be mailed back to you.

If you have any questions, please email us at: GM-FranchiseManagement@7-11.com

Thank you for continuing the journey with us.

# DELIVERY SERVICES AMENDMENT

This DELIVERY SERVICES AMENDMENT ("Amendment") between the undersigned franchisee(s) ("Franchisee") and 7-Eleven, Inc. ("7-Eleven") is entered into as of the date last set forth below,

## BACKGROUND INFORMATION

1. Franchisee and 7-Eleven entered into a 7-Eleven Franchise Agreement (the "Franchise Agreement"), covering 7 Eleven Store No 2367 16981C (the "Store");

2. 7-Eleven has entered into agreements with one or more 3rd party delivery companies ("Delivery Provider") to enable the promotion of 7-Eleven products on such Delivery Providers' app or on the 7-Eleven app, and fulfillment of orders through freelance shoppers who will purchase products at participating 7-Eleven stores and deliver to the customer;

3. Franchisee and 7-Eleven desire to amend the Franchise Agreement in certain respects as set forth below to cover the operation of the Delivery Providers at the Store.

The parties agree as follows:

1. Delivery Service. Each Delivery Provider will promote the availability of certain products from 7-Eleven branded convenience stores on one or more apps offered by the applicable Delivery Provider. As customers make purchases of 7-Eleven products through such apps, the applicable Delivery Provider will arrange for freelance shoppers to purchase products ordered through the app at participating 7-Eleven stores and deliver such purchase to the customer.

2. Cost Structure. Each Delivery Provider transaction will include a commission fee (the "Delivery Fee") of up to ten percent (10%) (based on the final sales price of each transaction) that will be charged by the applicable Delivery Provider directly to 7-Eleven. We have agreed to share the Delivery Fee with you based on your 7-Eleven Charge percentage by charging the Delivery Fee to your Store's Cost of Goods Sold, which is subject to the 7-Eleven Charge.

3. Term and Coverage. This Agreement begins on the Effective Date and terminates on the earlier of: (a) the termination of all agreements between 7-Eleven and the Delivery Providers, or (b) the termination of the Franchise Agreement. The Franchise Agreement, as amended or supplemented by this Amendment, will remain in full force and effect.

The words or terms used in this Amendment will have the meanings set forth in the Franchise Agreement unless otherwise defined in this Amendment, in which case the words or terms will have the meanings set forth in this Amendment.

Additional Store Number(s):

________ ________ ________ ________ ________

________ ________ ________ ________ ________

FRANCHISEE

By ______________________ By ______________________

Sung Hun Choe

Date 12.27.18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

7-ELEVEN, INC.

By ______________________

Arron B. Yount

Date 12/31/18

# 7-ELEVEN NOW PROGRAM AMENDMENT

This 7-ELEVEN NOW PROGRAM AMENDMENT ("Amendment") between the undersigned franchisee(s) ("you", "your" or "Franchisee") and 7-Eleven, Inc. ("we", "us" or "7-Eleven") is entered into as of the date last set forth below.

## BACKGROUND INFORMATION

1. Franchisee and 7-Eleven entered into a 7-Eleven Store Franchise Agreement (the "Franchise Agreement"), covering 7-Eleven Store No 2367 - 16981C (the "Store");

2. 7-Eleven has developed an application (the "7-Eleven Now App") that enables the promotion and sale of 7-Eleven products and fulfillment of online orders ("Order(s)"), which Orders will be transmitted electronically to participating 7-Eleven stores and fulfilled at such stores, and which Orders will either be picked up by the customer placing the Order or by one or more 3rd party delivery companies ("Delivery Provider") who will pick up and deliver such Order;

3. Franchisee and 7-Eleven desire to amend the Franchise Agreement in certain respects as set forth below to cover the Orders and operation of the Delivery Providers at the Store.

The parties agree as follows:

1. Ordering Service. The 7-Eleven Now App will allow customers to place Orders from participating 7-Eleven branded convenience stores (the "7-Eleven Now program"). All Orders will be directed to a participating 7-Eleven store for assembly at the store and preparation for pickup by, or delivery to, the customer. You agree to promptly assemble any Order transmitted to your Store using all required packaging designed to be used with such Orders, to properly maintain all Orders in appropriate hot, cold or ambient storage containers, and to have all Orders available for immediate pickup by the customer, or delivery to the customer by an authorized Delivery Provider. All Orders will be accounted for on your Financial Summaries in all respects as if they were traditional sales at the Store.

2. Special Proprietary Containers. Fulfillment of Orders may require the use of special standardized containers and condiments, including, but not limited to, bags for transporting the Orders, special trademarked containers used in connection with the sale of certain Proprietary Products, and other packaging or products used in connection with the fulfillment of the Orders (the "Specialty Items"). These Specialty Items include, but are not limited to, chicken wing boxes, hot dog wrappers, cup holders, delivery bags, and cheese and pepper condiment packets. You agree to order and maintain an adequate supply of all such Specialty Items throughout the term of this Amendment.

3. Maintain an Accurate Inventory. You acknowledge and understand the importance of having an accurate current inventory of all products that may be ordered through the 7-Eleven Now App, and therefore you agree to maintain an accurate current inventory on all items in the Store through proper check-in procedures and regular cycle counts.

4. Providing Excellent Customer Service. You acknowledge and understand the importance of providing accurate and timely fulfillment of all Orders, and therefore you agree to ensure that the Store is adequately prepared to perform all functions related to the timely and accurate fulfillment of all Orders and to provide excellent customer service in the fulfillment of all Orders. You further agree to ensure that all Orders are processed promptly and in a timely manner, as soon as possible after the submission of the Order to the Store for processing.

5. Installation and Maintenance Responsibility for Required Equipment. You acknowledge and understand that the fulfillment of Orders will require the installation and use of additional equipment in the Store, which additional equipment may include, but is not limited to, hold hot storage units, hold cold storage units, ambient temperature storage units, tablets and other electronic equipment used in connection with the transmission, picking and holding of Orders, and other equipment that we determine to be necessary in our sole discretion. All such additional equipment will be considered 7-Eleven Equipment that we will install and replace at our discretion, and you will be required to maintain such additional equipment or replace lost or stolen equipment consistent with the requirements under the Franchise Agreement. You agree to properly use such additional equipment in the manner that we require to properly fulfill all Orders.

6. Keep the Store Online. You agree not to take the store offline (turn off Store access to the 7-Eleven Now Program) for any reason except with our prior written request or approval. You agree to notify us in writing immediately if the 7-Eleven Now Program is offline or not properly operating for any reason.

7. Process Orders Promptly. You acknowledge and understand the importance of processing Orders as soon as possible in order to maintain customer satisfaction with the 7-Eleven Now Program and the 7-Eleven Now App, and therefore you agree to ensure that all Orders are processed promptly and in a timely manner, as soon as possible after the submission of the Order to the Store for processing.

8. Additional Licensing Requirement. You acknowledge and agree that there may be additional licenses or permits necessary in connection with implementation of the 7-Eleven Now Program and the processing of Orders, including, but not limited to, enhanced or different alcoholic beverage licenses that allow for electronic ordering and delivery of alcoholic beverages. You further acknowledge and understand that you are responsible for obtaining all licenses and permits necessary for the operation of the Store, and that you may be required to obtain such additional licenses or permits at your expense.

9. Payment Processing of Orders. You acknowledge that we have arranged with one or more payment processing companies (a "Payment Processor") to process customer payment of the Orders, and acknowledge and agree that such companies will be used to process customer payment for the Orders. You further acknowledge and agree that the Payment Processor may be different from current payment card processing arrangements covering the Store, and that such Payment Processor may have higher processing fees for processing payment of the Orders.

10. Delivery Non-Compete. You agree to only use the Delivery Providers we designate for delivery of all Orders, and not to engage in any other delivery programs or services related to the sale of products from the Store.

11. Participation in 7-Eleven Now App promotions. Notwithstanding anything to the contrary contained in the Franchise Agreement, you agree to implement all promotional offers and items that are included in the 7-Eleven Now App, including any special pricing promotions.

11. Term and Coverage. This Agreement begins on the date that Orders are transmitted to your Store (the "Effective Date") and terminates on the earlier of: (a) the termination of all agreements between 7-Eleven and the Delivery Providers, (b) the termination of the Franchise Agreement, or (c) upon our delivery of notice to you that we have terminated the 7-Eleven Now Program or your participation in the 7-Eleven Now Program. The Franchise Agreement, as amended or supplemented by this Amendment, will remain in full force and effect.

The words or terms used in this Amendment will have the meanings set forth in the Franchise Agreement unless otherwise defined in this Amendment, in which case the words or terms will have the meanings set forth in this Amendment.

FRANCHISEE

______________________________

By ____________________________

Sung Hun Choe

Date 12.27.18

By ____________________________

______________________________

Date ____________________________

By ____________________________

______________________________

Date ____________________________

By ____________________________

______________________________

Date ____________________________

7-ELEVEN, INC.

By ____________________________

Arron B. Yount
12/31/18

APPOINTMENT AGREEMENT FOR PAYMENT SERVICES

This Appointment Agreement for Payment Services ("Appointment Agreement"), dated as of 27 DEC, 2018 ("Effective Date") is made by and among InComm Financial Services, Inc., a South Dakota corporation ("Licensee"), Interactive Communications International, Inc., a Florida corporation ("InComm"), and Sung Hun Choe located at 801 Broadway, King City, CA 93930-3303 ("Agent"). Each of Licensee, InComm and Agent are referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, Licensee is engaged in the business of money transmission, and is licensed or otherwise authorized to provide the Payment Services (defined below) in various jurisdictions;

WHEREAS, InComm, an affiliate and authorized agent of Licensee, is engaged in the business of (i) marketing and distributing financial products and services on behalf of certain third parties, including, without limitation, state-licensed money transmitters, (ii) processing financial transactions, and (iii) performing other services for companies offering financial products and services, including stored value products and services;

WHEREAS, Licensee has entered into services agreements with InComm, under which InComm provides various services, including marketing and distribution services, relating to the Payment Services;

WHEREAS, Agent is a franchisee of 7-Eleven, Inc., a Texas corporation ("7-11");

WHEREAS, 7-11 and InComm entered into that certain Master Distribution and Service Agreement, as amended, pursuant to which Agent is obligated to perform certain services related to the provision of Payment Services in the manner prescribed by InComm (the "7-11 Agreement");

WHEREAS, Agent and InComm hereby agree to additional obligations on the part of Agent with respect to the provision of the Payment Services (together with those obligations owed by Agent to InComm pursuant to the 7-11 Agreement, the "InComm Agreement");

WHEREAS, in connection with those obligations of Agent under the InComm Agreement, Licensee desires to appoint Agent, as its representative and designated agent, solely to the extent required by Applicable Law, with the authority to provide the Payment Services, as defined herein, as appropriate, from time to time.

NOW, THEREFORE, in consideration of the agreements, conditions and covenants set forth below, the Parties agree as follows:

1. Appointment.

A. Licensee hereby appoints Agent as its representative and designated agent/authorized delegate, with the authority to provide the Payment Services, pursuant to the terms and conditions set forth herein, and to engage in money transmission on its behalf, as applicable, through the internet, telephone or retail locations, in each case as approved by Licensee, from time to time, for the sole purpose of performing Agent's obligations under the InComm Agreement. "Payment Services" may include (i) the sale or reload of stored value cards, (ii) walk-in bill payment services, whereby bill payment customers can enter participating Agent retail locations and make payments on certain consumer accounts held by merchants providing goods and services to such bill payment customer, which payments are then processed and remitted to the merchant on behalf of the bill payment customer, and (iii) general money transmission, whereby Licensee is engaged generally in receiving money for transmission or transmitting money within the United States or to locations outside the United States. Agent may not delegate its appointment hereunder without the prior written consent of Licensee and any regulatory authority whose consent is required by Applicable Law.

B. Any unauthorized provision of Payment Services by Agent shall constitute a material breach of this Appointment Agreement, and in such event, (i) Licensee shall be completely released from any liability or obligation to Agent relating to the unauthorized Payment Services, and (ii) Licensee shall have the right to terminate the Agent's rights under this Appointment Agreement at any time thereafter.

2. Payment Services.

A. Generally. Agent acknowledges that, as between Licensee and Agent, and subject to the fulfillment of any notice or approval obligations owed to consumers, Licensee shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend the terms and conditions, warranties, methods of payment and any other matters relating to the provision of the Payment Services, including discontinuance of the Payment Services at any time upon notice to Agent or the relevant consumers, as applicable. Upon receipt of notice of cancellation of the Payment Services, Agent shall immediately (i) cease, and cause each of its retail locations to cease, offering such cancelled service, and (ii) remove, and cause each of its retail locations to remove, from any physical location, telephone system or internet site of Agent, as applicable, any signage or other promotional material related to such cancelled service. Agent agrees to be solely responsible for the correctness and legitimacy of all Payment Services conducted by it and for all data entered by Agent's employees, agents or representatives in connection therewith. Agent shall not intentionally or negligently falsify sales records or engage in deceptive, unethical, misleading or

fraudulent conduct that is, or could reasonably be expected to be, detrimental to Licensee or their products or services. All Payment Services conducted by Agent shall be in accordance with Licensee's instructions and written procedures as provided to Agent. Without limiting the foregoing, upon reasonable advance written notice to Agent that Licensee has determined, in its reasonable discretion, that Applicable Law requires a modification to the manner in which Agent provides the Payment Services, Agent shall utilize commercially reasonable efforts to modify its provision of the Payment Services to so comply with Applicable Law. In the event that Licensee determines, in its reasonable discretion, that the modification implemented by Agent with respect to such Applicable Law is insufficient to comply, then Licensee may immediately terminate this Appointment Agreement upon written notice to Agent.

B. Emergency Suspension. Upon fax or written notice to Agent by Licensee, Agent agrees to immediately (within twenty-four (24) hours of Agent's receipt of such notice) halt the provision of all Payment Services ("Emergency Suspension"). An event giving rise to an Emergency Suspension may include an immediate regulatory change, governmental action, a breach of security, the need to protect or preserve Consumer Funds (defined below), the financial insolvency of any Party, a suspension, stay, or hold on any of Agent's deposit or bank accounts that contain Consumer Funds, the appointment of a receiver, trustee or fiduciary over any Party, or any other similar reason determined by Licensee using its commercially reasonable judgment in order to prevent fraud, abuse, or a violation of Applicable Law and immediately upon Agent being subject to a bankruptcy filing until the Bankruptcy Authorization (defined below) is obtained or waived in writing by Licensee.

C. Loss Recovery. Agent will be liable for all losses (A) caused by the fraud, negligence, or theft by Agent's employees, agents or representatives in connection with the provision of the Payment Services; or (B) caused by Agent's acceptance of a form of payment in connection with the provision of the Payment Services which results in (1) insufficient funds or (2) funds obtained in a fraudulent manner being used by a consumer in connection with the Payment Services, including, without limitation, checks drawn against accounts with insufficient funds, invalid credit cards, stolen checks, stolen credit or prepaid cards, or counterfeit currency. Licensee will cooperate in a commercially reasonable way with Agent's personnel in an effort to locate and prosecute the perpetrator of such fraud.

3. Compliance.

A. Agent shall comply with Applicable Law in its provision of the Payment Services including, without limitation, those provisions set forth in Exhibit A attached hereto and incorporated herein. "Applicable Law" means (i) all applicable rules and regulations of any card association utilized in connection with the Payment Services, (ii) any applicable rule or requirement of the National Automated Clearinghouse Association, and (iii) any and all foreign, federal, state and local laws, treaties, rules, regulations, regulatory guidance, determinations of (or agreements with) an arbitrator or governmental agency or authority and mandatory written direction from (or agreements with) any arbitrator or governmental agency or authority, including, without limitation, the Bank Secrecy Act and the regulations promulgated thereunder, including, without limitation, 31 C.F.R. 1022.210, 31 C.F.R. 1022.320, 31 C.F.R. 1022.420, and any successor provisions, any and all sanctions or regulations enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, and statutes or regulations relating to money transmission or unclaimed property, that are applicable to the marketing or provision of Payment Services, or otherwise applicable to any of the Parties, as the same may be amended and in effect from time to time during the Term.

B. Licensee and Agent acknowledge and agree that its activities hereunder, and the activities of any authorized delegates or sub delegates hereunder, are subject to the supervision, examination, and regulation of various state regulatory authorities having jurisdiction over Licensee as a licensed money transmitter.

4. Warranties, Limitations of Liability.

A. NO PARTY, NOR THEIR RESPECTIVE SUBSIDIARIES, PARENTS OR AFFILIATES SHALL BE LIABLE TO ANY OTHER PARTY TO THIS APPOINTMENT AGREEMENT OR ITS SUBSIDIARIES, PARENTS OR AFFILIATES, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING LOST PROFITS (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT ANY PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE WRONGFUL DEATH OR INJURY OF ANY PERSON. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS CONTAINED IN THIS SECTION 4(A) SHALL NOT APPLY TO ANY CLAIM THAT IS SUBJECT TO INDEMNIFICATION UNDER SECTION 5.

B. NO PARTY, NOR THEIR RESPECTIVE AFFILIATES MAKES ANY REPRESENTATIONS OR WARRANTIES, AND HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

C. Each Party shall have the duty to mitigate damages for which any other Party may become responsible.

5. Indemnification.

A. Licensee covenants and agrees to indemnify and hold Agent, its parent or affiliates, and their respective officers, directors, employees, agents and permitted assigns harmless against any and all liability, damages, costs, expenses, including reasonable legal fees and expenses, for any third party claim or demand, including, without limitation, any fees or penalties assessed by any regulatory authority ("Claim") arising out of or related to: (1) Licensee's breach of a representation, warranty or obligation under this Appointment Agreement; or (2) any negligence, fraud or willful misconduct by Licensee. This provision shall not apply with respect to Agent to the extent Agent is obligated to provide indemnity under sub paragraph (B) below.

B. Agent covenants and agrees to indemnify and hold Licensee, its respective parent or affiliates, and respective officers, directors, employees, agents and permitted assigns harmless against any and Claims arising out of or related to: (1) Agent's breach of a representation, warranty or obligation under this Appointment Agreement; or (2) any negligence, fraud or willful misconduct by Agent or any of its employees, agents or representatives, including, without limitation, fraudulently or incorrectly entering data regarding the Payment Services or failing to collect or deposit the appropriate amount of funds to be remitted as part of any Payment Services conducted by Agent. This provision shall not apply with respect to Licensee to the extent Licensee is obligated to provide indemnity under sub paragraph (A) above.

C. If any Claim is asserted against any party or parties (individually or collectively, the "Indemnified Party") by any person who is not a Party to this Appointment Agreement in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections (A) or (B) above, written notice of such Claim shall promptly be given to any Party or Parties (individually or collectively, the "Indemnifying Party") from whom indemnification may be sought. The Indemnifying Party shall have the right, by notifying the Indemnified Party within ten (10) business days of its receipt of the notice of the Claim, to assume the entire control (subject to the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice) of the defense, compromise or settlement of the matter, including, at the Indemnifying Party's expense, employment of counsel of the Indemnifying Party's choice. The Indemnifying Party shall not compromise or settle a Claim against the Indemnified Party without the Indemnified Party's consent, which shall not be unreasonably withheld or delayed, where such compromise or settlement involves the payment of money or an admission of liability by the Indemnified Party.

6. Consumer Funds; Obligations During Bankruptcy. The Parties acknowledge that Licensee has authorized InComm to enter into the InComm Agreement with Agent for the purposes of memorializing certain terms related to Agent's provision of the Payment Services, including, without limitation, specific terms related to each of the Payment Services which govern the timing and manner by which Agent shall remit the related Consumer Funds (defined below) to Licensee in connection therewith. Agent shall handle and remit all money and monetary value received in connection with the provision of the Payment Services in accordance with the terms of this Appointment Agreement, the InComm Agreement and Applicable Law. The consumer funds received by Agent and any authorized delegates or sub-delegates hereunder, in connection with the provision of the Payment Services less any commissions earned by Agent as set forth in the InComm Agreement ("Consumer Funds") shall be and remain the sole property of (and Agent shall hold Consumer Funds in trust for) the applicable consumers during and after the time the Consumer Funds are presented to Agent by the consumer and will not be deemed the property or an asset of Agent. Agent shall not include such Consumer Funds on any balance sheet or asset statement of Agent unless Agent has made appropriate and corresponding liability offsets on its internal ledger accounts consistent with generally accepted accounting principles. Furthermore, Agent represents and warrants that the Consumer Funds are not subject to, and covenants that during the term of this Appointment Agreement will not be subject to, and Agent shall not grant, any lien or encumbrance on the Consumer Funds for the benefit of any creditors (whether secured or unsecured) of Agent or its affiliates, whether in connection with any bankruptcy or secured creditor proceeding filed by or against Agent, its affiliates or otherwise. Agent shall take all action necessary or appropriate: (A) to ensure that the Consumer Funds do not become subject to any pledge, assignment, transfer or security interest made or granted, voluntarily or involuntarily, by Agent to any third party; and (B) to accomplish the immediate release to Licensee of all Consumer Funds, current or future, and remove such Consumer Funds from inclusion in any bankruptcy proceeding involving Agent or proceeding brought against Agent by any creditor of Agent. Agent agrees that (X) in any cash management or other related motion filed in its bankruptcy proceeding, that Agent will include a request to obtain bankruptcy court authorization to continue the remittance of Consumer Funds to Licensee in the manner provided under this Appointment Agreement and the InComm Agreement, and (Y) Agent will obtain entry of an order approving such arrangements on an interim and/or final basis in form and substance acceptable to Licensee ("Bankruptcy Authorization"). Notwithstanding anything to the contrary contained herein, Agent agrees that it shall be liable to Licensee for all Consumer Funds associated with the Payment Services provided by Agent pursuant to this Appointment Agreement. Agent hereby authorizes Licensee to initiate electronic funds transfers of Consumer Funds from the account in which such funds are maintained by Agent into an account designated by Licensee at such frequency as Licensee may determine appropriate, or as may otherwise be required by Applicable Law.

7. Inventory Control. Agent shall (i) store all Payment Services Products not displayed for sale in a secure location to which access is limited to only those employees and representatives of Agent whose duties justify their access to such secure location, and (ii) take all steps necessary to properly secure and protect the Payment Services Products displayed for sale. Upon request by InComm or in the event of expiration or termination of this Appointment Agreement, Agent will return all Payment Services Products in its possession to InComm. For the purposes of this Appointment Agreement, "Payment Services Products" shall include those items or services, whether tangible or intangible, offered for sale to consumers by Agent in connection with Agent's provision of the Payment Services pursuant to this Appointment Agreement, including, but not limited to, GPR Cards, Reload Services, walk-in bill payment services, and point-of-sale activated stored value card products. For purposes of this Appointment Agreement "Reload Services" means the reload of stored-value cards in the manner authorized by Licensee.

8. Merchant Destruction Form. Agent shall, on a daily basis, destroy all damaged Payment Services Products, including, without limitation, those with a missing or damaged tamper-resistant cover over the personal identification number, pursuant to the Merchant Destruction Form provided by InComm.

9. Fraud Alert/Recovery. Immediately following Agent's discovery that a Payment Services Product was activated in a fraudulent manner due to consumer or employee fraud, Agent shall communicate to InComm via fax, phone or overnight mail all information in Agent's possession regarding such fraudulent transaction and InComm will immediately attempt to cancel the affected Payment Services Product. Customer agrees that time is of the essence in such a situation and that should such a request for fraud recovery happen after the perpetrator of fraud has spent the funds in question, InComm will not have any obligation to refund or recover such funds. Customer will be responsible for all employee fraud.

10. Corporate Verification Form. Agent must cooperate in a background verification process pursuant to the Licensee's requirements and various state and federal regulations, including, without limitation, the Bank Secrecy Act, as amended. Prior to or contemporaneously with Agent's execution of this Appointment Agreement, Agent shall deliver to InComm executed Owner and Corporate Verification Forms (each, a "Verification Form"), as necessary. Agent must provide InComm updated Verification Forms as necessary from time to time to ensure that all information contained in the Verification Form(s) delivered by Agent to InComm remains current and accurate at all times. Agent acknowledges and agrees that all information contained in a Verification Form provided by Agent to InComm will be verified by independent third parties on at least an annual basis. The authorization of Agent hereunder to engage in the provision of Payment Services is subject to the results of the verification process and can be revoked at any time. In the event that Agent is a publicly held entity, Agent must provide InComm with its Standard Industrial Classification Code ("SIC Code").

11. Anti-Money Laundering Program. To assure compliance with applicable laws and regulations, both InComm and Agent hereby agree to cooperate fully to establish an anti-money laundering ("AML") training document suitable for use by Agent in training Agent's employees engaged in the provision of Payment Services (the "AML Training Program"). Agent agrees to designate an employee as the AML Compliance Officer for Agent. Agent further agrees to maintain internally a list of all employees who have received the AML training and shall make such list available to InComm upon request. InComm agrees to participate in the development of the AML Training Program for Agent as it relates hereto. Agent agrees to comply with, and cause its employees, licensees, franchisees, agents and representatives to comply with, all instructions of Licensee with respect to the sale of Payment Service Products and the provision of the Payment Services and compliance with any and all laws, treaties, rules, regulations, or regulatory guidance of the government of the United States, any state thereof, or of any applicable foreign government or state thereof.

12. Merchandising and Placement. Agent acknowledges and agrees that it: (i) shall comply, and shall cause each of its employees, agents and representatives to comply, with Applicable Law, and all policies, procedures and instructions of Licensee in the labeling, display, marketing, promotion and sale of the Payment Services Products and the provision of Payment Services; (ii) shall ensure that no GPR Card, including any temporary card issued in connection with a GPR Card program, which is distributed pursuant to this Appointment Agreement is "marketed or labeled as a gift card or gift certificate" (as defined or interpreted under Title IV of the Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734, and the regulations and regulatory guidance or interpretations promulgated or issued thereunder, including, without limitation, 12 CFR 205.20, or any successor provisions, as the same may be amended or modified from time to time); (iii) shall, prior to displaying, marketing, promoting or selling any GPR Card, including any temporary card issued in connection with a GPR Card program, implement, and at all times thereafter maintain, written policies and procedures which include detailed guidelines related to Agent's obligations under subsection (ii) and provide for ongoing monitoring and verification that Agent is in full compliance with its obligations under subsection (ii); and (iv) shall indemnify, defend and hold harmless InComm, Licensee, and their respective affiliates, sureties, officers, directors, agents, employees, parents and subsidiaries, from any and all liability, damages, costs, expenses, including reasonable legal fees and expenses, for any third party claim or demand, including, without limitation, any fees or penalties assessed by any regulatory authority, arising out of or related to Agent's failure to comply with this Section 12. For the purposes of this Appointment Agreement, "GPR Card" means a point-of-sale activated general purpose reloadable prepaid stored value card product.

13. Data Security. Agent hereby represents, warrants, covenants and agrees that it shall not: (i) use any Consumer Data (as defined below) for any purpose other than in the performance of its obligations hereunder, and (ii) store any Consumer Data other than the Personal Account Number of any Card ("PAN"), except in strict accordance with the terms of this Section 13. Agent shall, at all times, employ security systems, firewalls and other safeguarding procedures and methods to keep Consumer Data secure in accordance with the Payment Card Industry Data Security Standards ("PCI Standards"), and shall perform its obligations hereunder in accordance with such PCI Standards. Agent shall, upon InComm's request, deliver evidence to InComm of its compliance with the PCI Standards, and shall promptly provide notice to InComm in the event any third party audit concludes that Customer is not acting in compliance with the PCI Standards. "Consumer Data" means all information regarding any Cardholder, including, without limitation, all "non-public personal information," and "personally identifiable financial information" (as defined by law). With respect to the disposal of Cardholder information, Consumer Data shall also include any record containing consumer information, including but not limited to postal and e-mail addresses and associated data (including any personally identifiable information, personal account information, financial information, account numbers, personal identification numbers and other related information, social security numbers, or other non–public business or personal or financial information). For purposes of this Section 13, "Cardholder" means an individual who has been issued a Card or is otherwise authorized to use or add value to a Card, and "Card" means any reloadable prepaid card or other access device for which Agent conducts Reload Services.

14. Security Breaches. Agent represents, warrants, covenants and agrees to disclose to InComm and Licensee any actual breach in security that results in unauthorized intrusions into any Agent computer and other information systems whereby Consumer Data or any PAN is compromised, as soon as Agent becomes aware of such a security breach. Agent further agrees to promptly engage an independent qualified third party auditor to investigate any such breach (including the installation of monitoring or diagnostic software or equipment) to locate the source and scope of the breach, and to provide any material information related to such security breach that such independent auditor discovers with respect to the breach to InComm, which InComm shall be permitted to then share with its Payment Services partners whose Consumer Data and/ or PAN may have been compromised.

15 Terms and Conditions.

A. All purchases are subject to (a) the terms of this Appointment Agreement; (b) the terms of the InComm Agreement; and (c) the terms, conditions, policies, procedures and other instructions set forth from time-to-time by Licensee. Availability of all Payment Services and Payment Services Products contemplated herein, and all program terms and conditions, are subject to change upon notice by InComm and/or Licensee. Due to certain state laws, Reload Services may not be available for sale in some states. Agent expressly acknowledges and agrees that it shall not offer Reload Services to any person or entity located in the State of Vermont, outside of the United States or Puerto Rico, or in any jurisdiction which Licensee or InComm may designate as prohibited from time to time. Under no circumstances shall Agent allow or accept the refund of any Reload Services to consumers. Customer will be responsible for all such unauthorized returns and refunds.

B. Agent acknowledges and agrees that it shall (a) only offer Reload Services through those retail locations owned and operated by Agent which have been mutually agreed upon by Agent, InComm and Licensee, and (b) not offer any Reload Services through any location which is owned or operated by any sub-dealer, sub-franchisee or other third party.

16. Point-of-Sale System. InComm and Agent each agree to work together in good faith to enable Agent's proprietary point-of-sale system to be used to sell the Payment Services Products and provide the Payment Services contemplated herein and offered by InComm under this Appointment Agreement.

17. Compliance Audits. Agent acknowledges and agrees that Licensee may periodically, and upon ten (10) business days prior written notice, conduct audits of Agent during Agent's normal business hours, including a review of its facilities, books and records related to this Appointment Agreement or the Payment Services, to confirm Agent's compliance with Applicable Law, the InComm Agreement and this Appointment Agreement.

18. Term and Termination. The term of this Appointment Agreement ("Term") shall commence upon the Effective Date and continue until the earlier of: (i) the termination or expiration of the 7-11 Agreement; (ii) Licensee's written notice to Agent in the event of Agent's breach of this Appointment Agreement; or (iii) the exercise of any other termination right hereunder by Licensee.

19. Successors in Interest. In the event Licensee is acquired by or merged into an affiliated entity, such affiliated entity shall assume the obligations of Licensee hereunder and shall have the authority to maintain Agent's agency appointment according to the terms and conditions hereunder. The term "Licensee" as used hereunder shall apply to such affiliated entity in the same capacities and to the same extent as applied to Licensee so acquired by such affiliated entity.

20. Amendments. Agent acknowledges and agrees that Licensee may, from time to time, amend this Appointment Agreement, including, without limitation, Exhibit A attached hereto, as Licensee shall deem necessary in its reasonable discretion to comply with Applicable Law, at which time Licensee shall communicate to Agent the content of any such amendment. No later than five (5) business days following Agent's receipt of any such notification from Licensee, Agent shall acknowledge its receipt of such notice and provide Licensee with evidence of its consent to such amendment in the manner specified in the notice, following which this Appointment Agreement shall be amended in the manner specified in such amendment.

21. Assignment. No Party may assign or otherwise transfer any of its rights or obligations under this Appointment Agreement without the prior written consent of each of the other Parties; provided, however, that Licensee may assign its rights and obligations under this Appointment Agreement to any third party who: (a) is licensed as a money transmitter in each of the jurisdictions in which Licensee is required to be licensed hereunder, (b) is registered as a money services business with the U.S. Department of Treasury's Financial Crimes Enforcement Network, if applicable, and (c) otherwise acknowledges receipt of such assignment and agrees to assume the rights and obligations herein.

22. Governing Law. This Appointment Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflict of law principles thereof.

23. Severability; Waiver. If any provision of this Appointment Agreement (or any portion thereof) is determined to be invalid or unenforceable, the remaining provisions of this Appointment Agreement shall not be affected thereby and shall be binding upon the Parties and shall be enforceable, as though said invalid or unenforceable provision (or portion thereof) were not contained in this Appointment Agreement. The failure by any Party to insist upon strict performance of any of the provisions contained in this Appointment Agreement shall in no way constitute a waiver of its rights as set forth in this

Appointment Agreement, at law or in equity, or a waiver of any other provisions or subsequent default by any other Party in the performance of or compliance with any of the terms and conditions set forth in this Appointment Agreement.

24. Survival. All provisions of this Appointment Agreement which by their nature extend beyond the expiration or termination of this Appointment Agreement, including, without limitation, Sections 4, 5, and 19-25, shall survive the termination or expiration of this Appointment Agreement.

25. Counterparts. This Appointment Agreement may be executed and then delivered via facsimile transmission, via the sending of PDF or other copies thereof via email and in one or more counterparts, each of which shall be an original but all of which taken together shall constitute one and the same Appointment Agreement.

IN WITNESS HEREOF, the Parties have executed this Appointment Agreement as of the Effective Date.

**INCOMM FINANCIAL SERVICES, INC.**

By: ______________________________

Name: ______________________________

Title: ______________________________

**INTERACTIVE COMMUNICATIONS INTERNATIONAL, INC.**

By: ______________________________

Name: ______________________________

Title: ______________________________

**FRANCHISEE / AGENT:** Sung Hun Choe
[Franchisee / Agent Company Name]

By: [signature]

Name: Sung Hun Choe

Title: Franchisee

**THE FOLLOWING INFORMATION MUST BE COMPLETED BY THE FRANCHISEE / AGENT:**

**Franchisee:** Sung Hun Choe
**Store Number:** 2367 - 16981C
**Owner Full Name:** ______________________________
**Owner Social Security Number (SSN):** [redacted]
**Owner Date of Birth (MM/DD/YYYY)** [redacted]
**Street Address of Business:** 801 Broadway
**Suite Number:** ______________________________
**City, State, ZIP Code:** King City, CA 93930-3303
**Business Telephone Number:** (831) 385-5164
**Email Address:** [redacted]ail.com
**Federal Employment ID No. (FEIN):** [redacted]

MARKET/STORE # 2367 - 16981C

InComm

250 Williams Street Suite M100 Atlanta, GA 30303 Phone 770.240.6100 Fax 404.601.3000

## OWNER AND CORPORATE VERIFICATION FORM

The USA PATRIOT Act is intended to strengthen U.S. measures to prevent, detect, and prosecute money laundering and the financing of terrorism. These efforts include requirements on certain financial institutions to take affirmative steps to verify the identity of customers. For this reason, it is imperative that you provide complete and accurate information regarding your identity below and provide us with authorization to complete the verification process.

Each entity must fill out this Owner and Corporate Verification Form. **If your entity has individual persons with an equity ownership interest of ten percent (10%) or more in the entity, each person that meets the foregoing criteria must be included in the table below.** Please read, complete and sign this form in the spaces provided below. Your written authorization is necessary for completion of the verification process.

I, Sung Hun Choe, certify that I am an (*circle one*) officer / owner / partial owner in ____________________ ("Customer") located at 801 Broadway King City, CA 93930-3303 and as such I hereby authorize Interactive Communications International, Inc. or any one of its affiliates, which may include, but not be limited to, PRE Solutions, Inc.; PRE Holdings, Inc.; InComm Health & Affinity, Inc.; InComm Agent Solutions, Inc.; New E-Pay, LLC; InComm Digital Solutions, LLC; or InComm Financial Services, Inc. (collectively referred to herein as "InComm") to conduct a security check with the Office of Foreign Assets Control and to obtain a credit history report for purposes of evaluating whether Customer is authorized to (a) purchase from InComm and sell to end users prepaid stored value products, including, but not limited to the Vanilla Gift Card, One Vanilla Card, and the My Vanilla Card, and (b) participate in bill payment services. I understand that such security checks are to ensure compliance with provider requirements and various state and federal regulations, such as the USA PATRIOT Act. I understand that InComm may utilize an outside firm or firms to assist it in checking such information, and I specifically authorize the use of information services and outside entities of InComm's choice. I also understand that I may withhold my permission and that in such a case, Customer will not be authorized to purchase or sell prepaid stored value products or participate in bill payment services.

Signature: [signature] Date: 12.27.18

*Please provide the following information:*

[1] Customer's Full Corporate Legal Name: ____________________

[2] Customer's Dun and Bradstreet Number: ____________________

[3] Customer's State and Federal Tax ID Number: 94-3177786

*For each Owner / Partial Owner, please provide the following information:*

| [4]Owner's Full Legal Name ("Owner") | [5]Owner's Social Security Number | [6]Owner's Date of Birth | [7]Owner's Place of Birth | [8]Owner Signature |
|---|---|---|---|---|
| Sung Hun Choe | [redacted] | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

In the event any of the information provided by Customer and/or Owner to InComm via this form or otherwise changes, Customer and/or Owner agrees that it/he/she must promptly provide InComm with an amended version of this form. Customer and/or Owner acknowledges and agrees that the verification process is continuous and ongoing. As such, Customer's authorization to sell prepaid stored value products is subject to the results of the verification process and can be revoked at any time.

*InComm Proprietary*

**Exhibit A**

**State Addenda**

With respect to Agent's provision of the Payment Services in the following jurisdictions, Agent shall:

**ALASKA**

1. Operate in full compliance with the Alaska Uniform Money Services Act and any policies and procedures provided to Agent by Licensee in connection with same. Alaska Stat. § 06.55.301(a).

2. Remit all money owing to Licensee under the terms of the contract between Licensee and Agent. Alaska Stat. § 06.55.301(b).

3. Cease to provide money services as an authorized delegate of Licensee upon notice by the Alaska Departmet of Commerce, Community and Economic Development that Licensee's money service license is suspended and/or revoked. Alaska Stat. § 06.55.301(c).

4. Not provide money services outside the scope of activity permissible under the contract between Agent and Licensee. Alaska Stat. § 06.55.30(d).

5. Hold in trust for the benefit of Licensee all money, net of fees, received from money transmission. Alaska Stat. § 06.55.301(d).

6. Not use a sub-delegate to conduct money services on behalf of Licensee. Alaska Stat. § 06.55.301(e).

7. Consent to an on-site examination by the Alaska Department of Commerce, Community, and Economic Development. Alaska Stat. § 06.55.401(a).

8. File with the Alaska attorney general all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set out in 31 U.S.C. 5311, 31 C.F.R. 103, and other federal and state laws pertaining to money laundering. Alaska Stat. § 06.55.406(a).

9. Not disclose to another person financial information, defined to include a consumer's social security number, taxpayer identification number, account number, credit card account number, debit card account number, personal identification number, payment instrument number, or access code, provided to Licensee or Agent by such consumer except when, and only to the extent that, the disclosure is (1) authorized in writing by the consumer; (2) required by federal, state, or local law; (3) required by an order issued by a court or an administrative agency; or (4) part of the money services transaction ordered by the consumer. Alaska Stat. § 06.55.407(d)-(e).

10. Display a sign at each location where Agent provides money services under the Alaska Uniform Money Services Act. The sign shall be displayed at all times in full view of persons visiting the location and shall give the Alaska Department of Commerce, Community and Economic Development's address and telephone number for receiving calls regarding complaints and other concerns about Licensee and/or Agent. Alaska Stat. § 06.55.810(b)-(c).

11. Cooperate with examinations and investigations by the Alaska Department of Commerce, Community, and Economic Development. Alaska Stat. § 06.55.602(a)(2).

**ARIZONA** **For a copy of Arizona's statute, please see Schedule A.1

1. Display at each location a notice in a form prescribed by the Arizona Superintendent of Financial Institutions that indicates that Agent is an authorized delegate of Licensee under Title 6, Chapter 12 of the Arizona Code. A.R.S. § 6-1207(c).

2. Comply with the operating policies and procedures provided by Licensee to Agent to enable compliance with the provisions of Title 13, Chapter 23 and Title 6, Chapter 12 of the Arizona Code and any rules adopted thereunder. A.R.S. § 6-1208(B).

3. Immediately cease to operate as a delegate of Licensee upon notice of the revocation or suspension of Licensee's money transmitter license. A.R.S. § 6-1208(C).

4. Hold in trust for the benefit of Licensee all monies received from the sale or delivery of Licensee's payment instruments or monies received for transmission. A.R.S. § 6-1209(B).

5. Be subject to examination at the discretion of the Arizona Superintendent of Financial Institutions. A.R.S. § 6-1209(C).

6. Preserve its records for at least five years after making the final entry on any transaction and keep any other records required by the Arizona Superintendent of Financial Institutions. A.R.S. § 6-1213(B).

7. Ensure that every payment instrument sold by Agent bears the name of Licensee and a unique consecutive number clearly stamped or imprinted on it. A.R.S. § 6-1215(A).

8. For every transaction that involves the receipt of money, maintain written records, including (i) the name of Licensee, (ii) the street address of the location where the money was received, (iii) the name and street address of the consumer if reported to Agent,(iv) the approximate date of the transaction, (v) the name or other information of the employee of Agent who may have conducted the transaction, and (vi) the amount of the transaction, for a period of five years from the date of the transaction. A.R.S. § 6-1215(B).

ARKANSAS

1. Operate in full compliance with the Arkansas Uniform Money Services Act and any policies and procedures provided to Agent by Licensee in connection with same. A.C.A. § 23-55-501(b).

2. Remit all money owing to Licensee under the terms of the contract between Licensee and Agent. A.C.A. § 23-55-501(c).

3. Cease to provide money services as an authorized delegate of Licensee upon notice that the money service license is suspended or revoked. A.C.A. § 23-55-501(d).

4. Not provide money services outside the scope of activity permissible under the contract between Agent and Licensee. A.C.A. § 23-55-501(e).

5. Hold in trust for the benefit of Licensee all money, net of fees, received from money transmission. A.C.A. § 23-55-501(e).

6. Not use a sub-delegate to conduct money services on behalf of Licensee. A.C.A. § 23-55-501(e).

7 Submit to an on-site examination by the Arkansas Securities Commissioner. A.C.A. § 23-55-601(a).

8. File with the securities Arkansas Securities Commissioner all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set out in 31 U.S.C. 5311, 31 C.F.R. 103, and other federal and state laws pertaining to money laundering. A.C.A. § 23-55-606(a).

9. Ensure that the name and mailing address or telephone number of Licensee is provided to the consumer in connection with each money transmission or currency exchange transaction. A.C.A. § 23-55-608(a).

10. Display prominently in a form and in a medium prescribed by the Arkansas Securities Commissioner a notice that states or contains the following information: (i) the name, mailing address, and telephone number of Agent, (ii) a statement that Agent is an agent conducting business on behalf of Licensee under Title 23, Subtitle 2, Chapter 55 of the Arkansas Code, (iii) the name, mailing address, and telephone number of Licensee, (iv) a statement directing consumers with complaints to contact the Arkansas State Securities Department, and (v) the current mailing address and telephone number of the Arkansas State Securities Department. A.C.A. § 23-55-608(a)-(b).

CALIFORNIA

1. Make and keep accounts, correspondence, memorandums, papers, books, and other records as the California Commissioner of Financial Institutions by regulation or order requires and preserve the records for the time specified by the regulation or order. Cal. Fin. Code § 2060(c)(2).

2. Hold all funds, less any fees due to Agent, received for transmission by Agent on behalf of Licensee, in trust owned by and belonging to Licensee until the time when the money or an equivalent amount are remitted by Agent to Licensee. Cal. Fin. Code § 2060(c)(3) and (f).

3. Remit all money in accordance with the California Money Transmission Act. Cal. Fin. Code § 2060(c)(4)

4. Comply with any other provisions that the California Commissioner of Financial Institutions may find to be necessary to carry out the provisions and purposes of the California Financial Code, Chapter 14. Cal. Fin. Code § 2060(c)(5).

5. Remit all money owing to Licensee in accordance with the terms of contract with Licensee. Cal. Fin. Code § 2060(d).

6. Remit all money, less any fees, received on behalf of Licensee for money transmission as follows: (i) within three business days of receipt, (ii) in case the aggregate face amount of the money, less fees, does not in any calendar

week exceed ten thousand dollars ($10,000), within 10 business days of receipt, and (iii) within a period longer than three business days of receipt, if Agent has previously deposited with, and during such period maintains on deposit with, an office of an insured bank or of an insured savings and loan association located in the United States in an account that is in the sole and exclusive name of Licensee an amount that, for each day by which such period exceeds three business days, is not less than the aggregate face amount of money received on behalf of Licensee for money transmission that Agent usually sells per day, (iv) within such shorter period as Licensee may provide. Cal. Fin. Code § 2060(e).

7. Not provide money transmission outside the scope of activity permissible under the contract with Licensee. Cal. Fin. Code §2060(f).

8. Not appoint a sub-agent to receive transmission money. Cal. Fin. Code § 2060(g).

9. Not conduct money transmission on behalf of Licensee without concurrently receiving money, monetary value or its equivalent, credit card, or payment instrument, or a combination of same believed to be valid in an amount not less than the amount of the money transmission being provided. In the case of a sale of payment instruments or stored value to an insured bank, an insured savings and loan association, or an insured credit union, Agent may receive such amounts the next business day after the sale. Cal. Fin. Code § 2060(i).

10. If Agent commingles any money or monetary value, less fees, received on behalf of Licensee for money transmission with any other property owned or controlled by Agent, all such property shall be impressed with a trust in favor of Licensee in an amount equal to the aggregate amount of such money so commingled. No money or monetary value, less fees, received by Agent on behalf of Licensee for money transmission, while held by Agent, nor any property impressed with a trust pursuant to this subdivision, shall be subject to attachment, levy of execution, or sequestration by order of any court, except for the benefit of Licensee. Cal. Fin. Code § 2060(j).

11. Submit, at any time, to examination conducted by the California Commissioner of Financial Institutions in order to ascertain whether Agent's business is being conducted in a lawful manner and whether all moneys received for transmission are properly accounted for. Directors, officers, and employees of Agent shall exhibit to the California Commissioner of Financial Institutions, on request, any or all of Agent's accounts, books, correspondence, memoranda, papers, and other records and shall otherwise facilitate the examination so far as it may be in their power to do so. Cal. Fin. Code § 2120(a)-(b).

12. Display signage clearly identifying the name of Licensee as well as any trade names used by Licensee at that branch office. Cal. Fin. Code § 2103(c).

13. Prominently post on the premises of each branch office that conducts money transmission a notice, in English and in the same language principally used by Agent to advertise, solicit, or negotiate either orally or in writing and in a form provided by Licensee, stating that the following:

> If you have complaints with respect to any aspect of the money transmission activities conducted at this location, you may contact the California Department of Financial Institutions at its toll-free telephone number, 1-800-622- 0620, by e-mail at consumer.complaint@dfi.ca.gov, or by mail at Department of Financial Institutions, Consumer Services, 1810 13th Street, Sacramento, CA 95811.

The sign must be clear, legible, and in letters not less than one-half inch in height and posted in a conspicuous location in the unobstructed view of the public within the premises. Cal. Fin. Code § 2105(a)-(b).

14. Prominently post on the premises of each branch office that issues or sells payment instruments, and at machines located in operated by Agent that issues or sells payment instruments, a notice, printed in English and in the same language principally used by Agent to advertise, solicit, or negotiate, either orally or in writing, and in a form provided by Licensee, clearly stating that payment instruments are not insured by the federal government, the state government, or any other public or private entity. The notice shall be clear, legible, and in letters not less than one-half inch in height and shall be posted in a conspicuous location in the unobstructed view of the public within the premises. Cal. Fin. Code § 2104.

15. Not sell any payment instrument containing Agent's name which does not identify Licensee at least as conspicuously as it does the Agent. Cal. Fin. Code § 2106.

16. Upon notice that Licensee's license has been suspended or revoked or that the Commissioner has issued an order taking possession of the property and business of Licensee, not receive any transmission money on behalf of Licensee. Cal. Fin. Code § 2063(a).

17. Not engage in fraud, intentional misrepresentation, or gross negligence or any unsafe or unsound practice. Cal. Fin. Code § 2150(a)(3) and (a)(6).

18. Comply with California and federal anti-money laundering statutes. Cal. Fin. Code § 2150(a)(4).

19. Not make or cause to be made in any application or report filed with California Commissioner of Financial Institutions or in any proceeding before California Commissioner of Financial Institutions, any statement that was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or has omitted to state in any of those applications, reports, or proceedings any material fact which is required to be stated therein. Cal. Fin. Code § 2150(a)(7).

20. Unless the transmission is for the payment of goods or services or unless otherwise ordered by the customer, within 10 days after receiving the money, the Agent shall forward all money received for transmission or give instructions committing equivalent money to the person designated by the customer. Cal Fin. Code § 2101.

21. Within 10 days of receipt of the customer's written request for a refund, the Agent shall refund any and all money received for transmission. The refund needs to completed within the 10 days unless: (i) the money has been forwarded within 10 days of the date of receipt, (ii) instructions have been given committing an equivalent amount of money to the person designated by the customer within 10 days of the date of the receipt of the money from the customer, (iii) the customer instructs Licensee to transmit the money at a time beyond 10 days, (iv) the refund would violate law. Cal Fin. Code § 2102(a).

22. If money is received for transmission, the Agent shall give the customer a receipt at the time of the transaction that complies with the requirement set forth under Cal. Fin. Code § 2103. Cal Fin. Code § 2103.

23. Disclose and clearly state the exchange rates, fees, and commissions charged. Cal Fin. Code § 2103(b) and (c).

24. Maintain records of any receipts provided pursuant to Cal. Fin. Code § 2102 for six months. Cal Fin. Code § 2124.

**COLORADO**

1. Require each of its employees who perform money transmission services to either (i) understand and sign a form, promulgated by the Colorado Banking Board and containing a notice of the contents of Colo. Rev. Stat. 18-18-408 and other state and federal laws regarding money laundering, affirming knowledge of the money laundering laws prior to the employee performing such services or (ii) receive training that covers the money laundering laws within thirty days before the employee performs such services. Colo. Rev. Stat. 12-52-203(2)(a).

2. Maintain a record of each employee along with the signed notice or evidence of training on money laundering laws so long as the employee provides such money transmission services. The records may be maintained in an electronic or digital format that reproduces the signature on the documents by the agent. Colo. Rev. Stat. 12-52-203(2)(b).

3. Not knowingly employ a person to perform money transmission services who has been convicted of or plead guilty or nolo contendere to the offenses in Article 5 of Title 18 of the Colorado Revised Statutes or in Colo. Rev. Stat. 18-18-408; a felony in the selling or issuing of exchange or in money transmission; a felony involving a financial institution; or an equivalent crime outside Colorado. Colo. Rev. Stat. 12-52-205(2).

**CONNECTICUT**

1. Submit to examination by the Connecticut Banking Commissioner. Conn. Gen. Stat. § 36a-605

2. From the moment of receipt, hold the proceeds of a sale or delivery of Licensee's Connecticut payment instruments in trust for the benefit of Licensee on behalf of Licensee. Conn. Gen. Stat. § 36a-607(a)(3).

3. Operate in full compliance with sections 36a-595 to 36a-612 of the Connecticut Money Transmission Act, any regulation adopted under these sections, or any other law or regulation applicable to the conduct of the Agent's business. Conn. Gen. Stat. §36a-607(a)(5) and Conn. Gen. Stat. § 36a-608(d)(1).

4. Remit all money owed to Licensee in accordance with the terms of the contract between Licensee and Agent. Conn. Gen. Stat. §36a-607(a)(6).

5. Not provide money transmission services in Connecticut outside the scope of activity permissible under the contract between the Agent and Licensee. Conn. Gen. Stat. § 36a-607(a)(7).

**DELAWARE**

1. Ensure that every check, defined to include any instrument for the transmission or payment of money, bears the name of Licensee clearly imprinted thereon. 5 Del. C. § 2313(a).

**DISTRICT OF COLUMBIA**

1. Submit to and pay all reasonable costs for an on-site examination of Agent by the Commissioner of the Department of Insurance, Securities, and Banking. D.C. Code § 26-1013(b).

2. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Commissioner of the Department of Insurance, Securities, and Banking. D.C. Code § 26-1017(a).

3. Engage in money transmission strictly in accordance with the written procedures provided to Agent by Licensee. D.C. Code § 26-1017(b).

4. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent, but not to exceed a remittance time of 30 calendar days, as doing so may result in liability by Agent or Licensee for treble damages. D.C. Code § 26-1017(c) and CDCR 26A-2212.1.

5. Consent to inspection by the Commissioner of the Department of Insurance, Securities, and Banking, with or without prior notice to Agent, of the books and records of Agent when the Commissioner of the Department of Insurance, Securities, and Banking has a reasonable basis to believe that Agent is not in compliance with this Title 26, Chapter 10 of the District of Columbia Code. D.C. Code § 26-1017(d).

6. Act only as authorized under the contract with Licensee as failure to do so may result in cancelation of such contract and further disciplinary action by the Commissioner of the Department of Insurance, Securities, and Banking. D.C. Code § 26-1017(e).

7. Ensure all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or for transmission, from the time such funds are received by Agent until such time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. D.C. Code § 26-1017(f).

8. Report to Licensee the theft or loss of payment instruments within 24 hours from the time Agent knew or should have known of the theft or loss. D.C. Code § 26-1017(g).

**FLORIDA**

1. Report to Licensee, immediately upon discovery, the theft or loss of currency received for a transmission or payment instrument. Fla. Stat. § 560.2085(2)(b)1.

2. Display a notice to the public that Agent is the authorized agent of Licensee. Fla. Stat. § 560.2085(2)(b)2.

3. Remit all amounts owed to Licensee for all transmissions accepted and all payment instruments sold in accordance with the InComm Agreement. Fla. Stat. § 560.2085(2)(b)3.

4. Hold in trust all currency or payment instruments received for transmissions or for the purchase of payment instruments from the time of receipt by Agent until the time the transmission obligation is completed. Fla. Stat. § 560.2085(2)(b)4.

5. Not commingle the money received for transmissions accepted or payment instruments sold on behalf of Licensee with the money or property of Agent, except for making change in the ordinary course of Agent's business, and ensure that the money is accounted for at the end of the business day. Fla. Stat. § 560.2085(2)(b)5.

6. Consent to examination or investigation by the Florida Office of Financial Regulation. Fla. Stat. § 560.2085(2)(b)6.

7. Adhere to the applicable state and federal laws and rules pertaining to a money services business. Fla. Stat. § 560.2085(2)(b)7.

8. Provide such other information or disclosure as may be required by Applicable Law. Fla. Stat. § 560.2085(2)(b)8.

9. Maintain all books, accounts, documents, files, and information necessary for determining compliance with Title 33, Chapter 560 of the Florida Regulation of Trade, Commerce, Investments, and Solicitations Code and related rules for five (5) years unless a longer period is required by other state or federal law. Fla. Stat. § 560.1105.

10. Not receive or possess any property, except in payment of a just demand, and, with intent to deceive or defraud, to omit to make or to cause to be made a full and true entry thereof in its books and accounts, or to concur in omitting to make any material entry thereof. Fla. Stat. § 560.111(1)(a).

11. Not embezzle, abstract, or misapply any money, property, or thing of value belonging to the money services business or consumer with intent to deceive or defraud. Fla. Stat. § 560.111(1)(b).

12. Not make any false entry in its books, accounts, reports, files, or documents with intent to deceive or defraud another person, or with intent to deceive the Florida Office of Financial Regulation, any appropriate regulator, or any authorized third party appointed by the Florida Office of Financial Regulation to examine or investigate the affairs of the money services business or Agent. Fla. Stat. § 560.111(1)(c).

13. Not engage in an act that violates 18 U.S.C. 1956, 18 U.S.C. 1957, 18 U.S.C. 1960, 31 U.S.C. 5324, or any other law, rule, or regulation of another state or the United States relating to a money services business which may cause the denial or revocation of a money services business license or the equivalent in that jurisdiction. Fla. Stat. § 560.111(1)(d).

14. Not file with the Florida Office of Financial Regulation, sign as a duly authorized representative, or deliver or disclose, by any means, to the Florida Office of Financial Regulation or any of its employees any examination report, report of condition, report of income and dividends, audit, account, statement, file, or document known by it to be fraudulent or false as to any material matter. Fla. Stat. § 560.111(1)(e).

15. Not place among the assets of a money services business or Agent any note, obligation, or security that the money services business or Agent does not own or is known to be fraudulent or otherwise worthless, or to represent to the Florida Office of Financial Regulation that any note, obligation, or security is the property of the money services business or Agent and is genuine if it is known to be fraudulent or otherwise worthless. Fla. Stat. § 560.111(1)(f)

16. Not knowingly possess any fraudulent identification paraphernalia. Fla. Stat. § 560.111(1)(g).

17. Comply with all state and federal laws and rules relating to the detection and prevention of money laundering, including, as applicable, Fla. Stat. § 560.123, and 31 C.F.R. 103.20, 103.22, 103.23, 103.27,103.28, 103.29, 103.33, 103.37, and 103.41. Fla. Stat. § 560.1235(l).

18. Maintain an anti-money laundering program in accordance with 31 C.F.R. 103.125. The program must be reviewed and updated as necessary to ensure that the program continues to be effective in detecting and deterring money laundering activities. Fla. Stat. § 560.1235(2).

19. Provide each consumer with a toll-free telephone number for the purpose of contacting Licensee or Agent or, in lieu of a toll-free telephone number, provide the address and telephone number of the Florida Office of Financial Regulation. Fla. Stat. §560.128(1).

20. Ensure that each payment instrument bears the name of Licensee, and any other information as may be required by rule, clearly imprinted thereon. Fla. Stat. § 560.213.

**GEORGIA**

1. Sell payment instruments or transmit money only at the location designated in the written notice provided to the Georgia Department of Banking and Finance. O.C.G.A. § 7-1-683.1(a).

2. Timely remit all money legally due to Licensee. O.C.G.A. § 7-1-683.1(c)(2).

3. Not utilize subagents to carry out the Agent's responsibilities. O.C.G.A. § 7-1-683.1(c)(3).

4. Consent to examination and investigation by the Georgia Department of Banking and Finance. O.C.G.A. § 7-1-683.1(c)(4).

5. Consent to administrative actions, including but not limited to, the revocation or suspension of authorization to act as an Agent, a cease and desist order, and the imposition of fines. O.C.G.A. § 7-1-683.1(c)(5).

6. Provide a written receipt or other evidence of acceptance of the issuance of payment instruments, or the transmission of money to each customer that is a payment instrument holder. The receipt shall show the name of Licensee or trade name of Licensee that is registered with the Georgia Department of Banking and Finance, Agent identifier information, the date of issuance of the payment instrument or of the transmission of money, the dollar amount of the issued payment instrument or of the transmitted money, and the fee charged to the customer. Ga. Comp. R. & Regs. r. 80-3-1-.01(7).

7. Display prominently in the premises where checks, money orders, or other instruments are issued and sold a certificate in prescribed form indicating that such sales or transmissions are licensed under the Georgia Sale of Check Act or in lieu of the forgoing, have all window decals and other advertising material relative to the sale of checks or money services available within Georgia bear the legend "LICENSED BY THE GEORGIA DEPARTMENT OF BANKING AND FINANCE" in letters at least one-quarter inch high. Ga. Comp. R. & Regs. r. 80-3-1-.01(3).

8. Transmit proceeds received from the sale of checks or money transmission, net of fees charged and retained by the Agent, by such means as Licensee shall require within five (5) business days from the date of sale or issuance unless more frequent remittance is required by the Georgia Department of Banking and Finance or Licensee. Ga. Comp. R. & Regs. r. 80-3- 1.01(6).

9. Be subject to the filing requirements for large currency transactions as prescribed in O.C.G.A. Article 11 of Title 7. Ga. Comp. R. & Regs. R. 80-3-1-.04(1).

**HAWAII**

1. File with the Hawaii Commissioner of Financial Institutions all reports relating to transactions in Hawaii, as required by federal recordkeeping and reporting requirements in Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering. HRS § 489D-16(a).

2. Submit to and pay all reasonable costs for an on-site examination of Agent by the commissioner. HRS § 489D-17 and HRS § 489D-17(b).

3. Upon receipt of money or monetary value for transmission, transmit the money or its monetary equivalent received from a consumer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the consumer within ten business days after receiving the money or equivalent value, unless otherwise ordered by the consumer or unless Agent has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money. HRS § 489D-20(a).

4. Provide a receipt to the consumer that clearly states the amount of money or equivalent value presented for transmission and the total of the fees charged by Licensee. If the rate of exchange for a money transmission to be paid in the currency of another country is fixed by Licensee for that transaction at the time the money transmission is initiated, the receipt provided to the consumer shall disclose the rate of exchange for that transaction, and the duration, if any, for the payment to be made at that fixed rate of exchange. If the rate of exchange for a money transmission to be paid in the currency of another country is not fixed at the time the money transmission is sent, the receipt provided to the consumer shall disclose that the rate of exchange for that transaction will be set at the time the recipient of the money transmission picks up the funds in the foreign country. HRS § 489D-20(b).

5. Provide a refund of all moneys received for transmittal within ten days of receipt of a written request for a refund unless any of the following occurs: (i) the moneys have been transmitted and delivered to the person designated by the consumer prior to receipt of the written request for a refund, (ii) instructions have been given committing an equivalent amount of money to the person designated by the consumer prior to receipt of a written request for a refund, (iii) Agent has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money as requested by the consumer or refunding the money as requested by the consumer, or (iv) Licensee is otherwise barred by law from making a refund. HRS § 489D-20(d).

6. Not authorize sub-delegates without the written consent of the Hawaii Commissioner of Financial Institutions. HRS § 489D-21(2).

7. Certify that Agent is in compliance with the recordkeeping and reporting requirements under Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering. HRS § 489D-21(4).

8. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Hawaii Commissioner of Financial Institutions. HRS § 489D-22(a).

9. Ensure that all money transmissions conducted by Agent are in accordance with Licensee's written procedures provided to Agent. HRS § 489D-22(b).

10. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. HRS § 489D-22(c).

11. Consent to inspection by the Hawaii Commissioner of Financial Institutions, with or without prior notice, of the books and records Agent when the commissioner has a reasonable basis to believe that Agent is not in compliance with the Hawaii Money Transmitter's Act. HRS § 489D-22(d).

12. Act only as authorized under the contract with Licensee as failure to do so may result in the cancellation of such contract and further disciplinary action by the Hawaii Commissioner of Financial Institutions. HRS § 489D-22(e)

13. Ensure all funds, except fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. HRS § 489D-22(f).

14. Report to Licensee the theft or loss of payment instruments within twenty-four hours from the time Agent knew or should have known of the theft or loss. HRS § 489D-22(g).

**IDAHO**

1. Not authorize sub-representatives without the written consent of the Idaho Director of the Department of Finance. Idaho Code § 26-2918(2).

2. Be subject to supervision and regulation by the Idaho Director of the Department of Finance. Idaho Code § 26-2918(3).

3. Consent to inspection by the Idaho Director of the Department of Finance, with or without prior notice, of the books and records of Agent when the director has a reasonable basis to believe that the Agent is in violation of the provisions of Title 26, Chapter 29 of the Idaho Code. Idaho Code § 26-2918(4) and Idaho Code § 26-2914(1).

4. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract and further disciplinary action by the Idaho Director of the Department of Finance. Idaho Code § 26-2918(5).

5. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Idaho Director of the Department of Finance. Idaho Code § 26-2919(1).

6. Transmit money strictly in accordance with Licensee's written procedures provided to Agent. Idaho Code § 26-2919(2).

7. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. Idaho Code § 26-2919(3).

8. Ensure all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. Idaho Code § 26-2919(4).

9. Report to Licensee the theft or loss of payment instruments within twenty-four (24) hours from the time Agent knew or should have known of such theft or loss. Idaho Code § 26-2919(5).

**ILLINOIS**

1. Conspicuously display a disclosure notice supplied by Licensee providing the following information: (i) name of Licensee, (ii) a toll-free telephone number for the Illinois Department of Financial Institutions which will provide customer support for suspected violations of the Illinois Transmitters of Money Act, and (iii) a statement that the authorization for Agent to conduct money transmission may be revoked at any time by Licensee. 205 ILCS 657/37(b)(1) (3)

2. Upon termination as authorized seller, remove the disclosure notice from the premises within 10 business days after such termination. 205 ILCS 657/37(c).

3. Pay an examination fee established by rule and the actual expenses of the examination, should one be conducted by the Illinois Director of Financial Institutions. 205 ILCS 657/55(g).

4. Preserve for at least 5 years all documents relating to money transmission activities, unless the data embodied in such documents has been transmitted for recordation by Licensee. 205 ILCS 657/60(b).

5. Ensure that every payment instrument sold through Agent except for a stored value card shall bear the name of Licensee and a unique consecutive number clearly stamped or imprinted on it. When an order for the transmission of money results in the issuance of a payment instrument, both the order and the payment instrument may bear the same unique number. 205 ILCS 657/65)(a).

6. Create a record, which may be reduced to computer or other electronic medium, upon receiving any money from a customer. 205 ILCS 657/65(b).

7. For each payment instrument other than a stored value card sold, record the face amount of the payment instrument and the serial number of the payment instrument. 205 ILCS 657/65(c).

8. For each transmission of money, record the date the money was received, the face amount of the payment instrument, the name of the consumer, the manner of transmission, including the identity and location of any bank or other financial institution receiving or otherwise involved in accomplishing the transmission, the location to which the money is transmitted if different from the bank or other financial institution required to be recorded, the name of the intended recipient, and the date the transmission was accomplished or the money was refunded to the consumer due to an inability to transmit or failure of the intended recipient to receive or obtain the money transmitted. 205 ILCS 657/65(d).

9. Ensure that transmission is made within three business days after the receipt of the money to be transmitted. 205 ILCS 657/65(d).

10. Issue a receipt to each person delivering or depositing money with Agent indicating the date of the transaction,

the face amount of the payment instrument, to whom the money is to be transmitted, the service charge, and the name and address of Licensee or Agent. The receipt or a separate disclosure at the time of the money transmission shall also include a statement of Licensee's refund procedures as well as a toll-free telephone number for customer assistance. 205 ILCS 657/65(d).

11. Keep a copy of every receipt in a permanent record book or maintain the data embodied in the receipt using photographic, electronic, or other means. 205 ILCS 657/65(d).

12. For each exchange of money of the United States government or a foreign government to or from money of another government, record the date of the transaction, the amount of the transaction, the amount of funds stated in currency received by the recipient, and the rate of exchange at the time of the transaction. 205 ILCS 657/65(e).

13. For each exchange of money of the United States government or a foreign government to or from money of another government, issue a receipt to each person delivering or depositing money with Agent indicating the date of the transaction, the amount of the transaction, the service charge, and the name and address of Licensee or Agent making the transaction. 205 ILCS 657/65(e).

14. Preserve records required to be kept by Agent under the Illinois Money Transmitter Act for at least five years or as required to comply with any other Act the administration of which is vested in the Illinois Director of Financial Institutions and make such records available for examination upon request of Illinois Director of Financial Institutions. 205 ILCS 657/65(f).

15. Not commit fraud or misrepresentation and/or submit fraudulent statements to Licensee. 205 ILCS 657/75(e).

16. Hold in trust for Licensee, from the moment of receipt, the proceeds of any business transacted under this the Illinois Money Transmitter Act in an amount equal to the amount of proceeds due Licensee less the amount due Agent. 205 ILCS 657/75(f).

17. Remit funds to Licensee in accordance with the time specified in its contract with Licensee as failure to do so may result in a civil action against Agent for three times the actual damages. 205 ILCS 657/75(f).

18. Not act outside its scope of authority as defined by the Illinois Money Transmitter Act and by Agent's contract with Licensee with regard to any transaction regulated by the Illinois Money Transmitter Act. 205 ILCS 657/7(j).

19. The Agent shall immediately report to Licensee the theft or loss of any payment instrument from Licensee or the Agent having a value in excess of $100 or an aggregate value of $1,000 in any three month period. 205 ILCS 657/75(g).

**INDIANA**

1. Consent to an on-site examination by the Director of the Indiana Department of Financial Institutions and pay all reasonable costs for same. Ind. Code Ann. § 28-8-4-41(a) and Ind. Code Ann. § 28-8-4-44(b)(1).

2. Comply with all state and federal money laundering statutes and regulations, including the following: (1) the Bank Secrecy Act (31 U.S.C. 5311), (2) The USA Patriot Act of 2001 (P.L. 107-56), (3) any regulations, policies, or reporting requirements established by the Financial Crimes Enforcement Network of the United States Department of the Treasury, (4) any other state or federal money laundering statutes or regulations that apply to Agent. Ind. Code Ann. § 28-8-4-46(a)(1)-(4).

3. Not authorize a sub-delegate without the written consent of the Director of the Indiana Department of Financial Institutions. Ind. Code Ann. § 28-8-4-49(2).

4. Consent to inspection by the Director of the Indiana Department of Financial Institutions, with or without prior notice to Agent, of the books, records, and accounts of Agent when the Director of the Indiana Department of Financial Institutions has a reasonable basis to believe that Agent is in violation of Title 28, Article 8, Chapter 4 of the Indiana Code. Ind. Code Ann. § 28-8-4-49(4).

5. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract and further disciplinary action by the Director of the Indiana Department of Financial Institutions. Ind. Code Ann. § 28-8-4-49(5).

6. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Director of the Indiana Department of Financial Institutions. Ind. Code Ann. § 28-8-4-50(a).

7. Ensure that all money transmission or sale or issuance of payment instrument activities conducted by Agent are strictly in accordance with Licensee's written procedures provided to Agent. Ind. Code Ann. § 28-8-4-50(b)(1).

8. Remit funds to Licensee in accordance with the time specified in its contract with Licensee as failure to do so may

result in a civil action against Agent for three times the actual damages. Ind. Code Ann. § 28-8-4-50(b)(2).

9. Ensure that all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. Ind. Code Ann. § 28-8-4-50(3).

10. Report to Licensee the theft or loss of payment instruments not more than twenty-four (24) hours after the time Agent knew or should have known of the theft or loss. Ind. Code Ann. § 28-8-4-50(4).

**IOWA**

1. Operate in full compliance with Title XIII, Subtitle 2, Chapter 533C, Article 4 of the Iowa Code and any policies and procedures provided to Agent by Licensee in connection with same. Iowa Code § 533C.401(2).

2. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. Iowa Code § 533C.401(3).

3. Upon notice of suspension or revocation Licensee's money transmitter license, immediately cease to provide money services as a delegate of Licensee. Iowa Code § 533C.401(4).

4. Not provide money services outside the scope of activity permissible under the contract between Agent and Licensee, except activity in which the Agent is licensed to engage under Title XIII, Subtitle 2, Chapter 533C, Article 2 or 3. Iowa Code § 533C.401(5).

5. Hold in trust for the benefit of Licensee all money, net of fees, received from money transmission. Iowa Code § 533C.401(5).

6. Consent to examination by the Superintendent of Banking for the State of Iowa at any time, without notice, if the Superintendent of Banking for the State of Iowa has reason to believe that the Agent is engaging in an unsafe or unsound practice or has violated or is violating Title XIII, Subtitle 2, Chapter 533C or a rule adopted or an order issued under same. Iowa Code § 533C.501(2).

7. File all reports required by federal currency reporting, recordkeeping, and suspicious activity reporting requirements as set forth in 31 U.S.C. § 5311--5330, and 31 C.F.R. § 103.11--103.170. Iowa Code § 533C.506.

**KENTUCKY**

1. Consent to examination or investigation by the Executive Director of the Kentucky Office of Financial Institutions, whether or not prior notice is given to Agent, of the books, records, and business operations of Agent. KRS § 286.11-027(4).

2. File with the Executive Director of the Kentucky Office of Financial Institutions all reports by federal currency reporting, recordkeeping, and suspicious transaction reporting requirements as set forth in the Bank Secrecy Act, 31 U.S.C. secs. 5311 to 5332, 31 C.F.R. pt. 103, and other federal and state laws pertaining to money laundering, for every transaction in this state and maintain a copy of such reports in compliance with KRS 286.11-029. KRS § 286.11-031(1).

3. Operate in full compliance with Title XXV, Chapter 286, Subtitle 11 of the Kentucky Code, rules promulgated thereunder, and any order issued by the Executive Director of the Kentucky Office of Financial Institutions pursuant to same. KRS § 286.11-035(2).

4. Not authorize sub-agents. KRS § 286.11-035(3).

5. Remit all money legally due to Licensee in accordance with the terms of the written contract between Licensee and Agent. KRS § 286.11-035(4) and KRS § 286.11-037(3).

6. Be subject to regulation by the Executive Director of the Kentucky Office of Financial Institutions. KRS § 286.11-035(5).

7. Not make any fraudulent statements or misrepresentations to Licensee or to the Executive Director of the Kentucky Office of Financial Institutions. KRS § 286.11-037(1).

8. Conduct all money transmissions, or sale, or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. KRS § 286.11-037(2).

9. Act only as authorized under the contract with Licensee. KRS § 286.11-037(4).

10. Ensure all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until such time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. KRS § 286.11-037(5).

11. Report to Licensee the theft, forgery, or loss of payment instruments within twenty-four (24) hours from the time Agent knew of the theft, forgery, or loss. KRS § 286.11-037(6).

12. Comply with all applicable state and federal laws. KRS § 286.11-063.

**LOUISIANA**

1. Hold in trust from the moment of receipt the proceeds of a sale or delivery of Licensee's checks or money collected for transmittal. La. R.S. 6:1048.

2. Not commingle the proceeds of a sale or delivery of Licensee's checks or money collected for transmittal with customer's own property or funds, except to use the funds in the ordinary course of its business for the purpose of making change. La. R.S. 6:1048.

**MAINE**

1. Not authorize sub-delegates without the written consent of the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. 32 M.R.S. § 6117(2).

2. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. 32 M.R.S. § 6118(1).

3. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. 32 M.R.S. § 6118(2).

4. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and the Agent as failure to do so may result in liability of Agent to Licensee for three times Licensee's actual damages. 32 M.R.S. § 6118(3).

5. Consent to inspection by the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation, with or without prior notice, of the books and records of Agent when the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation has a reasonable basis to believe that Agent is in noncompliance with this Title 2, Chapter 80, Subchapter 1 of the Maine Code. 32 M.R.S. § 6118(4).

6. Act only as authorized under the contract with Licensee and Agent as failure to do so may result in cancelation of such contract and further disciplinary action by the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. 32 M.R.S. § 6118(5).

7. Ensure that all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. 32 M.R.S. § 6118(6).

8. Report to Licensee the theft or loss of payment instruments within 24 hours from the time Licensee knew or should have known of the theft or loss. 32 M.R.S. § 6118(7).

**MARYLAND**

1. Display prominently at each location open to the public a notice in at least 48-point type that states the following:

> "The Commissioner of Financial Regulation for the State of Maryland will accept all questions or complaints regarding authorized delegate of [insert name of Licensee] at [insert address of Commissioner], phone [insert toll-free phone number of the Commissioner]." Md. Financial Institutions Code Ann. § 12-410(e)(2).

2. Not authorize sub-agents or sub-delegates without written consent of the Commissioner of Financial Regulation for the State of Maryland. Md. Financial Institutions Code Ann. § 12-413(b)(2).

3. Be subject to supervision, examination, and regulation by the Commissioner of Financial Regulation for the State of Maryland. Md. Financial Institutions Code Ann. § 12-413(b)(3).

4. Operate in full compliance with the policies and procedures provided to Agent by Licensee. Md. Financial Institutions Code Ann. § 12-413(c).

5. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Commissioner of Financial Regulation for the State of Maryland. Md. Financial Institutions Code Ann. § 12-414(a).

6. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's operating procedures provided to Agent. Md. Financial Institutions Code Ann. § 12-414(b).

7. Operate in full compliance with all applicable laws and regulations. Md. Financial Institutions Code. Ann. § 12-413(b)(4).

8. Remit all funds owed to Licensee in accordance with the terms of the contract between Licensee and Agent, but not later than 48 hours after the next regular business day after Agent receives the proceeds from a money transmission. Md. Financial Institutions Code Ann. § 12-414(c) and §12-418(b).

9. Ensure that all funds received by Agent from the sale of a payment instrument, less fees, shall constitute trust funds belonging to Licensee from the time the funds are received by Agent until the time when the funds are remitted to Licensee. Md. Financial Institutions Code Ann. § 12-414(d)(1).

10. Report to Licensee the theft or loss of a payment instrument within 24 hours after the theft or loss. Md. Financial Institutions Code Ann. § 12-414(e).

**MICHIGAN**

1. Operate in compliance with the Michigan Money Transmission Services Act and any policies and procedures provided by Licensee to Agent with respect to same. MCL § 487.1033(1).

2. Remit all money owing to Licensee in accordance with the terms of the agreement between Licensee and Agent. MCL § 487.1033(2).

3. Upon receipt of notice from Licensee or Commissioner of the Michigan Office of Financial and Insurance Services that Licensee's money transmitter license has been suspended or revoked, immediately cease providing money transmission services as an authorized delegate of Licensee. MCL § 487.1033(3)

4. Not provide money transmission services outside the scope of activity permissible under the agreement between Agent and Licensee, except activity in which Agent is otherwise authorized to engage. MCL § 487.1033(4).

5. Hold all money received from providing money transmission services, reduced by any fees owed to Agent by Licensee, in escrow for the benefit of Licensee. MCL § 487.1033(4).

6. Not make any fraudulent or false statement or misrepresentation to a consumer or Licensee or to the Commissioner of the Michigan Office of Financial and Insurance. MCL § 487.1034(1).

7. Perform money transmission services lawfully and in accordance with Licensee's operating policies and procedures provided to Agent. MCL § 487.1034(2).

8. Hold all funds received by Agent from the sale of a payment instrument, less fees, in trust for Licensee from the time the funds are received by Agent until the time the funds are remitted to Licensee. MCL § 487.1034(3).

9. Report to Licensee the theft or loss of a payment instrument within 24 hours after the theft or loss. MCL § 487.1034(5).

**MINNESOTA**

1. Not authorize sub-delegates without the written consent of the Minnesota Commissioner of Commerce. Minn. Stat. § 53B.20(2).

2. Acknowledge that Licensee is subject to supervision and regulation by the Minnesota Commissioner of Commerce and that as a part of that supervision and regulation, the Minnesota Commissioner of Commerce may require Licensee to cancel its contract with Agent. Minn. Stat. § 53B.20(3).

3. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Minnesota Commissioner of Commerce. Minn. Stat. § 53B.21(a).

4. Conduct its money transmission activities in a safe and sound manner. Minn. Stat. § 53B.21(b)

5. Cooperate with an investigation conducted by the Minnesota Commissioner of Commerce under Chapter 53B.20 of the Minnesota Banking Code by providing any relevant information in its possession that the Minnesota Commissioner of Commerce cannot reasonably obtain from another source. Minn. Stat. § 53B.21(c).

6. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract. Minn. Stat. § 53B.21(d).

7. Ensure that all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, constitute trust funds owned by and belonging to Licensee from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee. Minn. Stat. § 53B.21(e).

**MISSISSIPPI**

1. Display prominently on the Agent's premises, where same may be readily viewed by prospective clients or purchasers, a printed certificate signed by an authorized official of Licensee setting forth in bold letters the names of Licensee and Agent and stating that Licensee holds a valid and existing license issued by the Commissioner of Banking and Consumer Finance of the State of Mississippi under Title 75, Chapter 15 of the Mississippi Sale of Checks Law and that Agent is a duly authorized agent of Licensee. Miss. Code Ann. § 75-15-17.

2. Not appoint a sub-agent to conduct money transmission. Miss. Code Ann. § 75-15-17.

3. At the point Agent ceases to be an agent of a Licensee, immediately cease displaying its agent's appointment certificate and immediately surrender same to Licensee. Miss. Code Ann. § 75-15-23.

4. Ensure that any check, which includes stored value cards, sold by Agent on behalf of Licensee shall bear the name of Licensee. Miss. Code Ann. § 75-15-23.

5. Not directly or indirectly conduct its own money transmission business and shall not be, continue to be, or become an officer, director, stockholder, employee, or agent of any other licensee, licensed under the Mississippi Money Transmitters Act. Miss. Code Ann. § 75-15-23.

**MISSOURI**

1. Upon demand, transfer and deliver to Licensee the proceeds of the sale of Licensee's checks less the fees, if any, due Agent. § 361.720 R.S.Mo.

**NEBRASKA**

1. Not appoint any sub-delegates without the written consent of the Director of the Nebraska Department of Banking and Finance. R.R.S. Neb. § 8-2739(2).

2. Acknowledge that Licensee is subject to supervision and regulation by the Director of the Nebraska Department of Banking and Finance. R.R.S. Neb. § 8-2739(3).

3. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Director of the Nebraska Department of Banking and Finance. R.R.S. Neb. § 8-2740(1).

4. Remit all money owed to Licensee in accordance with the terms of the contract between Licensee and Agent. R.R.S. Neb. § 8- 2740(3).

5. Consent to the Director of the Nebraska Department of Banking and Finance's inspection with or without prior notice. R.R.S. Neb. § 8-2740(4).

6. Act only as authorized under the contract with Licensee and the Nebraska Money Transmitters Act. R.R.S. Neb. § 8- 2740(5).

**NEVADA**

1. Consent to examination by the Nevada Commissioner of Financial Institutions. Nev. Rev. Stat. Ann. § 671.120(2).

2. Remit to Licensee or deposit with a bank or credit union authorized to do business in Nevada for credit to an account of Licensee, all money or credits received by Agent from the sale and issuance of checks or for the purpose of transmission, no later than the third business day following the receipt of such money and/or credits. Nev. Rev. Stat. Ann. § 671.150(1).

3. Not commingle money received from the sale or issuance of checks or for the purpose of transmission with the other assets of Licensee or Agent. Nev. Rev. Stat. Ann. § 671.150(2).

**NEW HAMPSHIRE**

1. Conspicuously post an authorized delegate registration notice, issued by the New Hampshire Banking Department

for each location where the business of money transmission is to be conducted other than Licensee's principal place of business, at each of Agent's offices within New Hampshire. RSA 399-G:9.

2. Consent to examination by the New Hampshire banking department. RSA 399-G:13(II).

3. Comply with Licensee's requirements pertaining to education, training, monitoring, and periodic inspection designed to inform Agent of its responsibilities, consistent with the Bank Secrecy Act and the requirements to file reports required by federal law. RSA 399-G:13(II-a).

**NEW JERSEY**

1. Pay for the costs of examination or investigation by New Jersey Commissioner of Banking and Insurance of Agent's operations unless stated otherwise in the Appointment Agreement. N.J. Stat. § 17:15C-11(c).

2. Provide any reports required by the New Jersey Commissioner of Banking and Insurance, under penalty of perjury or otherwise, concerning Agent's business conducted pursuant to the license issued to Licensee under the New Jersey Money Transmitters Act. N.J. Stat. § 17:15C-12.

3. Not make any fraudulent or false statement or misrepresentation to Licensee or to the New Jersey Commissioner of Banking and Insurance. N.J. Stat. § 17:15C-18(a).

4. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. N.J. Stat. § 17:15C-18(b).

5. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent as failure to remit within the time presented shall result in liability of Agent to Licensee for three times Licensee's actual damages. N.J. Stat. § 17:15C-18(c).

6. Consent to inspection by New Jersey Commissioner of Banking and Insurance, with or without prior notice to Agent, of the books and records of Agent whenever the New Jersey Commissioner of Banking and Insurance has a reasonable basis to believe that the Agent is not in compliance with the New Jersey Money Transmitters Act. N.J. Stat. § 17:15C-18(d).

7. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract and further disciplinary action by the New Jersey Commissioner of Banking and Insurance. N.J. Stat. § 17:15C-18(e).

8. Ensure that all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until that time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. N.J. Stat. § 17.15C-18(f).

9. Report to Licensee the theft or loss of payment instruments within 24 hours from the time Agent knew or should have known of that theft or loss. N.J. Stat. § 17:15C-18(g).

10. Comply with the provisions of 31 C.F.R. s.103.11 et seq. and P.L.1994, c.121 (C.2C:21-23 et seq.). N.J. Stat. § 17:15C-18(h).

11. Conduct all business governed by the New Jersey Money Transmitters Act in the name of Licensee. N.J. Stat. § 17:15C-18(i).

**NEW MEXICO**

1. Operate in full compliance with the Uniform Money Services Act and any policies and procedures provided to Agent by Licensee in connection with the same. N.M. Stat. Ann. § 58-32-501.B.

2. Remit all money owing to Licensee in accordance with the terms of the contract between License and Agent. N.M. Stat. Ann. § 58-32-501.D.

3. Cease to provide money services as a delegate of Licensee upon notice that the money service license of Licensee is suspended or revoked. N.M. Stat. Ann. § 58-32-501.E.

4. Not provide money services outside the scope of activity permissible under the terms of the contract between Agent and Licensee. N.M. Stat. Ann. § 58-32-501.F.

5. Hold in trust for the benefit of Licensee all money, net of fees, received from money transmission. N.M. Stat. Ann. § 58-32-501.F.

6. Not use a subdelegate to conduct money services on behalf of Licensee. N.M. Stat. Ann. § 58-32-501.G.

7. Submit to an examination by the Director of the New Mexico Financial Institutions Division. N.M. Stat. Ann. § 58-32-601.A and B.

8. File with the New Mexico attorney general all reports required by federal currency reporting, recordkeeping, and suspicious transaction reporting requirements as set forth in 31 U.S.C. Section 5311 et. seq. (1994) or any successor law, and other federal and state laws pertaining to money laundering. N.M. Stat. Ann. § 58-32-606.A.

9. Retain a record, in connection with each transaction that involves transmitting money in an amount of one thousand dollars ($1,000) or more, whether sending or receiving, of each of the following: (1) the name and social security or taxpayer identification number, if any, of the individual presenting the transaction and of the person and the entity on whose behalf the transaction is to be effected; (2) the type and number of the customer's verified photographic identification as described in 31 Code of Federal Regulations Section 1010.312 or any successor regulations; (3) the customer's current occupation; (4) the customer's current residential address; and (5) the customer's signature. This requirement shall not apply to transactions by which a customer is making a bill payment to (1) a commercial creditor pursuant to a contract between the Licensee and the commercial creditor; or (2) a utility company. N.M. Stat. Ann. § 58-32-606.C and D.

**NEW YORK**

1. Report the sale of any New York instruments or New York traveler's checks issued by Licensee to Licensee and remit the face amount of such instruments or checks to Licensee within such period of time as Licensee requires within the normal course of its business or as the New York Superintendent of Banks, by rule or regulation, may prescribe. NY CLS Bank § 651-a.

2. Make and keep such accounts, correspondence, memoranda, papers, books and other records as the New York Superintendent of Banks by regulation or order requires and preserve same for the time specified by the regulation or order of the New York Superintendent of Banks. NY CLS Bank § 651-b.

3. Not act on behalf of the consumer as a courier for the transmission of money which activity requires licensing as a money transmitter. 3 NYCRR § 406.5(a)(2).

4. Not retain any money orders sold and instead, provide the same to purchasers of the instruments for their own delivery to the beneficiary. 3 NYCRR § 406.5(a)(2).

5. Acknowledge that the New York Superintendent of Banks reserves the right to inspect, with or without prior notice, the books and records of Agent and any sub-agents of Agent. 3 NYCRR § 406.5(3).

6. Not sell any travelers check, money order or other money transmission instrument in New York unless the name of Licensee clearly appears on the face of the instrument. 3 NYCRR § 406.5(a)(4).

7. Not sell any travelers check, money order or other money transmission instrument in New York, unless Agent and sub-agent of Agent has provided the New York Superintendent of Banks with a written and irrevocable consent to examine, have access to, and retain copies of all of its books and records, wherever maintained, relating to these activities. 3 NYCRR § 406.5(5).

8. Act only as authorized under the agency contract with Licensee as failure to do so may result in cancellation of such contract and further disciplinary action against Licensee by the New York Superintendent of Banks. 3 NYCRR § 406.5(6).

9. Not advertise its money transmission services without including the name of Licensee and the legend that Licensee is "Licensed as a Money Transmitter by the Banking Department of the State of New York". 3 NYCRR § 406.6(a).

10. Maintain a complete file of its advertisements (including commercial scripts of all radio and television broadcasts) for examination by the New York Superintendent of Banks for a period of at least two years from the date of publication. 3 NYCRR § 406.6(c).

11. Make, keep and preserve its books and records in such form, in such manner and for such time as is in accordance with generally accepted accounting principles and in a condition which will allow the superintendent to determine whether Agent and its sub-agent, if any, is complying with Article XIII-B of the Banking Law. Preservation by photographic reproduction or in photographic form shall constitute compliance with this requirement. 3 NYCRR § 406.9(a).

12. Ensure that the books and records it maintains include the following: (1) a daily record of instruments sold by date; (2) a general ledger containing all asset, liability, capital, income and expense accounts which general ledger shall be posted at least monthly; (3) remittance reports received from sub-agents; (4) bank statements and bank

reconciliation records which shall be kept for three years; (5) outstanding money transmission instruments by year of sale which shall be maintained for at least five years after the time which such instruments have been deemed, under the New York Abandoned Property Law, to be abandoned property; (6) each money transmission instrument paid for a period of three years after the date of payment; (7) a list of the names and addresses of all sub-agents who sell or issue Licensee's money transmission instruments and copies of agency agreements thereunder. 3 NYCRR § 406.9(b)(1)-(7).

13. Post and at all times display in full public view a sign in the English language and in any other predominant language spoken by its customers. Each sign shall be no less than 20 inches wide and 12 inches high with letters at least one-half inch in height prominently indicating the following: (i) name, address and telephone number of the principal office of the Agent and the type of money transmission activity which the Agent has been authorized to conduct by Licensee; (ii) name and address of Licensee; and a telephone number established by Licensee to answer questions and register complaints; and (iii) that Licensee is licensed and regulated by the New York State Department of Financial Services and that unresolved consumer complaints may be mailed to the New York State Department of Financial Services, Consumer Services Division, as set forth in section 1.1 of Supervisory Policy G 1. 3 NYCRR § 406.4 (d)(1).

14. Post a notice provided by Licensee no less than 4 inches by 6 inches to be publicly displayed on the Agent's window or entrance door containing the following information: (i) the name of Licensee; (ii) the statement that Licensee is "Licensed as a Money Transmitter by the New York State Department of Financial Services"; and (iii) Licensee's designation of the Agent to act in such capacity. 3 NYCRR § 406.4 (d)(2).

15. Issue a receipt, or other evidence of acceptance of funds, to every person who utilizes the Agent to transfer money. The receipt shall contain the information required in section 3 NYCRR § 406.3(f) and the following additional information: (i) that Licensee is liable for the nondelivery or delayed delivery; (ii) the refund policy of Licensee; (iii) the dollar amount of transmission; and (iv) the fee charged. 3 NYCRR § 406.4 (e).

16. Comply with federal Bank Secrecy Act regulations as set forth in 31 CFR Part 103.28. 3 NYCRR § 406.9(c).

<u>NORTH CAROLINA</u>

1. Consent to an on-site examination by the Commissioner of Banks of the State of North Carolina of Agent's operations, without prior notice, and agree to pay all reasonably incurred costs of the examination. N.C. Gen. Stat. § 53-208.15(b).

2. Not authorize sub-delegates without the written consent of the Commissioner of Banks of the State of North Carolina. N.C. Gen. Stat. § 53-208.19(2).

3. Post a certificate in public view at each location and that states the following: "Money transmission on behalf of [insert name of Licensee] is conducted at this location pursuant to the Money Transmitters Act." N.C. Gen. Stat. § 53-208.19(4).

4. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Commissioner of Banks of the State of North Carolina. N.C. Gen. Stat. § 53-208.20(a).

5. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. N.C. Gen. Stat. § 53-208.20(b).

6. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent as failure to remit all money owing to Licensee within the time presented shall result in liability of Agent to Licensee for three times Licensee's actual damages. N.C. Gen. Stat. § 53-208.20(c).

7. Consent to inspection by the Commissioner of Banks of the State of North Carolina, with or without prior notice, of the books and records of Agent when the Commissioner of Banks of the State of North Carolina has a reasonable basis to believe that Agent is not in compliance with Chapter 53, Article 16A of the North Carolina Code. N.C. Gen. Stat. § 53-208.20(d).

8. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract and further disciplinary action by the Commissioner of Banks of the State of North Carolina. N.C. Gen. Stat. § 53-208.20(e).

9. Ensure that all funds, less fees, received by Agent from the sale or delivery of a payment instrument or stored value issued by Licensee or received by Agent for transmission constitutes, trust funds owned by and belonging to Licensee, from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee. N.C. Gen. Stat. § 53-208.20(f).

10. Report to Licensee the theft or loss of payment instruments within 24 hours from the time it knew or should have known of the theft or loss. N.C. Gen. Stat. § 53-208.20(g).

11. Prominently post the certificate of authority specified in N.C. Gen. Stat. § 53-208.19 at each location at which it conducts licensed activities in North Carolina. N.C. Gen. Stat. § 53-208.20(h).

12. Maintain at its office a record of the disposition of all checks received from Licensee. The record shall contain an accounting of all proceeds from those checks paid to Licensee and all proceeds due to Licensee. 4 N.C.A.C. 3F.0601(b).

**NORTH DAKOTA**

1. Consent to an on-site examination by the Commissioner of the North Dakota Department of Financial Institutions without prior notice to Agent in the event that Commissioner of the North Dakota Department of Financial Institutions has a reasonable basis to believe that Agent is in noncompliance with Title 13, Chapter 13-09 of the North Dakota Century Code. N.D. Cent. Code, § 13-09-13(2).

2. Pay all reasonably incurred costs of an on-site examination by the Commissioner of the North Dakota Department of Financial Institutions. N.D. Cent. Code, § 13-09-13(2).

3. Not authorize sub-delegates without the written consent of the Commissioner of the North Dakota Department of Financial Institutions. N.D. Cent. Code, § 13-09-15(2).

4. Not make a fraudulent or false statement or misrepresentation to Licensee or to the Commissioner of the North Dakota Department of Financial Institutions. N.D. Cent. Code, § 13-09-16(1).

5. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. N.D. Cent. Code, § 13-09-16(2).

6. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. N.D. Cent. Code, § 13-09-16(3).

7. Consent to inspection by the Commissioner of the North Dakota Department of Financial Institutions, with or without prior notice to Agent. N.D. Cent. Code, § 13-09-16(4).

8. Act only as authorized under the contract with Licensee and Title 13, Chapter 13-09 of the North Dakota Code as failure to do so may result in cancellation of such contract and further disciplinary action by the Commissioner of the North Dakota Department of Financial Institutions. N.D. Cent. Code, § 13-09-16(5).

9. Ensure all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time such funds are received by Agent until such time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. N.D. Cent. Code, § 13-09-16(6).

**OHIO**

1. Not perform accounting, verification, or reconciliation of transmissions completed or bank statements for Licensee. ORC Ann. 1315.02(B).

2. Satisfy its duties and responsibilities, as described in the Appointment Agreement, regarding money or its equivalent received from persons located in Ohio for transmission by Licensee. ORC Ann. 1315.11(A)(1).

3. Satisfy its duties and responsibilities, as described in the Appointment Agreement, regarding instruments, devices, or processes used by Licensee to transmit money. ORC Ann. 1315.11(A)(2).

4. Satisfy its duties and responsibilities, as described in this Appointment Agreement, with regard to compliance with laws regulating money transmission activities. ORC Ann. 1315.11(A)(3).

5. Keep separate money or its equivalent received for transmission by Licensee and not commingle same with other money or receipts. ORC Ann. 1315.11(D)(1).

6. Ensure that all money or its equivalent, less fees, that is received by Agent for transmission by Licensee, from the time received until remitted to Licensee, constitutes funds owned by and belonging to Licensee and is impressed with a trust for the benefit of the person from which the money or its equivalent is received. ORC Ann. 1315.11(D)(1).

**OKLAHOMA**

1. Prominently display at each location of Agent a license certificate issued by the Oklahoma State Bank Commissioner. 6 Okl. St. § 2107(B).

2. Ensure that all funds collected or received from the sale of checks by Agent are impressed with a trust in favor of Licensee in an amount equal to the amount of the proceeds due Licensee and are not commingled with other funds of Agent. 6 Okl. St. § 2123(a).

3. Acknowledge that no proceeds received by Agent from the sale of any check issued by Licensee, while held by Agent, nor any property impressed with a trust pursuant to Title 6, Chapter 6, Section 2123 of the Oklahoma Code 15 subject to attachment, levy of execution, or sequestration by order of any court, except for the benefit of Licensee. 6 Okl. St. § 2123(b).

4. Operate in full compliance with the Oklahoma Sales of Checks Act and any policies and procedures provided by Licensee with respect to same. Okla. Admin. Code 85:15-5-1(b).

5. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. Okla. Admin. Code 85:15-5-1(c).

6. Upon notice that Licensee's license has been revoked and/or suspended, cease to provide money transmission services as a delegate of Licensee. Okla. Admin. Code 85:15-5-1(d).

7. Not provide money transmission services outside the scope of activity permissible under the contract between Agent and Licensee. Okla. Admin. Code 85:15-5-1(e).

8. Hold in trust for the benefit of Licensee all money, net of fees, received from money transmission. Okla. Admin. Code 85:15-5-1(e).

9. Not use a sub-delegate to conduct money transmission services on behalf of Licensee. Okla. Admin. Code 85:15-5-1(f).

10. Maintain the following records for at least three years: (i) for each money transmission of $ 1,000 or more, the records specified in 31 C.F.R. § 103.33(f); (ii) all documents required to be maintained or completed by the federal Bank Secrecy Act; and (iii) any other records the Oklahoma State Bank Commissioner reasonably requires. O.A.C. § 85:15-7-5(b)(1-3). Each of those records must be open to inspection by the Commissioner or the Commissioner's authorized representative. O.A.C. § 85:15-7-5(e).

11. File all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set forth in 31 U.S.C. Section 5311, 31 C.F.R. Part 103, and other federal and state laws pertaining to money laundering. O.A.C. § 85:15-7-6.

**OREGON**

1. Consent to an on-site examination by the Oregon Director of the Department of Consumer and Business Services of the principal place of business of Agent, without prior notice to Agent, if the Oregon Director of the Department of Consumer and Business Services has a reasonable basis to believe that Agent is in violation of any provision of ORS 717.200 to 717.320, 717.900 and 717.905. ORS § 717.255(2).

2. Operate pursuant to an express written contract between Agent and Licensee. ORS § 717.270.

3. Not authorize sub-delegates without the written consent of the Director of the Department of Consumer and Business Services. ORS § 717.270(2).

4. Be subject to supervision and regulation by the Oregon Director of the Department of Consumer and Business Services. ORS § 717.270(3).

5. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Director of the Department of Consumer and Business Services. ORS § 717.275(1).

6. Conduct all money transmission activities strictly in accordance with Licensee's written procedures provided to Agent. ORS § 717.275(2).

7. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent as failure to remit within the time prescribed shall result in liability of Agent to Licensee for three times Licensee's actual damages. ORS § 717.275(3).

8. Consent to the inspection by Oregon Director of the Department of Consumer and Business Services, with or without prior notice to Agent, of the books and records of Agent when the Oregon Director of the Department of Consumer and Business Services has a reasonable basis to believe that Agent is not in compliance with ORS §§ 717.200 to 717.320, 717.900 and 717.905. ORS § 717.275(4).

9. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such

contract and further disciplinary action by the Oregon Director of the Department of Consumer and Business Services. ORS § 717.275(5).

10. Ensure all funds, not including fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee, or received by Agent for transmission, shall constitute trust funds owned by and belonging to Licensee during the period beginning when the funds are received by Agent and ending when the funds or an equivalent amount are remitted by Agent to Licensee. ORS § 717.275(6).

11. Report to Licensee the theft or loss of payment instruments within 24 hours from the time Agent first knows of the theft or loss. ORS § 717.275(6).

**PENNSYLVANIA**

1. Ensure that every transmittal instrument sold by Agent bears the name of Licensee clearly imprinted thercon. 7 P.S. § 6111(b).

2. Clearly indicate the name of Licensee in a sign publicly displayed in the Agent's place of business issuing and selling transmittal instruments. 10 Pa. Code § 19.6(b).

3. Agent is subject to the control of the Licensee, and must ensure that all funds, less fees, received by Agent for transmission, from the time such funds are received by Agent until such time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. 7 P.S. § 6112(c)(3).

4. There is no risk of loss to the individual initiating the transaction if the Agent fails to remit the funds to the person on whose behalf the Agent is acting. 7 P.S. § 6112(c)(4).

5. Receipt of funds by Agent is deemed receipt of funds by Licensee. 7 P.S. § 6112(c)(5).

6. Not provide money transmission outside the scope of activity permissible under the contract between Agent and Licensee except to the extent that the Agent is licensed itself or operating as an agent for another person. 7 P.S. § 6112(c)(6).

7. Ensure that individuals doing business with the Agent are aware that the Agent is working on behalf of Licensee. 7 P.S. § 6112(c)(7).

**PUERTO RICO**

1. Maintain any money received to carry out money transmissions in a separate account form the time such money is received until it is remitted by the Agent to Licensee. 10 L.P.R.A. § 2607(b).

2. Not comingle funds received for transmission by or to Licensee with the Agent's personal or business funds or any other personal or business property. 10 L.P.R.A. § 2607(d).

3. Act according to the authorization granted through the contract executed with Licensee and in strict compliance with the latter's standards and procedures. 10 L.P.R.A. § 2609(a)(1).

4. Notify Licensee immediately after any theft or loss of payment instruments or money. 10 L.P.R.A. § 2609(a)(2).

5. Display in a conspicuous place at the office that he/she is an Agent of Licensee under the provisions the Puerto Rico Money Service Business Regulatory Act, as well as the service charges for money transmissions. 10 L.P.R.A. § 2609(a)(3).

6. Immediately cease to operate as an Agent of Licensee or take any required action upon receipt of a notice from the Commissioner of Financial Institutions of Puerto Rico or Licensee to such effects. 10 L.P.R.A. § 2609(a)(4).

7. Remit to Licensee any money from transmissions plus service charges: (A) in accordance with the terms of the contract executed between Licensee and the Agent, or (B) as provided in the rules and regulations adopted under the provisions of the Puerto Rico Money Service Business Regulatory Act. 10 L.P.R.A. § 2609(a)(5).

8. Establish standards and procedures as necessary to comply with the provisions of the Office of Foreign Assets Control of the United States Department of the Treasury. 10 L.P.R.A. § 2609(a)(8).

9. Not make money advances to the client as loan to later charge for such service. 10 L.P.R.A. § 2609(b)(1).

10. Not enter into a contract with a third party to provide money transmission services on behalf of Licensee. 10 L.P.R.A. §2609(b)(2).

11. Not provide money transmission services outside the scope of activity permissible under the contract between the Agent and Licensee. 10 L.P.R.A. § 2609(b)(3).

12. Not carry out money transactions knowing that any portion of the money was derived from unlawful activities or transactions. 10 L.P.R.A. § 2609(b)(4).

13. Operate his/her business in a commercial facility approved by the Regulations and Permits Administration (ARPE, Spanish acronym) for such activity, where he/she may be located during business hours, and which is appropriate for receiving clients. In the event that a check cashing business is carried out from a mobile unit, the same shall meet the applicable requirements set forth by law. 10 L.P.R.A. § 2621(a)(1).

14. Maintain a visible sign outside the business stating its name or trademark. 10 L.P.R.A. § 2621(a)(2).

15. Provide clients with clear and accurate details in writing regarding money service charges and terms, as well as any other disclosure required by applicable federal and/or Commonwealth laws or regulations. 10 L.P.R.A. § 2621(a)(5).

16. Provide a receipt to any person who received money services or with whom a transaction was conducted as evidence thereof. 10 L.P.R.A. § 2621(a)(6).

17. Keep a record of all money services requested, including money orders sold, pursuant to applicable federal or Commonwealth laws or regulations. 10 L.P.R.A. § 2621(a)(7).

18. Keep in his/her office and make available to the Commissioner of Financial Institutions of Puerto Rico, within the term the latter specifies, any accounts, books, files, and any other documents necessary to perform his/her supervisory function and examination. 10 L.P.R.A. § 2621(a)(8).

19. Allow the Commissioner free access to his/her properties, facilities, and operating sites. 10 L.P.R.A. § 2621(a)(8).

20. Cooperate with any examinations and/or investigations carried out by the Commissioner. 10 L.P.R.A. § 2621(a)(8).

21. Make available to the Commissioner a copy of the annual financial statements audited by a certified public accountant corresponding to the last five (5) years, together with a report by the certified public accountant who certified the same, stating the value and nature of the liquid assets and the average annual outstanding or pending money services. 10 L.P.R.A. § 2621(a)(9).

22. Adopt business policies and procedures as necessary to comply with the provisions of Office of Foreign Assets Control of the United States Department of the Treasury. 10 L.P.R.A. § 2621(a)(11).

23. Verify with Office of the Commissioner of Financial Institutions that the persons with whom the Agent conducts money service businesses hold the required license. 10 L.P.R.A. § 2621(a)(12).

24. Furnish a copy of the license that authorizes Licensee to engage in the money service business to any financial institution with which the Agent does business. 10 L.P.R.A. § 2621(a)(12).

25. Comply with any order or resolution of the Commissioner. 10 L.P.R.A. § 2621(a)(13).

26. Carry out their functions with the highest degree of diligence, care, loyalty, and pecuniary benefit for their clients. 10 L.P.R.A. § 2621(a)(14).

27. Manage the money service business in a safe manner. 10 L.P.R.A. § 2621(a)(15).

28. Not commit fraud, misrepresent, or make false or fraudulent statements. 10 L.P.R.A. § 2622(a).

29. Not grant loans or credit, deduct negotiable instruments or other debt instruments, or engage in any activity allowed solely to banks under §§ 1 et seq. of Title 7. 10 L.P.R.A. § 2622(b).

30. Not engage in a money service business in an establishment where small personal loans are granted. 10 L.P.R.A. § 2622(c).

31. Not charge a double fee for each money service. 10 L.P.R.A. § 2622(d).

32. Not make promises to clients with the intent to do business or knowing that such promises shall not be kept, or make any false claim regarding a material fact in order to induce them to error. 10 L.P.R.A. § 2622(e).

33. Not compensate third parties, either directly or indirectly, for processing or referring cases. 10 L.P.R.A. § 2622(f).

34. Not engage in illegal or unfair business practices. 10 L.P.R.A. § 2622(g).

35. Not use misrepresentations to induce or persuade a person to carry out a transaction. 10 L.P.R.A. § 2622(h).

36. Not unduly retain any sum of money or document concerning a transaction, or failing to advise a client on his/her rights or any amount of money and/or document that is part of a transaction. 10 L.P.R.A. § 2622(i).

37. Not embezzle or misappropriate funds in the Agent's custody. 10 L.P.R.A. § 2622(j).

38. Not falsify documents that are part of a transaction. 10 L.P.R.A. § 2622(k).

39. Not render, publish or prepare false reports or make false entries in order to deceive or defraud any person or the Commissioner. 10 L.P.R.A. § 2622(l).

40. Not carry out a money service business without a license to do so through personal contact, by telephone, or in writing or through advertisements on newspapers, the Internet, publications, handouts, signs, banners, phone books, radio, television, or any other similar medium. 10 L.P.R.A. § 2622(m).

41. Not advertise, show, distribute, broadcast, or allow someone else to advertise, show, distribute, or broadcast information regarding a money service business in a false or deceiving manner. 10 L.P.R.A. § 2622(n).

42. Obey a summons, order, or requirement of the Commissioner, or a court order thus issued claiming that the testimony, data, or information required could incriminate the Agent or lead to the imposition of a penalty. 10 L.P.R.A. § 2622(o).

**RHODE ISLAND**

1. Consent to investigation by Director of the Rhode Island Department of Business Regulation or its designee(s), at any time, of the Agent's business, books, accounts, records and files used therein. R.I. Gen. Laws § 19-14-23(a).

2. Ensure that every check or electronic money transfer sold by Agent on behalf of Licensee, bears the name of Licensee clearly imprinted on it. R.I. Gen. Laws § 19-14.3-3.

3. Not advertise, print, display, publish, distribute, telecast, or broadcast or cause or permit to be advertised, printed, displayed, published, distributed, telecast, or broadcast in any manner whatsoever any false, misleading, or deceptive statement or representation with regard to the rates, terms or conditions for licensed activities. R.I. Gen. Laws § 19-14-21(a).

**SOUTH DAKOTA**

1. Consent to an on-site examination by the Director of the South Dakota Division of Banking, without prior notice, if the Director of the South Dakota Division of Banking has a reasonable basis to believe that Agent is in not in compliance with Title 51A, Chapter 51A-17-28. S.D. Codified Laws § 51A-17-28.

2. Consent to pay all reasonably incurred costs of an on-site examination by the Director of the South Dakota Division of Banking. S.D. Codified Laws § 51A-17-28.

3. Not authorize sub-delegates without the written consent of the Director of the South Dakota Division of Banking. S.D. Codified Laws § 51A-17-31(2).

4. Be subject to supervision and regulation by the Director of the South Dakota Division of Banking. S.D. Codified Laws § 51A-17-31(3).

5. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Director of the South Dakota Division of Banking. S.D. Codified Laws § 51A-17-32(1).

6. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. S.D. Codified Laws § 51A-17-32(2).

7. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent as failure to remit all money owing to Licensee within the time presented will result in liability of Agent to Licensee for Licensee's actual damages. S.D. Codified Laws § 51A-17-32(3).

8. Consent to inspection by the Director of the South Dakota Division of Banking, with or without prior notice, of the books and records of Agent if the Director of the South Dakota Division of Banking has a reasonable basis to believe that Agent is not in compliance with Title 51A, Chapter 51A-17-28. S.D. Codified Laws § 51A-17-32(4).

9. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such

contract and further disciplinary action by the Director of the South Dakota Division of Banking. S.D. Codified Laws § 51A-17-32(5).

10. Ensure any funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time such funds are received by Agent until such time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. S.D. Codified Laws § 51A-17-33.

11. Report to Licensee the theft or loss of payment instruments and stored value within twenty-four hours from the time Agent knew or should have known of such theft or loss. S.D. Codified Laws § 51A-17-34.

**TENNESSEE**

1. Report to Licensee the theft or loss of payment instruments valued at five thousand dollars ($5,000) or more within twenty-four (24) hours from the time Agent knew or should have known of the theft or loss. Tenn. Code Ann. § 45-7-212(b).

2. Consent to on-site examinations by the Tennessee Commissioner of Financial Institutions or the Tennessee Commissioner of Financial Institutions staff of all the books, papers and records of Agent. Tenn. Code Ann. § 45-7-214(a).

3. Not authorize sub-agents without the written consent of the Tennessee Commissioner of Financial Institutions. Tenn. Code Ann. § 45-7-218(2).

4. Be subject to supervision and regulation by the Tennessee Commissioner of Financial Institutions. Tenn. Code Ann. § 45-7-218(3).

5. Consent to inspection by the Tennessee Commissioner of Financial Institutions, with or without prior notice to Agent, of the books and records of Agent. Tenn. Code Ann. § 45-7-218(4).

6. Act only as authorized under the contract with Licensee as failure to do so may result in cancellation of such contract by Licensee and further disciplinary action by the Tennessee Commissioner of Financial Institutions. Tenn. Code Ann. § 45-7-218(5).

7. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Tennessee Commissioner of Financial Institutions. Tenn. Code Ann. § 45-7-219(a).

8. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with Licensee's written procedures provided to Agent. Tenn. Code Ann. § 45-7-219(b).

9. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent as failure to remit all money owing to Licensee within the contractual time period shall result in liability of Agent to Licensee for three times Licensee's actual damages. Tenn. Code Ann. § 45-7-219(c).

10. Ensure all funds, less fees, received by Agent from the sale or delivery of a payment instrument issued by Licensee or received by Agent for transmission, from the time the funds are received by Agent until the time when the funds or an equivalent amount are remitted by Agent to Licensee, constitute trust funds owned by and belonging to Licensee. Tenn. Code Ann. § 45-7-219(d).

**TEXAS**

1. Consent to the jurisdiction of the courts of Texas for all actions arising under Title 3, Subtitle E, Chapter 151 of the Texas Finance Code. Tex. Finance Code § 151.106.

2. Comply with the policies and procedures in place by Licensee to ensure that Agent is in compliance with applicable federal and state law. Tex. Finance Code § 151.402(b)(1).

3. Consent to a reasonable risk-based background investigation by Licensee to determine whether Agent has complied with applicable state and federal law. Tex. Finance Code § 151.402(b)(3).

4. Certify that it is familiar with and agrees to fully comply with all applicable state and federal laws, rules, and regulations pertaining to money transmission, including Title 3, Subtitle E, Chapter 151 of the Texas Finance Code and rules adopted thereunder, relevant provisions of the Bank Secrecy Act and the USA PATRIOT ACT, and Title 3, Subtitle Z, Chapter 271 of the Texas Finance Code. Tex. Finance Code § 151.402(c)(3).

5. Remit and handle money and monetary value in accordance with Title 3, Subtitle E, Chapter 151, Sections 151.403(b) and (c) of the Texas Finance Code. Tex. Finance Code § 151.402(c)(4).

6. Impose a trust on money and monetary value received in accordance with Title 3, Subtitle E, Chapter 151, Section 151.404 of the Texas Finance Code. Tex. Finance Code § 151.402(c)(5).

7. Prepare and maintain records as required by Title 3, Subtitle E, Chapter 151 or a rule adopted thereunder, including but not limited to 7 TACT 33.35, or as reasonably requested by the Banking Commissioner of Texas. Tex. Finance Code § 151.402(c)(6).

8. Consent to examination or investigation by the Banking Commissioner of Texas. Tex. Finance Code § 151.402(c)(7).

9. Acknowledge that Licensee is subject to regulation by the Banking Commissioner of Texas and that, as part of that regulation, the Banking Commissioner of Texas may suspend or revoke an authorized delegate designation or require Licensee to terminate an authorized delegate designation. Tex. Finance Code § 151.402(c)(8).

10. Acknowledge receipt of the written policies and procedures required under Title 3, Subtitle E, Chapter 151, Section 151.402(b)(1). Tex. Finance Code § 151.402(c)(9).

11. Acknowledge that Agent has been provided the following regulatory website addresses through which Agent can access Title 3, Subtitle E, Chapter 151 and rules adopted thereunder and the Bank Secrecy Act, the USA PATRIOT ACT, and Title 3, Subtitle Z, Chapter 271: http://www.banking.state.tx.us/sa/msb_home.htm, http://www.fincen.gov/statutes_regs/bsa/, http://www.fincen.gov/statutes_regs/patriot/, and http://policy.ctspublish.com/txdob/lpext.dll/Infobase/division00060/sd100061.htm?fn=frame_default.htm&f=templates. Tex. Finance Code § 151.402(c)(10).

12. Assist a Licensee in reporting to the Banking Commissioner of Texas the theft or loss of payment instruments or stored value from the Agent in Texas if the total value of the instruments or stored value exceeds $10,000. Tex. Finance Code § 151.402(d).

13. Act only as authorized under the contract with Licensee and in strict compliance with Licensee's written policies and procedures. Tex. Finance Code § 151.403(a)(1).

14. Not commit fraud or misrepresentation or make any fraudulent or false statement or misrepresentation to Licensee or the Banking Commissioner of Texas. Tex. Finance Code § 151.403(a)(2).

15. Cooperate with an investigation or examination conducted by the Banking Commissioner of Texas and consent to the Banking Commissioner of Texas's examination of Agent's books and records. Tex. Finance Code § 151.403(a)(3) and Tex. Finance Code § 151.601.

16. Not commit an unsafe or unsound act or practice or conduct business in an unsafe and unsound manner. Tex. Finance Code § 151.403(a)(4).

17. Immediately upon discovery, report to Licensee the theft or loss of payment instruments or stored value. Tex. Finance Code § 151.403(a)(5).

18. Display on the form prescribed by the Banking Commissioner of Texas, a notice that indicates that Agent is an authorized delegate of Licensee. Tex. Finance Code § 151.403(a)(6).

19. Cease to provide money services as an authorized delegate of Licensee or take other required action immediately on receipt of notice from the Banking Commissioner of Texas or Licensee as provided by Title 3, Subtitle Z, Chapter 151, Section 151.402(e). Tex. Finance Code § 151.403(a)(7).

20. Remit all money owed to Licensee not later than the 10th business day after the date Agent receives the money, in accordance with the contract between Licensee and Agent, or as directed by the Banking Commissioner of Texas. Tex. Finance Code § 151.403(b)(1)-(3).

21. Remit all money owed to Licensee later than the 10th business day after the date Agent receives the money only if Agent maintains on deposit with an office of a federally insured financial institution located in the United States an amount that (1) is in an account solely in the name of Licensee; and (2) for each day by which the period before the remittance exceeds 10 business days, is not less than the outstanding obligations of Licensee routinely incurred by the Agent on a daily basis. Tex. Finance Code § 151.403(c)(1)-(2).

22. Hold in trust in favor of Licensee, all money received for transmission by or for Licensee from the time of receipt until the time the money is remitted by the Agent to Licensee. Tex. Finance Code § 151.404(b).

23. Not commingle the money received for transmission by or for Licensee with the Agent's own money or other property, except to use in the ordinary course of the Agent's business for the purpose of making change, if the money is accounted for at the end of each business day. Tex. Finance Code § 151.404(c).

24. In the event that the Banking Commissioner of Texas revokes Licensee's license under Section Title 3, Subtitle E, Chapter 151, Section 151.703, assign to the Banking Commissioner of Texas all money held in trust by Agent for the benefit of the persons to whom the related money transmission obligations are owed. Tex. Finance Code § 151.404(e).

25. Provide Licensee's name and mailing address or telephone number to the consumer in connection with each money transmission transaction conducted through Agent. Tex. Finance Code § 151.405(a).

26. Prepare, maintain, and preserve the records required by rule issued by the Banking Commissioner of Texas or reasonably requested by the Banking Commissioner of Texas. Tex. Finance Code § 151.602(c).

27. In the event that Agent receives an emergency order, submit written certification to the Banking Commissioner of Texas, signed by the Agent, and its principals and responsible individuals, as applicable, and each person named in the order, stating that each person has received a copy of and has read and understands the order. Tex. Finance Code § 151.710(f).

28. Issue a receipt for each transaction that contains: (i) the name of Licensee and the business address or telephone number; (ii) the unique transaction or identification number; (iii) the date of the transaction; (iv) the amount of the transaction in United States dollars; and (v) the amount of any fee charged for the transaction. 7 TAC § 33.37(b)(2)(B)(i)-(v).

29. Provide notice to consumers, in a method prescribed by Licensee, of how to file complaints concerning the money transmission business. 7 TAC § 33.51(f)(1).

**VERMONT**

1. Operate in full compliance with Title 8, Chapter 79 of the Vermont Uniform Money Services Act. 8 V.S.A. § 2525(b).

2. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. 8 V.S.A. § 2525(c).

3. Upon notice that Licensee's license has been suspended, revoked, or nonrenewed, immediately cease to provide money services as a delegate of Licensee. 8 V.S.A. § 2525(d).

4. Not provide money services outside the scope of activity permissible under the contract between Agent and Licensee, except activity in which Agent is otherwise licensed or authorized to engage. 8 V.S.A. § 2525(e).

5. Hold in trust for the benefit of Licensee all money less fees earned from money transmission. 8 V.S.A. § 2525(f).

6. Not use any sub-delegates. 8 V.S.A. § 2525(h).

7. Make available to the Vermont Commissioner of Financial Regulation upon request books and records relating to the operations of Agent, and provide access to Agent's officers, principals, control persons, employees, independent contractors, agents and customers. 8 V.S.A. § 2530(c).

8. Make or compile reports or prepare other information as directed by the Commissioner of Financial Regulation in order to carry out the purposes of Section 2530 of the Vermont Uniform Money Services Act (examinations and investigations). 8 V.S.A. § 2530(d).

9. File with the Commissioner of Financial Regulation copies of all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set forth in 31 U.S.C. § 5311, 31 C.F.R. Part 103, and other federal and state laws pertaining to money laundering (Note: The timely filing of a complete and accurate report required above with the appropriate federal agency is compliance with the above requirements, unless the Commissioner of Financial Regulation notifies Licensee that reports of this type are not being regularly and comprehensively transmitted by the federal agency to the Commissioner of Financial Regulation.) 8 V.S.A. § 2535(a) and (b)

**VIRGINIA**

1. Consent to examination by the Virginia Commissioner of Financial Institutions of the books and records of Agent as often as it is deemed to be in the public interest. Va. Code Ann. § 6.2-1910 (A).

2. Comply with the provisions of Title 6.2, Chapter 19 of the Virginia Code and all other applicable state and federal laws and regulations. Va. Code Ann. § 6.2-1911(A)(i).

3. Remit all sums owing to Licensee in accordance with the terms of the Agent Appointment Agreement. Va. Code Ann. § 6.2-1911(A)(ii).

4. Permit the Virginia Commissioner of Financial Institutions to investigate or examine its business pursuant to Va. Code Ann.§ 6.2-1910. Va. Code Ann. § 6.2-1911(A)(iii).

5. Not use a sub-delegate, or otherwise designate or appoint another person to sell money orders or engage in the money transmission business on behalf of Licensee. Va. Code Ann. § 6.2-1911(A)(iv).

6. Ensure that every money order sold by Agent bears the name of Licensee clearly imprinted thereon as it appears on Licensee's license. Va. Code Ann. § 6.2-1912 (B).

7. Not sell a paper money order with a face amount of $750 or more that does not designate a specific payee. Va. Code. Ann. § 6.2-1915(A).

**WASHINGTON**

1. Operate in full compliance with Title 19, Chapter 19.230 of the Washington Uniform Money Services Act and the rules adopted thereunder. Rev. Code Wash. (ARCW) § 19.230.120(2).

2. Not authorize sub-delegates. Rev. Code Wash. (ARCW) § 19.230.120(3).

3. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent.
4. Upon notice that Licensee's license has been suspended, revoked, and/or surrendered, immediately cease to provide money services as a delegate of Licensee. Rev. Code Wash. (ARCW) § 19.230.120(5).

5. Not provide money services other than those allowed Licensee under its license. Rev. Code Wash. (ARCW) § 19.230.120(6).

6. Not provide money services outside the scope of activity permissible under the contract between Agent and Licensee, except activity in which Agent is authorized to engage under RCW 19.230.030 or 19.230.080. Rev. Code Wash. (ARCW) § 19.230.120(6).

7. Consent to an investigation or examination by Washington Director of Financial Institutions of the business, books, accounts, records, papers, documents, files, and other information used in the business of Agent. Rev. Code Wash. (ARCW) § 19.230.130(1).

8. File with the appropriate federal agency all reports required by federal currency reporting, recordkeeping, and suspicious transaction reporting requirements as set forth in 31 U.S.C. Sec. 5311, 31 C.F.R. Sec. 103 (2000), and other federal and state laws pertaining to money laundering and maintain copies of such reports in its records in compliance with RCW 19.230.170. Rev. Code Wash. (ARCW) § 19.230.180(1).

9. Transmit the monetary equivalent of all money or equivalent value received from a consumer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the consumer within ten business days after receiving the money or equivalent value, unless otherwise ordered by the consumer or unless Agent has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money. Rev. Code Wash. (ARCW) § 19.230.330(1)(a).

10. Provide a receipt to the consumer that clearly states the amount of money presented for transmission and the total of any fees charged by Licensee. If the rate of exchange for a money transmission to be paid in the currency of another country is fixed by Licensee for that transaction at the time the money transmission is initiated, then the receipt provided to the consumer shall disclose the rate of exchange for that transaction, and the duration, if any, for the payment to be made at the fixed rate of exchange so specified. If the rate of exchange for a money transmission to be paid in the currency of another country is not fixed at the time the money transmission is sent, the receipt provided to the consumer shall disclose that the rate of exchange for that transaction will be set at the time the recipient of the money transmission picks up the funds in the foreign country. Rev. Code Wash. (ARCW) § 19.230.330(2).

11. Refund to the consumer all moneys received for transmittal within ten days of receipt of a written request for a refund unless any of the following occurs: (a) the moneys have been transmitted and delivered to the person designated by the consumer prior to receipt of the written request for a refund; (b) instructions have been given committing an equivalent amount of money to the person designated by the consumer prior to receipt of a written request for a refund; (c) Agent has reason to believe that a crime has occurred, is occurring, or may potentially occur as a result of transmitting the money as requested by the customer or refunding the money as requested by the customer; or (d) Licensee is otherwise barred by law from making a refund. Rev. Code Wash. (ARCW) § 19.230.330(3)(a)-(d).

12. Not advertise or provide money services under the Agent's own name without an equally prominent display of Licensee's name, in close proximity, on all advertising, including web sites. Agent must not use its name alone when advertising money services provided on behalf of Licensee. WAC § 208-690-035(5).

**WEST VIRGINIA**

1. Upon reasonable notice from Commissioner of Banking of West Virginia, consent to an on-site examination by the Commissioner of Banking of West Virginia of all books, records, papers, or other objects that the Commissioner of Banking of West Virginia determines are necessary for conducting a complete examination. W. Va. Code § 32A-2-11(a).

2. Upon reasonable notice from Commissioner of Banking of West Virginia, consent to an examination under oath of any person officer, director, or employee of Agent. W. Va. Code § 32A-2-11(a).

3. Consent to inspection by Commissioner of Banking of West Virginia, with or without prior notice, of the books and records of Agent when the Commissioner of Banking of West Virginia has a reasonable basis to believe Agent is not in compliance with Chapter 32A, Article 2, of the West Virginia Code. W. Va. Code § 32A-2-12(a).

4. Unless the documents or data therefrom has been transmitted to Licensee for recordation, preserve records relating to licensed activities for the period of time as required in Chapter 31-A, Article 4, Section 31A-4-35of the West Virginia Code. W. Va. Code § 32A-2-14.

5. Ensure that every check sold by Agent bears the name of Licensee and a unique number clearly stamped or imprinted thereon. When an order for the transmission of money results in the issuance of a check, both the order and the check may bear the same number. W. Va. Code § 32A-2-15(a).
6. Record the face amount and unique number of the Agent's checks upon their sale. W. Va. Code § 32A-2-15(b).
7. Record the date on which money was received for transmission, the amount transmitted, the name of the consumer and the intended recipient, and the location to which the money was transmitted if specified by the consumer. W. Va. Code § 32A-2-15(c).

8. Unless otherwise directed by the consumer, transmit money within three business days after the receipt of payment. W. Va. Code § 32A-2-15(c).

9. Provide consumer with a written receipt sufficient to identify the transaction, Licensee, and the amount. W. Va. Code § 32A-2-15(c).

10. Maintain records required by Chapter 32A, Article 2, Section 32A-2-15 of the West Virginia Code as set forth in Section 32A-2-14, and ensure such records are available for examination by the Commissioner of Banking of West Virginia. W. Va. Code § 32A-2-15(e).

11. Maintain available for inspection, proof of the Agent's appointment by Licensee to conduct such business. W. Va. Code § 32A-2-4(d).

12. If the transaction involves the exchange of foreign currency, or the sale of travelers checks denominated in a foreign currency, record the date of the transaction, the amount of the transaction, and the rate of the exchange at the time of the transaction. The customer shall be provided a written receipt sufficient to identify the transaction, Licensee, and the amount. W. Va. Code § 32A-2-14(d).

13. Operate in full compliance with the laws of West Virginia and of the United States. W. Va. Code § 32A-2-27(c).

14. Not (i) commit fraud or misrepresentation; or (ii) submit fraudulent statements to Licensee. W. Va. Code § 32A-2-27(e).

15. From the moment of receipt of the proceeds of any business transacted under this article, hold in trust for Licensee an amount equal to the amount of proceeds due Licensee less the amount due to the Agent. W. Va. Code § 32A-2-27(f).

16. Report to Licensee the theft or loss of payment instruments within twenty-four hours from the time the Agent knew or should have known of the theft or loss. W. Va. Code § 32A-2-27(g).

17. Not act outside its scope of authority as defined under Title 32A, Article 2 of the West Virginia Code and by its contract with Licensee. W. Va. Code § 32A-2-27(j).

**WYOMING**

1. Comply with the Bank Secrecy Act, 12 U.S.C. §1951 et seq. Wyo. Stat. § 40-22-103(d).

2. Not authorize sub-delegates without the written consent of the Wyoming Banking Commissioner. Wyo. Stat. § 40-22-118(a)(ii).

3. Be subject to supervision and regulation by the Wyoming Banking Commissioner. Wyo. Stat. § 40-22-118(a)(iii).

4. Not make any fraudulent or false statement or misrepresentation to Licensee or to the Wyoming Banking Commissioner. Wyo. Stat. § 40-22-119(a).

5. Conduct all money transmission activities in strict accord with Licensee's written procedures provided to Agent. Wyo. Stat. § 40-22-119(b).

6. Remit all money owing to Licensee in accordance with the terms of the contract between Licensee and Agent. Wyo. Stat. § 40-22-119(c).

7. Consent to inspection by the Wyoming Banking Commissioner, with or without prior notice, pursuant to Wyo. Stat. § 40-22-115. Wyo. Stat. § 40-22-119(d).

# MONEY NETWORK SERVICES FRANCHISE PARTICIPATION AGREEMENT
**("Participation Agreement")**

Money Network Financial, LLC, a Delaware limited liability company ("Money Network"), and Sung Hun Choe Store # 2367 - 16981C with an address of 801 Broadway, King City, CA 93930-3303 ("Franchisee") agree as follows:

## STATEMENT OF PURPOSE

A. Money Network and 7-Eleven, Inc. ("7-Eleven") entered into the Money Network Services Agreement dated as of April 24, 2009 (the "Agreement"), as amended by Amendment No. 1 effective as of April 24, 2012, regarding the provision of a payroll program and related services pursuant to which funds are deposited by or on behalf of 7-Eleven into a master trust account established for the benefit of 7-Eleven's employees and held in trust for the benefit of, and to be paid to, or withdrawn by such employees via the use of Money Network Services (collectively, the "Program") at 7-Eleven locations.

B. The Program is also available to 7-Eleven franchisees that wish to participate in the Program.

C. Franchisee desires to offer the Program to his/her employees at Franchisee's 7-Eleven location(s) and agrees to meet certain obligations and responsibilities with regard to participation in the Program as described herein.

D. Money Network has agreed, subject to the terms and conditions of this Participation Agreement, to permit Franchisee to offer the Program to Franchisee's employees in accordance with this Participation Agreement.

**NOW THEREFORE**, in consideration of the foregoing premises and of the mutual covenants and conditions hereinafter set forth, Money Network and Franchisee (who hereafter may be collectively referred to as the "parties") agree as follows:

1. Definitions. The following terms have the meanings set forth below. Certain other terms are defined elsewhere in this Participation Agreement and are used with the meanings ascribed to them.

a. "Issuer" means the issuer of the Paycards, as selected by Money Network for the Program from time to time.

b. "Paycard" means a Visa-branded magnetic stripe plastic card with that accesses the data and balance maintained in Money Network's database for a particular participating employee and may be used by such employee to purchase goods and services, make payments or withdraw funds.

c. "Money Network Check" means the checking product available through the Program that provides a participating employee the ability to write a check to a payee, the amount of which is deducted from the Paycard balance.

d. "Money Network Services" means the services and products provided or facilitated by Money Network in connection with the Program, whereby participating employees receive direct payment for wages, commissions or similar compensation or work-related expenses designated by Franchisee through a Paycard or Money Network Check.

e. "Trustee" means First Data Trust Company, LLC, an affiliate of Money Network, or other trustee, financial institution or other person(s) authorized to exercise trust powers with which Money Network contracts from time to time.

2. Policies and Procedures. Franchisee shall comply with any and all policies and procedures provided by 7-Eleven and Money Network, as the same may be amended or replaced from time to time, with regard to the Program. Franchisee agrees that Money Network may disclose to 7-Eleven from time to time information that Money Network deems reasonably necessary relating to the administration of the Program with regard to Franchisee.

3. Additional Terms. Franchisee shall comply with any and all of the Additional Terms as set forth on Exhibit A.

4. Fees. The fees for the Program are paid by 7-Eleven and are part of the payroll services provided by 7-Eleven under the Franchise Agreement and Franchisee will not be charged any additional fees related to Franchisee's participation in the Program.

5. Compliance with Law. Franchisee shall comply with all Federal, state and local laws, regulations, rules and ordinances ("Applicable Law") applicable to Franchisee, to the Program and to Franchisee's performance of this Participation Agreement. To the extent that this Participation Agreement contains more restrictive requirements than Applicable Law, this Participation Agreement shall control. Each party shall promptly provide data reasonably requested by any other party regarding the Program in order for each party to meet its own compliance obligations, to conduct investigations and to prevent fraud.

6. Indemnification. Each party ("Indemnifying Party") shall defend, indemnify and hold harmless the other party and its affiliates (each an "Indemnified Party"), at Indemnifying Party's own cost and expense, from and against any and all claims, actions, suits or proceedings, and all costs (including reasonable attorneys' fees), damages, interest and liabilities assessed against or incurred by the Indemnified Party by reason of any third-party claims, suits, administrative proceedings or criminal investigations to the extent arising out of, or relating to: (i) any breach of the representations, warranties or covenants of Indemnifying Party set forth herein; and (ii) any gross negligence or willful misconduct of Indemnifying Party or its affiliates, employees or independent contractors in connection with Indemnifying Party's obligations herein. Indemnifying Party shall not enter into any settlement or compromise with respect to the foregoing without the prior written consent Indemnified Party.

7. Limitation of Liability; DISCLAIMER. NOTWITHSTANDING ANYTHING IN THIS PARTICIPATION AGREEMENT TO THE CONTRARY, EACH PARTY'S CUMULATIVE AGGREGATE MONETARY LIABILITY UNDER THIS PARTICIPATION AGREEMENT SHALL BE LIMITED TO THE LESSER OF: (a) FIVE THOUSAND DOLLARS ($5,000) OR (b) THE ACTUAL DIRECT DAMAGES SUFFERED BY ANY OTHER PARTY TO WHICH IT HAS LIABILITY HEREUNDER. IN NO EVENT SHALL ANY PARTY HAVE ANY LIABILITY TO ANY OTHER FOR ANY LOST OPPORTUNITY OR PROFITS, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR SPECIAL DAMAGES ARISING OUT OF OR RELATED TO THIS PARTICIPATION AGREEMENT, UNDER ANY CAUSE OF ACTION OR THEORY OF LIABILITY (INCLUDING NEGLIGENCE), AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PARTIES MAKE NO OTHER REPRESENTATIONS OR WARRANTIES, AND EACH PARTY DISCLAIMS ALL IMPLIED WARRANTIES, OBLIGATIONS AND LIABILITIES ARISING BY LAW OR OTHERWISE, INCLUDING

ANY (A) IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, (B) IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE OR (C) IMPLIED WARRANTY OF NON-INFRINGEMENT.

8. Confidentiality. Each party agrees that it will have no right to use any confidential or proprietary information received from the other party ("Confidential Information"), and will not disclose such information to any third parties without the prior written consent of the disclosing party, except as may be reasonably necessary for it to perform its obligations or exercise its rights under this Participation Agreement. Notwithstanding the foregoing, each party may use or disclose Confidential Information received from the other party: (a) to report, transmit, investigate and prevent incidences of fraud, misrepresentation or crime; (b) as required by any court or other governmental body after giving the other party as much advance notice of the possibility of such disclosure as reasonably practicable so that the other party may attempt to stop such disclosure or obtain a protective order concerning such disclosure (except that no notification is required if such party is prohibited by law from notifying the other party); (c) to legal counsel of such party; (d) in confidence, to accountants, banks and financing sources and their respective advisors; (e) if necessary in connection with the enforcement of this Participation Agreement or rights under this Participation Agreement; (f) in confidence, in connection with an actual or proposed merger, acquisition or similar transaction; or (g) to otherwise comply with Applicable Law. Each party further agrees that it will use commercially reasonable efforts to maintain the confidentiality of the other party's Confidential Information. The parties' obligations under this Section will survive the expiration or termination of this Participation Agreement. Upon a party's request from time to time, or with respect to any particular Confidential Information which the other party no longer requires in order to perform its obligations hereunder, or upon any termination of this Participation Agreement, such Confidential Information shall be promptly returned, or if the party who owns the Confidential Information so elects in writing, shall be erased or destroyed from files maintained and the returning party shall certify in writing that the Confidential Information has been erased or destroyed; provided that Franchisee agrees that (a) Money Network shall be entitled to retain for so long as may be required by Applicable Law any data of any nature, regardless of whether such data might otherwise constitute Franchisee's Confidential Information, which it is required to retain by Applicable Law or which will allow Money Network to fulfill any remaining obligations under this Participation Agreement and (b) if disposal or return of Franchisee's Confidential Information is not feasible immediately, Money Network will protect such information in accordance with the terms of this Section until such information is purged pursuant to Money Network's established record retention policies.

9. Term. The term of this Participation Agreement shall begin on the date of Franchisee's choice and continue in full force and effect until the earlier of:

a. April 24, 2015[1], or any earlier date on which the Agreement is terminated;

b. the expiration or termination of Franchisee's Franchise Agreement with 7-Eleven,

c. written notice from Money Network:

(i) if Franchisee materially breaches a representation, warranty or obligation under this Participation Agreement which has not been cured within 30 calendar days after receipt of written notice of such breach;

(ii) in the event of a bankruptcy, insolvency, liquidation or dissolution of Franchisee; or

---

1 If 7 Eleven and Money Network agree to extend the Agreement beyond April 24, 2015, then this Participation Agreement will continue to cover your participation under the extended Agreement.

(iii) if Money Network believes that changes to, or interpretations by any governmental authority of, Applicable Law, or any formal or informal order, instruction or directive communicated to Money Network or Issuer by such authority concerning the Program, or changes to other applicable rules (such as card association or NACHA rules), make it commercially impractical to continue offering the Program or a specific service that is part of the Money Network Services, or to continue offering the Program or a specific service in a specific jurisdiction (in which case, the Program and/or specific service shall terminate with respect to such jurisdiction, but this Participation Agreement shall otherwise remain in full force and effect).

d. written notice from Franchisee if Money Network breaches a representation, warranty, or obligation under this Participation Agreement which has not been cured within 30 calendar days after receipt of such breach..

10. Survival. Upon termination of this Participation Agreement, Franchisee will return all Paycard and Money Network Check inventory to 7-Eleven. Any provisions of this Participation Agreement which by their express or implicit terms are intended to survive the termination hereof (including Sections 6, 7, 8, 10 and 15 hereof and paragraphs 2, 3 and 5 of Exhibit A) will survive the termination of this Participation Agreement and be enforceable in accordance with their terms.

11. Law Governing. This Participation Agreement shall be construed and enforced in accordance with, and shall be governed by, the laws of the State of New York without regard to such state's conflict of law provisions.

12. Entire Agreement. This Participation Agreement constitutes the entire and sole agreement between the undersigned parties with respect to the subject matter herein and prior agreements between the parties, if any, are terminated immediately. This Participation Agreement supersedes all prior understandings, arrangements or agreements between the parties hereto not contained in this Participation Agreement, all of which are merged herein. No modification, renewal, extension or waiver of any of the provision of this Participation Agreement (other than the policies and procedures supplied by Money Network or 7-Eleven) shall be binding upon any party unless made in writing and signed by the parties to be bound.

13. Notice. Any notices required or permitted hereunder to Money Network shall be sent by certified mail to such party at the address specified below. All notices required or permitted to Franchisee hereunder shall be sent by certified mail to the address set forth above. Any party may change the address to which notices are to be sent by written notice to the other party. All such notices if communicated as set forth above shall be effective when received.

14. Force Majeure. No party will be liable for, or be considered in breach of or default under this Participation Agreement on account of, any delay or failure to perform as required by this Participation Agreement as a result of any cause or condition beyond such party's reasonable control (including acts of God or the elements, fire, flood, earthquake, labor disputes, governmental acts, orders or regulations, strike, lockout, riot, insurrection, sabotage, war, terrorism, unavailability of raw materials or supplies, or any other cause beyond the reasonable control of the non-performing party whether of a similar or dissimilar nature to those listed above); provided that such party uses commercially reasonable efforts to promptly overcome or mitigate the delay or failure to perform.

15. Third Party Beneficiaries. Franchisee agrees that Issuer and Trustee (and their respective successors and assigns) are each third party beneficiaries of this Participation Agreement, entitled to enforce such provisions hereof against Franchisee, including in equity and in law, as if it or they were a party hereto. Except for the foregoing, this Participation Agreement is entered into solely for the benefit of Money Network and Franchisee,

and will not confer any rights upon any other persons not expressly a party to this Agreement including participating employees.

The information contained in this Participation Agreement is a general description of the services provided for in the Agreement between 7-Eleven and Money Network as applicable to franchised stores that wish to participate in the Agreement. By agreeing to participate in the Program by signing in the space(s) provided below, you understand that you will be bound by the terms of the Agreement as applicable to franchised stores.

**IN WITNESS WHEREOF**, the parties have caused their authorized representatives to sign this Participation Agreement as of the day and year first above written.

**FRANCHISEE**

______________________________

By ______________________________ By ______________________________

Sung Hun Choe ______________________________

Date 12 . 27 . 18 Date ______________________________

By ______________________________ By ______________________________

______________________________ ______________________________

Date ______________________________ Date ______________________________

Market: 2367 Store: 16981C

**Money Network Financial, LLC**

By: ______________________________

Printed Name: ______________________________

Title: ______________________________

Notices to: First Data Prepaid Services
6200 South Quebec Street
Greenwood Village, CO 80111
Attn: General Counsel's Office

## EXHIBIT A - ADDITIONAL TERMS

1. Program Implementation; Employee Set-Up.

a) Franchisee agrees to provide each employee with: (a) a copy of the Terms and Conditions as provided by Money Network; (b) the notice required under the USA Patriot Act as provided by Money Network; and (c) any other Program information and materials provided by Money Network and/or Issuer from time to time. Franchisee will be responsible for the safekeeping of the inventory of enrollment kits (consisting of Paycards and Money Network Checks) received by Franchisee.

b) Franchisee agrees to obtain the consents and authorizations of each employee included in the Program on the form(s) provided to 7-Eleven by Money Network or another form previously approved by Money Network to receive payments from the Franchisee on Paycards or Money Network Checks, and represents that, to the best of its knowledge, each such employee is employed by Franchisee. Franchisee represents, warrants and covenants that (i) its use of the Program will be for the payment of legitimate and lawful employee wages and other compensation only and (ii) it is solely responsible for proper withholding of taxes, agreed salary reduction amounts, garnishments, support order payments, and any other applicable lien or levy with respect to each employee that is set up in the Program to use the Money Network Services ("Participating Employee").

c) Franchisee agrees to cooperate with Money Network to implement any other practices and policies of Money Network or Issuer to set up employees in the Program and for authentication of Participating Employees' identity, in each case, in accordance with the Network Rules and Applicable Law.

d) Franchisee agrees to use only the materials, procedures and information provided or approved by Money Network in marketing and implementing the Program.

e) Franchisee agrees to implement the Program and the Money Network Services as described herein and otherwise as directed by Money Network and/or 7-Eleven, including that: (a) the Program shall not be the sole and exclusive manner for receipt by employees of payroll funds, but rather, Franchisees will offer direct deposit to a deposit account at a financial institution of employees' own selection as an alternative to the Program for receipt of payroll funds; (b) Franchisees shall offer both the Paycard and Money Network Check to all Participating Employees; (c) any state-specific enrollment kits provided by Money Network will be disseminated by Franchisees in the appropriate states; and (d) any state-specific procedures designated by Money Network for Franchisees to complete and authorize Money Network Checks for employees that decline both direct deposit and the Money Network Services as options for receipt of payroll. Franchisee agrees to implement the Program only in the states and jurisdictions designated by Money Network or 7-Eleven from time to time.

2. Identity Verification and Record Preservation.

a) Franchisee agrees to inspect identification documents of each Participating Employee that meet the requirements of Form I-9 (*e.g.* (i) a passport or (ii) a U.S. issued driver's license and social security card or (iii) a U.S. driver's license and birth certificate) to verify such employee's identity.

b) Franchisee agrees and acknowledges that 7-Eleven, on Franchisee's behalf, will submit to Money Network the following information for use in the initial set up of the Participating Employees: (A) name; (B) street address; (C) date of birth and (D) social security number (or other government issued ID number acceptable to Money Network) ("Identity Verification Documents"); provided that either Money Network or the Issuer may request and obtain identity information and documentation directly from the employee to verify the identity of any employee if Franchisee does not promptly and sufficiently provide such information

or material to Money Network as required under this Participation Agreement. Franchisee agrees to take reasonable steps to determine whether the identification documents provided by employees are genuine, and shall notify Money Network if it reasonably believes, based upon its inspection of the documents or otherwise, that identity theft has occurred with respect to any such employee (including to the extent Franchisee believes that any such identification documents appear to be forged, inaccurate or incomplete).

c) Franchisee agrees to make and preserve during the applicable Identity Record Preservation Period (as defined below) either of the following: (i) at least one (1) copy of all Identity Verification Documents; or (ii) a description of the Identity Verification Documents that were relied on by the Franchisee, noting the type of document (*e.g.*, driver's license, passport, alien registration card), any identification number contained in the document, the place of issuance (*e.g.*, state or country) and, if any, the date of issuance and expiration date.

d) "Identity Record Preservation Period" for a particular Participating Employee is the period commencing on the date such person becomes a Participating Employee, and ending three (3) years thereafter or the period required by Applicable Law, whichever period is longer; provided, however, that in the event a longer retention period is required for Issuer to meet its legal obligations, as a result of a change in Applicable Law or official interpretations thereof, the parties will use their commercially reasonable efforts to agree on a process that permits Issuer to comply with its legal obligations.

3. Legal Compliance.

a) Subject to Applicable Law, Franchisee will provide to Money Network all information and documents in its or their control or possession requested by Money Network (whether requested on behalf of Issuer, Trustee or otherwise) to comply with Applicable Law governing the Money Network Services and/or the Program (whether with respect to Money Network, Issuer, Trustee or otherwise).

b) Franchisee agrees that, upon prior notice, Money Network, Issuer, Trustee and/or any regulatory authorities which have jurisdiction over Money Network, Issuer or Trustee shall have the right to audit and inspect Franchisee's books and records related to the Program and Franchisee's performance of its obligations with respect thereto, including: (a) any records pertaining to the set-up of employees on in the Program and participation of Participating Employees in the Program; and (b) the Identity Verification Documents.

c) In the event a communication from a governmental authority relating to the Program or the Money Network Services is received by Franchisee. (a) Franchisee shall promptly notify Money Network; (b) Money Network shall commence a review of the communication and create a response to the communication and/or arrange a conference with the governmental authority from which such communication was received, subject to Franchisee's ongoing cooperation; and (c) Money Network shall design and execute an action plan in response to the communication and/or as a result of communications or discussions with the governmental authority and provide 7-Eleven, on Franchisee's behalf, with ongoing status reports in connection with the same, which such action plan may include, if commercially reasonable, modifications to the Program and/or the Money Network Services in accordance with Section 3(d) below.

d) Franchisee agrees that if the Program and/or the provision of the Money Network Services as provided for in the Agreement and this Participation Agreement is determined by 7-Eleven, Money Network or a governmental agency or court to contravene Applicable Law, Money Network shall promptly notify 7-Eleven of same in writing and shall either (a) use commercially reasonable efforts to cooperate with 7-Eleven to modify the Program and/or the Money Network Services in a mutually agreeable manner to the extent necessary to comply with such law or (b) either Money Network or 7-Eleven may terminate the Agreement in its entirety, or the offering of the Program and the Money Network Services in certain jurisdictions, in accordance with the Agreement and Section 9(c)(iii) of this Participation Agreement.

4. Limited License; Reservation of Rights. Money Network hereby grants to Franchisee, during the term of this Participation Agreement, a limited, non-exclusive, royalty-free, non-assignable, nontransferable right and license, in the United States, to use the registered and common law trademarks and service marks of Issuer and/or Money Network or its agents and subcontractors ("Program Marks"), solely in connection with the Program and in the form and manner prescribed by Money Network and subject to any Money Network sublicense to use and/or sublicense Program Marks (if applicable). Money Network reserves the right to approve in advance all uses of Program Marks other than uses on materials previously approved by Money Network. The parties agree that all use of Program Marks and all goodwill associated with or deriving from the use of Program Marks by Franchisee will inure to the benefit of the respective owners of Program Marks and their successors and assigns. Each party owns all right, title and interest in and to its intellectual property rights and associated goodwill. No right, title or interest in, to or under any existing copyright, patent, trademark or trade secret of either party, including any implied license thereto, is created, assigned or otherwise transferred to the other party pursuant hereto.

5. Paycard Data. As between the parties, Money Network will at all times own all right, title and interest in and to all data generated under the Program and will retain such data for each Paycard on its database for a period of twenty-four (24) months following the earlier of the date that the Paycard expires (if applicable) or the date that the Paycard balance reaches zero, or such longer time as may be required by Applicable Law. Franchisee understands that it is not entitled to access or review any Participating Employee transaction information.

**GREEN DOT® LIMITED AGENCY AGREEMENT**
**(7-Eleven Franchisees)**

Green Dot Corporation ("GDC") markets and distributes prepaid debit cards ("Cards), load and reload services and other payment products and services (via "swipe" transaction, use of bar codes to authorize or initiate transactions and otherwise) through GDC's proprietary Green Dot® Network (collectively, "GDC Products"). [Insert Company Name:] ________________ Sung Hun Choe ________________ (hereinafter "Franchisee") has agreed to market and sell the GDC Products in its retail locations ("Stores") as a franchisee of 7-Eleven, Inc. ("7-Eleven"). Certain GDC Products may be issued by or settled through Green Dot Bank (such products, "Green Dot Bank-Issued Products") or other financial institutions.

GDC (and, solely with respect to Green Dot Bank-Issued Products, Green Dot Bank) hereby grants to Franchisee a non-exclusive right to distribute, market, promote and sell GDC Products. As a member of GDC's Green Dot® Network, Franchisee agrees to permit all prepaid stored value cards, accounts or payees which are part of GDC's Green Dot® Network to be loaded, reloaded, funded or paid, as applicable, at any of Franchisee's Stores.

GDC and, solely with respect to Green Dot Bank-Issued Products, Green Dot Bank hereby appoint Franchisee as its limited agent and authorized delegate with the authority to distribute, market and sell GDC Products, and to engage in the receipt and transmission of funds related thereto, at its Stores on behalf of GDC and Green Dot Bank (collectively, the "Principals") in accordance with this Agreement and the Principals' instructions, from time to time, and Franchisee hereby accepts such appointment. Neither the Principals nor Franchisee may authorize sub-agents except in compliance with applicable state and federal law and regulations ("Applicable Law") and, with respect to Franchisee, with the Principals' prior written consent. Franchisee is authorized to distribute, market, and sell GDC Products only as authorized under this Agreement. If Franchisee exceeds such authority, this Agreement may be terminated immediately and Franchisee and Principals may be subject to disciplinary action by regulatory authorities. The parties acknowledge that the Principals and Franchisee are subject to supervision, examination and regulation as provided by Applicable Law, including, without limitation, the Credit Card Accountability Responsibility and Disclosure Act of 2009 (together with the rules promulgated thereunder, and as the same may be modified from time to time, the "CARD Act"), and certify that each is familiar with, and shall comply with, Applicable Law, including, with respect to Franchisee, the requirements set forth on the Appendices attached hereto. Franchisee hereby consents to examination and investigation by applicable regulatory authorities, without prior notice, of its books and records relating to the activities conducted by Franchisee on behalf of the Principals. Franchisee agrees that the Principals may amend this Agreement from time to time upon notice to Franchisee to include additional or revised provisions as required by Applicable Law or a regulatory authority. Franchisee shall be responsible for the conduct, including negligence and fraud, of any of its employees related to its services provided under this Agreement. To the extent Franchisee has operations in the State of New York, the Principals and Franchisee agree to the additional terms set forth in Appendix 1 hereto, incorporated herein by reference, with respect to such operations. To the extent Franchisee has operations in the various states listed on Appendix 2 hereto, GDC and Franchisee agree to the additional terms set forth in such Appendix 2, incorporated herein by reference, with respect to such operations in such states. As required by Arizona law, a copy of the Arizona statute governing money transmission is appended hereto as Appendix 3, and incorporated herein by reference. ATTACHED HERETO ARE THE MANDATORY STATE APPENDICES, WHICH ARE A BINDING PART OF THIS AGREEMENT.

Franchisee shall display any signs, decals, and other display materials at its Stores as required by Applicable Law and as directed by the Principals. As required by the CARD Act, and except those products, if any, specifically designated by the Principals as gift cards, Franchisee shall not market or label any GDC Products as gift cards, and Franchisee shall maintain written policies and procedures reasonably designed to avoid marketing or labeling GDC Products as gift cards, including controls to regularly monitor or otherwise verify that GDC Products are not marketed or labeled as gift cards. Franchisee consents to the use of Franchisee's name by the Principals, and the listing of its Store locations on GDC's website, for promotion of the GDC products. Franchisee shall from time to time and upon the request of either Principal, meet with the Principals to discuss compliance with the provisions of this Agreement and the CARD Act. Franchisee shall provide a receipt to each customer that purchases a GDC Product, which clearly states the amount of funds presented and any related fees, and such other information as required by Applicable Law. Franchisee shall remit funds collected from customers for the GDC Products to the Principals pursuant to the Principals' instructions. Franchisee shall hold in trust all funds received in connection with GDC Products until such funds are remitted to the Principals, and Franchisee shall not commingle such funds with Franchisee's funds or property. This Agreement shall terminate upon the earlier of (i) such time as Franchisee ceases to be a franchisee of 7-Eleven, (ii) the expiration or termination of GDC's agreement with 7-Eleven, or (iii) at Franchisee's election at any time upon not less than ninety days' prior written notice to GDC. Upon termination of this Agreement or upon a Principal's request, Franchisee shall immediately cease to hold itself out as an agent of the Principals and return to GDC all GDC Products, signs, decals, materials, and supplies furnished to Franchisee by the Principals in connection with this Agreement. Franchisee may not assign this Agreement or any of its rights or obligations hereunder, whether by operation of law or otherwise, without the Principals' prior written consent. Franchisee must give the Principals at least ten days' prior written notice in the event of a change of control, reorganization or acquisition of Franchisee or its business (including without limitation by merger or acquisition of assets). This Agreement shall continue to apply to the successor of any assignment by, or reorganization of, Franchisee. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the application of conflicts of laws principles.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of DEC 27, 2018.

GREEN DOT CORPORATION

By:________________________
John Ricci, Corporate Secretary

________________________
[FRANCHISEE [Company Name]

By:________________________
[Signature]

Sung Hun Choe
[Print Name]

GREEN DOT BANK

________________________
[Title]
By: ________________________
Lewis Goodwin, President

[THIS SECTION MUST BE COMPLETED BY FRANCHISEE AND THE INFORMATION PRINTED BELOW MUST BE CLEAR AND READABLE]

Franchisee: Sung Hun Choe

Store Number: 16981C

801 Broadway
[Print Street Address of Business]

[redacted]
[FEDERAL EMPLOYMENT ID NO.]

________________________
[Suite Number]

King City
[City]

[redacted]
[SSN of Owner]

California
[State]

[redacted]
[Date of Birth of Owner]

[MM/DD/YYYY]
93930-3303
[Zip Code]

(831) 385-5164
[Business Telephone Number]

[redacted]il.com
[Email Address]

## Appendix 1

### New York Provisions

The purpose of this Appendix is to clarify Client's role as the agent of Green Dot Bank for the marketing and distribution of prepaid debit cards, load and reload services and other payment products and services (via "swipe" transaction, use of bar codes to authorize or initiate transactions and otherwise) issued by or settled through Green Dot Bank ("Green Dot Bank-Issued Products") solely with respect to Client's operations in the State of New York. "Client" refers to the company or person that signed the agency agreement or contract containing agency provisions ("Agreement") that refers to this Appendix. "Bank" refers to Green Dot Bank. To the extent that any part of this Appendix conflicts with the Agreement, this Appendix shall control.

- Client is hereby appointed as Bank's agent solely for the limited purpose of selling the Green Dot Bank-Issued Products in the State of New York and delivering to Bank any fees and payments paid by purchasers of the Green Dot Bank-Issued Products, in accordance with the terms of the Agreement. Client hereby acknowledges that Bank is the issuer of the Green Dot Bank-Issued Products, has the primary relationship with purchasers of the Green Dot Bank-Issued Products, and that Bank is responsible for all amounts collected by Client from consumers who purchase the Green Dot Bank-Issued Products. Remittance of proceeds of sales of Green Dot Bank-Issued Products is not a condition to Bank's obligations as obligor to purchasers of such Green Dot Bank-Issued Products.
- All funds (less any fees belonging to Client, if applicable) received by Client from the sales of Green Dot Bank-Issued Products shall be funds owned by and belonging to Bank, and shall be held in trust for the benefit of Bank.
- Client shall make and keep such accounts, papers, books, and other records, and preserve such materials for such period of time as may be required by this Agreement.
- Client shall comply with any other requirements or instructions issued by Bank relating to the Green Dot Bank-Issued Products or arising out of this Agreement.
- Client shall not sell any travelers check, money order or other money transmission instrument in the State of New York on behalf of Bank unless the Bank's name clearly appears on the face of the instrument.

- Client shall comply with all applicable provisions of the laws of the State of New York and regulations and orders issued by the New York State Department of Financial Services, and irrevocably consents to inspections or examinations by New York State authorities, with or without prior notice, and to such authorities' right to access and retain copies of agent's books and records wherever maintained relating to money transmission services, and the expenses of any such inspection or examination to be borne by a New York money transmitter licensee with which Client has an agency agreement, or Bank.

- a prohibition in the licensee's agents and subagents acting on behalf of the consumer as a courier for the transmission of money which activity requires licensing as a money transmitter and a requirement that all money orders sold may not be retained by the agent and subagent but must be given to the purchasers of the instruments for their own delivery to the beneficiary

- Client shall act only as authorized under this Agreement and that if Client exceeds its authority this Agreement may be cancelled and disciplinary action by the Superintendent of the New York State Department of Financial Services may result.

## Appendix 2

### Provisions Required by Various State Laws

With respect to Client's sale of prepaid card products or services issued, offered or managed by Green Dot, this Appendix applies to any of Client's locations and operations in the states listed below. "Client" refers to the company or person that signed the agency agreement or contract containing agency provisions ("Agreement") that refers to this Appendix. Client may be referred to below as "delegate", "authorized delegate", "authorized vendor", "agent", "delegate", "authorized seller", "authorized representative" or "you", in accordance with the applicable statutory text. "Green Dot" refers to Green Dot Corporation and, solely with respect to Green Dot Bank-Issued Products, Green Dot Bank. To the extent any part of this Appendix conflicts with the Agreement, the terms of this Appendix shall control.

**Alaska**

- Licensee designates Client as its authorized delegate with the authority to conduct business regulated under the Alaska Uniform Money Services Act, Alaska Stat. § 06.55.101 et seq. (the "Alaska Act") on behalf of licensee.
- Authorized delegate certifies that it is familiar with, and agrees to operate in full compliance with the Alaska Act, including the requirements of Section 06.55.301(b) for the remission of money, the trust and other requirements of Section 06.55.301(d), and the record maintenance requirements of Section 06.55.405.
- Authorized delegate consents to examination or investigation by the Alaska Department of Commerce, Community, and Economic Development (the "Department").
- Authorized delegate acknowledges that licensee is subject to regulation by the Department and that, as part of that regulation, the Department may suspend or revoke authorized delegate's designation or require licensee to terminate authorized delegate's designation.
- Authorized delegate acknowledges receipt of the written policies and procedures required under Section 06.55.301(a) of the Alaska Act.

**Arizona**

- Authorized delegate shall operate in full compliance with Arizona law, including the Transmitters of Money Act, Ariz. Rev. Stat. § 6-1201 et seq., a current copy of which is provided as Appendix 3 hereto.

**Arkansas**

- Authorized delegate shall operate in full compliance with the Uniform Money Services Act, Ark. Code § 23-55-101 et seq.

**Connecticut**

- Authorized delegate shall operate in full compliance with Sections 36a-595 to 36a-612 of the Money Transmission Act, Conn. Gen. Stat. §§ 36a-595 et seq.
- Authorized delegate's appointment is not effective during any period when licensee's license has been suspended.

**District of Columbia**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Authorized delegate shall operate in full compliance with the District of Columbia Money Transmissions Law, Chapter 12 of Title 26 of the District of Columbia Code (DC Code § 26-1001 et seq.) and any rules, regulations or orders issued thereunder.

**Florida**

- Authorized vendor shall report to licensee, immediately upon discovery, the theft or loss of currency received for a transmission or payment instrument.
- Authorized vendor shall display a notice to the public, in such form as prescribed by rule, that Client is the authorized vendor of licensee.
- Authorized vendor shall remit all amounts owed to licensee for all transmissions accepted and all payment instruments sold in accordance with this Agreement.
- Authorized vendor shall hold in trust all currency or payment instruments received for transmissions or for the purchase of payment instruments from the time of receipt by licensee or authorized vendor until the time the transmission obligation is completed.
- Authorized vendor shall not commingle the money received for transmissions accepted or payment instruments sold on behalf of licensee with the money or property of authorized vendor, except for making change in the ordinary course of authorized vendor's business, and ensure that the money is accounted for at the end of the business day.
- Authorized vendor consents to examination or investigation by the Florida Office of Financial Regulation.
- Authorized vendor shall adhere to the applicable state and federal laws and rules pertaining to a money services business, including Fla. Stat. § 560.103 et seq.

- Authorized vendor shall provide such other information or disclosure as may be required by rule.

**Georgia**

- Agent is authorized to operate only pursuant to the terms of this Agreement.

**Hawaii**

- Licensee appoints Client as licensee's authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Hawaii Commissioner of Financial Institutions (the "Commissioner").
- Authorized delegate acknowledges that licensee is subject to supervision and rule by the Commissioner.
- Authorized delegate certifies that it is in compliance with the recordkeeping and reporting requirements under Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering.
- Authorized delegate shall comply with the Hawaii Money Transmitters Act, Hawaii Rev. Stat. § 498D-1 et seq.

**Idaho**

- Licensee appoints Client as its authorized representative with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized representative may authorize sub-representatives without the written consent of the Director of the Idaho Department of Finance (the "Director").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Director.
- Authorized representative consents to the Director's inspection, with or without prior notice to licensee or its authorized representative, of the books and records of authorized representative when the Director has a reasonable basis to believe that licensee or authorized representative is in violation of the Money Transmitters Act, Idaho Code § 26-2901 et seq.
- Authorized representative is under a duty to act only as authorized under this Agreement, and if authorized representative exceeds its authority, this Agreement is subject to cancellation and authorized representative is subject to disciplinary action by the Director.
- Authorized representative shall comply with the Idaho Money Transmitters Act, Idaho Code § 26-2901 et seq.

**Illinois**

- Authorized seller shall operate in full compliance with the laws of Illinois and the United States, including the Illinois Transmitters of Money Act, 205 Illinois Compiled Statutes Section 657, 205 Ill. Comp. Stat. § 657/1 et seq. (the "Illinois Act"), and any rules, regulations or orders issued thereunder.
- The appointment of Client as an authorized seller in Illinois is subject to satisfaction of all applicable requirements of the Illinois Act.
- This Agreement is conditioned on Client receiving approval from the State of Illinois to operate as a Money Transfer Agent in that State and shall not take effect unless and until such approval is received. In the event such approval is denied or not received, this Agreement shall be null and void. In the event that approval is revoked, Green Dot may terminate this Agreement upon written notice, any other provision of this Agreement notwithstanding.

**Iowa**

- Authorized delegate shall operate in full compliance with the Iowa Uniform Money Services Act, Iowa Code § 533C.101 et seq.
- Authorized delegate shall remit all money owing to licensee in accordance with the terms of this Agreement.
- Authorized delegate shall not provide money services outside the scope of activity permissible under this Agreement, except activity in which the authorized delegate is licensed to engage under Article 2 or 3 of the Iowa Code.
- Authorized delegate acknowledges that it holds in trust for the benefit of licensee all money net of fees received from money transmission.

**Kansas**

- Agent shall operate in full compliance with the Money Transmitter Act, Kan. Stat. § 9-508 et seq. and the rules and regulations adopted thereunder.
- Agent shall not use subagents or conduct money transmission business from locations that have not been approved by licensee.

**Kentucky**

- Licensee designates Client as its agent with authority to engage in money transmission on behalf of licensee as authorized under the Kentucky Money Transmitters Act, Ky. Rev. Stat. § 286.11-001 et seq. (the "Kentucky Act").
- Agent shall operate in full compliance with applicable the Kentucky Act and rules promulgated thereunder, and any order issued by the Commissioner of the Kentucky Department of Financial Institutions (the "Commissioner") pursuant thereto.
- Neither licensee nor an agent of licensee may authorize subagents.

- Agent shall timely remit all money legally due to licensee in accordance with the terms of this Agreement.
- Licensee and agent are subject to regulation by the Commissioner.
- GDC and agent shall comply with applicable federal and state law.

**Maine**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Superintendent of Consumer Credit Protection within the Maine Department of Professional and Financial Regulation (the "Superintendent").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Superintendent.
- Authorized delegate shall comply with the Maine Money Transmitters Act, 32Maine Rev. Stat. § 6101 et seq.

**Maryland**

- Licensee appoints Client as its authorized delegate with authority to engage in the business of money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subagents or subauthorized delegates without written consent of the Commissioner of Financial Regulation in the Maryland Department of Labor, Licensing and Regulation (the "Commissioner").
- Authorized delegate acknowledges that it is subject to supervision, examination, and regulation by the Commissioner.
- Authorized delegate will operate in full compliance with all applicable laws and regulations, including the Maryland Money Transmission Act, Md. Financial Institutions Code Ann. § 12-401 et seq. and any rules, regulations or orders issued thereunder.

**Michigan**

- Authorized delegate shall operate in compliance with the Money Transmission Services Act, Mich. Comp. Laws § 487.1001 et seq. (the "Michigan Act") and other applicable law. Without limiting the foregoing, authorized delegate shall operate in compliance with the following sections of the Michigan Act.
- Section 487.1021, authorizing the Commissioner of the Department of Financial and Insurance Services (the "Commissioner") to conduct regulatory examinations or investigations, subject to nondisclosure obligations.
- Section 487.1025, which requires persons subject to the Michigan Act to maintain records for at least 3 years of payment instruments from date of creation, outstanding and paid payment instruments, bank statements and reconciliation and any other records the Commissioner reasonable requires, and provides that records may be stored on any tangible medium or in any electronic or other medium that is immediately retrievable in perceivable form.
- M.C.L. §487.1033, which requires that this Agreement be in writing and require authorized delegate to operate in compliance with the Michigan Act and other applicable law, pursuant to policies and procedures furnished by licensee; requires that authorized delegate make direct payments of all money owing to licensee to licensee or its authorized representative or into an account at a depository financial institution specified by the licensee, in accordance with the terms of this Agreement; requires that in the event of suspension or revocation of licensee's money transmitter license, authorized delegate shall immediately cease providing money transmission services as an authorized delegate of licensee upon receiving notification from licensee directing it to cease such services; prohibits authorized delegate from providing money transmission services outside the scope of activity permissible under this Agreement; and provides that authorized delegate hold all money received from providing money transmission services, reduced by any fees owed to authorized delegate by licensee, in escrow for the benefit of licensee.
- M.C.L. §487.1034, which prohibits authorized delegates from making false statements or misrepresentations, requires authorized delegates to perform money transmission services lawfully and in accordance with licensee's operating policies and procedures, requires that all funds received by an authorized delegate from the sale of a payment instrument, less fees, shall be held in trust for the licensee from the time the funds are received by the authorized delegate until the time the funds are remitted to licensee, imposes a trust for the licensee upon money transmission funds received by the authorized delegate that are commingled with the delegates other funds or property, and requires authorized delegates to report to licensee the loss of a payment instrument within 24 hours.
- Section 487.1042, which makes it a felony punishable by imprisonment or a fine of up to $100,000.00, or both, and requires restitution for persons who make intentional false statements, misrepresentations, false certifications, entries or material omissions, commit criminal fraud in the conduct of its money transmission services, or engage in money transmission without a license.

**Minnesota**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Commissioner of the Minnesota Department of Commerce (the Commissioner").

- Authorized delegate shall comply with the Minnesota Money Transmitters Act, Minn. Stat. § 53B.01 et seq. (the "Minnesota Act").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Commissioner and that as a part of that supervision and regulation, the Commissioner may require licensee to cancel this Agreement as a result of a violation of Section 53B.21 of the Minnesota Act (relating to authorized delegate conduct, including prohibitions on fraudulent statements and a requirement to conduct business in a safe and sound manner).

**Nebraska**

- Licensee appoints Client as its authorized delegate with authority to engage in the sale and issue of payment instruments or engage in the business of money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Director of the Nebraska Department of Banking and Finance (the "Director").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Director.

**New Hampshire**

The New Hampshire Banking Department may examine the business affairs and records of licensee, authorized delegate, or any other person, whether licensed or not, as it deems necessary to determine compliance with New Hampshire Rev Stat. Ann., Chapter 399-G, relating to Licensing of Money Transmitters, and the rules adopted pursuant thereto.

**New Jersey**

- Licensee appoints Client as its authorized delegate with authority to engage in the activities of a money transmitter on behalf of licensee.
- Delegate shall operate in compliance with the New Jersey Money Transmitters Act, N.J. Stat. Ann. § 17:15C-1 et seq., and any regulations and orders issued thereunder.

**North Carolina**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Commissioner of Banks of the State of North Carolina (the "Commissioner").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Commissioner.
- Licensee shall issue a certificate of authority for each location at which it conducts licensed activities in North Carolina through authorized delegate. Authorized delegate shall post the certificate in public view at each location of Client in North Carolina. The certificate shall state as follows: "Money transmission on behalf of [Green Dot] is conducted at this location pursuant to the Money Transmitters Act."
- Authorized delegate shall operate in full compliance with the North Carolina Money Transmitters Act, N.C. Gen. Stat. § 53-208.1 et seq.

**North Dakota**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Commissioner of the North Dakota Department of Financial Institutions (the "Commissioner").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Commissioner.
- Authorized delegate shall operate in compliance with the North Dakota Sale of Checks Act, N.D. Cent. Code § 13-09-01 et seq.

**Ohio**

Authorized delegate shall operate in compliance with the Ohio Money Transmitters Law, Ohio Rev. Code Ann. § 1315.01 et seq.

**Oregon**

- Licensee appoints Client as licensee's authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Director of the Oregon Department of Consumer and Business Services (the "Director").
- Authorized delegate acknowledges that licensee, authorized delegate and subdelegates are subject to supervision and regulation by the Director.

- Authorized delegate shall operate in compliance with the Oregon Money Transmission Law (Oregon Rev. Stat. § 717.200 et seq.

**Pennsylvania**

- Licensee appoints Client as its agent with authority to engage in money transmission on behalf of licensee.
- Licensee is liable for the money transmission activities of agent, in accordance with Section 11 of the Pennsylvania Money Transmitter Act, 7 Pa. Cons. Stat. § 6101 et seq.

**South Dakota**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Neither licensee nor authorized delegate may authorize subdelegates without the written consent of the Director of the South Dakota Division of Banking (the "Director").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Director.
- Authorized delegate shall operate in compliance with the South Dakota Money Transmission law, S.D. Codified Laws § 51A-17 et seq.

**Tennessee**

- Licensee appoints Client as its authorized agent with authority to sell payment instruments or transmit money on behalf of licensee in compliance with state and federal law, including the Tennessee Money Transmission Act of 1994, Tenn. Code Ann. § 45-7-201 et seq.
- Neither licensee nor authorized agent may authorize sub-agents without the written consent of the Commissioner of the Tennessee Department of Financial Institutions (the "Commissioner").
- Authorized delegate acknowledges that licensee is subject to supervision and regulation by the Commissioner.
- Authorized agent consents to the Commissioner's inspection, with or without prior written notice to licensee or authorized agent, of the books and records of authorized agent.
- Authorized agent acknowledges that it is under a duty to act only as authorized under this Agreement, and if authorized agent exceeds its authority; this Agreement is subject to cancellation by licensee and disciplinary action by the Commissioner.

**Texas**

- Client is hereby appointed as Green Dot's authorized delegate with the authority to conduct money transmission on behalf of Green Dot in accordance this Agreement.
- Authorized delegate acknowledges that this Agreement sets forth the nature and scope of the relationship and respective rights and responsibilities as between Green Dot and authorized delegate.
- Authorized delegate certifies that it is familiar with, and agrees to fully comply with, all applicable state and federal laws, rules and regulations pertaining to money transmission, including the Texas Money Services Act, Tex. Fin. Code § 151.001 et seq. (the "Texas Act") and rules adopted thereunder, relevant provisions of the Bank Secrecy Act and the USA PATRIOT ACT, and Chapter 271 of the Texas Finance Code.
- Authorized delegate agrees to remit funds to Green Dot and handle money and monetary value in accordance with this Agreement and with Sections 151.403(b) and (c) of the Texas Act.
- Authorized delegate shall hold in trust all money and monetary value received in accordance with this Agreement and Section 151.404 of the Texas Act.
- Authorized delegate shall prepare and maintain records as required by the Texas Act or a rule adopted thereunder or as reasonably requested by the Banking Commissioner of the State of Texas or persons designated thereby and acting under his or her direction and authority (the "Commissioner").
- You consent to examination or investigation by the Commissioner.
- Authorized delegate acknowledges that licensee is subject to regulation by the Commissioner and that, as part of that regulation, the Commissioner may suspend or revoke Client's authorized delegate designation or require Green Dot to terminate Client's authorized delegate designation.
- Authorized delegate acknowledges receipt of written policies and procedures required under Section 151.402(b)(1) of the Texas Act.
- Authorized delegate acknowledges that it has been provided regulatory website addresses through which it can access the Texas Act and rules adopted under the Texas Act and the Bank Secrecy Act, the USA PATRIOT ACT, and Chapter 271 of the Texas Finance Code.

**Utah**

- Licensee appoints Client as its authorized agent with authority to sell payment instruments or transmit money on behalf of licensee in compliance with state and federal law.
- Neither licensee nor authorized agent may authorize a subagent without the written consent of the Commissioner of the Utah Department of Financial Institutions (the "Commissioner").
- Authorized agent acknowledges that licensee is subject to supervision and regulation by the Commissioner.
- Authorized agent consents to the Commissioner's inspection, with or without prior notice to licensee or authorized agent, of the records of authorized agent.
- Authorized agent is under a duty to act only as authorized under this Agreement and, if authorized agent exceeds its authority, this Agreement is subject to cancellation by licensee and authorized agent is subject to disciplinary action by the Commissioner.

**Vermont**

Authorized delegate shall operate in full compliance with the Vermont money services statute, Vt. Stat. Tit. 8, § 2500 et seq.

**Virginia**

- Authorized delegate shall comply with the provisions of the Virginia money order sellers and money transmitters statute, Va. Code § 6.2-1900 et seq. (the "Virginia Act") and all other applicable state and federal laws and regulations.
- Authorized delegate shall remit all sums owing to licensee in accordance with the terms of this Agreement.
- Authorized delegate shall permit the State Corporation Commission and the Commissioner of the Virginia Bureau of Financial Institutions to investigate or examine its business pursuant to Section 6.2-1910 of the Virginia Act.
- Authorized delegate is prohibited from using a subdelegate, or from otherwise designating or appointing another person to sell money orders or engage in money transmission business on behalf of licensee.

**Washington**

- Authorized delegate shall operate in full compliance with the Uniform Money Services Act, Wash. Rev. Code § 19.230.005 et seq. (the Washington Act") and the rules adopted thereunder
- Neither licensee nor authorized delegates may authorize subdelegates not authorized by the Director of the Washington Department of Financial Institutions or his or her designee (the "Director").
- Authorized delegate may not provide money services from locations not authorized by the Director.

**West Virginia**

- Authorized delegate shall operate in full compliance with the laws of West Virginia and the United States, including the West Virginia Check and Money Order Sales, Money Transmission Services, Transportation and Currency Exchange, W. Va. Code § 32A-2-1 et seq. (the "West Virginia Law").
- Authorized delegate shall hold in trust for licensee from the moment of receipt of the proceeds of any business transacted under the West Virginia Law in an amount equal to the amount of proceeds due licensee less the amount due the authorized delegate.

**Wyoming**

- Licensee appoints Client as its authorized delegate with authority to engage in money transmission on behalf of licensee.
- Authorized delegate may not authorize subdelegates without the written consent of the Wyoming State Banking Commissioner (the "Commissioner").
- Authorized delegate acknowledges that it is subject to supervision and regulation by the Commissioner.
- Authorized delegate shall operate in full compliance with the Wyoming Money Transmitters Act, Wyo. Stat. § 40-22-101 et seq.

**Appendix 3**

**Arizona Statute**

**(Text of statute appended as required by Arizona law – Current as of August 20, 2015)**

**Arizona Revised Statutes § 6-1201 et seq.**
**Title 6, Banks and Financial Institutions**
**Chapter 12, Transmitters of Money**

**Article 1 Licenses and Regulation**

**6-1201. Definitions**
In this chapter, unless the context otherwise requires:
1. "Authorized delegate" means a person designated by the licensee under section 6-1208.
2. "Check cashing" means exchanging for compensation a check, debit card payment order, draft, money order, traveler's check or payment instrument of a licensee for money delivered to the presenter at the time and place of the presentation.
3. "Control" means ownership of fifteen per cent or more of a licensee or controlling person, or the power to vote fifteen per cent or more of the outstanding voting securities of a licensee or controlling person. For the purpose of determining the percentage controlled by any one person, that person's interest shall be aggregated with the interest of any other person controlled by that person, by an officer, partner or authorized delegate of that person, or by a spouse, parent or child of that person.
4. "Controlling person" means a person directly or indirectly in control of a licensee.
5. "Engage in the business" means conducting activities regulated under this chapter more than ten times in any calendar year for compensation or in the expectation of compensation. For purposes of this paragraph, "compensation" means any fee, commission or other benefit.
6. "Foreign money exchange" means exchanging for compensation money of the United States government or a foreign government to or from money of another government at a conspicuously posted exchange rate at the time and place of the presentation of the money to be exchanged.
7. "Licensee" means a person licensed under this chapter.
8. "Location" means a place of business at which activity regulated by this chapter occurs.
9. "Money" means a medium of exchange that is authorized or adopted by a domestic or foreign government as a part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance.
10. "Money accumulation business" means obtaining money from a money transmitter as part of any activity that is carried on for financial gain if the money that is obtained by all persons acting in concert in the activity, in amounts of one thousand dollars or more, totals over fifty thousand dollars in the preceding twelve-month period. Money accumulation business does not include a person who is subject to the reporting requirements under 31 United States Code section 5313. The exception that is established by 31 United States Code section 5331, subsection (c), paragraph 1 does not apply to persons who are engaged in the money accumulation business.
11. "Money transmitter" means a person who is located or doing business in this state, including a check casher and a foreign money exchanger, and who does any of the following:
(a) Sells or issues payment instruments.
(b) Engages in the business of receiving money for the transmission of or transmitting money.
(c) Engages in the business of exchanging payment instruments or money into any form of money or payment instrument.
(d) Engages in the business of receiving money for obligors for the purpose of paying that obligor's bills, invoices or accounts.
(e) Meets the definition of a bank, financial agency or financial institution as prescribed by 31 United States Code section 5312 or 31 Code of Federal Regulations section 1010.100.
12. "Outstanding payment instruments" means unpaid payment instruments whose sale has been reported to a licensee.
13. "Payment instrument" means a check, draft, money order, traveler's check or other instrument or order for the transmission or payment of money sold to one or more persons whether or not that instrument or order is negotiable. Payment instrument does not include an instrument that is redeemable by the issuer in merchandise or service, a credit card voucher or a letter of credit.
14. "Permissible investment" means any of the following:
(a) Money on hand or on deposit in the name of the licensee.
(b) Certificates of deposit or other debt instruments of a bank, savings and loan association or credit union.
(c) Bills of exchange or time drafts that are drawn on and accepted by a bank, otherwise known as banker's acceptances, and that are eligible for purchase by member banks of the federal reserve system.
(d) Commercial paper bearing a rating of one of the three highest grades as defined by a nationally recognized organization that rates these securities.
(e) Securities, obligations or other instruments whose payment is guaranteed by the general taxing authority of the issuer,

of the United States or of any state or by any other governmental entity or any political subdivision or instrumentality of a governmental entity and that bear a rating of one of the three highest grades by a nationally recognized investment service organization that has been engaged regularly in rating state and municipal issues for at least five years.
(f) Stocks, bonds or other obligations of a corporation organized in any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico or the several territories organized by Congress that bear a rating of one of the three highest grades by a nationally recognized investment service organization that has been engaged regularly in rating corporate securities for at least five years.
(g) Any receivable that is due to a licensee from its authorized delegate pursuant to a contract between the licensee and authorized delegate as prescribed in section 6-1208 if the amount of investment in those receivables does not exceed ninety per cent of the total amount of those receivables after subtracting the amount of those receivables that is past due or doubtful of collection.
15. "Responsible individual" means a person who is employed by a licensee and who has principal active management authority over the business of the licensee in this state that is regulated under this chapter.
16. "Trade or business" has the same meaning prescribed in section 162 of the internal revenue code of 1954 and includes the money accumulation business.
17. "Transmitting money" means the transmission of money by any means including transmissions within this country or to or from locations abroad by payment instrument, wire, facsimile, internet or any other electronic transfer, courier or otherwise.
18. "Traveler's check" means an instrument identified as a traveler's check on its face or commonly recognized as a traveler's check and issued in a money multiple of United States or foreign currency with a provision for a specimen signature of the purchaser to be completed at the time of purchase and a countersignature of the purchaser to be completed at the time of negotiation.

**6-1202. License required**
A. A person shall not sell or issue payment instruments, engage in the business of receiving money for transmission or transmitting money, engage in the business of exchanging payment instruments or money into any form of money or payment instrument or engage in the business of receiving money for an obligor for the purpose of paying that obligor's bills, invoices or accounts without first obtaining a license as provided in this chapter or becoming an authorized delegate of a licensee with respect to those activities. A licensee is under the jurisdiction of the department. A person who is not licensed under this chapter or who is not an authorized delegate of a licensee with respect to those activities is presumed to be engaged in a business that is regulated by this chapter and that requires a license if the person advertises, solicits or holds himself out as being in the business of selling or issuing payment instruments, of receiving money for transmission or transmitting money or of converting one form of money to another form of money.
B. No person other than a corporation or limited liability company organized and in good standing under the laws of the state of its incorporation or formation or a corporation or limited liability company organized under the laws of a country other than the United States and in good standing under the laws of the country of its incorporation or formation and authorized to do business in this state may apply for or be issued a license as provided in this chapter.
C. A person engages in business activity regulated by this chapter in this state if any of the following applies:
1. Conduct constituting any element of the regulated activity occurs in this state.
2. Conduct occurs outside this state and constitutes an attempt, offer or conspiracy to engage in the activity within this state and an act in furtherance of the attempt, offer or conspiracy occurs within this state.
3. As part of a business activity described by this section a person knowingly transmits money into this state or makes payments in this state without disclosing the identity of each person on whose behalf money was transmitted or payment was made.

**6-1203. Exemptions**
A. This chapter does not apply to:
1. The United States or any department or agency of the United States.
2. This state, including any political subdivision of this state.
B. This chapter does not apply to the following if engaged in the regular course of their respective businesses, except that the provisions of article 2 of this chapter apply to:
1. A bank, financial institution holding company, credit union, savings and loan association or savings bank, whether organized under the laws of any state or the United States when the term "money transmitter" is used.
2. A person who engages in check cashing or foreign money exchange and engages in other activity regulated under this chapter only as an authorized delegate of a licensee acting within the scope of the contract between the authorized delegate and the licensee.
3. A person licensed pursuant to chapter 5, 6, 7 or 8 of this title, chapter 9, article 2 of this title, chapter 12.1 of this title or title 32, chapter 9.

**6-1204. Application for license; fees**
A. Each application for a license shall be made in writing, under oath and in the form prescribed by the superintendent. The application shall contain at least the following:
1. Copies of the articles of incorporation for the applicant, a listing of all trade names or fictitious names used by the applicant and other information concerning the corporate status of the applicant.

2. The address of the applicant's principal place of business, the address of each location where the applicant intends to transact business in this state, including any branch offices, and the name and address of each location of any authorized delegates.
3. For each executive officer and director of the applicant and for each executive officer and director of any controlling person, unless the controlling person is a publicly traded company on a recognized national exchange and has assets in excess of four hundred million dollars, a statement of personal history in the form prescribed by the superintendent.
4. An identification statement for each branch manager and responsible individual including all of the following:
(a) Name and any aliases or previous names used.
(b) Date and place of birth.
(c) Alien registration information, if applicable.
(d) Employment history and residence addresses for the preceding fifteen years.
(e) Social security number.
(f) Criminal convictions, excluding traffic offenses.
5. The name and address of each authorized delegate.
6. The identity of any account in any financial institution through which the applicant intends to conduct any business regulated under this chapter.
7. A financial statement audited by a licensed independent certified public accountant.
B. Each application shall be accompanied by the nonrefundable application fee and an annual fee as prescribed in section 6-126.

**6-1205. Bond required; conditions; notice; cancellation; substitution**
A. Each application for a license shall be accompanied by and each licensee shall maintain at all times a bond executed by the licensee as principal and a surety company authorized to do business in this state as surety. The bond shall be in the amount of twenty-five thousand dollars for a licensee with five or fewer authorized delegates and locations, one hundred thousand dollars for a licensee with more than five but fewer than twenty-one authorized delegates and locations and an additional five thousand dollars for each authorized delegate and location in excess of twenty but fewer than two hundred one authorized delegates and locations, to a maximum of two hundred fifty thousand dollars and an additional five thousand dollars for each authorized delegate and location in excess of two hundred authorized delegates and locations, to a maximum of five hundred thousand dollars.
B. The bond shall be conditioned on the faithful compliance of the licensee, including its directors, officers, authorized delegates and employees, with this chapter. The bond shall be payable to any person injured by the wrongful act, default, fraud or misrepresentation of the licensee, his authorized delegates or his employees or to the state for the benefit of the person injured. Only one bond is required for any licensee irrespective of the number of officers, directors, locations, employees or authorized delegates of that licensee.
C. The bond shall remain in effect until cancelled by the surety, which cancellation may be had only after thirty days' written notice to the superintendent. That cancellation does not affect any liability incurred or accrued during the thirty day period.
D. In lieu of the bond prescribed in this section, an applicant for a license or a licensee may deposit with the superintendent cash or alternatives to cash acceptable to the superintendent in the amount of the required bond. Notwithstanding section 35-155, subsection E, the principal amount of the deposit shall be released only on written authorization of the superintendent or on the order of a court of competent jurisdiction. The principal amount of the deposit shall not be released to the licensee before the expiration of five years from the first occurrence of any of the following:
1. The date of substitution of a bond for a cash alternative unless the superintendent determines in his discretion that the bond constitutes adequate security for all past, present or future obligations of the licensee. After that determination, the cash alternative may be immediately released.
2. The surrender of the license.
3. The revocation of the license.
4. The expiration of the license.
E. Notwithstanding subsections A through D of this section, if the required amount of the bond is reduced, whether by change in the number of authorized delegates or locations or by legislative action, a cash deposit in lieu of that bond shall not be correspondingly reduced but shall be maintained at the higher amount until the expiration of three years from the effective date of the reduction in the required amount of that bond unless the superintendent in his discretion determines otherwise.

**6-1205.01. Net worth requirements**
A. Each applicant for a license shall have and each licensee shall maintain at all times a net worth of at least one hundred thousand dollars, calculated according to generally accepted accounting principles.
B. Any licensee who is engaged in the business regulated under this chapter at more than one location pursuant to section 6-1207 or through authorized delegates pursuant to section 6-1208 shall have an additional net worth of fifty thousand dollars for each location or authorized delegate located in this state, as applicable, to a maximum of five hundred thousand dollars.
C. A licensee whose business conducts a total of more than five hundred thousand dollars in transactions that involve transmitting money in an amount of one thousand dollars or more during the preceding year shall maintain net worth in addition to the amounts required by subsections A and B of this section. The additional net worth shall be not less than ten

per cent of the total of such transactions conducted in this state, calculated according to generally accepted accounting principles to a maximum of five hundred thousand dollars.

**6-1206. Issuance of license; renewal**

A. On the filing of a complete application, the superintendent shall investigate the financial condition and responsibility, financial and business experience, character and general fitness of the applicant. In his discretion, the superintendent may conduct an on-site investigation of the applicant, the reasonable cost of which shall be borne by the applicant. The superintendent shall issue a license to an applicant if the superintendent finds that all of the following conditions are met:

1. The applicant has complied with sections 6-1204, 6-1205 and 6-1205.01.
2. The competence, experience and integrity of the officers, directors and controlling persons and any proposed management personnel indicate that it would be in the interest of the public to permit such person to participate in the affairs of a licensee.
3. The applicant has paid the required license fee.

B. The superintendent shall approve or deny every application for an original license within one hundred twenty days after the date an application is complete, which period may be extended by the written consent of the applicant. The superintendent shall notify the applicant of the date on which the application is determined to be complete. In the absence of approval or denial of the application or consent to the extension of the one hundred twenty day period, the application is deemed approved and the superintendent shall issue the license effective as of the first business day after that one hundred twenty day period or any extended period.

C. A licensee shall pay a renewal fee as prescribed in section 6-126 on or before November 1 of each year. The renewal fee shall be accompanied by a renewal application in the form prescribed by the superintendent. A license for which no renewal fee and application have been received by November 1 shall be suspended. A licensee may renew a suspended license no later than December 1 of the year of expiration by paying the renewal fee plus one hundred dollars for each day the renewal fee and application were not received by the superintendent. A license expires on December 1 of each year, unless earlier renewed, surrendered or revoked. A license shall not be granted to the holder of an expired license or to an incorporator, director or officer of the holder of an expired license except on compliance with the requirements provided in this article for an original license.

**6-1207. Principal and branch offices; notices**

A. A licensee shall designate and maintain a principal place of business for the transaction of business regulated by this chapter. If a licensee maintains one or more places of business in this state, the licensee shall designate a place of business in this state as its principal place of business for purposes of this section. The license shall specify the address of the principal place of business and shall designate a responsible individual for its principal place of business.

B. If a licensee maintains one or more locations in this state in addition to a principal place of business, and those locations are to be under the control of the licensee and not under the control of authorized delegates as prescribed in section 6-1208, the licensee shall obtain a branch office license from the superintendent for each additional location by filing an application as required by the superintendent at the time the licensee files its license application. If branch offices are added by the licensee, the licensee shall file with the superintendent an application for a branch office license with the licensee's next quarterly fiscal report prescribed by section 6-1211. The superintendent shall issue a branch office license if the superintendent determines that the licensee has complied with the provisions of this subsection. The license shall indicate on its face the address of the branch office and shall designate a manager for each branch office to oversee that office. The superintendent may disapprove the designated manager then or at any later time if the superintendent finds that the competence, experience and integrity of the branch manager warrants disapproval. A person may be designated as the manager for more than one branch. The licensee shall submit a fee as prescribed in section 6-126 for each branch office license.

C. A licensee shall prominently display the money transmitter license in its principal place of business and the branch office license in each branch office. Each authorized delegate shall prominently display at each location a notice in a form prescribed by the superintendent that indicates that the authorized delegate is an authorized delegate of a licensee under this chapter.

D. If the address of the principal place of business or any branch office is changed, the licensee shall immediately notify the superintendent of the change. The superintendent shall endorse the change of address on the license for a fee as prescribed in section 6-126.

**6-1208. Authorized delegates of licensee; reports**

A. A licensee may conduct the business regulated under this chapter at one or more locations in this state through authorized delegates designated by the licensee.

B. Each contract between a licensee and an authorized delegate shall require the authorized delegate to operate in full compliance with the law and shall contain as an appendix a current copy of this chapter. The licensee shall provide each authorized delegate with operating policies and procedures sufficient to permit compliance by the delegate with the provisions of title 13, chapter 23 and this chapter and rules adopted pursuant to this chapter. The licensee shall promptly update the policies and procedures to permit compliance with those laws and rules.

C. An authorized delegate is not liable for any obligation imposed on its licensee by this chapter with respect to the business for which it is a delegate. On suspension or revocation of a license or the failure of a licensee to renew its license, the

superintendent shall notify all delegates of the licensee who are on record with the department of the department's action. On receipt of this notice, an authorized delegate shall immediately cease to operate as a delegate of that licensee.

**6-1209. Cease and desist orders; examinations**

A. In addition to his authority under section 6-137, the superintendent may issue an order to cease and desist against a licensee, requiring the licensee to cease conducting its business through an authorized delegate and to take appropriate affirmative action, pursuant to section 6-137, if the superintendent finds that:

1. The authorized delegate has violated, is violating or is about to violate any applicable law or rule or order of the superintendent.
2. The authorized delegate has failed to cooperate with an examination or investigation by the superintendent or the attorney general authorized by this title.
3. The competence, experience, integrity or overall moral character of the authorized delegate or any controlling person of the authorized delegate indicates that it would not be in the interest of the public to permit that person to participate in the business regulated under this chapter.
4. The financial condition of the authorized delegate is such that it might prejudice the interests of the public in the conduct of the business regulated under this chapter.
5. The authorized delegate has engaged, is engaging or is about to engage in any unsafe or unsound act, practice or transaction or an act, practice or transaction that constitutes a violation of this title or of any rule or order of the superintendent.

B. Any business for which a license is required by this chapter conducted by an authorized delegate outside the scope of authority conferred in the contract between the authorized delegate and the licensee is unlicensed activity. An authorized delegate of a licensee holds in trust for the benefit of the licensee all monies received from the sale or delivery of the licensee's payment instruments or monies received for transmission. If an authorized delegate commingles any such monies with any monies or other property owned or controlled by the authorized delegate, a trust against all commingled proceeds and other monies or property owned or controlled by the authorized delegate is imposed in favor of the licensee in an amount equal to the amount of the proceeds due the licensee.

C. An authorized delegate is subject to examination by the superintendent at the discretion of the superintendent. The licensee is responsible for the payment of an assessment for the examination of its authorized delegates to the extent that the examination relates to the activities conducted by the authorized delegate on behalf of the licensee. That assessment shall be made at the rate set by the superintendent for examination of an enterprise pursuant to section 6-125, subsection B, and payment of that assessment shall be made as prescribed by section 6-125.

**6-1210. Suspension or revocation of licenses**

The superintendent may suspend or revoke a license if the superintendent finds any of the following:

1. The licensee has made a material misstatement or suppressed or withheld information on an application for a license or any document required to be filed with the superintendent.
2. A fact or condition exists that, if it had existed or had been known at the time the licensee applied for its license, would have been grounds for denying the application.
3. The licensee is insolvent as defined in section 47-1201.
4. The licensee has violated any provision of title 13, chapter 23, this chapter or rules adopted pursuant to this chapter or any order of the superintendent.
5. An authorized delegate of the licensee has violated any provision of title 13, chapter 23, this chapter or rules adopted thereunder or any order of the superintendent as a result of a course of negligent failure to supervise or as a result of the wilful misconduct of the licensee.
6. The licensee refuses to permit the superintendent or the attorney general to make any examination authorized by this title.
7. The licensee knowingly fails to make any report required by this chapter.
8. The licensee fails to pay a judgment entered in favor of a claimant, plaintiff or creditor in an action arising out of the licensee's business regulated under this article within thirty days after the judgment becomes final or within thirty days after expiration or termination of a stay of execution or other stay of proceedings, whichever is later. If execution on the judgment is stayed by court order, operation of law or otherwise, proceedings to suspend or revoke the license for failure of the licensee to comply with that judgment may not be commenced by the superintendent under this subsection until thirty days after that stay.
9. The licensee has been convicted in any state of a felony or of any crime involving a breach of trust or dishonesty.

**6-1211. Reports**

Each licensee shall file with the superintendent within forty-five days after the end of each fiscal quarter a consolidated financial statement including a balance sheet, income and expense statements and a list of all authorized delegates, branch managers, responsible individuals and locations within this state that have been added or terminated by the licensee within the fiscal quarter. Information regarding branch managers and responsible individuals shall include the information prescribed in section 6-1204, subsection A, paragraph 4. For locations and authorized delegates, the licensee shall include the name and street address of each location and authorized delegate.

**6-1212. Permissible investments**
A. Every licensee shall maintain at all times permissible investments that comply with either of the following:
1. A market value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments.
2. A net carrying value computed in accordance with generally accepted accounting principles of not less than the aggregate amount of all of its outstanding payment instruments, provided the market value of these permissible investments is at least ninety-five per cent of the net carrying value.
B. Notwithstanding any other provision of this chapter, the superintendent, with respect to any particular licensee or all licensees, may limit the extent to which any class of permissible investments as defined in section 6-1201 may be considered a permissible investment, except for money and certificates of deposit. The superintendent may by rule prescribe or by order allow other types of investments which the superintendent determines to have substantially equivalent safety as other permissible investments to be considered a permissible investment under this chapter.

**6-1213. Records**
A. Each licensee shall keep and use in its business books, accounts and records in accordance with generally accepted accounting principles that will enable the superintendent to determine whether that licensee is complying with the provisions of this chapter. Each licensee and authorized delegate shall preserve its records for at least five years after making the final entry on any transaction. Each authorized delegate shall keep records as required by the superintendent.
B. For each authorized delegate, the licensee shall maintain records that demonstrate that the licensee conducted a reasonable background investigation of each authorized delegate. A licensee shall preserve those records for at least five years after the authorized delegate's most recent designation by the licensee. For an authorized delegate designated after November 1, 1991, the records shall be available at all times, and for an authorized delegate designated on or before November 1, 1991, the records shall be available at all times after November 1, 1992.
C. The records of the licensee regarding the business regulated under this chapter shall be maintained at its principal place of business or, with notice to the superintendent, at another location designated by the licensee. If the records are maintained outside this state, the superintendent may require that the licensee make those records available to the superintendent at his office not more than five business days after demand. The superintendent may further require that those records be accompanied by an individual who is available to answer questions regarding those records and the business regulated under this chapter. The superintendent may require the appearance of a specific individual or may request the licensee to designate an individual knowledgeable with regard to the records and the business. The individual appearing with the records shall be available to the superintendent for up to three business days.
D. On-site examinations of records prescribed by this chapter may be conducted in conjunction with representatives of other state agencies or agencies of another state or of the federal government as determined by the superintendent. In lieu of an on-site examination, the superintendent may accept the examination report of an agency of this state or of another state or of the federal government or a report prepared by an independent licensed certified public accountant. Joint examination or acceptance of an examination report shall not be deemed a waiver of examination assessments provided by law, and joint reports and reports accepted under this subsection are considered an official report of the department for all purposes. Information obtained by examinations prescribed by this article shall be disclosed only as provided in section 6-129.

**6-1214. Liability of licensees**
Each licensee is liable for the payment of all moneys covered by payment instruments that it sells or issues in any form in this state whether directly or through an authorized delegate and whether as a maker or drawer or as money received for obligors or for transmission by any means whether or not that instrument is a negotiable instrument under the laws of this state.

6-1215. Notice of source of instrument; transaction records
A. Every payment instrument sold by a licensee directly or through an authorized delegate shall bear the name of the licensee and a unique consecutive number clearly stamped or imprinted on it.
B. For every transaction involving the receipt of money from a customer, the licensee or authorized delegate who receives the money shall maintain written records of the transaction. The records may be reduced to computer or other electronic medium. The records collectively shall contain the name of the licensee, the street address of the location where the money was received, the name and street address of the customer if reported to the licensee or authorized delegate, the approximate date of the transaction, the name or other information from which, together with other contemporaneous records, the superintendent can determine the identity of those employees of the licensee or authorized delegate who may have conducted the transaction and the amount of the transaction. The information required by this section shall be available through the licensee or authorized delegate who received the money for at least five years from the date of the transaction.

**6-1216. Acquisition of control**
A. A person shall not directly or indirectly acquire control of a licensee or controlling person without the prior written approval of the superintendent, except as otherwise provided by this section.
B. An application for approval to acquire control of a licensee shall be in writing in a form prescribed by the superintendent and shall be accompanied by information as the superintendent may require. The application shall be accompanied by the fee prescribed in section 6-126. The superintendent shall act on the application within one hundred twenty days after the

date on which the application is complete, unless the applicant consents in writing to an extended period. An application that is not denied or approved within that period shall be deemed approved as of the first business day after the expiration of that period.
C. The superintendent shall deny the application to acquire control of a licensee if he finds that the acquisition of control is contrary to law or determines that disapproval is reasonably necessary to protect the interest of the public. In making that determination, the superintendent shall consider both of the following:
1. Whether the financial condition of the person that seeks to control the licensee might jeopardize the financial condition of the licensee or prejudice the interests of the public in the conduct of the business regulated under this chapter.
2. Whether the competence, experience, integrity and overall moral character of the person that seeks to control the licensee, or the officers, directors and controlling persons of the person that seeks to control the licensee, indicate that it would not be in the interest of the public to permit that person to control the licensee.
D. Nothing in this section prohibits a person from negotiating or entering into agreements subject to the condition that the acquisition of control will not be effective until approval of the superintendent is obtained.
E. This section does not apply to any of the following persons or transactions:
1. A registered dealer who acts as an underwriter or member of a selling group in a public offering of the voting securities of a licensee or controlling person of a licensee.
2. A person who acts as proxy for the sole purpose of voting at a designated meeting of the security holders of a licensee or controlling person of a licensee.
3. A person who acquires control of a licensee or controlling person of a licensee by devise or descent.
4. A person who acquires control of a licensee or controlling person as a personal representative, custodian, guardian, conservator, trustee or any other officer appointed by a court of competent jurisdiction or by operation of law.
5. A pledgee of a voting security of a licensee or controlling person who does not have the right, as pledgee, to vote that security.
6. A person or transaction that the superintendent by rule or order exempts in the public interest.
F. Before filing an application for approval to acquire control, a person may request in writing a determination from the superintendent as to whether that person will be deemed in control on consummation of a proposed transaction. If the superintendent determines in response to that request that the person will not be in control within the meaning of this chapter, the superintendent shall enter an order to that effect and the proposed transaction is not subject to the requirements of this section.

**6-1217. Appointment of superintendent as agent for service of process; forwarding of process; consent to jurisdiction**
A. A licensee, an authorized delegate or a person who knowingly engages in business activities that are regulated under this chapter with or without filing an application is deemed to have done both of the following:
1. Consented to the jurisdiction of the courts of this state for all actions arising under this chapter.
2. Appointed the superintendent as his lawful agent for the purpose of accepting service of process in any action, suit or proceeding that may arise under this chapter.
B. Within three business days after service of process upon the superintendent, the superintendent shall transmit by certified mail copies of all lawful process accepted by the superintendent as an agent to that person at its last known address. Service of process shall be considered complete three business days after the superintendent deposits the copies of the documents in the United States mail.

**6-1218. Prohibited transactions**
A person shall not engage in conduct requiring a license under this chapter as an authorized delegate of a principal if that principal is not licensed under this chapter. A person who does so shall be deemed to be the principal seller, issuer or actor, and not merely an authorized delegate, and is liable to the holder, remitter or customer as the principal.

**Article 2 Money Laundering**

**6-1241. Reports to the attorney general; investigation; violation; classification**
A. Within thirty days after any transaction or series or pattern of transactions that is conducted or attempted by, at or through the business and that involves or aggregates five thousand dollars or more in funds or other assets, each licensee and authorized delegate of a licensee and each money transmitter shall file with the attorney general's office in a form prescribed by the attorney general a report of the transaction or series or pattern of transactions if the licensee, authorized delegate or money transmitter knows, suspects or has reason to suspect that the activity either:
1. Involves funds that are derived from illegal activities, is intended or conducted in order to hide or disguise funds or other assets that are derived from illegal activities, including, without limitation, the ownership, nature, source, location or control of the funds or other assets, as part of a plan to violate or evade any law or regulation or to avoid any transaction reporting requirement under this chapter or may constitute a possible money laundering violation under section 13-2317 or another racketeering violation as defined in section 13-2301.
2. Has no business or apparent lawful purpose or is not the sort of activity in which the particular customer would normally be expected to engage and the licensee, authorized delegate or money transmitter knows of no reasonable explanation for the activity after examining the available facts, including the background and possible purpose of the activity.

B. A licensee, authorized delegate or money transmitter that is required to file a report regarding business conducted in this state pursuant to the currency and foreign transactions reporting act (31 United States Code sections 5311 through 5326, including any special measures that are established under 31 United States Code section 5318A, and 31 Code of Federal Regulations chapter X or 12 Code of Federal Regulations section 21.11) shall file a duplicate of that report with the attorney general.
C. All persons who are engaged in a trade or business and who receive more than ten thousand dollars in money in one transaction or who receive more than ten thousand dollars in money through two or more related transactions shall complete and file with the attorney general the information required by 31 United States Code section 5331 and the federal regulations relating to this section concerning reports relating to cash received in trade or business.
D. A licensee, authorized delegate or money transmitter that is regulated under the currency and foreign transactions reporting act (31 United States Code section 5325 and 31 Code of Federal Regulations chapter X) and that is required to make available prescribed records to the secretary of the United States department of treasury on request at any time shall follow the same prescribed procedures and create and maintain the same prescribed records relating to each transaction.
E. In addition to the requirements under subsection D of this section and in connection with each transaction that involves transmitting money in an amount of one thousand dollars or more, whether sending or receiving, a licensee or, for transactions conducted through an authorized delegate, an authorized delegate shall retain a record of each of the following:
1. The name and social security or taxpayer identification number, if any, of the individual presenting the transaction and the person and the entity on whose behalf the transaction is to be effected.
2. The type and number of the customer's verified photographic identification, as described in 31 Code of Federal Regulations section 1010.312.
3. The customer's current occupation.
4. The customer's current residential address.
5. The customer's signature.
F. Subsection E of this section does not apply to transactions by which the licensee's customer is making a bill payment either to a commercial creditor pursuant to a contract between the licensee and the commercial creditor or to a utility company.
G. Each licensee shall create records that reflect the provision of updated operating policies and procedures pursuant to section 6-1208, subsection B and of instruction that promotes compliance with this chapter, title 13, chapter 23 and 31 United States Code section 5318, including the identification of the provider and the material and instruction that were provided.
H. On request of the attorney general, a county attorney or the superintendent, a licensee, authorized delegate or money transmitter shall make any records that are created pursuant to this section available to the attorney general, a county attorney or the superintendent at any time.
I. A licensee or, for transactions conducted through an authorized delegate, an authorized delegate shall maintain any customer identification records that are created pursuant to subsection E of this section for three years. After three years, the licensee or, for transactions conducted through an authorized delegate, the authorized delegate shall deliver the customer identification records to the attorney general. The attorney general shall make the records available on request to the superintendent or a county attorney but shall not otherwise distribute the customer identification records without a court order. The customer identification records shall not be used for any purpose other than for criminal and civil prosecution and the prevention and detection of fraud and other criminal conduct.
J. If the superintendent or the attorney general finds that reasonable grounds exist for requiring additional record keeping and reporting in order to carry out the purposes of this chapter and to prevent the evasion of this chapter, the superintendent or the attorney general may:
1. Issue an order requiring any group of licensees, authorized delegates or money transmitters in a geographic area to do any of the following:
(a) Obtain information regarding transactions that involve total dollar amounts or denominations of five hundred dollars or more, including the names of any persons participating in those transactions and any persons or entities on whose behalf they are to be effected.
(b) Maintain records of that information for at least five years and make those records available to the attorney general and the superintendent.
(c) File a report with the attorney general and the superintendent regarding any transaction in the manner prescribed in the order.
2. Issue an order exempting any group of licensees or authorized delegates from the requirements of subsection E of this section based on the geographic area, the volume of business conducted, the record of compliance with the reporting requirements of this chapter and other objective criteria.
K. An order issued pursuant to subsection J of this section is not effective for more than one hundred eighty days unless renewed after finding that reasonable grounds exist for continuation of the order.
L. The timely filing of a report required by this section with the appropriate federal agency shall be deemed compliance with the reporting requirements of this section, unless the attorney general has notified the superintendent that reports of that type are not regularly and comprehensively transmitted by that federal agency to the attorney general.
M. This chapter does not preclude a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business from instituting contact with and disclosing customer financial records to appropriate state or local law enforcement agencies if the licensee, authorized delegate, money transmitter, financial institution or person has information that may be relevant to a possible violation of any criminal statute or to the evasion or attempted evasion of any reporting requirement of this chapter.

N. A licensee, authorized delegate, money transmitter, financial institution, person engaged in a trade or business or director, officer, employee, agent or authorized delegate of any of them that keeps or files a record as prescribed by this section, that communicates or discloses information or records under subsection M of this section or that requires another to make any such disclosure is not liable to any person under any law or rule of this state or any political subdivision of this state or under any contract or other legally enforceable agreement, including any arbitration agreement, for the disclosure or for the failure to provide notice of the disclosure to the person who is the subject of the disclosure or to any other person who is identified in the disclosure. This subsection shall be construed to be consistent with 31 United States Code section 5318(g)(3).
O. The attorney general may report any possible violations indicated by analysis of the reports required by this chapter to any appropriate law enforcement agency for use in the proper discharge of its official duties. If an officer or employee of this state or any political subdivision of this state receives a report pursuant to 31 United States Code section 5318(g), the report shall be disclosed only as provided in 31 United States Code section 5318(g). A person who releases information received pursuant to this subsection except in the proper discharge of official duties is guilty of a class 2 misdemeanor.
P. The requirements of this section shall be construed to be consistent with the requirements of the currency and foreign transactions reporting act (31 United States Code sections 5311 through 5326 and federal regulations prescribed under those sections) unless the context otherwise requires.
Q. A person who refuses to permit any lawful investigation by the superintendent, a county attorney or the attorney general or who refuses to make records available to the superintendent, a county attorney or the attorney general pursuant to subsection H of this section is guilty of a class 6 felony.

**6-1242. Investigations**
A. The attorney general may conduct investigations within or outside this state to determine if a licensee, authorized delegate, money transmitter, financial institution or person engaged in a trade or business has failed to file a report required by this article or has engaged or is engaging in an act, practice or transaction that constitutes a money laundering violation as provided in section 13-2317.
B. On request of the attorney general, all licensees, authorized delegates, money transmitters and financial institutions shall make their books and records available to the attorney general during normal business hours for inspection and examination in connection with an investigation pursuant to this section.

# RETAILER AGREEMENT

THIS RETAILER AGREEMENT (this "*Agreement*") is made and entered into effective as of the date last signed (the "*Effective Date*") by and between NETSPEND CORPORATION, a Delaware corporation ("*NetSpend*"), and the party set forth on the signature page hereto ("*Retailer*") (each of NetSpend and Retailer, a "*Party*", and collectively, the "*Parties*").

WHEREAS, NetSpend serves as processor and program manager for general purpose, reloadable prepaid debit cards issued by financial institutions ("*Issuing Banks*") and/or NetSpend ("*NetSpend Cards*");

WHEREAS, NetSpend and Interactive Communications International, Inc., a Florida corporation ("*InComm*"), have entered into that certain Second Amended and Restated Services Agreement, dated as of October 1, 2015, pursuant to which InComm has agreed to provide reloadable prepaid card activation, fee remittance and sales reporting services for NetSpend (as amended and/or restated from time to time, the "*InComm Agreement*"); and

WHEREAS, NetSpend and 7-Eleven, Inc. ("*7-Eleven*") have entered into that certain Third Amended and Restated Retailer Agreement, dated as of August 1, 2016, pursuant to which 7-Eleven has agreed to sell, load and reload NetSpend Cards (as amended and/or restated from time to time, the "*7-Eleven Retailer Agreement*"); and

WHEREAS, NetSpend desires for Retailer to sell, load and reload NetSpend Cards at Retailer Locations (as hereinafter defined);

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual promises and covenants hereinafter set forth, and payments provided for in this Agreement, the parties agree as follows:

## ARTICLE 1 – DEFINITIONS

For the purposes of this Agreement and except as otherwise specifically set forth herein, the following terms shall be defined as hereinafter set forth:

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"*Business Day*" means any Monday through Friday, other than a day on which banks are authorized to be closed in the State of Texas.

"*Cardholder Data*" means any data or information regarding any Cardholder, including but not limited to, "Nonpublic Personal Information" and "Personally Identifiable Financial Information" (as defined in 12 C.F.R. §§ 573.3(n) and (o), respectively); *provided, however*, that "Cardholder Data" shall not include data or information collected by Retailer from a customer in connection with a transaction separate and apart from the sale, load and/or reload of a NetSpend Card. For purposes of clarity, the PAN and other Track 2 data encoded on the magnetic stripe of a NetSpend Card shall constitute "Cardholder Data" hereunder.

"*Cardholder*" means a holder of a NetSpend Card.

"*Cardholder Funds*" means the funds received by in connection with the load or reload of a NetSpend Card.

"*Control*" means the possession, direct or indirect, of the power to vote fifty-one percent (51%) or more of the securities that have ordinary voting power for the election of directors of any entity, or to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or by contract or otherwise.

"*Customer Fees*" means the fees charged by Retailer in connection with the sale, load and/or reload of NetSpend Cards.

"*GLBA*" means Gramm-Leach-Bliley Act and its implementing regulations, as amended.

"*Master Services Agreement*" means that certain agreement by and between InComm and 7-Eleven relating to, among other things, the sale, load and reload of NetSpend Cards, as amended and/or restated from time to time.

"*NetSpend Trademarks*" means NetSpend's trademarks and service marks provided to Retailer by NetSpend in connection with the Program.

"*Person*" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, trust, association, organization or other entity, or any governmental authority.

"*Program*" means the marketing, promotion, distribution, sale, load and reload of NetSpend Cards by Retailer.

"*System*" means Visa U.S.A., Inc., MasterCard International, Inc., Discover Network, Inc., American Express Travel Related Services Company, Inc. or any other electronic card network.

## ARTICLE 2 - PROGRAM OVERVIEW

2.1 Appointment.

(a) NetSpend hereby appoints Retailer as its authorized agent to sell, and offer load services with respect to the sale of, NetSpend Cards in those jurisdictions where NetSpend is licensed as a money transmitter ("*Subject States*"). Retailer acknowledges that, as an authorized agent of NetSpend in the Subject States, it may be engaged in the provision of money transmission services in connection with the Program and as result agrees to be bound by the terms set forth on www.netspend.com/7eleven/MTL (the "*MTL Terms*"). The Parties acknowledge and agree that NetSpend may, from time to time, unilaterally amend the MTL Terms in the manner and to the extent that NetSpend may, in its reasonable discretion, deem necessary to comply with applicable law, at which time NetSpend shall communicate to Retailer the content of any such amendment (by e mail or otherwise) and the effective date thereof.

(b) The Parties acknowledge and agree that in those jurisdictions that are not Subject States and where a money transmitter license is required for Retailer to sell, and offer load services with respect to the sale of, NetSpend Cards (the "*Non-Subject States*"), Retailer shall perform its obligations hereunder as an agent of an Issuing Bank or a Person licensed as a money transmitter in such Non-Subject State (a "*Third Party Licensor*") pursuant to the authority granted by such Issuing Bank or such Third Party Licensor under an Agency Agreement. Prior to selling, or offering load services with respect to the sale of, NetSpend Cards in any Non-Subject State, Retailer shall enter into an agency agreement with an Issuing Bank or a Third Party Licensor licensed in such Non-Subject State in form and substance satisfactory to NetSpend and such Issuing Bank or Third Party Licensor, as applicable (an "*Agency Agreement*").

(c) The Parties acknowledge and agree that to the extent that a Retailer is offering reload services with respect to NetSpend Cards, Retailer is acting as an authorized agent of InComm.



©2017 NetSpend Corporation
CONFIDENTIAL

(d) The agency authority granted herein is solely for the benefit of Retailer only, and may not be subcontracted or delegated by Retailer to any sub-agent or other third party without the written consent of NetSpend.

(e) Retailer represents and warrants to NetSpend that (i) the information set forth on Schedule 1 hereto regarding Retailer and its officers and owners is true, correct and complete in all respects, and (ii) Retailer will promptly update such information as NetSpend may request from time to time to cause Schedule 1 to remain true, correct and complete in all respects.

2.2 General Responsibilities.

(a) Retailer will offer for sale, load and reload NetSpend Cards at each Retailer Location and, in connection therewith, receive Cardholder Funds and Customer Fees and remit the same to 7-Eleven for remittance to InComm for further remittance to the applicable Issuing Banks.

(b) Retailer will process Transaction Data related to the sale, load and/or reload of NetSpend Cards by Retailer. Upon the sale, load or reload of a NetSpend Card by Retailer, Retailer will immediately transmit to 7-Eleven by secure electronic means such information as designated by NetSpend ("***Transaction Data***").

2.3 Customer Fees. The Customer Fees charged to Cardholders in connection with the sale, load and/or reload of NetSpend Cards by Retailer shall be as designated by 7-Eleven in accordance with the Master Services Agreement.

**ARTICLE 3 - CARDHOLDER FUNDS**

3.1 Transfer of Cardholder Funds.

(a) Retailer acknowledges and agrees that it will receive Cardholder Funds for the express purpose of delivering such Cardholder Funds to 7-Eleven for delivery to InComm for further delivery to the Issuing Banks, so that such Cardholder Funds may be deposited to the appropriate NetSpend Card accounts held at the Issuing Banks.

(b) With respect to Cardholder Funds received by Retailer in a Subject State, Retailer shall hold such Cardholder Funds in trust for the benefit of NetSpend. If Retailer commingles Cardholder Funds received by Retailer in a Subject State with other funds, the total commingled funds are hereby impressed with a trust for the benefit of NetSpend to the extent of any amounts due 7-Eleven from Retailer hereunder.

(c) Retailer further agrees that Cardholder Funds will not be used for any operating or general purpose of Retailer or otherwise treated as property of Retailer, including by granting any interest or right therein to any third party, and Retailer shall not make Cardholder Funds available to its creditors as part of its property and thereby its estate in the event of bankruptcy. Retailer shall be ultimately liable to NetSpend for all Cardholder Funds attributable to the sale, load or reload of any NetSpend Card at any Retailer Location.

**ARTICLE 4 –AUDIT RIGHTS**

4.1 Audit Rights. Retailer agrees to: (i) upon ten (10) Business Days prior written notice or such other shorter period as required by applicable law or any regulatory authority, submit to any audit or examination of Retailer's operations to be performed during normal business hours which may be required by NetSpend, any Issuing Bank or any regulatory authority with audit and examination authority over NetSpend or any Issuing Bank; (ii) promptly provide to NetSpend and each Issuing Bank, as applicable, any information that may be required by any auditor or regulatory authority in connection with their audit or review of NetSpend, such Issuing Bank or the Program and reasonably cooperate with such auditor or regulatory authority in connection with such any audit or review; and (iii) promptly provide such other information as the NetSpend, any Issuing Bank or any regulatory authority may from time to time reasonably request to verify Retailer's compliance with its obligations hereunder.

**ARTICLE 5 – COMPLIANCE WITH LAW; CARDHOLDER DATA**

5.1 Covenants of the Parties.

(a) The Parties will perform their respective obligations under this Agreement in compliance, in all material respects, with all applicable law. Without limiting the generality of the foregoing, Retailer will post such signs or other notifications at all Retailer Locations as NetSpend may request from time to time as required under applicable law.

(b) Retailer will comply with such Program guidelines provided by NetSpend in connection herewith, as may be modified by NetSpend from time to time (the "***Program Guidelines***"), including, without limitation, NetSpend's policies set forth therein regarding the merchandizing and display of NetSpend Cards at Retailer Locations. Retailer will additionally perform such other regulatory compliance and consumer protection duties, both federal and state, as NetSpend or any Issuing Bank may reasonably require, including but not limited to implementing controls related to each Issuing Bank's Identity Theft Prevention Program. Retailer will ensure that all of Retailer's employees are trained to comply with the Program Guidelines and such other duties as NetSpend or any Issuing Bank may require.

5.2 Cardholder Data.

(a) The purpose of this Section 5.2 is to ensure that this Agreement conforms to the applicable provisions of GLBA and otherwise set forth the Parties' agreement with respect to the use and disclosure of Cardholder Data. Retailer shall not collect any Cardholder Data in connection with the sale or initial load of a NetSpend Card. Retailer shall not collect any Cardholder Data in connection with the reload of a NetSpend Card, except such Cardholder Data as designated by NetSpend. As between Retailer and NetSpend, Cardholder Data shall be the sole property of and owned by NetSpend.

(b) Retailer agrees that, during and after the term of this Agreement, it shall not use, nor shall it permit any third party to use, any Cardholder Data other than as necessary to perform its obligations hereunder or as required to comply with applicable law. Further, Retailer agrees not to, and agrees not to permit any third party to, directly or indirectly, sell or otherwise transfer any right in or to Cardholder Data. Retailer will not at any time store Cardholder Data. Further, Retailer will establish and maintain appropriate administrative, technical and physical safeguards designed to (i) protect the security, confidentiality and integrity of Cardholder Data, (ii) ensure against any anticipated threats or hazards to its security and integrity, (iii) protect against unauthorized access to or use of such information or associated records which could result in substantial harm or inconvenience to any Cardholder and (iv) ensure the proper disposal of Cardholder Data. Such safeguards shall be established in accordance with applicable law. In the event that Retailer becomes aware of any unauthorized use, modification, destruction or disclosure of, or access to, Cardholder Data, Retailer shall immediately notify NetSpend and shall cooperate with NetSpend and each Issuing Bank and their representatives, (x) to assess the nature and scope of such incident, (y) to contain and control such incident to prevent further unauthorized access to or use of Cardholder Data, and (z) to provide prompt notice to affected Cardholders as may be required by applicable law. Retailer shall bear the cost and expenses of any notice or other action required by applicable law due to unauthorized use, modification, destruction or disclosure of, or access to, Cardholder Data. At all times during the term of this Agreement, Retailer will be in compliance with all information and data security requirements of the Payment Card Industry Data Security Standard, as the same may be revised from time to time.

**ARTICLE 6 – TRADEMARKS; MARKETING**

©2017 NetSpend Corporation
CONFIDENTIAL

6.1 Use of NetSpend Trademarks. NetSpend grants to Retailer a non-exclusive, non-transferable limited license during the term of this Agreement to use the NetSpend Trademarks solely in connection with the Program, which uses shall include, without limitation, on advertising and promotional and public relations materials, and any other item reasonably necessary to the establishment, operation or advancement of the Program. Retailer shall not make any use of the NetSpend Trademarks without obtaining NetSpend's prior written approval thereof. Without limitation of the foregoing, Retailer shall use the NetSpend Trademarks (to the extent such use is permitted hereunder) only in the form and manner and with appropriate legends as prescribed from time to time by NetSpend.

6.2 Marketing. All marketing materials used by Retailer to promote and market NetSpend Cards, including scripts and forms of communication, shall be subject to the prior review and approval of NetSpend, the applicable Issuing Bank and the applicable card association(s). Retailer shall not at any time market any NetSpend Card as a gift card or gift certificate.

## ARTICLE 7 – INDEMNIFICATION

7.1 Indemnification of NetSpend. Retailer shall (i) defend NetSpend and each Issuing Bank and their respective Affiliates and their respective employees, officers, directors and shareholders (collectively, the "***NetSpend/Bank Indemnified Parties***") against any and all claims, actions, suits, proceedings and demands brought by a third party (collectively, "***Claims***") and (ii) indemnify and hold the NetSpend/Bank Indemnified Parties harmless from and against any and all losses, liabilities, damages, awards, judgments, fines, penalties and other amounts, costs and expenses (including reasonable attorneys' fees and court costs) (collectively, "***Losses***") that are awarded to a third party in final judgment by a court of competent jurisdiction or in settlement of any Claim or that are assessed or imposed against any NetSpend/Bank Indemnified Party by a regulatory authority as a result of any Claim, in all of the foregoing cases to the extent arising out of (A) the actual or alleged infringement by Retailer intellectual property of the intellectual property or other proprietary rights of any third party, (B) Retailer's or any of its agents' or employees' violation (or act causing NetSpend or such Issuing Bank to be in violation) of any applicable law, or (C) Retailer's breach of any term, representation, warranty or covenant contained in this Agreement. For purposes of this Article 7, the term "third party" shall be deemed to include any regulatory authority.

## ARTICLE 8 - TERM AND TERMINATION

8.1 Term. The term of this Agreement shall commence on the Effective Date and shall continue for a period of three (3) years thereafter (the "***Initial Term***") unless terminated earlier by either Party pursuant to this Article 8. This Agreement shall automatically renew upon the expiration of the Initial Term and each anniversary thereof (the "Annual Expiration Date") for successive one (1) year terms unless either Party terminates this Agreement under this Section 8.1 by providing written notice to the other Party of its intent to terminate at least ninety (90) days prior to the applicable Annual Expiration Date. If such notice is timely provided, the term of this Agreement shall expire on the Annual Expiration Date immediately following the date on which such notice was provided. Any reference in this Agreement to the "termination" of this Agreement shall include, without limitation, the expiration of the term as set forth in this Section 8.1. This Agreement shall automatically terminate upon the termination of the InComm Agreement, the 7-Eleven Retailer Agreement or the Master Services Agreement.

8.2 Termination of Agreement by NetSpend for Cause. NetSpend shall have the right to terminate this Agreement by written notice to Retailer upon the occurrence of one or more of the following events: (i) Retailer fails to perform any of its obligations under this Agreement; (ii) Retailer engages in any dishonest or fraudulent activity in connection with the Program or otherwise or (iii) NetSpend or any Issuing Bank is directed by any regulatory authority to cease or materially limit its performance under this Agreement.

8.3 Effect of Termination. Upon the termination of this Agreement, Retailer shall cease the sale, load and reload of NetSpend Cards.

8.4 Emergency Suspension. In the event that Retailer has reasonable suspicion to believe that fraudulent activity is taking place at a Retailer Location, Retailer shall promptly notify NetSpend and InComm. Retailer shall cooperate fully with NetSpend and each Issuing Bank and their respective representatives in connection with any investigation conducted thereby into a suspected fraudulent transaction. Furthermore, should a Retailer Location have a high volume of suspicious transaction activity (as determined by NetSpend in its sole but reasonable discretion), Retailer agrees that NetSpend may suspend and/or restrict all NetSpend Card transactions from such Retailer Location, upon notice to Retailer (by e-mail communication or otherwise) until such time as NetSpend determines, in its reasonable judgment, that the event giving rise to such suspension has ceased and Retailer has taken appropriate measures to assure that similar events don't arise in the future. An event giving rise to an "emergency suspension" pursuant to this paragraph may include an immediate regulatory change, governmental action, a breach of security, the need to protect or preserve Cardholder Funds, the financial insolvency of Retailer, or any other similar circumstance, as determined by NetSpend using its reasonable judgment, necessitating the prevention of fraud, abuse, or a violation of applicable law.

## ARTICLE 9 –LIMITATION OF LIABILITY; DISCLAIMER OF WARRANTIES

9.1 Limitation of Liability.

(a) NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, NEITHER PARTY, OR THEIR RESPECTIVE AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY TO THIS AGREEMENT OR THEIR RESPECTIVE AFFILIATES, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING LOST PROFITS (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT ANY PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE WRONGFUL DEATH OR INJURY OF ANY PERSON.

(b) NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS CONTAINED IN SECTION 9.1(A) SHALL NOT APPLY TO ANY CLAIM THAT (I) IS SUBJECT TO INDEMNIFICATION UNDER ARTICLE 7, OR (II) ARISES OUT OF A BREACH OF SECTION 5.2.

9.2 Disclaimer of Warranties. EXCEPT AS OTHERWISE SET FORTH HEREIN, RETAILER WITH RESPECT TO NETSPEND OR ISSUING BANK, AND NETSPEND AND ISSUING BANK WITH RESPECT TO RETAILER, SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES.

## ARTICLE 10 - ADDITIONAL PROVISIONS

10.1 Relationship of Parties. Retailer and NetSpend agree they are independent contractors to each other in performing their respective obligations hereunder. Nothing in this Agreement or in the working relationship being established and developed hereunder shall be deemed, nor shall it cause, Retailer and NetSpend to be treated as partners, joint ventures, or otherwise as joint associates for profit. Notwithstanding the



©2017 NetSpend Corporation
CONFIDENTIAL

foregoing, NetSpend's appointment of Retailer as its authorized representative will establish an agency relationship, limited strictly to the rights, duties and obligations set forth herein. Retailer acknowledges the statutory authority of NetSpend's and each Issuing Bank's Regulatory Authorities to regulate and examine and take an enforcement action against Retailer with respect to the activities performed by Retailer as agent or representative of NetSpend and/or any Issuing Bank. Retailer further acknowledges that such Regulatory Authorities may institute any other requirements or conditions relating to this Agreement that such Regulatory Authorities deems appropriate.

10.2 Governing Law. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Texas.

10.3 Severability. In the event that any part of this Agreement is deemed by a court of competent jurisdiction or regulatory authority to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent.

10.4 Survival. All provisions of this Agreement which by their nature extend beyond the expiration or termination of this Agreement including, without limitation, Article 4 (Audit Rights), Article 7 (Indemnification), Article 9 (Limitation of Liability) and this Article 10 (Additional Provisions) and Section 5.2 shall survive termination or expiration of this Agreement.

10.5 Successors and Third Parties. This Agreement and the rights and obligations hereunder shall bind, and inure to the benefit of the Parties and their successors and permitted assigns; *provided, however*, that each Issuing Bank is a third-party beneficiary of NetSpend's rights under this Agreement. Except as set forth in the immediately preceding sentence, nothing in this Agreement, expressed or implied, is intended to confer upon any Person, other than the Parties and their successors and permitted assigns, any of the rights hereunder.

10.6 Assignments. The rights and obligations of each Party under this Agreement may not be assigned without prior written consent from the other Party; provided that any Party may assign this Agreement to any entity that controls such Party, that is controlled by such Party or that is under common control with such Party, or becomes an assignee of this Agreement pursuant to a merger, corporate reorganization or sale of all or substantially all of its assets, stock or securities.

10.7 Notices. All notices, requests and approvals required by this Agreement shall be in writing and addressed/directed to a Party at the address set forth on the signature page hereto, or at such other address of which the notifying Party hereafter receives notice in conformity with this section. All such notices, requests, and approvals shall be deemed given upon actual receipt thereof.

10.8 Waivers. Neither Party shall be deemed to have waived any of its rights, power, or remedies hereunder except in writing signed by an authorized agent or representative of the Party to be charged. Either Party may, by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement. The waiver by a Party of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

10.9 Entire Agreement; Amendments. This Agreement, together with the MTL Terms, constitutes the entire Agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. Subject to Section 2.1(a), this Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought.

10.10 Counterparts. This Agreement may be executed and then delivered via facsimile transmission, via the sending of PDF or other copies thereof via email and in one or more counterparts, each of which shall be an original but all of which taken together shall constitute one and the same Agreement.

10.11 Authorization. Retailer hereby grants NetSpend and its representatives authorization to verify, receive, exchange and obtain business and/or personal credit and other information, including, without limitation, criminal background checks, with respect to Retailer and its officers and owners in connection with NetSpend ongoing evaluation of Retailer's activities under this Agreement.

*[SIGNATURES ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and effective as of the Effective Date.

NETSPEND CORPORATION

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

Address:

701 Brazos Street
Suite 1200
Austin, Texas 78701
Attention: General Counsel

______________________
(Legal Name of Retailer)

By: ______________________
(Signature of Authorized Officer)

Name: Sung Hun Choe
(Print Name of Authorized Officer)

Title: ______________________
(Title of Authorized Officer)

Date: 12.27.18

Address:
801 Broadway
King City, CA 93930-3303

Attention:
Sung Hun Choe

| Market Number | Store Number |
|---|---|
| 2367 | 16981C |
| | |
| | |
| | |
| | |
| | |



©2017 NetSpend Corporation
CONFIDENTIAL

# SCHEDULE 1

*Please be sure to fill out all sections below:*

| RETAILER INFORMATION | |
|---|---|
| Location # | 2367 — 16981C |
| Legal Business Name: | |
| DBA/Assumed Name: | 7-Eleven Inc. |
| State of Incorporation/Organization | California |
| Year Incorporated/Organized: | |
| Federal Tax ID Numb[redacted] | |

| PRINCIPAL PLACE OF BUSINESS | |
|---|---|
| Physical Street Address (No P.O. Boxes): | 801 Broadway |
| City: | King City |
| State: | CA |
| Zip: | 93930-3303 |
| Phone: | (831) 385-5164 |
| Fax: | |
| Business Website Address | |

**OWNER PERSONAL INFORMATON (Each officer that owns 25% or more of the company)**

| | Full Legal Name: | | | Date of Birth: | SS# |
|---|---|---|---|---|---|
| Beneficial Owner 1 | Sung Hun Choe | | | [redacted] | |
| | [redacted] armel | | CA | ~~93923~~ 93924 | [redacted] |
| Beneficial Owner 2 | | | | | |
| | | 8 | | 8 | [redacted] |
| Beneficial Owner 3 | | | | | |
| | | | | | [redacted] |
| Beneficial Owner 4 | | | | | |
| | | | | | [redacted] |
| Controlling Person (CEO, COO, President) | Sung Hun Choe | | | | |
| | | | | | [redacted] |

| PRIMARY CONTACT INFO | |
|---|---|
| Name: | |
| Title: | |
| Phone: | |
| Fax: | |
| E-Mail: | |

| SECONDARY CONTACT | |
|---|---|
| Name: | |
| Title: | |
| Phone: | |
| Fax: | |
| E-Mail: | |

# NETSPEND RISK MANAGEMENT AND COMPLIANCE GUIDELINES ACKNOWLEDGMENT FORM
## 7-Eleven Franchisee

By signing below, I acknowledge that I have received and reviewed NetSpend's Risk Management and Compliance Guidelines, including the attached appendices (the "Guidelines"), available at www.netspend.com/7eleven/guidelines . I understand and acknowledge the requirements set forth in the Guidelines, agree to communicate the material contained within the Guidelines to appropriate personnel within the organization, and agree to incorporate the Guidelines into my organization's overall training program, as appropriate.

Acknowledged By:

Signature: ______________________

Printed Name: Sung Hun Choe

Title: ______________________

Company name: ______________________

Date of Acknowledgment: 12.27.18

**PLEASE SIGN AND RETURN THIS PAGE TO:**

NetSpend Corporation, a TSYS Company
701 Brazos St., Suite 1300
Austin, TX 78701
Attn: Partner Support

Email: partnersupport@netspend.com

Fax #: 512-532-8361

**PLEASE KEEP THE NEXT PAGE MARKED "COPY" FOR YOUR RECORDS**

If you have any questions regarding the Guidelines, please contact your Account Manager or NetSpend Partner Services at 1-866-397-5643 or partnersupport@netspend.com.

Ria

**APPOINTMENT OF AGENT TRUST AGREEMENT**
**RIA FINANCIAL SERVICES**

**(CALIFORNIA)**

This Appointment of Agent Trust Agreement ("Agreement") is made and entered into this 27 day of DEC, 20 18, by and between, Sung Hun Choe located at 801 Broadway, King City, CA 93930-3303 ("AGENT"), and Continental Exchange Solutions, Inc. dba RIA Financial Services, a Delaware corporation, located at 6565 Knott Avenue, Buena Park, CA 90620 ("RIA").

WHEREAS,

A. RIA is licensed to engage in the money transmission business;

B. RIA must operate in full compliance with all applicable local, state and federal laws and is subject to the supervision, examination and regulation of the State Licensing Authority;

C. RIA and 7-Eleven, Inc. ("7-Eleven") have entered into an agreement that permits qualified 7-Eleven franchisees to operate as RIA agents for money transmission and AGENT is currently a franchisee of 7-Eleven; and

D. RIA desires to appoint AGENT, and AGENT is willing to act, as RIA's agent for money transmission.

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Definitions**.

(a) **"Money Transmission"** means the service provided or related to the process whereby AGENT accepts funds from customers for RIA's money transfer service.

(b) **"State Licensing Authority"** means the California Department of Financial Institutions, including its directors, commissioners, administrators, superintendents and employees, that governs the licensing and regulation of money transmission services providers within the State of California.

(c) **"Trust Funds"** means the cash amounts accepted by AGENT from customers on behalf of RIA for Money Transmission service.

2. **Appointment.** In reliance upon the information provided to RIA by AGENT, RIA hereby appoints AGENT as its agent for the sole purposes of providing Money Transmission services in accordance with the terms of this Agreement, and AGENT hereby accepts such appointment. AGENT has made an independent examination of the business and has not entered into this Agreement by virtue of any representations of potential profits or success by RIA.

3. **Duties of AGENT.**

(a) AGENT agrees to accept Trust Funds, and to deposit daily, or at such frequency mutually agreed upon by the parties, all such Trust Funds ("Trust Funds") AGENT shall be absolutely liable to RIA for the amounts received by it from customers for the provision of Money Transmission services and assumes all risks in any such amounts. AGENT shall be deemed a trustee and AGENT shall act as a fiduciary with respect to cash amounts in its possession that have been received from customers for transfer. In the event AGENT commingles such cash amounts, AGENT shall be deemed to hold such amounts in trust and there shall be a constructive trust on AGENT's property for the exclusive benefit of RIA in the amount of the Trust Funds, which agent owes RIA. AGENT shall not accept a Money Transmission order from a customer without receiving full payment in cash of the amount to be transmitted and the corresponding fee.

(b) In providing Money Transmission services, AGENT shall use only Money Transmission instruments (receipts, disclaimers and cards) provided by RIA. AGENT will be held strictly accountable for use of the forms.

(c) AGENT shall comply with such standard rate schedules, policies and procedures and directives as RIA may from time to time establish for Money Transmission services, copies of which have been provided to AGENT. RIA reserves the right to amend the aforementioned at any time by giving written notice thereof to AGENT. In the event of any conflict between such amendments and the terms of this Agreement, the former shall control. Agent shall comply with all regulations of governmental authorities and all anti-money laundering and anti-terrorist financing policies and procedures of RIA, on which AGENT and its designated representatives shall receive training.

(d) AGENT shall not engage in Money Transmission at any locations or outlets or through any subagent(s) or any franchisee(s), which have not been pre-approved in writing (i) by RIA and (ii) if required, by the State Licensing Authority.

(e) AGENT agrees to maintain such accounts, correspondence, memorandums, papers, books and other records concerning transactions subject to this Agreement as are required by state and federal regulations. If required by State Licensing Authority, AGENT agrees to prominently display licenses, certificates of authority, disclosure notices or any other required documentation. AGENT agrees to permit RIA to inspect such records, as well as any and all other records maintained by AGENT with respect to its business operations or financial condition, and to make and take copies of any such records. The expenses incurred in any such inspection by RIA shall be borne by RIA. AGENT also agrees to permit the State Licensing Authority, with or without notice, to inspect such books and records maintained by the AGENT.

(f) AGENT shall not sell any Money Transmission services unless the name of the licensee (Continental Exchange Solutions, Inc.) clearly appears on the face of the receipt (the licensee shall not condition its engagement as obligor under the receipt upon remittance of the proceeds of sale from AGENT).

(g) AGENT shall not act on behalf of customer(s) as a courier for Money Transmission, which activity would itself require the AGENT to be licensed as a money transmitter.

(h) AGENT agrees and understands that all RIA signs in its possession are the property of RIA. Agent shall allow RIA representatives reasonable access during regular business hours upon advance notice to enter AGENT's location for the purpose of retrieving RIA's signs, and other RIA property.

(i) EACH PARTY SHALL BE SOLELY RESPONSIBLE FOR ITS COMPLIANCE WITH THE BANK SECRECY ACT AND OTHER FEDERAL ANTI-MONEY LAUNDERING REGULATIONS.

(j) It is expressly agreed that a default or breach of any Obligation under this Agreement at any one of AGENT's business locations shall be deemed a default and breach at each and every one of AGENT's business locations; provided, however, that if RIA, in its sole and reasonable discretion, believes that the breach relates strictly to a single business location and does not materially affect performance by AGENT under the Agreement, said breach shall not be deemed a default of the entire Agreement. Notwithstanding the foregoing, RIA, in its sole discretion, may suspend or cancel service to and from the breaching business location.

(k) AGENT acknowledges and agrees that a change in AGENT's business address (es) shall not affect whatsoever the validity of this Agreement, or the obligations of the AGENT to comply with same. This Agreement shall remain in full force and effect notwithstanding a change of AGENT's business address (es).

(l) AGENT shall operate in full compliance with the laws of the State of California and all federal United States laws. AGENT acknowledges and agrees that it is subject to the supervision, examination and regulation of the State Licensing Authority regulating money transmission within the State of California. As part of that supervision, examination and regulation, AGENT acknowledges and agrees to provide to State Licensing Authority and RIA any materials and/or documentation, including photo identification and fingerprints upon request. AGENT further acknowledges and agrees that as a part of that supervision, examination and regulation, the State Licensing Authority may require RIA to cancel the Agent Trust Agreement.

(m) AGENT is under a duty to act only as authorized under this Agent Trust Agreement. If AGENT exceeds its authority under this Agent Trust Agreement, AGENT is subject to the cancellation of Agent Trust Agreement and further disciplinary action by the State Licensing Authority.

(n) AGENT shall report to RIA the theft and/or loss of a payment instrument within 24 hours from the time the AGENT knew or should have known of the theft or loss.

(o) AGENT shall cooperate with RIA and use its commercially reasonable efforts to ensure the successful implementation, operation and launch of Money Transmission services at AGENT's location. In addition, AGENT shall work with RIA and use commercially reasonable efforts to maximize customer awareness of Money Transmission services, including, but not limited to, cooperating with marketing and promotional activities, grand opening events, merchandising programs, employee training and incentive initiatives, working with RIA to optimize the money transfer order entry and payment methods at AGENT's location.

(p) AGENT acknowledges and agrees that RIA has the right to perform a criminal background check on AGENT and/or any individual employees, owners, shareholders, members or partners of AGENT, for purposes of determining AGENT's eligibility to become and/or remain a RIA agent for Money Transmission. AGENT further authorizes RIA, and/or any consumer reporting agency or investigative firm designated by RIA, to receive, investigate and verify any business and/or personal information about AGENT, and/or any individual employees, owners, shareholders, members or partners of AGENT, related to AGENT's eligibility to become and/or remain a RIA agent for Money Transmission.

4. **<u>Compensation to AGENT.</u>** AGENT acknowledges and understands that all compensation for AGENT'S performance under this Agreement will be paid directly by 7-Eleven pursuant to the terms of AGENT'S separate contractual relationship with 7-Eleven.

5. **<u>Trademarks, Service Marks and Trade Names.</u>** AGENT shall be authorized to use RIA's trademarks, service marks and trade names only with respect to material approved by RIA and 7-Eleven. AGENT shall not at any time, either during the term of this Agreement or after its expiration or termination, adopt or use or register a symbol or combination thereof which is identical to or similar to any trademarks, service marks, or trade names of RIA. In no event shall AGENT

use such words, symbols, or combination as part of its corporate name. RIA shall be authorized to include AGENT's name in any listing describing RIA's agent network.

6. **Confidentiality.** Each party recognizes that the other party may make available to it confidential trade secrets and proprietary information, including, but not limited to, information relating to agents, correspondents, customers, procedures and methods of operation (hereinafter "Confidential Information"). Each party agrees not to disclose Confidential Information directly or indirectly to any third party and/or copy or duplicate any Confidential Information for his/her own use without the other party's prior consent, which must be in a writing signed by an executive officer of the other party. Notwithstanding the foregoing, the nondisclosure obligations in this Section shall not apply in the event a party is required to disclose such Confidential Information in order to comply with applicable laws or government regulations. The provisions of this Section shall expressly survive termination of this Agreement.

7. **Indemnification.** Each party shall indemnify and hold harmless the other party, its officers, directors and shareholders, and all affiliates of each of them, from and against any loss, liability or expense, including attorneys' fees and costs, caused directly or indirectly by its (a) failure to adequately or timely perform any of its Obligations hereunder; (b) failure to comply with all laws and regulations of governmental authorities; (c) failure to comply with RIA's policies and procedures; and/or (d) negligence or misconduct.

8. **Termination.**

(a) This Agreement shall be co-terminus with the Appointment of Agent Trust Agreement between RIA and 7-Eleven.

(b) Notwithstanding Section 8(a) above, RIA may immediately terminate this Agreement at any time if (i) AGENT defaults in any of its Obligations under this Agreement; (ii) AGENT engages in any conduct which RIA in its sole discretion deems to constitute negligence or a violation of applicable law; (iii) the transactions originating from the AGENT's location are deemed by RIA, in its sole discretion, to represent a legal or regulatory compliance risk; (iv) any material, adverse change occurs with respect to the financial or other condition of AGENT or any change occurs in the ownership of AGENT; (v) AGENT fails to pay Trust Funds in accordance with this Agreement or otherwise becomes indebted to RIA; (vi) any unexplained disappearance or misuse of Money Transmission receipts occurs; and/or (vii) State Licensing Authority orders RIA to terminate its relationship with the AGENT.

(c) Upon termination of this Agreement; (i) AGENT shall forthwith return all documents, equipment, moneys or other property of RIA in AGENT's possession; (ii) AGENT shall furthermore cease providing RIA's Money Transmission services; and (iii) AGENT shall promptly remove all postings, licenses, disclosure notices or any other material that identify the AGENT as a location offering RIA Money Transmission services.

9. **Independent Contractor.**

(a) It is hereby acknowledged and agreed that AGENT is an independent contractor and, that except as expressly provided herein, this Agreement shall not constitute AGENT as a legal representative or agent of RIA for any purpose. AGENT is not granted any right or authority to assume or create any responsibility, express or implied, on behalf of RIA or to bind RIA in any manner whatsoever.

(b) This Agreement shall not in any way be construed to create between RIA and the employees of AGENT a relationship of agency, employment or representation, and AGENT hereby agrees to assume full and sole responsibility for the supervision of the conduct of such employees in rendering services for RIA.

(c) AGENT agrees to perform the services required under this Agreement with its own employees and not to use or appoint any sub-agents or correspondents for such purpose without the prior written approval of RIA and, if necessary, the State Licensing Authority. AGENT agrees not to share, split, rebate or discount any fees or charges for providing services hereunder with any person or entity.

10. **Non-Exclusivity.**

(a) AGENT agrees to enter into a non-exclusive business relationship with RIA for the Term of this Agreement and may conduct money transfers independently or as an agent of or on behalf of any other money transmitter.

(b) AGENT agrees that AGENT's appointment is not exclusive as to RIA, and RIA may at its discretion appoint other agents in any location whatsoever.

11. **General Provisions.**

(a) Governing Law and Venue. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas.

(b) Notices. All notices shall be deemed duly given if delivered personally or sent by registered or certified mail or recognized overnight courier to the respective addresses set forth above, or to such other address as either party may advise from time to time.

(c) Assignment. Neither this Agreement nor any rights or obligations hereunder may be assigned by any party without the other party's prior written consent. Notwithstanding the foregoing, any party may assign this Agreement to an affiliate company upon notice to the other party; provided, however, that in the event of AGENT's assignment of the Agreement to an affiliate company, said affiliate company must provide all information required as part of RIA's due

diligence and agent approval policies and must satisfy all prospective agent requirements prior to being activated by RIA as an agent under this Agreement.

(d) Waiver. No waiver by either party of any breach of any of the Obligations or duties of the other party shall be construed as a waiver of any succeeding breach of the same or any other obligation or duty. The rights and remedies provided herein are cumulative and not exclusive of any rights or remedies provided by law.

(e) Entire Agreement. This Agreement constitutes the entire agreement between RIA and AGENT with respect to the subject matter hereof and supersedes all previous negotiations, commitments and writings. This Agreement may be changed or modified only by a writing expressly to that effect signed by RIA and AGENT.

(f) Severability. The invalidity of any provision of this Agreement as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

(g) Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

(h) Headings. The section headings used in this Agreement are intended for convenience only and shall not be used in interpreting this Agreement or in determining any of the rights or obligations of the parties to this Agreement.

(i) Facsimile Signatures. The parties agree that this Agreement, agreements ancillary to this Agreement, and related documents to be entered in connection with this Agreement will be considered signed when the signature of a party is delivered by facsimile transmission. Such facsimile signature shall be treated in all respects as giving the same effect as an original signature. Notwithstanding the foregoing, AGENT remains obligated to deliver to RIA all original, signed signature pages immediately upon execution.

**12. AGENT's Compliance Obligations.**

(a) AGENT shall assume total responsibility for AGENT's and its Employees' compliance with the USA Patriot Act ("Act"), the Bank Secrecy Act ("BSA"), and all other anti-money laundering and terrorist financing laws, and shall train all its employees in the proper procedures for compliance with said laws.

(b) AGENT understands and warrants that AGENT and its Employees (hereinafter collectively referred to as "AGENT") shall comply with "AGENT's Compliance Obligations" as described in Exhibit 1 attached hereto.

(c) For each AGENT business location operating under this Agreement, an AGENT employee with management responsibility for said business location shall sign and initial "AGENT's Compliance Obligations" in the form attached hereto as Exhibit 1.

IN WITNESS WHEREOF, this Agreement is entered into by and between RIA and AGENT as of the date first above written.

**RIA**

By: ______________________
Name: Juan C. Bianchi
Title: Chief Executive Officer

**AGENT**

By: ______________________
Name: Sung Hun Choe
Title: ______________________

**AGENT**

By: ______________________
Name: ______________________
Title: ______________________

**AGENT**

By: ______________________
Name: ______________________
Title: ______________________

**STORE NUMBER:** 2367 - 16981C

Ria

## EXHIBIT 1

## AGENT'S COMPLIANCE OBLIGATIONS

1. ______ Agent shall never commit or knowingly facilitate the crime of money laundering or terrorist financing. Agent shall never offer money transfer, money order, check cashing, bill payment, or any other money service unless Agent is in compliance with all laws.

2. ______ Agent acknowledges that transactions of $3,000 dollars or more are subject to the customer identification and record keeping requirements prescribed by law. Although this is a Bank Secrecy Act requirement, Agent acknowledges that it is subject to and must adhere to 7-Eleven's current policy that limits money transfer transactions to $1,000.00.

3. ______ Agent acknowledges that currency transactions over $10,000 dollars (including fees) require the filing of an IRS Currency Transaction Report ('CTR") with the IRS Detroit Computing Center, P.O. Box 33604, Detroit, MI 48232-5604, Attn: CTR, within fifteen days of the transaction. Although this is a Bank Secrecy Act requirement, Agent acknowledges that it is subject to and must adhere to 7-Eleven's current policy that limits money transfer transactions to $1,000.00.

4. ______ Agent shall call RIA at 1-866-470-4389 to report any suspicious activity to RIA. RIA will then research and determine whether there is a need to file a Suspicious Activity Report by Money Services Businesses (SAR-MSB) with FinCEN.

5. ______ Agent acknowledges that the Act requires the Agent to have in place a program to prevent money laundering and terrorist financing, which includes at a minimum, (i) internal policies, procedures, and controls; (ii) the designation of a compliance officer; (iii) an ongoing employee training program; and (iv) an independent audit function to test the compliance program. Agent shall adopt and follow RIA's compliance policies and procedures strictly, including, but not limited to those described in RIA's Compliance Manual. Agent shall designate in writing an employee, who shall serve as Compliance Officer and who shall oversee Agent's compliance with applicable law. Agent shall use the Compliance Manual and all other materials Agent receives from RIA and/or 7-Eleven to train its employees in preventing money laundering and terrorist financing. As required by law, Agent shall subject its compliance program to a review by an independent firm or a person within Agent's organization, who is not the Compliance Officer and knows the requirements of the law.

6. ______ Agent acknowledges that Office of Foreign Assets Control (OFAC) regulations prohibit Agent from engaging in transactions involving: (i) countries which are under some type of U.S. embargo or sanction; and/or (ii) specially designated nationals, terrorists, and narcotics traffickers (hereinafter referred to as "prohibited transactions"). OFAC regulations also require the blocking of funds corresponding to prohibited transactions. Agent understands that RIA will be conducting all necessary OFAC checks in conjunction with the services.

7. ______ Agent acknowledges receipt of RIA's Compliance Manual. Agent shall read thoroughly the Compliance Manual and all the materials it receives from RIA concerning compliance with the Act, BSA, and other anti-money laundering /terrorist financing statutes.

8. ______ **AGENT shall <u>NEVER</u> KNOWINGLY ALLOW AN EMPLOYEE WHO IS NOT TRAINED IN ANTI-MONEY LAUNDERING AND TERRORIST FINANCING COMPLIANCE TO ACCEPT OR PROCESS TRANSACTIONS.**

9. ______ Agent shall follow all RIA policies concerning compliance, which RIA may establish or amend from time to time.

10. ______ Agent shall contact RIA's Compliance Department or the IRS/CID at 1-800-800-2877 should Agent have any questions or doubts about the proper procedures for compliance with anti-money laundering / terrorist financing laws.

11. ______ Agent shall indemnify and hold harmless RIA, its officers, directors, shareholders, and employees, for and against any loss, liability or expense, including attorneys' fees, caused directly by a failure of Agent to fully perform its compliance obligations.

**AGENT**

By: ______________________

Name: Sung Hun Choe

Title: ______________________

# ADDENDUM TO
# APPOINTMENT OF AGENT TRUST AGREEMENT

This Addendum to the Appointment of Agent Trust Agreement, dated as DEC 27, 2018 (the "Addendum"), is made to the Appointment of Agent Trust Agreement ("Agreement"), of even date herewith, between Continental Exchange Solutions, Inc. dba Ria Financial Services ("CES"), a Delaware corporation, and Sung Hun Choe ("AGENT"). The parties have discussed the relationship contemplated by the Agreement and have found some aspects in need of modification. In accordance with that discussion, the parties have mutually agreed to make this Addendum in mutual agreement that this Addendum modifies and expands the scope of the Agreement sufficiently to address each Party's concerns and represents the accurate present intention of the Parties to authorize AGENT to provide RIA branded bill payment services to the public as an agent of Continental Payment Solutions, Inc. dba RIA Financial Services ("CPS"), a California corporation and a wholly owned subsidiary of RIA, in addition to RIA Money Transmission services (as defined in the Agreement). Except as expressly set forth herein, the terms and conditions of the Agreement are incorporated herein by reference and shall continue in full force and effect. **This Addendum shall be governed by the terms and conditions of the Agreement and the terms and conditions set forth below.**

RECITALS:

WHEREAS, AGENT is authorized to offer RIA branded Money Transmission services to the public pursuant to the terms of the Agreement;

WHEREAS, in addition to RIA branded Money Transmission services, AGENT desires to also offer RIA branded bill payment services ("RIA Bill Payment Services) to customers in California whereby AGENT would accept funds from customers for purposes of paying bills, invoices or accounts of such customers;

WHEREAS, CES's wholly owned subsidiary, CPS, is licensed as a bill payer by the Department of Corporations of the State of California pursuant to the Check Sellers, Bill Payers and Proraters Law and offers bill payment services to the public in California;

WHEREAS, pursuant to the terms of CPS's license as a bill payer, CPS may appoint authorized agents to provide such RIA Bill Payment Services to the public on its behalf;

WHEREAS, AGENT desires to be appointed as an agent of CPS for the purposes of offering RIA Bill Payment Services in California on behalf of CPS;

NOW, THEREFORE, in consideration of the mutual promises contained herein, the AGENT and CPS agree as follows:

I. Appointment. In reliance upon the information provided to CPS by AGENT, CPS hereby appoints AGENT as its agent for the sole purposes of providing RIA Bill Payment Services in accordance with the terms of this Addendum and the Agreement, and AGENT hereby accepts such appointment. AGENT has made an independent examination of the business and has not entered into this Agreement by virtue of any representations of potential profits or success by CPS.

II. Term and Termination.

A. This Addendum shall commence on the date first above written and shall continue until termination and/or expiration of the Agreement. Notwithstanding the foregoing, CPS may immediately terminate this Addendum and the RIA Bill Payment Services provided hereunder in accordance with the termination provisions in Section 8 of the Agreement or in the event the Department of Corporations instructs CPS to terminate its relationship with the AGENT.

B. Upon termination of this Addendum, (i) AGENT shall forthwith return all documents, equipment, moneys or other property of CPS in AGENT's possession; (ii) AGENT shall furthermore cease providing RIA Bill Payment Services; and (iii) AGENT shall promptly remove all postings, licenses, disclosure notices or any other material that identify the AGENT as a location offering RIA Bill Payment Services.

III. Offset. CPS shall be entitled to credit or offset an amount equal to any or all amounts due to CPS from AGENT under this Addendum against any amount due to AGENT by CPS under this Addendum. CPS shall be further entitled to credit or offset an amount equal to any or all amounts due to CES from AGENT under the Agreement against any amount due to AGENT by CES under the Agreement.

IV. Counterparts. This Addendum may be executed in counterparts, each of which shall be an original, but all of which shall constitute one, and the same, document.

V. Effect of Original Agreement and Addendum. All provisions of the Agreement, except as expressly modified by this Addendum for purposes of providing RIA Bill Payment Services, shall remain in full force and effect and are reaffirmed. Each party to this Addendum acknowledges that it, as its respective interests appear, is liable for all damages arising from nonperformance under this Addendum if all conditions of this Addendum are not met. Other than as stated in this Addendum, this Addendum shall not operate as a waiver of any condition or obligation imposed on the parties under the Agreement. All references to RIA in Sections 3 through 12 and Exhibit 1 in the Agreement shall be deemed to collectively refer to CES and CPS. AGENT acknowledges and understands that all RIA Money Transmission services provided by it to the public shall be as an agent of CES and all RIA Bill Payment Services provided by it to the public shall be as an agent of CPS.

VI. Interpretation of Addendum. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, as they relate to the RIA Bill Payment Services, the provisions of this Addendum shall govern and control. This Addendum shall be governed by the terms and conditions of the Agreement and the terms and conditions set forth below.

IN WITNESS WHEREOF, this Addendum has been executed as of the day and year first above written.

**CONTINENTAL PAYMENT SOLUTIONS, INC.**

By: ______________________
Name: Juan C. Bianchi
Title: Chief Executive Officer

**AGENT**

By: ______________________
Name: Sung Hun Choe
Title: ______________________

**AGENT**

By: ______________________
Name: ______________________
Title: ______________________

**AGENT**

By: ______________________
Name: ______________________
Title: ______________________

# BUSINESS & PERSONAL STATEMENT

[X] Sole Proprietorship [ ] Partnership [ ] LLC [ ] Corporation

Company Name 7-Eleven Store # 2367 - 16981C Tax ID [redacted]

Address 801 Broadway

City King City State CA Zip Code 93930-3303

Company Telephone (831) 385-5164 Fax

## Ownership Information

First Name Sung Hun Choe Middle Last

Home Address [redacted]

City Carmel State CA Zip Code 93923

Home Phone# [redacted] Cellular Phone #

SSN/ITIN [redacted] DOB [redacted] Driver's License #

Expires Title: % of Ownership

## Ownership Information

First Name Middle Last

Home Address

City State Zip Code

Home Phone# Cellular Phone #

SSN/ITIN DOB Driver's License #

Expires Title: % of Ownership

## Ownership Information

First Name Middle Last

Home Address

City State Zip Code

Home Phone# Cellular Phone #

SSN/ITIN DOB Driver's License #

Expires Title: % of Ownership

Ria

# COMPLIANCE TRAINING WAIVER FORM

Agent Name: Sung Hun Choe Agent #: ____________

## NEW AGENT REQUIREMENTS

1. The Compliance Officer or On-site Compliance Delegate has been trained. Information as follows:

   Name: Sung Hun Choe Title: ____________

   Fax or email: ____________

   Names of other employees trained:

   ____________

   ____________

2. If appropriate, an Action Plan has been established with documentation requirements and deadlines clearly understood by the Compliance Officer or on-site designate (i.e. complete training of other employees).

## Compliance Officer or On-site Delegate Confirmation of Training:

I hereby represent and warrant that: (i) compliance training relative to BSA/AML in accordance with all applicable laws has been completed; and (ii) all compliance Action Plan items identified will be completed to Ria's satisfaction within the time periods identified in the Compliance Action Plan.

[signature] 12.27.18

Authorized Representative Date

Sung Hun Choe

Print Name

## COMMENTS

____________

____________

____________

____________

**AGENCY AGREEMENT FOR MONEY TRANSMISSION SERVICES AT FRANCHISED 7-ELEVEN STORES**

1. **Introduction.** 7-Eleven, Inc. ("*SEI*") recently entered into a *Master Agent Agreement* with PayNearMe MT, Inc. ("*PAYNEARME*") in order to enable money transmitter services for PAYNEARME through SEI's corporate and franchised locations. Each *FRANCHISEE*'s agreement to act as a money transmitter agent is necessary in order to provide these expanded services. By way of background:

(a) PAYNEARME operates a web-based technology information and payment processing service *Network* that promotes commerce by enabling payments from consumers at various *Payment Locations* to businesses with whom PAYNEARME has a separate contractual relationship.

(b) PAYNEARME's parent corporation and SEI entered into a contract to enable all SEI stores to act as Payment Locations for such payments and FRANCHISEE has been processing these transactions pursuant to FRANCHISEE's contract with SEI for some time. Such transactions have not required a money transmitter license.

(c) PAYNEARME has obtained a money transmitter license from each *Authority* to engage in money transmitter activities in the applicable *State(s)*.

(d) In order for FRANCHISEE to lawfully process payment transactions requiring a money transmitter license for PAYNEARME, the Authority may require that FRANCHISEE and PAYNEARME enter into an agreement by which FRANCHISEE is designated as PAYNEARME's statutory agent for purposes of receiving such payments.

Therefore as of the *Effective Date*, the FRANCHISEE identified in the Signature Block and PAYNEARME agree as follows. All italicized terms are defined in the Signature Block section below.

2. **Appointment, Trust Funds and Compensation.** In reliance upon the information provided by FRANCHISEE, PAYNEARME appoints FRANCHISEE as its agent for the sole purpose of receiving payments at the *Approved Locations* in accordance with the *Directions*, the terms of this Agreement, the *SEI Franchisee Agreement* and the Master Agent Contract, and FRANCHISEE accepts such appointment for the term. Franchisee will not knowingly attempt to exceed the scope of this limited appointment. FRANCHISEE agrees that all payments received from *Customers* on behalf of PAYNEARME at the Approved Location(s) are accepted in a fiduciary capacity and that a constructive trust will be imposed on all funds with which such payments are commingled ("*Trust Funds*"). FRANCHISEE is liable to PAYNEARME for these Trust Funds and will deposit them timely and faithfully pursuant to the SEI Franchisee Agreement and Applicable Law. Each party acknowledges that SEI maintains the information systems necessary to participate in the Network and controls the bank account into which such funds are deposited, all pursuant to the terms of the SEI Franchisee Agreement. FRANCHISEE agrees that all compensation for FRANCHISEE's performance under this Agreement will be paid directly by SEI pursuant to the terms of the SEI Franchisee Agreement.

3. **Term.** This Agreement begins on the Effective Date and terminates when the Master Agency Contract terminates, or any earlier termination of the SEI Franchisee Agreement. PAYNEARME can elect to terminate this Agreement with respect to any or all Approved Locations at any time on notice to FRANCHISEE for any or no reason. FRANCHISEE can elect to terminate this Agreement at any time on ninety days' notice to PAYNEARME for any or no reason, subject to SEI's approval. Upon termination of this Agreement, FRANCHISEE will stop providing money transmitter services for PAYNEARME and will promptly remove all postings, licenses, disclosure notices or any other materials that identify FRANCHISEE as an Approved Location. Also, each party will return all Confidential Information of the other party or certify its destruction.

4. **Directions.** In performing money transmission services for PAYNEARME, FRANCHISEE will use only documentation (receipts, disclaimers, cards, etc.) provided by PAYNEARME, and FRANCHISEE will comply with such standard rate schedules, policies, procedures and directions as PAYNEARME may from time to time establish for money transmission services ("*Directions*"). PAYNEARME can modify these Directions for prospective application from time to time by notifying FRANCHISEE. FRANCHISEE will not subcontract or delegate any of Franchisee's obligations under this Agreement (i.e., no sub-agencies or sub-franchising is permitted). FRANCHISEE, directly or through SEI pursuant to the SEI Franchisee Agreement, agrees to maintain such accounts, correspondence, memorandums, papers, books and other records concerning transactions subject to this Agreement as are required by Applicable Law and the Directions. FRANCHISEE also irrevocably consents to permit the Authority and PayNearMe, with or without notice, to inspect or audit such records. If required by the Authority, FRANCHISEE agrees to prominently display licenses, certificates of authority, disclosure notices or any other required display material. FRANCHISEE agrees to allow PAYNEARME (or its representatives) to inspect and copy or retrieve these materials for compliance purposes, at PAYNEARME's own expense. All PAYNEARME display material and signage in FRANCHISEE's possession remains the property of PAYNEARME.

5. **Compliance with Law.** FRANCHISEE will operate in full compliance with the laws of the State in which each Approved Location is situated and all other Applicable Laws, including the requirement to timely remit of Trust Funds. Although PAYNEARME will use reasonable, good faith efforts consistent with industry standards to train FRANCHISEE on such compliance matters,

DOCID - 22208393.1

FRANCHISEE will remain responsible for FRANCHISEE's compliance with Applicable Laws and shall train all of FRANCHISEE's staff in the proper procedures for compliance with these laws. FRANCHISEE agrees that FRANCHISEE is subject to the supervision, examination and regulation of the Authority regulating money transmission within the State in which the Approved Location is situated. FRANCHISEE acknowledges and agrees to provide to the Authority and PAYNEARME any materials and/or documentation, including photo identification and fingerprints upon request. The parties acknowledge that the Authority may require PAYNEARME to cancel this Agreement in connection with such obligations. FRANCHISEE and PAYNEARME agree to be bound by the provisions of Schedule 4 applicable to each State (the "*Required Attachments*"). PAYNEARME may update Schedule 4 from time to time to comply with state money transmitter laws, including through the communications authorized in Schedule 3(f). In this regard, FRANCHISEE agrees that PAYNEARME has the right to perform a criminal background check (including investigative consumer reports) on FRANCHISEE and/or any of FRANCHISEE's individual owners, shareholders, members or partners, for purposes of determining FRANCHISEE's eligibility to become and/or remain a statutory agent of PAYNEARME for money transmission services. FRANCHISEE further authorizes PAYNEARME, and/or any consumer reporting agency or investigative firm designated by PAYNEARME, to receive, investigate and verify any business and/or personal information about FRANCHISEE, and/or any of FRANCHISEE's individual, owners, shareholders, members or partners in this regard. FRANCHISEE will complete and sign Schedule 2 for this purpose and understands that PAYNEARME will reasonably rely on all information obtained in connection with Schedule 2. FRANCHISEE will promptly advise PAYNEARME of any changes in such information, including any governmental investigations, crimes and bankruptcies.

6. **General Provisions.** The general provisions of Schedule 3 are incorporated into this Agreement by reference.

7. **Signature Block.** FRANCHISEE and PAYNEARME agree that this Agreement will be considered signed when the signature of a party is delivered by facsimile transmission or by other mutually agreeable electronic signature as of the Effective Date entered below. Such signatures shall be treated in all respects as giving the same effect as an original signature. Upon PAYNEARME's request, FRANCHISEE will promptly deliver to PAYNEARME all original, signed signature pages.

**Definitions:**

**Applicable Law**: means all laws applicable to the performance of each party's respective obligations under this Agreement, including: (a) state licensing laws; (b) the Bank Secrecy Act (31 U.S.C. § 5311 et seq., and its implementing regulations, 31 C.F.R. Part 103); (c) the IRS's cash reporting requirements (26 U.S.C. § 6050I) and related regulations; (d) state currency reporting requirements; (e) federal and state anti-money laundering laws, including all rules and regulations promulgated thereunder (e.g., 18 U.S.C. §§ 1956 and 1957); (f) all applicable state money transfer or sale of checks laws and regulations (including those laws and regulations referred to or set out in Schedule 4, if any); (g) all applicable federal and state privacy laws and regulations; (h) the USA PATRIOT Act; and (i) all applicable federal and state laws regulating access for the disabled, including but not limited to the Americans with Disabilities Act.

**Approved Location(s)**: mean(s) the 7-Eleven, Inc. franchised stores located at the addresses entered below.

**Authority:** means any agency of the State that governs the licensing and regulation of money transmission services.

**Compliance Manual:** PAYNEARME's Anti-Money Laundering Compliance Program.

**Confidential Information:** means confidential and proprietary information about FRANCHISEE's business (including background check information), the operation of the Network, Customers and payments processed.

**Customer(s):** means consumers tendering payments to PAYNEARME for money transmission.

**Directions:** means standard rate schedules, policies and procedures and directions as PAYNEARME may from time to time establish for its agents.

**Effective Date:** means the day this Agreement is entered into by PAYNEARME and FRANCHISEE as set forth in the Signature Block.

**FRANCHISEE:** means the 7-Eleven, Inc. franchisee identified below.

**General Provisions**: means the general terms and conditions applicable to this Agreement attached as Schedule 3.

**Master Agency Contract**: means the statutory agent contract entered into between 7-Eleven, Inc. and PayNearMe MT, Inc.

**Network**: means the web-based technology information and payment processing service operated by PAYNEARME.

**PAYNEARME:** means PayNearMe MT, Inc., a Delaware corporation. PAYNEARME is a wholly owned subsidiary of PayNearMe, Inc.

**Payment Location(s):** means places (*e.g.*, a retail outlets or stores) at which Customers can make payments through the Network.

**Required Attachments:** means those attachments to or incorporations by reference into this Agreement required by the Authority set forth in Schedule 4.

**SEI:** means 7-Eleven, Inc., a Texas corporation.

**SEI Contract:** means the contract entered into by PayNearMe, Inc. and 7-Eleven, Inc. to enable SEI stores to act as Payment Locations.

**SEI Franchisee Agreement:** means the contract entered into by FRANCHISEE and 7-Eleven, Inc.

**State(s):** means the state in which the Approved Location(s) is located.

**Trust Funds:** means amounts paid by Customers to FRANCHISEE on behalf of PAYNEARME at Approved Locations.

**Address for purposes of providing a legal notice pursuant to Schedule 3(b):**

| **PayNearMe MT, Inc.** | | **Franchisee** | [redacted] |
|---|---|---|---|
| Street | 292 Gibraltar Drive | Street | |
| Suite or PO | #104 | Suite or PO | |
| City and State | Sunnyvale, CA | City and State | Carmel CA |
| Zip Code | 94089 | Zip Code | 93923 |
| Phone/Fax | (650)930-1030 | Phone/Fax | [redacted] |
| email | MTinfo@paynearmemt.com | email | [redacted]mail.com |

**Approved Location(s) address(es):**

| **Location #1 Store number:** | | **Location #2 Store number:** | |
|---|---|---|---|
| Street | | Street | |
| Suite or PO | | Suite or PO | |
| City and State | | City and State | |
| Zip Code | | Zip Code | |
| **Location #3 Store number:** | | **Location #4 Store number:** | |
| Street | | Street | |
| Suite or PO | | Suite or PO | |
| City and State | | City and State | |
| Zip Code | | Zip Code | |
| **Location #5 Store number:** | | **Location #6 Store number:** | |
| Street | | Street | |
| Suite or PO | | Suite or PO | |
| City and State | | City and State | |
| Zip Code | | Zip Code | |
| **Location #7 Store number:** | | **Location #8 Store number:** | |
| Street | | Street | |
| Suite or PO | | Suite or PO | |
| City and State | | City and State | |
| Zip Code | | Zip Code | |
| **Location #9 Store number:** | | **Location #10 Store number:** | |
| Street | | Street | |
| Suite or PO | | Suite or PO | |
| City and State | | City and State | |
| Zip Code | | Zip Code | |

**If Payment Locations are situated in more than one state, identify the applicable State law for purposes of Schedule 3(a):**
_______________________________________________ **(not applicable if left blank).**

**Identify any Required Attachments in Schedule 4:**

**Signatures:**

| **PAYNEARME MT, INC.** | | **7-ELEVEN, INC. FRANCHISEE (name of business):** | |
|---|---|---|---|
| By: | | By: | |
| Name: | Brenda Swiney | Name: | Sung Hun Choe |
| Title: | CFO | Title: | |
| Effective Date: | | Date: | 12.27.18 |

**Schedule I**

**COMPLIANCE AFFIRMATION**

**1.** I will never commit or knowingly facilitate the crime of money laundering or terrorist financing. I will comply with all Applicable Law(s) whenever offering a service that requires a money transmission license.

**2.** I acknowledge that cash transactions of $3,000 dollars or more are subject to legally prescribed customer identification and record keeping requirements. I understand PAYNEARME's current standard daily transaction limit for money transmission is $1,000 or $1500, subject to the Directions.

**3.** I acknowledge that cash transactions over $10,000 dollars (including fees) require the filing of an IRS Currency Transaction Report ("CTR") with the IRS Detroit Computing Center within fifteen days of the transaction. I agree to adhere to PAYNEARME's monthly cumulative transaction limit per user of $10,000. Upon request, PAYNEARME will assist you in this process.

**4.** I will call PAYNEARME at (888)714-0004to report any suspicious activity to PAYNEARME related to the services. PAYNEARME will then research and determine whether there is a need to file a Suspicious Activity Report by Money Services Businesses (SAR-MSB) with the Financial Crimes Enforcement Network ("FinCEN").

**5.** I acknowledge that the Bank Secrecy Act requires me to have in place a compliance program to prevent money laundering and terrorist financing, which includes at a minimum, (i) internal policies, procedures, and controls; (ii) the designation of a compliance officer; (iii) an ongoing employee training program; and (iv) an independent audit function to test the compliance program. I will adopt and follow PAYNEARME's compliance policies and procedures as described in PAYNEARME's Directions and Compliance Manual. I will designate in writing an employee, who will serve as compliance officer and who will oversee my compliance with applicable law. I will use the Compliance Manual and all other materials from PAYNEARME and/or SEI to train my employees in preventing money laundering and terrorist financing. I will have my compliance program reviewed by an independent firm or a person within my organization, who is not the compliance officer and knows the applicable legal requirements. Upon request, PAYNEARME will assist you in this process.

**6.** I acknowledge that the Office of Foreign Assets Control (OFAC) regulations prohibit me from engaging in transactions involving: (i) countries which are under some type of U.S. embargo or sanction; and/or (ii) specially designated nationals, terrorists, and narcotics traffickers. OFAC regulations also require the blocking of funds corresponding to these prohibited transactions. I understand that PAYNEARME or its designees will be conducting all necessary OFAC checks in conjunction with money transmission services.

**7.** I acknowledge receipt of PAYNEARME's Compliance Manual. I will review the Compliance Manual and other directions that I receive from PAYNEARME concerning compliance and adhere to them.

**8.** **I WILL <u>NEVER</u> KNOWINGLY ALLOW AN EMPLOYEE WHO IS NOT TRAINED IN ANTI-MONEY LAUNDERING AND TERRORIST FINANCING COMPLIANCE TO ACCEPT OR PROCESS TRANSACTIONS THAT REQUIRE A MONEY TRANSMISSION LICENSE.**

**9.** I will promptly notify PAYNEARME if my agency agreement with any other money transmitter terminates.

**10.** I will contact PAYNEARME's Compliance Department at (888)714-0004, SEI's Compliance Department at 1-800-255-0711 or the IRS/CID at 1-800-800-2877, if I have any questions or concerns about the foregoing.

**7-ELEVEN, INC. FRANCHISEE**

**(name of business):**

By: [signature]

Name: Sung Hun Choe

Date: 12.27.18

**Schedule 2**

## BACKGROUND CHECK AUTHORIZATION

I authorize the PayNearMe MT, Inc. ("PAYNEARME") to conduct from time to time a background check, including investigative consumer reports, in order to fulfill its compliance obligations, directly or through appropriate service providers. Although PAYNEARME may rely on this authorization to conduct additional background checks during my time as a statutory agent without asking me for my authorization again I will provide additional authorization upon request. I will reasonably cooperate with all background checks and confirm that all information that I provide is true to the best of my knowledge.

I also authorize all of the following to disclose to PAYNEARME and its agents all information about or concerning me, including but not limited to: past or present employers; educational institutions; law enforcement and all other federal, state and local agencies; federal, all courts and arbitration/mediation services; the military; credit bureaus; testing facilities; motor vehicle records agencies; charities and other non-governmental organizations, all other private and public sector repositories of information; and individual friends, family, neighbors and acquaintances. The information that can be disclosed includes, but is not limited to, information concerning my employment, business and earnings history, education, credit history, motor vehicle history, criminal history, military service, professional credentials and licenses, and may include inquiries regarding workers' compensation, harassment, violence, theft or fraud.

**Full Legal Name** — **First:** Sung Hun Choe **Middle:** **Last:**

**Residential Address** — **Street:** [redacted] **City:** Carmel **State:** CA **Zip:** 93923

**DOB** (mm/dd/yyyy) ____/__[redacted] **SSN** [redacted]

**Phone #** [redacted] **E-mail** [redacted]ail.com

Sung Hun Choe
Printed name

[signature]
Signature

Date: 12/27/2018 (Month/Day/Year)

**If the Authorized Location is in California, Minnesota or Oklahoma**, please check this box if you would like a free copy of your background check report: ☐

DOCID - 22208393.1

**Schedule 3 General Provisions.**

(a) This Agreement is governed by the laws of the State excluding its conflict of law provisions; or if there is more than one Approved Location and they are situated in more than one state, the state identified in the Signature Block below. This Agreement (including Schedules 1, 2 and 3) constitutes the entire agreement between PAYNEARME and FRANCHISEE with respect to FRANCHISEE acting as a statutory money transmission agent for PAYNEARME and supersedes all previous negotiations, commitments and writings between the parties. This Agreement may be changed or modified only by a writing expressly to that effect signed by PAYNEARME and FRANCHISEE, including through the expedited communications measures described in paragraph (f) below. In this regard, FRANCHISHEE will not unreasonably refuse to promptly approve any supplemental documents necessary to advance the purpose of the Agreement, including the addition or substitution of parties or such documents necessary to establish agency with payees, at PAYNEARME's reasonable discretion. The invalidity of any provision of this Agreement will not affect the validity of any other provision to the extent reasonable and equitable. This Agreement may be executed in any number of counterparts, including by facsimile or electronic signature, each of which shall be considered an original and which together will constitute one document. The section headings and captions used in this Agreement are intended for convenience only. Neither this Agreement nor any rights or obligations hereunder may be assigned by any party without the other party's prior written consent (not to be unreasonably withheld), except by PAYNEARME in connection with a merger or sale of substantially all assets or to a wholly owned affiliate (subject to approval of the Authority).

(b) All notices shall be deemed duly given if delivered personally or sent by registered or certified mail or recognized overnight courier to the respective addresses set forth below, or to such other address as either party may advise from time to time, or through the expedited communications measures described in paragraph (f) below. Each party will promptly notify the other of any change in such notice address.

(c) No waiver by either party of any breach of any of this Agreement shall be construed as a waiver of any other breach. Unless otherwise expressly provided, the rights and remedies provided are cumulative and not exclusive of any rights or remedies provided by law.

(d) Each party is an independent contractor. FRANCHISEE is not authorized to assume or create any other obligation, express or implied, on behalf of PAYNEARME or to bind PAYNEARME in any manner whatsoever. FRANCHISEE assumes full and sole responsibility for the supervision of the conduct of FRANCHISEE's employees. FRANCHISEE will perform its obligations to PAYNEARME with FRANCHISEE's own employees and FRANCHISEE will not use or appoint any sub-agents or correspondents for such purpose without the prior written approval of PAYNEARME and, if necessary, the Authority. FRANCHISEE agrees not to share, split, rebate or discount any fees or charges for providing services hereunder with any person or entity other than pursuant to the SEI Franchisee Agreement.

(e) FRANCHISEE is not precluded by this Agreement from acting as an agent for other money transmitters, and FRANCHISEE agrees that PAYNEARME may at its complete discretion appoint other agents in any location whatsoever. There are no exclusive territories.

(f) At PAYNEARME's discretion, PAYNEARME will maintain a website accessible only to FRANCHISEE and other SEI franchisees acting as agents of PAYNEARME for the purpose of providing Directions and communicating important updating information related to this Agreement, including requirements of the Authority. FRANCHISEE will regularly monitor such website and promptly advise PAYNEARME of any concerns that FRANCHISEE may have concerning these updates. In this regard, Franchisee authorizes PAYNEARME to alert FRANCHISEE by text message as to any update.

(g) During the term, FRANCHISEE is authorized to use PAYNEARME's trademarks, service marks and trade names only with respect to materials approved by PAYNEARME and SEI that conform to the Directions. PAYNEARME is authorized to include FRANCHISEE's name and Approved Location addresses in any listing describing the Network, including on PAYNEARME's website.

(h) FRANCHISEE and PAYNEARME each recognize that the other party may share confidential and proprietary information about FRANCHISEE's business (including information obtained in connection with background checks), the operation of the Network, Customers and payments processed ("*Confidential Information*"). FRANCHISEE and PAYNEARME agree not to disclose Confidential Information directly or indirectly to any third party other than SEI and the Authority and/or copy or duplicate any Confidential Information other than to perform such party's obligations under this Agreement, the SEI Franchisee Agreement or the SEI Contract or as required by law. These provisions survive any termination of this Agreement.

(i) FRANCHISEE will indemnify PAYNEARME, and PAYNEARME will indemnify FRANCHISEE(including officers, directors and shareholders, and all affiliates of each), from and against any loss, liability or expense, including attorneys' fees and costs, associated with any third party claim to the extent caused by the indemnifying party's breach of this Agreement, including the failure to comply with Applicable Law and Directions, as well as any negligence or misconduct related to the performance of the money transmission services.

**Schedule 4**

**REQUIRED ATTACHMENTS**

**ARKANSAS, CALIFORNIA, HAWAII, IDAHO, INDIANA, KENTUCKY, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW YORK, NORTH CAROLINA, NORTH DAKOTA, OREGON, TENNESSEE, TEXAS, WYOMING**

Franchisee is under a duty to act only as authorized under this Agreement. Franchisee and PAYNEARME are subject to supervision, regulation and disciplinary action, including but not limited to termination of the Agreement, by or at the direction of the Authority (as defined below). Franchisee hereby consents to the Authority's inspection of the books and records of Franchisee, with or without prior written notice to PAYNEARME or Franchisee. "Authority" means the following for each of the states listed below:

Arkansas — Arkansas Securities Commissioner
California—Commissioner of Financial Institutions
Idaho— Director of the Idaho Department of Finance
Hawaii — Hawaii Commissioner of Financial Institutions
Indiana— Director of Indiana Department of Financial Institutions
Kentucky — Executive Director of the Kentucky Office of Financial Institutions
Maine — Director of Office of Consumer Credit Regulation within the Department of Professional and Financial Regulation
Maryland — Bank Commissioner of the Department of Licensing and Regulation
Michigan — Commissioner of the Office of Financial and Insurance Services
Minnesota — Commissioner of Commerce
New York — Superintendent of the New York State Department of Financial Services
North Carolina— Commissioner of Banks of the State of North Carolina
North Dakota — Commissioner of the Department of Financial Institutions
Oregon — Director of the Department of Consumer and Business Services
Tennessee — Tennessee Commissioner of Financial Institutions
Texas — Texas Commissioner of Banking
Wyoming— State Banking Commissioner

**ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, IDAHO, ILLINOIS, INDIANA, IOWA, KENTUCKY, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, VERMONT, WASHINGTON, TEXAS**

Franchisee will perform all services in compliance with the Act (as defined below) and any rules, regulations or orders issued thereunder, as amended from time to time. The "Act" means the following for each of the states listed below:

Alaska — Alaska Uniform Money Services Act, Chapter 55 of Title 6 of the Alaska Statutes
Arkansas — Arkansas Uniform Money Services Act, Arkansas Code, Title 23, Chapter 55
California — Division 16 of the California Payment Instruments Law, including but not limited to Article 2 and Article 3 of Chapter 6 thereof, and all applicable provisions of Chapter 14 of the California Financial Code relating to the Transmission of Money Abroad
District of Columbia — Money Transmissions Law, Chapter 10 of Title 26 of the District of Columbia Code
Idaho — Chapter 29 of Title 26 of the Idaho Code
Illinois — the laws of the State of Illinois and the United States, including without limitation, Illinois Transmitters of Money Act, 205 Illinois Compiled Statutes Section 657
Indiana — Indiana Code Section 28-8-4-1 through Section 284-4-53 Iowa— Iowa Uniform Money Services Act, Chapter 533C of the Iowa Code Kentucky —Kentucky Revised Statutes Chapter 286
Maryland — Maryland Money Transmission Act, Md. Code Ann., Fin. Inst. Sections 12-401 to 12-431
Michigan — Michigan Money Transmission Services Act, Act 250 of 2006, Michigan Compiled Laws Section 487
Minnesota — Minnesota Statutes Annotated Chapter 53821
New Jersey — New Jersey Money Transmitters Act, New Jersey Statutes, Title 17, Chapter 15C
Vermont— Chapter 79, Title 8 of the Vermont Statutes
Washington — Washington Uniform Money Services Act, Revised Code of Washington, Title 19, Chapter 19.230

Texas — All applicable state and federal laws rules and regulations pertaining to money transmission, including Chapter 151 of the Texas Finance Code, relevant provisions of the Bank Secrecy Act and USA PATRIOT Act, and Chapter 271 of the Texas Finance Code, and regulations of the State of Texas.

**CALIFORNIA**
Franchisee shall make and keep accounts, correspondence, memoranda, papers, books and other records which the California Commissioner of Financial Institutions by regulation or order requires, and Franchisee shall preserve such records for the time specified by such regulation or order. The effectiveness of this Agreement is subject to Franchisee receiving approval from California to operate as a money transfer agent. Without such approval, this Agreement is rescinded. In the event such approval is later revoked, PAYNEARME can elect to terminate this Agreement upon five days' written notice, despite any other provision of this Agreement.

**HAWAII**
Franchisee hereby certifies that it is in compliance, and shall comply, with the recordkeeping and reporting requirements under Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering.

**KENTUCKY**

Pursuant to the laws of the State of Kentucky, PAYNEARME hereby provides Franchisee with the following information: PAYNEARME is required to comply with applicable federal and state law.

**MAINE**
Franchisee is prohibited from providing the services to anyone under the age of 18 years.

**MICHIGAN**
In the event PAYNEARME's license is suspended or revoked, the Commissioner shall notify PAYNEARME and order PAYNEARME to send a notice to its agents directing them to cease providing money transmission services on behalf of PAYNEARME, and the Franchisees shall immediately cease providing money transmission services as an agent of PAYNEARME. Franchisee shall not make any fraudulent or false statement or misrepresentation to a consumer or PAYNEARME or to the Commissioner.

**NEW YORK**
Franchisee is prohibited from acting on behalf of the consumer as a courier for the transmission of money, and no instrument sold may be retained by Franchisee. All money transmission instruments sold must be given by the Franchisee to the purchasers of the instruments for their own delivery to the beneficiary. Franchisee shall not sell any money transmission instruments in New York State pursuant to this Agreement unless the name "PayNearMe MT, Inc." clearly appears on the face of the instrument.

**NORTH CAROLINA**
PAYNEARME shall issue a certificate of authority for each PAYNEARME Service offered at each location at which it conducts licensed activities in North Carolina through authorized delegates such as Franchisee. The certificate(s) shall be posted in public view at each location of Franchisee in North Carolina and shall state as follows: "Money transmission on behalf of PayNearMe MT, Inc. is conducted at this location pursuant to the Money Transmitters Act."

**TEXAS**
Franchisee hereby certifies that it is familiar with and agrees to fully comply with all applicable state and federal laws, rules, and regulations pertaining to money transmission, including Chapter 151 of the Texas Finance Code and rules adopted thereunder, relevant provisions of the Bank Secrecy Act and the USA PATRIOT Act, and Chapter 271 of the Texas Finance Code. Franchisee agrees to prepare and maintain all records as required by Chapter 151 of the Texas Finance Code or any rule adopted thereunder or as reasonably requested by the Texas Commissioner of Banking. Franchisee acknowledges that PayNearMe, as a license holder under Chapter 151 of the Texas Finance Code, is subject to regulation by the Texas Commissioner of Banking and that, as part of that regulation, the Commissioner may suspend or revoke an authorized delegate designation or require PayNearMe to terminate an authorized delegate designation. Franchisee acknowledges receipt of the PAYNEARME written policies and procedures applicable to Franchisee's compliance with applicable state and federal laws. Franchisee acknowledges that it has been provided the website address through which Franchisee can access Chapter 151 of the Texas Finance Code and rules adopted pursuant to said chapter (www.dob.texas.gov) and the Bank Secrecy Act and the USA PATRIOT Act (www.msb.gov and www.fincen.gov) and Chapter 271 of the Texas Finance Code (www.dob.texas.gov).

**ALL STATES, OTHER THAN MONTANA, NEW MEXICO, SOUTH CAROLINA AND MASSACHUSETTS, AS WELL AS THE DISTRICT OF COLUMBIA AND PUERTO RICO, please refer to the attached additional information provided on a state by state basis in alphabetical order.**

**ALASKA**

1. Operate in full compliance with the Alaska Uniform Money Services Act and any policies and procedures provided to Franchisee by PAYNEARME in connection with same. *Alaska Stat. § 06.55.301(a)*.
2. Remit all money owing to PAYNEARME under the terms of the contract between PAYNEARME and Franchisee. *Alaska Stat. § 06.55.301(b)*.
3. Cease to provide money services as an authorized delegate of PAYNEARME upon notice by the Alaska Department of Commerce, Community and Economic Development that PAYNEARME money service license is suspended and/or revoked. *Alaska Stat. § 06.55.301(c)*.
4. Not provide money services outside the scope of activity permissible under the contract between Franchisee and PAYNEARME *Alaska Stat. § 06.55.30(d)*.
5. Hold in trust for the benefit of PAYNEARME all money, net of fees, received from money transmission. *Alaska Stat. § 06.55.301(d)*.
6. Not use a sub-delegate to conduct money services on behalf of PAYNEARME *Alaska Stat. § 06.55.301(e)*.
7. Consent to an on-site examination by the Alaska Department of Commerce, Community, and Economic Development. *Alaska Stat. § 06.55.401(a)*.
8. File with the Alaska attorney general all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set out in 31 U.S.C. 5311, 31 C.F.R. 103, and other federal and state laws pertaining to money laundering. *Alaska Stat. § 06.55.406(a)*.
9. Not disclose to another person financial information, defined to include a consumer's social security number, taxpayer identification number, account number, credit card account number, debit card account number, personal identification number, payment instrument number, or access code, provided to PAYNEARME or Franchisee by such consumer except when, and only to the extent that, the disclosure is (1) authorized in writing by the consumer; (2) required by federal, state, or local law; (3) required by an order issued by a court or an administrative agency; or (4) part of the money services transaction ordered by the consumer. *Alaska Stat. § 06.55.407(d)-(e)*.
10. Display a sign at each location where Franchisee provides money services under the Alaska Uniform Money Services Act. The sign shall be displayed at all times in full view of persons visiting the location and shall give the Alaska Department of Commerce, Community and Economic Development's address and telephone number for receiving calls regarding complaints and other concerns about PAYNEARME and/or Franchisee. *Alaska Stat. § 06.55.810(b)-(c)*.

**ARIZONA**

1. Display at each location a notice in a form prescribed by the Arizona Superintendent of Financial Institutions that indicates that Franchisee is an authorized delegate of PAYNEARME under Title 6, Chapter 12 of the Arizona Code. *A.R.S. § 6-1207(c)*.
2. Comply with the operating policies and procedures provided by PAYNEARME to Franchisee to enable compliance with the provisions of Title 13, Chapter 23 and Title 6, Chapter 12 of the Arizona Code and any rules adopted thereunder. *R.S. § 6-1208(B)*.
3. Immediately cease to operate as a delegate of PAYNEARME upon notice of the revocation or suspension of PAYNEARME money transmitter license. *A.R.S. § 6-1208(C)*.
4. Hold in trust for the benefit of PAYNEARME all monies received from the sale or delivery of PAYNEARME payment instruments or monies received for transmission. *A.R.S. § 6-1209(B)*.
5. Be subject to examination at the discretion of the Arizona Superintendent of Financial Institutions. *A.R.S. § 6-1209(C)*.
6. Preserve its records for at least five years after making the final entry on any transaction and keep any other records required by the Arizona Superintendent of Financial Institutions. *A.R.S. § 6-1213(B)*.
7. Ensure that every payment instrument sold by Franchisee bears the name of PAYNEARME and a unique consecutive number clearly stamped or imprinted on it. *A.R.S. § 6-1215(A)*.
8. For every transaction that involves the receipt of money, maintain written records, including (i) the name of PAYNEARME (ii) the street address of the location where the money was received, (iii) the name and street address of the consumer if reported to Franchisee, (iv) the approximate date of the transaction, (v) the name or other information of the employee of Franchisee who may have conducted the transaction, and (vi) the amount of the transaction, for a period of five years from the date of the transaction. *A.R.S. § 6-1215(B)*.

**ARKANSAS**

1. Operate in full compliance with the Arkansas Uniform Money Services Act and any policies and procedures provided to Franchisee by PAYNEARME in connection with same. *A.C.A. § 23-55-501(b)*.
2. Remit all money owing to PAYNEARME under the terms of the contract between PAYNEARME and Franchisee. *A.C.A. § 23-55-501(c)*.
3. Cease to provide money services as an authorized delegate of PAYNEARME upon notice that the money service license is suspended or revoked. *A.C.A. § 23-55-501(d)*.
4. Not provide money services outside the scope of activity permissible under the contract between Franchisee and PAYNEARME *A.C.A. § 23-55-501(e)*.
5. Hold in trust for the benefit of PAYNEARME all money, net of fees, received from money transmission. *A.C.A. § 23-55-501(e)*.
6. Not use a sub-delegate to conduct money services on behalf of PAYNEARME *A.C.A. § 23-55-501(e)*.
7. Submit to an on-site examination by the Arkansas Securities Commissioner. *A.C.A. § 23-55-601(a)*.
8. File with the securities Arkansas Securities Commissioner all reports required by federal currency reporting, record keeping, and suspicious transaction reporting requirements as set out in *31 U.S.C. 5311, 31 C.F.R. 103*, and other federal and state laws pertaining to money laundering. *A.C.A. § 23-55-606(a)*.
9. Ensure that the name and mailing address or telephone number of PAYNEARME is provided to the consumer in connection with each money transmission or currency exchange transaction. *A.C.A. § 23-55-608(a)*.
10. Display prominently in a form and in a medium prescribed by the Arkansas Securities Commissioner a notice that states or contains the following information: (i) the name, mailing address, and telephone number of Franchisee, (ii) a statement that Franchisee is an agent conducting business on behalf of PAYNEARME under Title 23, Subtitle 2, Chapter 55 of the Arkansas Code, (iii) the name, mailing address, and telephone number of PAYNEARME (iv) a statement directing consumers with complaints to contact the Arkansas State Securities Department, and (v) the current mailing address and telephone number of the Arkansas State Securities Department. *A.C.A. § 23-55-608(a)-(b)*.

DOCID - 22208393.1

**CALIFORNIA**

1. Make and keep accounts, correspondence, memorandums, papers, books, and other records as the California Commissioner of Financial Institutions by regulation or order requires and preserve the records for the time specified by the regulation or order. *Cal. Fin. Code § 1825(c)(2)*.
2. Hold all funds, less any fees due to Franchisee, received for transmission by Franchisee on behalf of PAYNEARME in trust owned by and belonging to PAYNEARME until the time when the money or an equivalent amount are remitted by Franchisee to PAYNEARME *Cal. Fin. Code § 1825(c)(3) and (f)*.
3. Remit all money in accordance with the California Money Transmission Act. *Cal. Fin. Code § 1825(c)(4)*.
4. Comply with any other provisions that the California Commissioner of Financial Institutions may find to be necessary to carry out the provisions and purposes of the California Financial Code, Chapter 14. *Cal. Fin. Code § 1825(c)(5)*.
5. Remit all money owing to PAYNEARME in accordance with the terms of contract with PAYNEARME *Cal. Fin. Code § 1825 (d)*.
6. Remit all money, less any fees, received on behalf of PAYNEARME for money transmission as follows: (i) within three business days of receipt, (ii) in case the aggregate face amount of the money, less fees, does not in any calendar week exceed ten thousand dollars ($10,000), within 10 business days of receipt, and (iii) within a period longer than three business days of receipt, if Franchisee has previously deposited with, and during such period maintains on deposit with, an office of an insured bank or of an insured savings and loan association located in the United States in an account that is in the sole and exclusive name of PAYNEARME an amount that, for each day by which such period exceeds three business days, is not less than the aggregate face amount of money received on behalf of PAYNEARME form money transmission that Franchisee usually sells per day, (iv) within such shorter period as PAYNEARME may provide. *Cal. Fin. Code § 1825(e)*
7. Not provide money transmission outside the scope of activity permissible under the contract with PAYNEARME *Cal. Fin. Code § 1825(f)*.
8. Not appoint a sub-agent to receive transmission money. *Cal. Fin. Code § 1825(g)*.
9. Not conduct money transmission on behalf of PAYNEARME without concurrently receiving money, monetary value or its equivalent, credit card, or payment instrument, or a combination of same believed to be valid in an amount not less than the amount of the money transmission being provided. In the case of a sale of payment instruments or stored value to an insured bank, an insured savings and loan association, or an insured credit union, Franchisee may receive such amounts the next business day after the sale. *Cal. Fin. Code § 1825(i)*.
10. If Franchisee commingles any money or monetary value, less fees, received on behalf of PAYNEARME for money transmission with any other property owned or controlled by Franchisee, all such property shall be impressed with a trust in favor of PAYNEARME in an amount equal to the aggregate amount of such money so commingled. No money or monetary value, less fees, received by Franchisee on behalf of PAYNEARME for money transmission, while held by Franchisee, nor any property impressed with a trust pursuant to this subdivision, shall be subject to attachment, levy of execution or sequestration by order of any court, except for the benefit of PAYNEARME *Cal. Fin. Code § 1825(j)*.
11. Submit, at any time, to examination conducted by the California Commissioner of Financial Institutions in order to ascertain whether Franchisee's business is being conducted in a lawful manner and whether all moneys received for transmission are properly accounted for. Directors, officers, and employees of Franchisee shall exhibit to the California Commissioner of Financial Institutions, on request, any or all of Franchisee's accounts, books, correspondence, memoranda, papers, and other records and shall otherwise facilitate the examination so far as it may be in their power to do so. *Cal. Fin. Code § 1850(a)-(b)*.
12. Not use any receipt, a certified copy of which has not been filed with the California Commissioner of Financial Institutions, or use a receipt that the California Commissioner of Financial Institutions has deemed not to be noncompliant. *Cal. Fin. Code § 1840(a)(1)*.
13. Forward all funds received for transmission or give instructions committing equivalent funds to the person designated by the consumer within 10 days after receiving such funds, unless otherwise ordered by the consumer. *Cal. Fin. Code § 1841*.
14. Refund to the consumer within 10 days of receipt of the consumer's written request for a refund any and all moneys received for transmission unless any of the following occurs: (1) the funds have been forwarded within 10 days of the date of receipt, (2) instructions have been given committing an equivalent amount of money to the person designated by the consumer within 10 days of the date of the receipt of the funds from the consumer, (3) consumer instructs Franchisee to transmit the moneys at a time beyond 10 days. If the consumer gives instructions as to when the moneys shall be forwarded or transmitted and the moneys have not yet been forwarded or transmitted, Franchisee shall refund the consumer's money within 10 days of receipt of the consumer's written request for a refund, or (4) a refund would violate law. *Cal. Fin. Code § 1842(a)*.
15. Provide a receipt to consumer which shall be available in English and in the language principally used by Franchisee to advertise, solicit, or negotiate, either orally or in writing, at that office if other than English. *Cal. Fin. Code § 1842(b)*.
16. Include in or with the receipt a conspicuous statement in English and in the language principally used by Franchisee to advertise, solicit, or negotiate, either orally or in writing at that office if other than English, in a size equal to at least 10-point bold type, as follows:

> **RIGHT TO REFUND**
> "You, the customer, are entitled to a refund of the money to be transmitted as the result of this agreement if PAYNEARME does not forward the money received from you within 10 days of the date of its receipt, or does not give instructions committing an equivalent amount of money to the person designated by you within 10 days of the date of the receipt of the funds from you unless otherwise instructed by you.
> If your instructions as to when the moneys shall be forwarded or transmitted are not complied with and the money has not yet been forwarded or transmitted you have a right to a refund of your money.
> If you want a refund, you must mail or deliver your written request to PAYNEARME at [mailing address of PAYNEARME If you do not receive your refund, you may be entitled to your money back plus a penalty of up to $1,000 and attorney's fees pursuant to Section 1842 of the California Financial Code." *Cal. Fin. Code § 1842(b)*.

17. Ensure that a receipt provided to any consumer clearly states (i) the rate of exchange for the particular transaction, (ii) amount of commission or fees, (iii) net exchange after all fees and commissions have been deducted, (iv) total amount of currency presented by the consumer, and (v) total amount to be delivered to the beneficiary designated by the consumer. These disclosures shall be in English and in the same language as that principally used by Franchisee to advertise, solicit, or negotiate, either orally or in writing, at that office if other than English. If the consumer does not specify at the time the currency is presented to Franchisee the country to which the currency is to be transmitted, the rate of exchange for the transaction is not required to be set forth on the receipt. If the customer does specify at the time the money is presented to Franchisee the country to which the money is to be transmitted but the specified country's laws require the rate of exchange for the transaction to be determined at the time the transaction is paid out to the intended recipient, the rate of exchange for the transaction is not required to be set forth on the receipt. *Cal. Fin. Code § 1843(a) and (d).*

18. Maintain records of receipts provided to consumers for six months or a longer period of time specified in the Agreement with PAYNEARME *Cal. Fin. Code § 1854(b).*

19. Ensure that all window and exterior signs concerning the rates of exchange clearly state in English and in the same language principally used by Franchisee to advertise, solicit, or negotiate, either orally or in writing, at that office if other than English, the rate of exchange for exchanging the currency of the United States for foreign currency. *Cal. Fin. Code § 1843(b).*

20. Ensure that all interior signs and all advertising, on which rates are quoted, shall clearly state in English and in the same language principally used by Franchisee to advertise, solicit, or negotiate, either orally or in writing, at that office if other than English, the rates of exchange for exchanging the currency of the United States for foreign currency and all commissions and fees charged on all transactions. *Cal. Fin. Code § 1843(b).*

21. Display signage clearly identifying the name of PAYNEARME as well as any trade names used by PAYNEARME at that branch office. *Cal. Fin. Code § 1843(c).*

22. Prominently post on the premises of each branch office that conducts money transmission a notice, in English and in the same language principally used by Franchisee to advertise, solicit or negotiate either orally or in writing and in a form provided by PAYNEARME stating that the following:

If you have complaints with respect to any aspect of the money transmission activities conducted at this location, you may contact the California Department of Financial Institutions at its toll-free telephone number, 1-800-622-0620, by e-mail at consumer.complaint@dfi.ca.gov, or by mail at Department of Financial Institutions, Consumer Services, 1810 13th Street, Sacramento, CA 95811.

23. The sign must be clear, legible, and in letters not less than one-half inch in height and posted in a conspicuous location in the unobstructed view of the public within the premises. *Cal. Fin. Code § 1845(a)-(b).*

24. Prominently post on the premises of each branch office that issues or sells payment instruments, and at machines located in operated by Franchisee that issues or sells payment instruments, a notice, printed in English and in the same language principally used by Franchisee to advertise, solicit or negotiate, either orally or in writing, and in a form provided by PAYNEARME clearly stating that payment instruments are not insured by the federal government, the state government, or any other public or private entity. The notice shall be clear, legible, and in letters not less than one-half inch in height and shall be posted in a conspicuous location in the unobstructed view of the public within the premises. *Cal. Fin. Code § 1844.*

25. Not sell any payment instrument containing Franchisee's name which does not identify PAYNEARME at least as conspicuously as it does the Franchisee. *Cal. Fin. Code § 1846.*

26. Upon notice that PAYNEARME license has been suspended or revoked or that the Commissioner has issued an order taking possession of the property and business of PAYNEARME not receive any transmission money on behalf of *PAYNEARME Cal. Fin. Code § 1828(a).*

27. Not engage in fraud, intentional misrepresentation, or gross negligence or any unsafe or unsound practice. *Cal. Fin. Code § 1862(a)(3) and (a)(6).*

28. Comply with California and federal anti-money laundering statutes. *Cal. Fin. Code § 1862(a)(4).*

29. Not make or cause to be made in any application or report filed with California Commissioner of Financial Institutions or in any proceeding before California Commissioner of Financial Institutions, any statement that was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or has omitted to state in any of those applications, reports, or proceedings any material fact which is required to be stated therein. *Cal. Fin. Code § 1862(a)(7).*

**COLORADO**

1. Require each of its employees who perform money transmission services to either (i) understand and sign a form, promulgated by the Colorado Banking Board and containing a notice of the contents of Colo. Rev. Stat. 18-5-309 and other state and federal laws regarding money laundering, affirming knowledge of the money laundering laws prior to the employee performing such services or (ii) receive training that covers the money laundering laws within thirty days before the employee performs such services. *Colo. Rev. Stat. 12-52-203(2)(a).*

2. Maintain a record of each employee along with the signed notice or evidence of training on money laundering laws so long as the employee provides such money transmission services. The records may be maintained in an electronic or digital format that reproduces the signature on the documents by the Franchisee. *Colo. Rev. Stat. 12-52-203(2)(b).*

3. Not knowingly employ a person to perform money transmission services who has been convicted of or plead guilty or nolo contendere to the offenses in Article 5 of Title 18 of the Colorado Revised Statutes or in Colo. Rev. Stat. 18-5-309; a felony in the selling or issuing of exchange or in money transmission; a felony involving a financial institution; or an equivalent crime outside Colorado. *Colo. Rev. Stat. 12-52-205(2).*

**CONNECTICUT**

1. Submit to examination by the Connecticut Banking Commissioner. *Conn. Gen. Stat. § 36a-605*

2. From the moment of receipt, hold the proceeds of a sale or delivery of PAYNEARME Connecticut payment instruments in trust for the benefit of PAYNEARME on behalf of PAYNEARME *Conn. Gen. Stat. § 36a-607(3).*

**DELAWARE**

1. Ensure that every check, defined to include any instrument for the transmission or payment of money, bears the name of PAYNEARME clearly imprinted thereon. *5 Del. C. § 2313(a).*

**DISTRICT OF COLUMBIA**

1. Submit to and pay all reasonable costs for an on-site examination of Franchisee by the Commissioner of the Department of Insurance, Securities, and Banking. *D.C. Code § 26-1013(b).*
2. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Commissioner of the Department of Insurance, Securities, and Banking. *D.C. Code § 26-1017(a).*
3. Engage in money transmission strictly in accordance with the written procedures provided to Franchisee by PAYNEARME *D.C. Code § 26 1017(b).*
4. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee, but not to exceed a remittance time of 30 calendar days, as doing so may result in liability by Franchisee or PAYNEARME for treble damages. *D.C. Code § 26-1017(c) and CDCR 26A-2212.1.*
5. Consent to inspection by the Commissioner of the Department of Insurance, Securities, and Banking, with or without prior notice to Franchisee, of the books and records of Franchisee when the Commissioner of the Department of Insurance, Securities, and Banking has a reasonable basis to believe that Franchisee is not in compliance with this Title 26, Chapter 10 of the District of Columbia Code. *D.C. Code § 26-1017(d).*
6. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancelation of such contract and further disciplinary action by the Commissioner of the Department of Insurance, Securities, and Banking. *D.C. Code § 26-1017(e).*
7. Ensure all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or for transmission, from the time such funds are received by Franchisee until such time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *D.C. Code § 26-1017(f).*
8. Report to PAYNEARME the theft or loss of payment instruments within 24 hours from the time Franchisee knew or should have known of the theft or loss. *D.C. Code § 26-1017(g).*

**FLORIDA**

1. Report to PAYNEARME immediately upon discovery, the theft or loss of currency received for a transmission or payment instrument. *Fla. Stat. § 560.2085(2)(b)1.*
2. Display a notice to the public that Franchisee is the authorized vendor of PAYNEARME *Fla. Stat. § 560.2085(2)(b)2.*
3. Remit all amounts owed to PAYNEARME for all transmissions accepted and all payment instruments sold in accordance with the Agreement between Franchisee and PAYNEARME *Fla. Stat. § 560.2085(2)(b)3.*
4. Hold in trust all currency or payment instruments received for transmissions or for the purchase of payment instruments from the time of receipt by Franchisee until the time the transmission obligation is completed. *Fla. Stat. § 560.2085(2)(b)4.*
5. Not commingle the money received for transmissions accepted or payment instruments sold on behalf of PAYNEARME with the money or property of Franchisee, except for making change in the ordinary course of Franchisee's business, and ensure that the money is accounted for at the end of the business day. *Fla. Stat. § 560.2085(2)(b)5.*
6. Consent to examination or investigation by the Florida Office of Financial Regulation. *Fla. Stat. § 560.2085(2)(b)6.*
7. Adhere to the applicable state and federal laws and rules pertaining to a money services business. *Fla. Stat. § 560.2085(2)(b)7.*
8. Provide such other information or disclosure as may be required by Applicable Law. *Fla. Stat. § 560.2085(2)(b)8.*
9. Maintain all books, accounts, documents, files, and information necessary for determining compliance with Title 33, Chapter 560 of the Florida Regulation of Trade, Commerce, Investments, and Solicitations Code and related rules for five (5) years unless a longer period is required by other state or federal law. *Fla. Stat. § 560.1105.*
10. Not receive or possess any property, except in payment of a just demand, and, with intent to deceive or defraud, to omit to make or to cause to be made a full and true entry thereof in its books and accounts, or to concur in omitting to make any material entry thereof. *Fla. Stat. § 560.111(1)(a).*
11. Not embezzle, abstract, or misapply any money, property, or thing of value belonging to the money services business or consumer with intent to deceive or defraud. *Fla. Stat. § 560.111(1)(b).*
12. Not make any false entry in its books, accounts, reports, files, or documents with intent to deceive or defraud another person, or with intent to deceive the Florida Office of Financial Regulation, any appropriate regulator, or any authorized third party appointed by the Florida Office of Financial Regulation to examine or investigate the affairs of the money services business or Franchisee. *Fla. Stat. § 560.111(1)(c).*
13. Not engage in an act that violates 18 U.S.C. 1956, 18 U.S.C. 1957, 18 U.S.C. 1960, 31 U.S.C. 5324, or any other law, rule, or regulation of another state or the United States relating to a money services business which may cause the denial or revocation of a money services business license or the equivalent in that jurisdiction. *Fla. Stat. § 560.111(1)(d).*
14. Not file with the Florida Office of Financial Regulation, sign as a duly authorized representative, or deliver or disclose, by any means, to the Florida Office of Financial Regulation or any of its employees any examination report, report of condition, report of income and dividends, audit, account, statement, file, or document known by it to be fraudulent or false as to any material matter. *Fla. Stat. § 560.111(1)(e).*
15. Not place among the assets of a money services business or Franchisee any note, obligation, or security that the money services business or Franchisee does not own or is known to be fraudulent or otherwise worthless, or to represent to the Florida Office of Financial Regulation that any note, obligation, or security is the property of the money services business or Franchisee and is genuine if it is known to be fraudulent or otherwise worthless. *Fla. Stat. § 560.111(1)(f).*
16. Comply with all state and federal laws and rules relating to the detection and prevention of money laundering, including, as applicable, Fla Stat. § 560.123, and 31 C.F.R. 103.20, 103.22, 103.23, 103.27, 103.28, 103.29, 103.33, 103.37, and 103.41. *Fla. Stat. § 560.1235(1).*
17. Maintain an anti-money laundering program in accordance with 31 C.F.R. 103.125. The program must be reviewed and updated as necessary

to ensure that the program continues to be effective in detecting and deterring money laundering activities. *Fla. Stat. § 560.1235(2).*

18. Provide each consumer with a toll-free telephone number for the purpose of contacting PAYNEARME or Franchisee or, in lieu of a toll-free telephone number, provide the address and telephone number of the Florida Office of Financial Regulation. *Fla. Stat. § 560.128(1).*

**GEORGIA**

1. Display prominently in the premises where checks, money orders, or other instruments are issued and sold a certificate in prescribed form indicating that such sales or transmissions are licensed under the Georgia Sale of Check Act or in lieu of the foregoing, have all window decals and other advertising material relative to the sale of checks or money services available within Georgia bear the legend "LICENSED BY THE GEORGIA DEPARTMENT OF BANKING AND FINANCE" in letters at least one-quarter inch high. *Ga. Comp. R. & Regs. r. 80-3-1-.01(3).*
2. Transmit proceeds received from the sale of checks or money transmission net of fees charged and retained by the Franchisee, by such means as PAYNEARME shall require within five (5) business days from the date of sale or issuance unless more frequent remittance is required by the Georgia Department of Banking and Finance or PAYNEARME *Ga. Comp. R. & Regs. r. 80-3-1-.01(6).*
3. Be subject to the filing requirements for large currency transactions as prescribed in O.C.G.A. Article 11 of Title 7. *Ga. Comp. R. & Regs r. 80-3-1-.04(1).*

**HAWAII**

1. File with the Hawaii Commissioner of Financial Institutions all reports relating to transactions in Hawaii, as required by federal recordkeeping and reporting requirements in Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering. *HRS § 489D-16(a).*
2. Submit to and pay all reasonable costs for an on-site examination of Franchisee by the commissioner. *HRS § 489D-17 and HRS § 489D-17(b).*
3. Upon receipt of money or monetary value for transmission, transmit the money or its monetary equivalent received from a consumer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the consumer within ten business days after receiving the money or equivalent value, unless otherwise ordered by the consumer or unless Franchisee has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money. *HRS § 489D-20(a).*
4. Provide a receipt to the consumer that clearly states the amount of money or equivalent value resented for transmission and the total of the fees charged by PAYNEARME If the rate of exchange for a money transmission to be paid in the currency of another country is fixed by PAYNEARME for that transaction at the time the money transmission is initiated, the receipt provided to the consumer shall disclose the rate of exchange for that transaction, and the duration, if any, for the payment to be made at that fixed rate of exchange. If the rate of exchange for a money transmission to be paid in the currency of another country is not fixed at the time the money transmission is sent, the receipt provided to the consumer shall disclose that the rate of exchange for that transaction will be set at the time the recipient of the money transmission picks up the funds in the foreign country. *HRS § 489D-20(b).*
5. Provide a refund of all moneys received for transmittal within ten days of receipt of a written request for a refund unless any of the following occurs: (i) the moneys have been transmitted and delivered to the person designated by the consumer prior to receipt of the written request for a refund, (ii) instructions have been given committing an equivalent amount of money to the person designated by the consumer prior to receipt of a written request for a refund, (iii) Franchisee has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money as requested by the consumer or refunding the money as requested by the consumer, or (iv) PAYNEARME is otherwise barred by law from making a refund. *HRS § 489D-20(d).*
6. Not authorize sub-delegates without the written consent of the Hawaii Commissioner of Financial Institutions. *HRS § 489D-21(2).*
7. Certify that Franchisee is in compliance with the recordkeeping and reporting requirements under Title 31 United States Code Section 5311 et seq., 31 Code of Federal Regulations Part 103, Section 125, and other federal and state laws pertaining to money laundering. *HRS § 489D-21(4).*
8. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Hawaii Commissioner of Financial Institutions. *HRS § 489D-22(a).*
9. Ensure that all money transmissions conducted by Franchisee are in accordance with PAYNEARME written procedures provided to Franchisee. *HRS § 489D-22(b).*
10. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *HRS § 489D-22(c).*
11. Consent to inspection by the Hawaii Commissioner of Financial Institutions, with or without prior notice, of the books and records Franchisee when the commissioner has a reasonable basis to believe that Franchisee is not in compliance with the Hawaii Money Transmitter's Act. *HRS § 489D-22(d).*
12. Act only as authorized under the contract with PAYNEARME as failure to do so may result in the cancellation of such contract and further disciplinary action by the Hawaii Commissioner of Financial Institutions. *HRS § 489D-22(e).*
13. Ensure all funds, except fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by Franchisee until the time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *HRS§ 489D-22(f).*
14. Report to PAYNEARME the theft or loss of payment instruments within twenty-four hours from the time Franchisee knew or should have known of the theft or loss. *HRS § 489D-22(g).*

**IDAHO**

1. Not authorize sub-representatives without the written consent of the Idaho Director of the Department of Finance. *Idaho Code § 26-2918(2).*
2. Be subject to supervision and regulation by the Idaho Director of the Department of Finance. *Idaho Code § 26-2918(3).*
3. Consent to inspection by the Idaho Director of the Department of Finance, with or without prior notice, of the books and records of Franchisee when the director has a reasonable basis to believe that the

Franchisee is in violation of the provisions of Title 26, Chapter 29 of the Idaho Code. *Idaho Code § 26-2918(4)* and *Idaho Code § 26-2914(1)*.

4. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract and further disciplinary action by the Idaho Director of the Department of Finance. *Idaho Code § 26-2918(5)*.

5. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Idaho Director of the Department of Finance. *Idaho Code § 26-2919(1)*.

6. Transmit money strictly in accordance with PAYNEARME written procedures provided to Franchisee. *Idaho Code § 26-2919(2)*.

7. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *Idaho Code § 26-2919(3)*.

8. Ensure all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by Franchisee until the time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *Idaho Code § 26-2919(4)*.

9. Report to PAYNEARME the theft or loss of payment instruments within twenty four (24) hours from the time Franchisee knew or should have known of such theft or loss. *Idaho Code § 26-2919(5)*.

**ILLINOIS**

1. Conspicuously display a disclosure notice supplied by PAYNEARME providing the following information: (i) name of PAYNEARME (ii) a toll-free telephone number for the Illinois Department of Financial Institutions which will provide customer support for suspected violations of the Illinois Transmitters of Money Act, and (iii) a statement that the authorization for Franchisee to conduct money transmission may be revoked at any time by PAYNEARME *205 ILCS 657/37(b)(1)-(3)*.

2. Upon termination as authorized seller, remove the disclosure notice from the premises within 10 business days after such termination. *205 ILCS 657/37(c)*.

3. Pay an examination fee established by rule and the actual expenses of the examination, should one be conducted by the Illinois Director of Financial Institutions. *205 ILCS 657/55(g)*.

4. Preserve for at least 5 years all documents relating to money transmission activities, unless the data embodied in such documents has been transmitted for recordation by PAYNEARME *205 ILCS 657/60(b)*.

5. Ensure that every payment instrument sold through Franchisee except for a stored value card shall bear the name of PAYNEARME and a unique consecutive number clearly stamped or imprinted on it. When an order for the transmission of money results in the issuance of a payment instrument, both the order and the payment instrument may bear the same unique number. *205 ILCS 657/65*.

6. Create a record, which may be reduced to computer or other electronic medium, upon receiving any money from a customer. *205 ILCS 657/65(b)*.

7. For each payment instrument other than a stored value card sold, record the face amount of the payment instrument and the serial number of the payment instrument. *205 ILCS 657/65(c)*.

8. For each transmission of money, record the date the money was received, the face amount of the payment instrument, the name of the consumer, the manner of transmission, including the identity and location of any bank or other financial institution receiving or otherwise involved in accomplishing the transmission, the location to which the money is transmitted if different from the bank or other financial institution required to be recorded, the name of the intended recipient, and the date the transmission was accomplished or the money was refunded to the consumer due to an inability to transmit or failure of the intended recipient to receive or obtain the money transmitted. *205 ILCS 657/65(d)*.

9. Ensure that transmission is made within three business days after the receipt of the money to be transmitted. *205 ILCS 657/65(d)*.

10. Issue a receipt to each person delivering or depositing money with Franchisee indicating the date of the transaction, the face amount of the payment instrument, to whom the money is to be transmitted, the service charge, and the name and address of PAYNEARME or Franchisee. The receipt or a separate disclosure at the time of the money transmission shall also include a statement of PAYNEARME refund procedures as well as a toll-free telephone number for customer assistance. *205 ILCS 657/65(d)*.

11. Keep a copy of every receipt in a permanent record book or maintain the data embodied in the receipt using photographic, electronic, or other means. *205 ILCS 657/65(d)*.

12. For each exchange of money of the United States government or a foreign government to or from money of another government, record the date of the transaction, the amount of the transaction, the amount of funds stated in currency received by the recipient, and the rate of exchange at the time of the transaction. *205 ILCS 657/65(e)*.

13. For each exchange of money of the United States government or a foreign government to or from money of another government, issue a receipt to each person delivering or depositing money with Franchisee indicating the date of the transaction, the amount of the transaction, the service charge, and the name and address of PAYNEARME or Franchisee making the transaction. *205 ILCS 657/65(e)*.

14. Preserve records required to be kept by Franchisee under the Illinois Money Transmitter Act for at least five years or as required to comply with any other Act the administration of which is vested in the Illinois Director of Financial Institutions and make such records available for examination upon request of Illinois Director of Financial Institutions. *205 ILCS 657/65(f)*.

15. Not commit fraud or misrepresentation and/or submit fraudulent statements to PAYNEARME *205 ILCS 657/75(e)*.

16. Hold in trust for PAYNEARME from the moment of receipt, the proceeds of any business transacted under this the Illinois Money Transmitter Act in an amount equal to the amount of proceeds due PAYNEARME less the amount due Franchisee. *205 ILCS 657/75(f)*.

17. Remit funds to PAYNEARME in accordance with the time specified in its contract with PAYNEARME as failure to do so may result in a civil action against Franchisee for three times the actual damages. *205 ILCS 657/75(f)*.

18. Not act outside its scope of authority as defined by the Illinois Money Transmitter Act and by Franchisee's contract with PAYNEARME with regard to any transaction regulated by the Illinois Money Transmitter Act. *205 ILCS 657/7(j)*.

**IOWA**

1. Operate in full compliance with Title XIII, Subtitle 2, Chapter 533C, Article 4 of the Iowa Code and any policies and procedures provided to Franchisee by PAYNEARME in connection with same. *Iowa Code § 533C.401(2).*
2. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *Iowa Code § 533C.401(3).*
3. Upon notice of suspension or revocation PAYNEARME money transmitter license immediately cease to provide money services as a delegate of PAYNEARME *Iowa Code § 533C.401(4).*
4. Not provide money services outside the scope of activity permissible under the contract between Franchisee and PAYNEARME except activity in which the Franchisee is licensed to engage under Title XIII, Subtitle 2, Chapter 533C, Article 2 or 3. *Iowa Code § 533C.401(5).*
5. Hold in trust for the benefit of PAYNEARME all money, net of fees, received from money transmission. *Iowa Code § 533C.401(5).*
6. Consent to examination by the Superintendent of Banking for the State of Iowa at any time, without notice, if the Superintendent of Banking for the State of Iowa has reason to believe that the Franchisee is engaging in an unsafe or unsound practice or has violated or is violating Title XIII, Subtitle 2, Chapter 533C or a rule adopted or an order issued under same. *Iowa Code § 533C.501(2).*
7. File all reports required by federal currency reporting, recordkeeping, and suspicious activity reporting requirements as set forth in *31 U.S.C. § 5311–5330, and 31 C.F.R. § 103.11–103.170. Iowa Code § 533C.506.*

**KENTUCKY**

1. Consent to examination or investigation by the Executive Director of the Kentucky Department of Financial Institutions, whether or not prior notice is given to Franchisee, of the books, records, and business operations of Franchisee. *KRS § 286.11-027(4).*
2. File with the Executive Director of the Kentucky Department of Financial Institutions all reports by federal currency reporting, recordkeeping, and suspicious transaction reporting requirements as set forth in the Bank Secrecy Act, 31 U.S.C. secs. 5311 to 5332, 31 C.F.R. pt. 103, and other federal and state laws pertaining to money laundering, for every transaction in this state and maintain a copy of such reports in compliance with KRS 286.11-029. *KRS § 286.11-031(1).*
3. Operate in full compliance with Title XXV, Chapter 286, Subtitle 11 of the Kentucky Code, rules promulgated thereunder, and any order issued by the Executive Director of the Kentucky Department of Financial Institutions pursuant to same. *KRS § 286.11-035(2).*
4. Not authorize sub-Franchisees. *KRS § 286.11-035(3).*
5. Remit all money legally due to PAYNEARME in accordance with the terms of the written contract between PAYNEARME and Franchisee. *KRS § 286.11-035(4) and KRS § 286.11-037(3).*
6. Be subject to regulation by the Executive Director of the Kentucky Department of Financial Institutions. *KRS § 286.11-035(5).*
7. Not make any fraudulent statements or misrepresentations to PAYNEARME or to the Executive Director of the Kentucky Department of Financial Institutions. *KRS § 286.11-037(1).*
8. Conduct all money transmissions, or sale, or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *KRS § 286.11-037(2).*
9. Act only as authorized under the contract with PAYNEARME *KRS § 286.11-037(4).*
10. Ensure all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by Franchisee until such time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *KRS § 286.11-037(5).*
11. Report to PAYNEARME the theft, forgery, or loss of payment instruments within twenty-four (24) hours from the time Franchisee knew of the theft, forgery, or loss. *KRS § 286.11-037(6).*

**LOUISIANA**

1. Hold in trust from the moment of receipt the proceeds of a sale or delivery of PAYNEARME checks or money collected for transmittal. *La. R.S. 6:1048.*
2. Not commingle the proceeds of a sale or delivery of PAYNEARME checks or money collected for transmittal with customer's own property or funds, except to use the funds in the ordinary course of its business for the purpose of making change. *La. R.S. 6:1048.*

**MAINE**

1. Not authorize sub-delegates without the written consent of the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. *32 M.R.S. § 6117(2).*
2. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. *32 M.R.S. § 6118(1).*
3. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *32 M.R.S. § 6118(2).*
4. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and the Franchisee as failure to do so may result in liability of Franchisee to PAYNEARME for three times PAYNEARME actual damages. *32 M.R.S. § 6118(3).*
5. Consent to inspection by the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation, with or without prior notice, of the books and records of Franchisee when the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation has a reasonable basis to believe that Franchisee is in noncompliance with this Title 2, Chapter 80, Subchapter 1 of the Maine Code. *32 M.R.S. § 6118(4).*
6. Act only as authorized under the contract with PAYNEARME and Franchisee as failure to do so may result in cancelation of such contract and further disciplinary action by the Superintendent of Consumer Credit Protection within the Department of Professional and Financial Regulation. *32 M.R.S. § 6118(5).*
7. Ensure that all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by

Franchisee until the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *32 M.R.S. § 6118(6)*.
8. Report to PAYNEARME the theft or loss of payment instruments within 24 hours from the time PAYNEARME knew or should have known of the theft or loss. *32 M.R.S. § 6118(7)*.

**MARYLAND**

1. Display prominently at each location open to the public a notice in at least 48-point type that states the following:
"The Commissioner of Financial Regulation for the State of Maryland will accept all questions or complaints regarding authorized delegate of PAYNEARME at [insert address of Commissioner], phone [insert toll-free phone number of the Commissioner]." *Md. Financial Institutions Code Ann. § 12-410(E)(2)*.
2. Not authorize sub-agents or sub-delegates without written consent of the Commissioner of Financial Regulation for the State of Maryland. *Md. Financial Institutions Code Ann. § 12-413(2)*.
3. Be subject to supervision, examination, and regulation by the Commissioner of Financial Regulation for the State of Maryland. *Md. Financial Institutions Code Ann. § 12-413(3)*.
4. Operate in full compliance with the policies and procedures provided to Franchisee by PAYNEARME. *Md. Financial Institutions Code Ann. § 12-413(c)*.
5. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Commissioner of Financial Regulation for the State of Maryland. *Md. Financial Institutions Code Ann. § 12-414(a)*.
6. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME operating procedures provided to Franchisee. *Md. Financial Institutions Code Ann. § 12-414(b)*.
7. Remit all funds owed to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee, but not later than 48 hours after the next regular business day after Franchisee receives the proceeds from a money transmission. *Md. Financial Institutions Code Ann. § 12-414(c) and §12-418(b)*.
8. Ensure that all funds received by Franchisee from the sale of a payment instrument, less fees, shall constitute trust funds belonging to PAYNEARME from the time the funds are received by Franchisee until the time when the funds are remitted to PAYNEARME *Md. Financial Institutions Code Ann. § 12-414(d)(1)*.
9. Report to PAYNEARME the theft or loss of a payment instrument within 24 hours after the theft or loss. *Md. Financial Institutions Code Ann. § 12-414(e)*.

**MICHIGAN**

1. Operate in compliance with the Michigan Money Transmission Services Act and any policies and procedures provided by PAYNEARME to Franchisee with respect to same. *MCL § 487.1033(1)*.
2. Remit all money owing to PAYNEARME in accordance with the terms of the agreement between PAYNEARME and Franchisee. *MCL § 487. 1033(2)*.
3. Upon receipt of notice from PAYNEARME or Commissioner of the Michigan Office of Financial and Insurance Services that PAYNEARME money transmitter license has been suspended or revoked, immediately cease providing money transmission services as an authorized delegate of PAYNEARME *MCL § 487.1033(3)*.
4. Not provide money transmission services outside the scope of activity permissible under the agreement between Franchisee and PAYNEARME except activity in which Franchisee is otherwise authorized to engage. *MCL § 487.1033(4)*.
5. Hold all money received from providing money transmission services, reduced by any fees owed to Franchisee by PAYNEARME in escrow for the benefit of PAYNEARME *MCL § 487.1033(4)*.
6. Not make an fraudulent or false statement or misrepresentation to a consumer or PAYNEARME or to the Commissioner of the Michigan Office of Financial and Insurance. *MCL § 487. 1034(1)*.
7. Perform money transmission services lawfully and in accordance with PAYNEARME operating policies and procedures provided to Franchisee. *MCL § 487.1034(2)*.
8. Hold all funds received by Franchisee from the sale of a payment instrument, less fees, in trust for PAYNEARME from the time the funds are received by Franchisee until the time the funds are remitted to PAYNEARME *MCL § 487.1034(3)*.
9. Report to PAYNEARME the theft or loss of a payment instrument within 24 hours after the theft or loss. *MCL § 487.1034(5)*.
10. Delegates must operate in accordance with 487.1042 Violations; penalties; restitution. Sec. 42. (1) A person that intentionally makes a false statement, misrepresentation, or false certification in any record or document filed or required to be maintained under this act or that intentionally makes a false entry or omits a material entry in a record is guilty of a felony punishable by imprisonment for not more than 5 years or a fine of not more than $100,000.00, or both. (2) A person that engages in criminal fraud in the conduct of its money transmission services business is guilty of a felony punishable by imprisonment for not more than 5 years or a fine of not more than $100,000.00, or both. (3) A person that knowingly engages in an activity for which a license is required under this act and is not licensed under this act is guilty ot a felony punishable by imprisonment for not more than 5 years or a fine of not more than $100,000.00, or both. A court shall order a person convicted of violating subsection (1) or (2) to pay restitution as provided in section 1a of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1a, and the crime victim's rights act, 1985 PA 87, MCL 780.751 to 780.834.

**MINNESOTA**

1. Not authorize sub-delegates without the written consent of the Minnesota Commissioner of Commerce. *Minn. Stat. § 53B.20(2)*.
2. Acknowledge that PAYNEARME is subject to supervision and regulation by the Minnesota Commissioner of Commerce and that as a part of that supervision and regulation, the Minnesota Commissioner of Commerce may require PAYNEARME to cancel its contract with Franchisee. *Minn. Stat. § 53B.20(3)*.
3. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Minnesota Commissioner of Commerce. *Minn. Stat. § 53B.219(a)*.
4. Conduct its money transmission activities in a safe and sound manner. *Minn. Stat. § 53B.21(b)*.
5. Cooperate with an investigation conducted by the Minnesota Commissioner of Commerce under Chapter 538.20 of the Minnesota

Banking Code by providing any relevant information in its possession that the Minnesota Commissioner of Commerce cannot reasonably obtain from another source. *Minn. Stat. § 53B.21(c).*

6. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract. *Minn. Stat. § 53B.21(d).*

7. Ensure that all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, constitute trust funds owned by and belonging to PAYNEARME from the time the funds are received by Franchisee until the time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME *Minn. Stat. § 53B.21(e).*

**MISSISSIPPI**

1. Display prominently on the Franchisee's premises, where same may be readily viewed by prospective clients or purchasers, a printed certificate signed by an authorized official of PAYNEARME setting forth in bold letters the names of PAYNEARME and Franchisee and stating that PAYNEARME holds a valid and existing license issued by the Commissioner of Banking and Consumer Finance of the State of Mississippi under Title 75, Chapter 15 of the Mississippi Sale of Checks Law and that Franchisee is a duly authorized Franchisee of PAYNEARME *Miss. Code Ann. § 75-15-17.*

2. Not appoint a sub-agent to conduct money transmission *Miss. Code Ann. § 75-15-17.*

3. At the point Franchisee ceases to be an agent of a PAYNEARME immediately cease displaying its Franchisee's appointment certificate and immediately surrender same to PAYNEARME *Miss. Code Ann. § 75-15-23.*

4. Ensure that any check which includes stored value cards, sold by Franchisee on behalf of PAYNEARME shall bear the name of PAYNEARME *Miss. Code Ann. § 75-15-23.*

5. Not directly or indirectly conduct its own money transmission business and shall not be, continue to be, or become an officer, director, stockholder, employee, or agent of any other PAYNEARME licensed under the Mississippi Money Transmitters Act. *Miss. Code Ann. § 75-15-23.*

**MISSOURI**

1. Upon demand, transfer and deliver to PAYNEARME the proceeds of the sale of PAYNEARME checks less the fees, if any, due Franchisee. *§ 361.720 R.S.Mo.*

**NEBRASKA**

1. Ensure that every check sold by Franchisee, on behalf of PAYNEARME bears the name of PAYNEARME clearly imprinted thereon. *R.R.S. Neb. § 8-1011.*

**NEVADA**

1. Consent to examination by the Nevada Commissioner of Financial Institutions. *Nev. Rev. Stat. Ann. § 671.120(2).*

2. Remit to PAYNEARME or deposit with a bank or credit union authorized to do business in Nevada for credit to an account of PAYNEARME all money or credits received by Franchisee from the sale and issuance of checks or for the purpose of transmission, no later than the third business day following the receipt of such money and/or credits. *Nev. Rev. Stat. Ann. § 671.150(1).*

3. Not commingle money received from the sale or issuance of checks or for the purpose of transmission with the other assets of PAYNEARME or Franchisee. *Nev. Rev. Stat. Ann. § 671.150(2).*

**NEW HAMPSHIRE**

1. Conspicuously post an authorized delegate registration notice, issued by the New Hampshire Banking Department for each location where the business of money transmission is to be conducted other than PAYNEARME principal place of business, at each of Franchisee's offices within *New Hampshire. RSA 399-G:9.*

2. Consent to examination by the New Hampshire banking department. *RSA 399-G:13(II).*

3. Comply with PAYNEARME requirements pertaining to education, training, monitoring, and periodic inspection designed to inform Franchisee of its responsibilities, consistent with the Bank Secrecy Act and the requirements to file reports required by federal law. *RSA 399-G:13(II-a).*

**NEW JERSEY**

1. Pay for the costs of examination or investigation by New Jersey Commissioner of Banking and Insurance of Franchisee's operations unless stated otherwise in the Appointment Agreement. *N.J. Stat. § 17:15C-11(c).*

2. Provide any reports required by the New Jersey Commissioner of Banking and Insurance, under penalty of perjury or otherwise, concerning Franchisee's business conducted pursuant to the license issued to PAYNEARME under the New Jersey Money Transmitters Act. *N.J. Stat. § 17:15C-12.*

3. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the New Jersey Commissioner of Banking and Insurance. *N.J. Stat. § 17:15C-18(a).*

4. Conduct all money transmission or sale or issuance of Payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *N.J. Stat. § 17:15C-1(b).*

5. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee as failure to remit within the time presented shall result in liability of Franchisee to PAYNEARME for three times PAYNEARME actual damages. *N.J. Stat. § 17:15C-18(c).*

6. Consent to inspection by New Jersey Commissioner of Banking and Insurance, with or without prior notice to Franchisee, of the books and records of Franchisee whenever the New Jersey Commissioner of Banking and Insurance has a reasonable basis to believe that the Franchisee is not in compliance with the New Jersey Money Transmitters Act. *N.J. Stat. § 17:15C-18(d).*

7. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract and further disciplinary action by the New Jersey Commissioner of Banking and Insurance. *N.J. Stat. § 17:15C-18(e).*

8. Ensure that all funds, less fees, received b Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by Franchisee until that time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *N.J. Stat. § 17:15C-18(f)*.
9. Report to PAYNEARME the theft or loss of payment instruments within 24 hours from the time Franchisee knew or should have known of that theft or loss. *N.J. Stat. § 17:15C-18(g)*.
10. Comply with the provisions of 31 C.F.R. s.103.11 et seq. and P.L.1994, c.121 (C.2C:21-23 et seq.). *N.J. Stat. § 17:15C-18(h)*.
11. Conduct all business governed by the New Jersey Money Transmitters Act in the name of PAYNEARME *N.J. Stat. § 17:15C-18(i)*.

**NEW YORK**

1. PAYNEARME is licensed by the Superintendent of the New York State Department of Financial Services to engage in the business of receiving money for transmission and transmitting the same pursuant to the provisions of Article XIII-B of the Banking Law. *3 NYCRR §406.5(a)(1)*.
2. PAYNEARME will conduct such business through Franchisee and Franchisee may only engage in the category or categories of money transmission activity that PAYNEARME is authorized to lawfully engage in under its license. *3 NYCRR §406.5(a)(1)*.
3. Acknowledge that the use of subagents is prohibited under New York Banking Law § 648-a and agrees that Franchisee may not designate or authorize any person or entity to provide the services or perform Franchisee's obligations under this Agreement. *NY CLS Bank § 648-a*.
4. Report the sale of any New York instruments issued by PAYNEARME to PAYNEARME and remit the face amount of such instruments to PAYNEARME within such period of time as PAYNEARME requires within the normal course of its business or as the Superintendent of the New York State Department of Financial Services, by rule or regulation, may prescribe. *NY CLS Bank § 651-a*.
5. Make and keep such accounts, correspondence, memoranda, papers, books and other records as the Superintendent of the New York State Department of Financial Services by regulation or order requires and preserve same for the time specified by the regulation or order of the Superintendent of the New York State Department of Financial Services. *NY CLS Bank § 651-b*.
6. Franchisee is prohibited from acting on behalf of the consumer as a courier for the transmission of money which activity requires licensing as a money transmitter. *3 NYCRR § 406.5(a)(2)*.
7. Acknowledge that the Superintendent of the New York State Department of Financial Services reserves the right to inspect, with or without prior notice to PAYNEARME or Franchisee, the books and records of Franchisee and that the expenses incurred in any such inspection shall be borne by PAYNEARME. *NYCRR § 406.5(3)*.
8. Franchisee shall not sell any money transmission instrument in New York unless the name of PAYNEARME clearly appears on the face of the instrument and PAYNEARME shall not condition its engagement as obligor under the payment instrument upon remittance of the proceeds of sale from Franchisee. *3 NYCRR § 406.5(a)(4)*.
9. Franchisee shall not sell any money transmission instrument in New York, unless Franchisee has provided the Superintendent of the New York State Department of Financial Services with a written and irrevocable consent to examine, have access to, and retain copies of all of its books and records, wherever maintained, relating to these activities. *3 NYCRR § 406.5(5)*.
10. Franchisee is under a duty to act only as authorized under the agency contract and any Franchisee who exceeds its authority is subject to cancellation of such agency contract and may result in further disciplinary action against PAYNEARME by the Superintendent of the New York State Department of Financial Services. *3 NYCRR § 406.5(6)*.
11. PAYNEARME and Franchisee shall not advertise its money transmission services without including the name of PAYNEARME and the legend that PAYNEARME is "Licensed as a Money Transmitter by the New York State Department of Financial Services". *3 NYCRR § 406.6(a)*.
12. PAYNEARME and Franchisee shall maintain a complete file of its advertisements (including commercial scripts of all radio and television broadcasts) for examination by the Superintendent of the New York State Department of Financial Services for a period of at least two years from the date of publication. *3 NYCRR § 406.6(c)*.
13. PAYNEARME and Franchisee shall make, keep and preserve its books and records in such form, in such manner and for such time as is in accordance with generally accepted accounting principles and in a condition which will allow the Superintendent of the New York State Department of Financial Services to determine whether PAYNEARME and Franchisee are complying with Article XIII-B of the Banking Law. Preservation by photographic reproduction or in photographic form shall constitute compliance with this requirement. *3 NYCRR § 406.9(a)*.
14. The books and records maintained by PAYNEARME and Franchisee shall include the following: (1) a daily record of instruments sold by date; (2) a general ledger containing all asset, liability, capital, income and expense accounts which general ledger shall be posted at least monthly; (3) remittance reports received from Franchisee; (4) bank statements and bank reconciliation records which shall be kept for three years; (5) outstanding money transmission instruments by year of sale which shall be maintained for at least five years after the time which such instruments have been deemed, under the New York Abandoned Property Law, to be abandoned property; (6) each money transmission instrument paid for a period of three years after the date of payment; (7) a list of the names and addresses of each Franchisee who sells or issues PAYNEARME money transmission instruments and copies of agency agreements thereunder. *3 NYCRR § 406.9(b)(1)-(7)*.
15. PAYNEARME and Franchisee shall comply with federal Bank Secrecy Act regulations as set forth in 31 CFR Part 103.28. *3 NYCRR § 406.9(d)*.

**NORTH CAROLINA**

1. Consent to an on-site examination by the Commissioner of Banks of the State of North Carolina of Franchisee's operations, without prior notice, and agree to pay all reasonably incurred costs of the examination. *N.C. Gen. Stat. § 53-208.15(b)*.
2. Not authorize sub-delegates without the written consent of the Commissioner of Banks of the State of North Carolina. *N.C. Gen. Stat. § 53-208.19(2)*.
3. Post a certificate in public view at each location and that states the following: "Money transmission on behalf of PAYNEARME Corporation

is conducted at this location pursuant to the Money Transmitters Act." *N.C. Gen. Stat. § 53-208.19(4)*.

4. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Commissioner of Banks of the State of North Carolina. *N.C. Gen. Stat. § 53-208.2(a)*.

5. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *N.C. Gen. Stat. § 53-208.20(b)*.

6. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee as failure to remit all money owing to PAYNEARME within the time presented shall result in liability of Franchisee to PAYNEARME for three times PAYNEARME actual damages. *N.C. Gen. Stat. § 53-208.2(c)*.

7. Consent to inspection by the Commissioner of Banks of the State of North Carolina, with or without prior notice, of the books and records of Franchisee when the Commissioner of Banks of the State of North Carolina has a reasonable basis to believe that Franchisee is not in compliance with Chapter 53, Article 16A of the North Carolina Code. *N.C. Gen. Stat. § 53-208.20(d)*.

8. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract and further disciplinary action by the Commissioner of Banks of the State of North Carolina. *N.C. Gen. Stat. § 53-208.20(e)*.

9. Ensure that all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument or stored value issued by PAYNEARME or received by Franchisee for transmission constitutes, trust funds owned by and belonging to PAYNEARME from the time the funds are received by Franchisee until the time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME *N.C. Gen. Stat. § 53- 208.20(f)*.

10. Report to PAYNEARME the theft or loss of payment instruments within 24 hours from the time it knew or should have known of the theft or loss. *N.C. Gen. Stat. § 53-208.20(g)*.

11. Prominently post the certificate of authority specified in N.C. Gen. Stat. § 53-208.19 at each location at which it conducts licensed activities in North Carolina. *N.C. Gen. Stat. § 53-208.20(h)*.

12. Maintain at its office a record of the disposition of all checks received from PAYNEARME. The record shall contain an accounting of all proceeds from those checks paid to PAYNEARME and all proceeds due to PAYNEARME *4 N.C.A.C. 3F.0601(b)*.

**NORTH DAKOTA**

1. Consent to an on-site examination by the Commissioner of the North Dakota Department of Financial Institutions without prior notice to Franchisee in the event that Commissioner of the North Dakota Department of Financial Institutions has a reasonable basis to believe that Franchisee is in noncompliance with Title 13, Chapter 13-09 of the North Dakota Century Code. *N.D. Cent. Code, § 13-09-13(2)*.

2. Pay all reasonably incurred costs of an on-site examination by the Commissioner of the North Dakota Department of Financial Institutions. *N.D. Cent. Code, § 13-09-13(2)*.

3. Not authorize sub-delegates without the written consent of the Commissioner of the North Dakota Department of Financial Institutions. *N.D. Cent. Code, § 13-09-15(2)*.

4. Not make a fraudulent or false statement or misrepresentation to PAYNEARME or to the Commissioner of the North Dakota Department of Financial Institutions. *N.D. Cent. Code, § 13-09-16(1)*.

5. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *N.D. Cent. Code, § 13-09-16(2)*.

6. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *N.D. Cent. Code, § 13-09-16(3)*.

7. Consent to inspection by the Commissioner of the North Dakota Department of Financial Institutions, with or without prior notice to Franchisee. *N.D. Cent. Code, § 13-09-16(4)*.

8. Act only as authorized under the contract with PAYNEARME and Title 13, Chapter 13-09 of the North Dakota Code as failure to do so may result in cancellation of such contract and further disciplinary action by the Commissioner of the North Dakota Department of Financial Institutions. *N.D. Cent. Code, § 13-09-16(5)*.

9. Ensure all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time such funds are received by Franchisee until such time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *N.D. Cent. Code, § 13-09-16(6)*.

**OHIO**

1. Not perform accounting, verification, or reconciliation of transmissions completed or bank statements for PAYNEARME *ORC Ann. 1315.02(B)*.

2. Satisfy its duties and responsibilities, as described in this Agreement, regarding money or its equivalent received from persons located in Ohio for transmission by PAYNEARME *ORC Ann. 1315.11(1)*.

3. Satisfy its duties and responsibilities, as described in this Agreement, regarding instruments, devices, or processes used by PAYNEARME to transmit money. *ORC Ann. 1315.11(2)*.

4. Satisfy its duties and responsibilities, as described in this Agreement, with regard to compliance with laws regulating money transmission activities. *ORC Ann. 1315.11(3)*.

5. Keep separate money or its equivalent received for transmission by PAYNEARME and not commingle same with other money or receipts. *ORC Ann. 1315.11(D)(1)*.

6. Ensure that all money or its equivalent, less fees, that is received by Franchisee for transmission by PAYNEARME from the time received until remitted to PAYNEARME constitutes funds owned by and belonging to PAYNEARME and is impressed with a trust for the benefit of the person from which the money or its equivalent is received. *ORC Ann. 1315.11(D)(1)*.

**OKLAHOMA**

1. Prominently display at each location of Franchisee a license certificate issued by the Oklahoma State Bank Commissioner. *6 Okl. St. § 2107(B)*.

2. Ensure that all funds collected or received from the sale of checks by Franchisee are impressed with a trust in favor of PAYNEARME in an amount equal to the amount of the proceeds due PAYNEARME and are not commingled with other funds of Franchisee. *6 Okl. St. § 2123(a)*.

3. Acknowledge that no proceeds received by Franchisee from the sale of any check issued by PAYNEARME while held by Franchisee, nor any property impressed with a trust pursuant to Title 6, Chapter 6, Section 2123 of the Oklahoma Code 15 subject to attachment, levy of execution, or sequestration by order of any court, except for the benefit of PAYNEARME *6 Okl. St. § 2123(b).*
4. Operate in full compliance with the Oklahoma Sales of Checks Act and any policies and procedures provided by PAYNEARME with respect to same. *Okla. Admin. Code 85:15-5-1(b).*
5. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *Okla. Admin. Code 85:15-5-1 (c).*
6. Upon notice that PAYNEARME license has been revoked and/or suspended cease to provide money transmission services as a delegate of PAYNEARME *Okla. Admin. Code 85:15-5-1(d).*
7. Not provide money transmission services outside the scope of activity permissible under the contract between Franchisee and PAYNEARME *Okla. Admin. Code 85:15-5-1(e).*
8. Hold in trust for the benefit of PAYNEARME all money, net of fees, received from money transmission. *Okla. Admin. Code 85:15-5-1(e).*
9. Not use a sub-delegate to conduct money transmission services on behalf of PAYNEARME *Okla. Admin. Code 85:15-5-1(f).*

**OREGON**

1. Consent to an on-site examination by the Oregon Director of the Department of Consumer and Business Services of the principal place of business of Franchisee, without prior notice to Franchisee, if the Oregon Director of the Department of Consumer and Business Services has a reasonable basis to believe that Franchisee is in violation of any provision of ORS 717.200 to 717.320, 717.900 and 717.905. *ORS § 717.255(2).*
2. Operate pursuant to an express written contract between Franchisee and PAYNEARME *ORS § 717.270.*
3. Not authorize sub-delegates without the written consent of the Director of the Department of Consumer and Business Services. *ORS § 717.270(2).*
4. Be subject to supervision and regulation by the Oregon Director of the Department of Consumer and Business Services. *ORS § 717.270(3).*
5. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Director of the Department of Consumer and Business Services. *ORS § 717.275(1).*
6. Conduct all money transmission activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *ORS § 717.275(2).*
7. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee as failure to remit within the time prescribed shall result in liability of Franchisee to PAYNEARME for three times PAYNEARME actual damages. *ORS § 717.275(3).*
8. Consent to the inspection by Oregon Director of the Department of Consumer and Business Services, with or without prior notice to Franchisee, of the books and records of Franchisee when the Oregon Director of the Department of Consumer and Business Services has a reasonable basis to believe that Franchisee is not in compliance with ORS §§ 717.200 to 717.320, 717.900 and 717.905. *ORS § 717.275(4).*
9. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract and further disciplinary action by the Oregon Director of the Department of Consumer and Business Services. *ORS § 717.275(5).*
10. Ensure all funds, not including fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, shall constitute trust funds owned by and belonging to PAYNEARME during the period beginning when the funds are received by Franchisee and ending when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME *ORS § 717.275(6).*
11. Report to PAYNEARME the theft or loss of payment instruments within 24 hours from the time Franchisee first knows of the theft or loss. *ORS § 717.275(6).*

**PENNSYLVANIA**

1. Ensure that every transmittal instrument sold by Franchisee bears the name of PAYNEARME clearly imprinted thereon. *7 P.S. § 6111(b).*
2. Clearly indicate the name of PAYNEARME in a sign publicly displayed in the Franchisee's place of business issuing and selling transmittal instruments. *10 Pa. Code § 19.6(b).*
3. In accordance with Section 12(c) of the Pennsylvania Money Transmitter Act, Franchisee acknowledges the following:
    a) Franchisee is acting as an agent on behalf of PayNearMe for the purpose of conducting money transmission.
    b) In conducting money transmission services on behalf of PayNearMe, Franchisee and PayNearMe, in accordance with the terms set forth in the Agreement, assume complete financial responsibility for consumer funds upon receipt at retail location.
    c) Receipt of funds by Franchisee is deemed receipt of funds by PayNearMe and there is no subsequent risk of loss to the consumer.
    d) Franchisee shall not knowingly attempt to exceed the scope of the limited appointment set forth in the Agreement.
    e) Franchisee will comply with all agent signage requirements to ensure consumers are aware of the agency relationship between the parties.

**RHODE ISLAND**

1. Consent to investigation by Director of the Rhode Island Department of Business Regulation or its designee(s), at any time, of the Franchisee's business, books, accounts, records and files used therein. *R.I. Gen. Laws § 19-14-23(a).*
2. Ensure that every check or electronic money transfer sold by Franchisee on behalf of PAYNEARME bears the name of PAYNEARME clearly imprinted on it. *R.I. Gen. Laws § 19-14.3-3*

**SOUTH DAKOTA**

1. Consent to an on-site examination by the Director of the South Dakota Division of Banking, without prior notice, if the Director of the South Dakota Division of Banking has a reasonable basis to believe that Franchisee is in not in compliance with Title 51A, Chapter 51A-17-28. *S.D. Codified Laws § 51A-17-28.*

2. Consent to pay all reasonably incurred costs of an on-site examination by the Director of the South Dakota Division of Banking. *S.D. Codified Laws § 51A-17-28.*
3. Not authorize sub-delegates without the written consent of the Director of the South Dakota Division of Banking. *S.D. Codified Laws § 51A-17-31(2).*
4. Be subject to supervision and regulation by the Director of the South Dakota Division of Banking. *S.D. Codified Laws § 51A-17-31(3).*
5. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Director of the South Dakota Division of Banking. *S.D. Codified Laws § 51A-17-32(1).*
6. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *S.D. Codified Laws § 51A-17-32(2).*
7. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee as failure to remit all money owing to PAYNEARME within the contractual time period shall result in liability of Franchisee to PAYNEARME for three times actual damages. *S.D. Codified Laws § 51A-17-32(3).*
8. Consent to inspection by the Director of the South Dakota Division of Banking, with or without prior notice, of the books and records of Franchisee if the Director of the South Dakota Division of Banking has a reasonable basis to believe that Franchisee is not in compliance with Title 51A, Chapter 51A-17-28. *S.D. Codified Laws § 51A-17-32(4).*
9. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract and further disciplinary action by the Director of the South Dakota Division of Banking. *S.D. Codified Laws § 51A-17-32(5).*
10. Ensure any funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time such funds are received by Franchisee until such time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME constitute trust funds owned by and belonging to PAYNEARME *S.D. Codified Laws § 51A-17-33.*
11. Report to PAYNEARME the theft or loss of payment instruments and stored value within twenty-four hours from the time Franchisee knew or should have known of such theft or loss. *S.D. Codified Laws § 51A-17-34.*

**TENNESSEE**

1. Report to PAYNEARME the theft or loss of payment instruments valued at five thousand dollars ($5,000) or more within twenty-four (24) hours from the time Franchisee knew or should have known of the theft or loss. *Tenn. Code Ann. § 45-7-212(b).*
2. Consent to on-site examinations by the Tennessee Commissioner of Financial Institutions or the Tennessee Commissioner of Financial Institutions staff of all the books, papers and records of Franchisee. *Tenn. Code Ann. § 45-7-214(a).*
3. Not authorize sub-agents without the written consent of the Tennessee Commissioner of Financial Institutions. *Tenn. Code Ann. § 45-7-218(2).*
4. Be subject to supervision and regulation by the Tennessee Commissioner of Financial Institutions. *Tenn. Code Ann. § 45-7-218(3).*
5. Consent to inspection by the Tennessee Commissioner of Financial Institutions, with or without prior notice to Franchisee, of the books and records of Franchisee. *Tenn. Code Ann. § 45-7-218(4).*
6. Act only as authorized under the contract with PAYNEARME as failure to do so may result in cancellation of such contract by PAYNEARME and further disciplinary action by the Tennessee Commissioner of Financial Institutions. *Tenn. Code Ann. § 45-7-218(5).*
7. Not make any fraudulent or false statement or misrepresentation to or to the Tennessee Commissioner of Financial Institutions. *Tenn. Code Ann. § 45-7-219(a).*
8. Conduct all money transmission or sale or issuance of payment instrument activities strictly in accordance with PAYNEARME written procedures provided to Franchisee. *Tenn. Code Ann. § 45-7-219(b).*
9. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee as failure to remit all money owing to PAYNEARME within the contractual time period shall result in liability of Franchisee to PAYNEARME for three times PAYNEARME actual damages. *Tenn. Code Ann. § 45-7-219(c).*
10. Ensure all funds, less fees, received by Franchisee from the sale or delivery of a payment instrument issued by PAYNEARME or received by Franchisee for transmission, from the time the funds are received by Franchisee until the time when the funds or an equivalent amount are remitted by Franchisee to PAYNEARME, constitute trust funds owned by and belonging to PAYNEARME *Tenn. Code Ann. § 45-7-219(d).*

**TEXAS**

1. Consent to the jurisdiction of the courts of Texas for all actions arising under Title 3, Subtitle E, Chapter 151 of the Texas Finance Code. *Tex. Finance Code § 151.106.*
2. Comply with the policies and procedures in place by PAYNEARME to ensure that Franchisee is in compliance with applicable federal and state law. *Tex. Finance Code § 151.402(b)(1).*
3. Consent to a reasonable risk-based background investigation by PAYNEARME to determine whether Franchisee has complied with applicable state and federal law. *Tex. Finance Code § 151.402(b)(3).*
4. Certify that it is familiar with and agrees to fully comply with all applicable state and federal laws, rules, and regulations pertaining to money transmission, including Title 3, Subtitle E, Chapter 151 of the Texas Finance Code and rules adopted thereunder, relevant provisions of the Bank Secrecy Act and the USA PATRIOT ACT, and Title 3, Subtitle Z, Chapter 271 of the Texas Finance Code. *Tex. Finance Code § 151.402(c)(3).*
5. Remit and handle money and monetary value in accordance with Title 3, Subtitle E, Chapter 151, Sections 151.403(b) and (c) of the Texas Finance Code. *Tex. Finance Code § 151.402(c)(4).*
6. Impose a trust on money and monetary value received in accordance with Title 3, Subtitle E, Chapter 151, Section 151.404 of the Texas Finance Code. *Tex. Finance Code § 151.402(c)(5).*
7. Prepare and maintain records as required by Title 3, Subtitle E, Chapter 151 or a rule adopted thereunder, including but not limited to 7 TACT 33.35, or as reasonably requested by the Banking Commissioner of Texas. *Tex. Finance Code § 151.402(c)(6).*
8. Consent to examination or investigation by the Banking Commissioner of Texas. *Tex. Finance Code § 151.402(c)(7).*
9. Acknowledge that PAYNEARME is subject to regulation by the Banking Commissioner of Texas and that, as part of that regulation, the Banking Commissioner of Texas may suspend or revoke an authorized

delegate designation or require PAYNEARME to terminate an authorized delegate designation. *Tex. Finance Code § 151.402(c)(8).*
10. Acknowledge receipt of the written policies and procedures required under Title 3, Subtitle E, Chapter 151, Section 151.402(b)(1). *Tex. Finance Code § 151.402(c)(9).*
11. Acknowledge that Franchisee has been provided the following regulatory website addresses through which Franchisee can access Title 3, Subtitle E, Chapter 151 and rules adopted thereunder and the Bank Secrecy Act, the USA PATRIOT ACT, and Title 3, Subtitle Z, Chapter 271: http://www.dob.texas.gov/money-services-businesses, http://www.fincen.gov/statutes_regs/bsa/, http://www.fincen.gov/statutes_regs/patriot/, and http://policy.ctspublish.com/txdob/lpext.dll/Infobase/division00060/sd100061.htm?fn=frame_default.htm&f=templates. *Tex. Finance Code § 151.402(c)(10).*
12. Assist PAYNEARME in reporting to the Banking Commissioner of Texas the theft or loss of payment instruments or stored value from the Franchisee in Texas if the total value of the instruments or stored value exceeds $10,000. *Tex. Finance Code § 151.402(d).*
13. Act only as authorized under the contract with PAYNEARME and in strict compliance with PAYNEARME written policies and procedures. *Tex. Finance Code § 151.403(a)(1).*
14. Not commit fraud or misrepresentation or make any fraudulent or false statement or misrepresentation to PAYNEARME or the Banking Commissioner of Texas. *Tex. Finance Code § 151.403(a)(2).*
15. Cooperate with an investigation or examination conducted by the Banking Commissioner of Texas and consent to the Banking Commissioner of Texas's examination of Franchisee's books and records. *Tex. Finance Code § 151.403(a)(3).*
16. Not commit an unsafe or unsound act or practice or conduct business in an unsafe and unsound manner. *Tex. Finance Code § 151.403(a)(4).*
17. Immediately upon discovery, report to PAYNEARME the theft or loss of payment instruments or stored value. *Tex. Finance Code § 151. 403 (a)(5).*
18. Display on the form prescribed by the Banking Commissioner of Texas a notice that indicates that Franchisee is an authorized delegate of PAYNEARME. *Tex. Finance Code § 151.403(a)(6).*
19. Cease to provide money services as an authorized delegate of PAYNEARME or take other required action immediately on receipt of notice from the Banking Commissioner of Texas or as provided by Title 3, Subtitle Z, Chapter 151, Section 151.402(e). *Tex. Finance Code § 151.403(a)(7).*
20. Remit all money owed to PAYNEARME not later than the 10th business day after the date Franchisee receives the money, in accordance with the contract between PAYNEARME and Franchisee, or as directed by the Banking Commissioner of Texas. *Tex. Finance Code § 151.403(b)(1)(3).*
21. Remit all money owed to PAYNEARME later than the 10th business day after the date Franchisee receives the money only if Franchisee maintains on deposit with an office of a federally insured financial institution located in the United States an amount that (1) is in an account solely in the name of PAYNEARME and (2) for each day by which the period before the remittance exceeds 10 business days, is not less than the outstanding obligations of PAYNEARME routinely incurred by the Franchisee on a daily basis. *Tex. Finance Code § 151.403(c)(1)-(2).*
22. Hold in trust in favor of PAYNEARME all money received for transmission by or for PAYNEARME from the time of receipt until the time the money is remitted by the Franchisee to PAYNEARME. *Tex. Finance Code § 151.404(b).*
23. Not commingle the money received for transmission by or for PAYNEARME with the Franchisee's own money or other property, except to use in the ordinary course of the Franchisee's business for the purpose of making change, if the money is accounted for at the end of each business day. *Tex. Finance Code § 151404(c).*
24. In the event that the Banking Commissioner of Texas revokes PAYNEARME license under Section Title 3, Subtitle E, Chapter 151, Section 151.703, assign to the Banking Commissioner of Texas all money held in trust by Franchisee for the benefit of the persons to whom the related money transmission obligations are owed. *Tex. Finance Code § 151.404(e).*
25. Provide PAYNEARME name and mailing address or telephone number to the consumer in connection with each money transmission transaction conducted through Franchisee. *Tex. Finance Code § 151.405(a).*
26. Prepare, maintain, and preserve the records required by rule issued by the Banking Commissioner of Texas or reasonably requested by the Banking Commissioner of Texas. *Tex. Finance Code § 151.602(c).*
27. In the event that Franchisee receives an emergency order, submit written certification to the Banking Commissioner of Texas, signed by the Franchisee, and its principals and responsible individuals, as applicable, and each person named in the order, stating that each person has received a copy of and has read and understands the order. *Tex. Finance Code § 151.710(f).*
28. Issue a receipt for each transaction that contains: (i) the name of PAYNEARME and the business address or telephone number, (ii) the unique transaction or identification number, (iii) the date of the transaction; (iv) the amount of the transaction in United States dollars; and (v) the amount of any fee charged for the transaction. *7 TAC § 33.37(b)(2)(B)(i)-(v).*
29. Provide notice to consumers, in a method prescribed by PAYNEARME of how to file complaints concerning the money transmission business. *7 TAC § 33.516 (f).*

**VIRGINIA**

1. Consent to examination by the Virginia Commissioner of Financial Institutions of the books and records of Franchisee as often as it is deemed to be in the public interest. *Va. Code Ann. § 6.2-1910(A).*
2. Comply with the provisions of Title 6.2, Chapter 19 of the Virginia Code and all other applicable state and federal laws and regulations. *Va. Code Ann. § 6.2-1911(A)(i).*
3. Remit all sums owing to PAYNEARME in accordance with the terms of this Agreement. *Va. Code Ann. § 6.2-1911(A)(ii).*
4. Permit the Virginia Commissioner of Financial Institutions to investigate or examine its business pursuant to Va. Code Ann. § 6.21910(A). *Va. Code Ann. § 6.2-1911(A)(iii).*
5. Not use a sub-delegate, or otherwise designate or appoint another person to sell money orders or engage in the money transmission business on behalf of PAYNEARME *Va. Code Ann. § 6.2-1911(A)(iv).*

6. Ensure that every money order sold by Franchisee bears the name of PAYNEARME clearly imprinted thereon as it appears on PAYNEARME license. *Va. Code Ann. § 6.2-1912.*

**WASHINGTON**

1. Operate in full compliance with Title 19, Chapter 19.230 of the Washington Uniform Money Services Act and the rules adopted thereunder. *Rev. Code Wash. (ARCW) § 19.230.120(2).*
2. Not authorize sub-delegates. *Rev. Code Wash. (ARCW) § 19.230.120(3).*
3. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee.
4. Upon notice that PAYNEARME license has been suspended, revoked, and/or surrendered immediately cease to provide money services as a delegate of PAYNEARME *Rev. Code Wash. (ARCW) § 19.230.120(5).*
5. Not provide money services other than those allowed PAYNEARME under its license. *Rev. Code Wash. (ARCW) § 19.230.120(6).*
6. Not provide money services outside the scope of activity permissible under the contract between Franchisee and PAYNEARME except activity in which Franchisee is authorized to engage under RCW 19.230.030 or 19.230.080. *Rev. Code Wash. (ARCM) § 19.230.120(6).*
7. Consent to an investigation or examination by Washington Director of Financial Institutions of the business, books, accounts, records, papers, documents, files, and other information used in the business of Franchisee. *Rev. Code Wash. (ARCW) § 19.230.130(1).*
8. File with the appropriate federal agency all reports required by federal currency reporting, recordkeeping, and suspicious transaction reporting requirements as set forth in 31 U.S.C. Sec. 5311, 31 C.F.R. Sec. 103 (2000), and other federal and state laws pertaining to money laundering and maintain copies of such reports in its records in compliance with RCW 19.230.170. *Rev. Code Wash. (ARCM) § 19.230.180(1).*
9. Transmit the monetary equivalent of all money or equivalent value received from a consumer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the consumer within ten business days after receiving the money or equivalent value, unless otherwise ordered by the consumer or unless Franchisee has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money. *Rev. Code Wash. (ARCW) § 19.230.330(1).*
10. Provide a receipt to the consumer that clearly states the amount of money presented for transmission and the total of any fees charged by PAYNEARME If the rate of exchange for a money transmission to be paid in the currency of another country is fixed by PAYNEARME for that transaction at the time the money transmission is initiated, then the receipt provided to the consumer shall disclose the rate of exchange for that transaction, and the duration, if any, for the payment to be made at the fixed rate of exchange so specified. If the rate of exchange for a money transmission to be paid in the currency of another country is not fixed at the time the money transmission is sent, the receipt provided to the consumer shall disclose that the rate of exchange for that transaction will be set at the time the recipient of the money transmission picks up the funds in the foreign country. *Rev. Code Wash. (ARCW) § 19.230.330(2).*
11. Refund to the consumer all moneys received for transmittal within ten days of receipt of a written request for a refund unless any of the following occurs: (a) the moneys have been transmitted and delivered to the person designated by the consumer prior to receipt of the written request for a refund; (b) instructions have been given committing an equivalent amount of money to the person designated by the consumer prior to receipt of a written request for a refund; (c) Franchisee has reason to believe that a crime has occurred, is occurring, or may potentially occur as a result of transmitting the money as requested by the customer or refunding the money as requested by the customer, or (d) PAYNEARME is otherwise barred by law from making a refund. *Rev. Code Wash. (ARM § 19.230.330(3)(a)-(d).*

**WEST VIRGINIA**

1. Upon reasonable notice from Commissioner of Banking of West Virginia, consent to an on-site examination by the Commissioner of Banking of West Virginia of all books, records, papers, or other objects that the Commissioner of Banking of West Virginia determines are necessary for conducting a complete examination. *W. Va. Code § 32A-2-11(a).*
2. Upon reasonable notice from Commissioner of Banking of West Virginia, consent to an examination under oath of any person officer, director, or employee of Franchisee. *W. Va. Code § 32A-2-11(a).*
3. Consent to inspection by Commissioner of Banking of West Virginia, with or without prior notice, of the books and records of Franchisee when the Commissioner of Banking of West Virginia has a reasonable basis to believe Franchisee is not in compliance with Chapter 32A, Article 2, of the West Virginia Code. *W. Va. Code § 32A-2-12(a).*
4. Unless the documents or data therefrom has been transmitted to PAYNEARME for recordation, preserve records relating to licensed activities for the period of time as required in Chapter 31-A, Article 4, Section 31A-4-35 of the West Virginia Code. *W. Va. Code § 32A-2-14.*
5. Ensure that every check sold by Franchisee bears the name of PAYNEARME and a unique number clearly stamped or imprinted thereon. When an order for the transmission of money results in the issuance of a check, both the order and the check may bear the same number. *W. Va. Code § 32A-2-15(a).*
6. Record the date on which money was received for transmission, the amount transmitted, the name of the consumer and the intended recipient, and the location to which the money was transmitted if specified by the consumer. *W. Va. Code § 32A-2-15(c).*
7. Unless otherwise directed by the consumer, transmit money within three business days after the receipt of payment. *W. Va. Code § 32A-2-15(c).*
8. Provide consumer with a written receipt sufficient to identify the transaction, PAYNEARME and the amount. *W. Va. Code § 32A-2-15(c).*
9. Maintain records required by Chapter 32A, Article 2, Section 32A-2-15 of the West Virginia Code as set forth in Section 32A-2-14, and ensure such records are available for examination by the Commissioner of Banking of West Virginia. *W. Va. Code § 32A-2-15(e).*

**WYOMING**

1. Comply with the Bank Secrecy Act, 12 U.S.C. §1951 et seq. *Wyo. Stat. § 40-22-103(d).*
2. Not authorize sub-delegates without the written consent of the Wyoming Banking Commissioner. *Wyo. Stat. § 40-22-118(a)(ii).*

3. Be subject to supervision and regulation by the Wyoming Banking Commissioner. *Wyo. Stat. § 40-22-118(a)(iii).*

4. Not make any fraudulent or false statement or misrepresentation to PAYNEARME or to the Wyoming Banking Commissioner. *Wyo. Stat. § 40 22-119(a).*

5. Conduct all money transmission activities in strict accord with PAYNEARME written procedures provided to Franchisee. *Wyo. Stat. § 40-22119(b).*

6. Remit all money owing to PAYNEARME in accordance with the terms of the contract between PAYNEARME and Franchisee. *Wyo. Stat. § 40-22 119(c).*

7. Consent to inspection by the Wyoming Banking Commissioner, with or without prior notice, pursuant to *Wyo. Stat. § 40-22-115. Wyo. Stat. § 40-22-119(d).*

8. Consent to inspection by the Wyoming Banking Commissioner, with or without prior notice, pursuant to *Wyo. Stat. § 40-22-115. Wyo. Stat. § 40-22-119(d).*

# UNIFORM POWER OF ATTORNEY - STATE

The undersigned Franchisee ("you" or "your"), signed a 7-Eleven Franchise Agreement (the "Agreement") with 7-Eleven, Inc. ("we", "us" or "our"), under which you are an independent contractor(s); and

We agree to provide certain bookkeeping services under the Agreement, including, but not limited to, paying certain specified taxes on your behalf and charging them to your Open Account (as defined in the Agreement) with us, and to negotiate with taxing authorities on your behalf; and

We need a Power of Attorney from you in order to perform the services described above.

NOW THEREFORE, you appoint each individual who from time to time is designated as our employee to perform the duties associated with filing tax returns related to the operation of your 7-Eleven store, as your attorney-in-fact for all state (and political subdivisions of the state) purposes with full powers on your behalf to sign all tax returns related to the operation of your 7-Eleven store, except income tax returns, to file the same, to cause the taxes to be paid from your Open Account with us, to negotiate with taxing authorities, and to take all other actions necessary or desirable in connection with such taxes, deficiencies in such taxes, refunds of such taxes, and interest and penalties on such taxes.

FRANCHISEE

By ______________________ By ______________________
Sung Hun Choe

Date 12.27.18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

Market/Store No. 2367 - 16981C

Store Address: 801 Broadway, King City, CA 93930-3303

Office Address: Ops Support Admin., 3200 Hackberry Road, Irving, TX 75063

Form 2400025 1/04 Uniform
Power of Attorney - State

# PAYROLL AMENDMENT TO FRANCHISE AGREEMENT

This Amendment (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in this Amendment.

BACKGROUND INFORMATION:

A. You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering the operation of a convenience store to be known as 7 Eleven Store No. 2367 - 16981C (the "Store"); and

B. You and we desire to amend the Agreement to allow you the option to temporarily receive payroll services for your Store.

The parties agree as follows:

Notwithstanding anything to the contrary contained in the Agreement, the parties amend the Agreement as follows:

1. 7-Eleven agrees to provide, on a temporary basis, and you desire to obtain from 7-Eleven, certain payroll-related services for the Store. We agree to record, prepare and distribute payroll to you and/or your employees (the "Payroll Services"), provided that you prepare and furnish to us, on forms, at times and in the manner (including submission in an electronic format) we require, time and wage authorizations for your Store employees on a weekly or other periodic basis that we require. If you are not in Material Breach of the Agreement, we agree to pay, on your behalf, the cost of payroll for your Store employees in connection with the Payroll Services, the cost of which we will debit to the Open Account.

2. You acknowledge that we are relying on the accuracy of all information you and your employees provide, including all payroll information, and you further agree that all information that you and your employees provide will be truthful, accurate, complete, and in compliance with all applicable laws and with all policies or requirements we implement from time to time related in any way to the Payroll Services.

3. The definition of "Operating Expenses" is hereby amended to include payroll and payroll taxes (including unemployment, worker's compensation, payroll insurance, and social security contributions).

4. You acknowledge and understand that we may discontinue the Payroll Services and terminate this Amendment at any time upon at least thirty (30) days' prior notice to you. If we discontinue the Payroll Services, you will be required to perform the Payroll Services and all other payroll-related activities at your own direction and expense.

5. By agreeing to temporarily provide the Payroll Services to you under the terms of this Amendment, you agree that we are in no way altering your status as an independent contractor or assuming any responsibility for the manner and means of the daily operation of your Store or any of your employment-related decisions. We do not recruit, screen, interview, suggest, and/or hire employees for your Store, nor do we set the wages for your employees, and you are not permitted to indicate or imply to any applicant or employee of your Store otherwise.

6. Unless otherwise defined in this Amendment, the terms used in this Amendment will have the same meaning as those used in the Agreement.

7. In all other respects, the Agreement is hereby ratified and reaffirmed.

FRANCHISEE

______________________________

By ______________________________ By ______________________________

Sung Hun Choe

______________________________ ______________________________

Date 12.27.18 ______________________________ Date ______________________________

By ______________________________ By ______________________________

______________________________ ______________________________

Date ______________________________ Date ______________________________

7-ELEVEN, INC.

By ______________________________

Arron B. Yount

Date 12/31/18

# AMENDMENT TO FRANCHISE AGREEMENT – 7-ELEVEN CHARGE FOR EXISTING FRANCHISEES

This Amendment (the "Amendment") is signed by the undersigned franchisee ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in this Amendment.

BACKGROUND INFORMATION:

A. You and we signed a 7-Eleven Store Franchise Agreement (the "New Agreement") covering 7-Eleven Store No. 2367 - 16981C (the "Store");

B. You and we had previously signed a 7-Eleven Store Franchise Agreement (the "Prior Agreement") that covered the Store immediately prior to the New Agreement, and you elected to terminate the Prior Agreement prior to its expiration and execute the New Agreement; and

C. You and we desire to amend the New Agreement to change certain provisions of the New Agreement.

The parties agree as follows:

Notwithstanding anything to the contrary contained in the New Agreement, the parties amend the New Agreement as follows:

1 Exhibit D (h)(1) is hereby deleted in its entirety and replaced with the following:

(1) For a 24-Hour Operation:

The 7-Eleven Charge for the Store will be determined according to table 1 on the attached Schedule D (except as otherwise provided in Paragraphs 10(b) and/or (c) of the Franchise Agreement) beginning on the Effective Date and continuing through and including the December 2029 Accounting Period. Beginning with the January 2030 Accounting Period and continuing through the remainder of the Term, the 7-Eleven Charge for the Store will be determined according to table 2 on the attached Schedule D (except as otherwise provided in Paragraphs 10(b) and/or (c) of the Franchise Agreement).

2. In consideration of the mutual benefits and obligations contained in this Amendment, you and we will sign, together with the execution of this Amendment, the mutual termination of the Prior Agreement and general release of claims (the "Release") which is attached hereto and incorporated herein for all purposes as Exhibit 1. You and we agree that the Release is a material part of the consideration we are receiving in exchange for the benefits we are providing to you in this Amendment.

3. Unless otherwise defined in this Amendment, the terms used in this Amendment will have the same meaning as those used in the New Agreement.

4. The terms of this Amendment shall remain open to you until 5:00 p.m. local time on December 31, 2018. If this Amendment is not signed by you and submitted to our authorized representative on or before such date, the offer contained herein shall lapse.

5. In all other respects, the New Agreement is hereby ratified and reaffirmed.

FRANCHISEE

______________________________

By ______________________________

Sung Hun Choe

Date 12.27.18

By ______________________________

______________________________

Date ______________________________

By ______________________________

______________________________

Date ______________________________

By ______________________________

______________________________

Date ______________________________

7-ELEVEN, INC.

By ______________________________

Arron B. Yount

Date 12/31/18

TABLE 1

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $150,000 or less | 48% of Current Period Gross Profit |
| $150,001 to $300,000 | $72,000 + .49 (Base Period Gross Profit - $150,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $300,001 - $400,000 | $145,500 + .52 (Base Period Gross Profit - $300,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $400,001 - $500,000 | $197,500 + .53 (Base Period Gross Profit - $400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $500,001 - $750,000 | $250,500 + .55 (Base Period Gross Profit - $500,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $750,001 - $1,000,000 | $388,000 + .56 (Base Period Gross Profit - $750,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,000,001 or more | $528,000 + .57 (Base Period Gross Profit - $1,000,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

"Base Period Gross Profit" is defined in Exhibit E. If the Store has not been in operation for twelve (12) full months, then the Base Period Gross Profit shall be $150,000 for the first two (2) Accounting Periods, and thereafter, until the thirteenth Accounting Period of Store operations, will be twelve (12) multiplied by the average of all prior full Accounting Periods for the Store.

TABLE 2

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $200,000 or less | 45% of Current Period Gross Profit |
| $200,001 to $250,000 | $90,000 + .49 (Base Period Gross Profit - $200,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $250,001 - $300,000 | $114,500 + .54 (Base Period Gross Profit - $250,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $300,001 - $350,000 | $141,500 + .55 (Base Period Gross Profit - $300,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $350,001 - $400,000 | $169,000 + .56 (Base Period Gross Profit - $350,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $400,001 - $450,000 | $197,000 + .57 (Base Period Gross Profit - $400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $450,001 - $650,000 | $225,500 + .58 (Base Period Gross Profit - $450,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $650,001 - $900,000 | $341,500 + .59 (Base Period Gross Profit - $650,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

| BASE PERIOD GROSS PROFIT | 7-ELEVEN CHARGE FOR CURRENT ACCOUNTING PERIOD |
|---|---|
| $900,001 to $1,400,000 | $489,000 + .58 (Base Period Gross Profit - $900,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,400,001 - $1,600,000 | $779,000 + .57 (Base Period Gross Profit - $1,400,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |
| $1,600,001 or more | $893,000 + .56 (Base Period Gross Profit - $1,600,000)<br>Base Period Gross Profit<br><br>Multiplied by<br>Current Period Gross Profit |

"Base Period Gross Profit" is defined in Exhibit E. If the Store has not been in operation for twelve (12) full months, then the Base Period Gross Profit shall be $200,000 for the first two (2) Accounting Periods, and thereafter, until the thirteenth Accounting Period of Store operations, will be twelve (12) multiplied by the average of all prior full Accounting Periods for the Store.

**EXHIBIT 1**

## RELEASE OF CLAIMS AND TERMINATION

1. The 7-Eleven Store Franchise Agreement between 7-Eleven, Inc. ("we," "us", "our" or "7-Eleven") and the undersigned parties ("you") as amended (the "Agreement") and which covered 7-Eleven Store No. 2367 - 16981C (the "Store") is hereby terminated effective ______ a.m./p.m. on DEC 27, 2018.

2. Except as specifically provided below, you and we, on our own behalves and on behalf of our respective current and former agents, employees, representatives, attorneys, and successors and assigns, hereby release, acquit and discharge each other and our respective current and former agents, principals, officers, directors, shareholders, employees, representatives, attorneys, parents, affiliates, subsidiaries, divisions, and successors and assigns, of and from any and all manner of obligation, debt, liability, tort, covenant, contract, agreement, undertaking, and account, and any and all claims or causes of action that either of us had, have, or may have, known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual, liquidated or unliquidated, including, without limitation, any and all claims or causes of action arising under or related to the Agreement or any agreement entered into in connection therewith, any and all claims arising under or related to the execution, operation under or termination of the Agreement or any other agreement relating to the Store, any and all contract, employment, and wage and hour claims, and any and all claims or causes of action arising under or in connection with any applicable state franchise disclosure or relationship laws or regulations. You and we intend for this release to be construed as broadly as permitted by law.

3. If you are in California, you agree that the release contained in Paragraph 2 includes, without limitation, any claim that you were improperly classified as an independent contractor, any claim of wages due for your services rendered in executing or operating under the Agreement, any claim for reimbursement of expenses incurred in connection with executing or operating under the Agreement, any claims that have been or reasonably could have been raised by you or anyone acting on your behalf in the action entitled Haitayan, et al. v. 7-Eleven, Inc., Case No. CV 17-7454-JFW, 2018 WL 1626248 (C.D. Cal. Mar. 14, 2018) (the "Haitayan Lawsuit"), any claims regarding your services or other actions under any applicable IWC Wage Order or the California Labor Code, Business & Professions Code section 17200, et seq. and/or the Private Attorneys General Act seeking penalties or any other relief in connection with or relating to the Agreement or the operation of the Store. You further represent that (a) you are aware of the Haitayan Lawsuit on appeal with the United States Court of Appeals for the Ninth Circuit; (b) you are aware that this release will release claims that were or could have been brought in the Haitayan Lawsuit; (c) you are aware plaintiffs in the Haitayan Lawsuit are represented by Shannon Liss-Riordan, Esq. of Lichten & Liss Riordan, P.C., 729 Boylston Street, Suite 2000, Boston, MA 02116 and other legal counsel; (d) you have had an opportunity to contact Ms. Liss-Riordan or such other legal counsel regarding the Haitayan Lawsuit prior to signing this release; and (e) in signing this release, you are not relying on any representations regarding the Haitayan Lawsuit made by 7-Eleven.

4. If you are in Massachusetts, you agree that the release contained in Paragraph 2 includes, without limitation, all claims under the Massachusetts Wage Act, G.L. c. 149 § 148, Massachusetts Independent Contract Statute, G.L. c. 149 § 148B, the Massachusetts Minimum Wage Act, G.L. c. 151, § 1, the Massachusetts Overtime Statute, G.L. c. 151, § 1A, Massachusetts Tips Law, G.L. c. 149 § 152A, and any other claim that can be brought pursuant to G.L. c. 149, § 150, c. 151 § 1B, or G.L. c. 151 § 20, or any similar statute. You further represent that (a) you are aware of the putative class action captioned Patel et al. v. 7-Eleven, Inc., et al., Case No. 1:17-cv-11414-NMG (the "Patel Lawsuit") pending in the federal District Court for the District of Massachusetts; (b) you are aware that this release will release claims that could be brought in the Patel Lawsuit; (c) you are aware that plaintiffs in the Patel Lawsuit are represented by Shannon

Liss-Riordan, Esq. of Lichten & Liss Riordan, P.C., 729 Boylston Street, Suite 2000, Boston, MA 02116; (d) you have had an opportunity to contact Ms. Liss-Riordan regarding the Patel Lawsuit prior to signing this release; and (e) in signing this release, you are not relying on any representations regarding the Patel Lawsuit made by 7-Eleven.

5. You intend the release contained herein to acquit and forever fully discharge us, any parent of ours and any of our or our parent's direct or indirect subsidiaries, divisions or Affiliates and our, its and their respective officers, directors, shareholders, partners, agents, employees, heirs, legal representatives, successors and assigns.

6. If you are in California, the parties expressly waive and relinquish all rights and benefits which either may now have or in the future have under and by virtue of California Civil Code Section 1542. The parties do so understanding the significance and consequence of such specific waiver. Section 1542 provides that "[a] general release does not extend to claims which the creditor does not know or suspect exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." For the purpose of implementing a general release and discharge as described in Paragraph 2 above, the parties expressly acknowledge that this Release of Claims and Termination Agreement is intended to include in its effect all claims described in Paragraph 2 above which the parties do not know or suspect to exist in their favor at the time of execution hereof, and that this Release of Claims and Termination Agreement contemplates the extinguishment of any such claims.

7. You and we represent and warrant that the execution of this Release of Claims and Termination Agreement is free and voluntary, and that no inducements, threats, representations or influences of any kind were made or exerted by or on behalf of either party. You acknowledge that you have had adequate opportunity to review this release with an attorney of your choice.

8. This release will be binding upon you and us and upon your and our respective heirs, legal representatives, successors and assigns. This release is intended to be mutual and reciprocal, and it will be effective against one party only if it is effective against both parties. You and we acknowledge that this Release of Claims and Termination Agreement will be a complete defense to any claim released under the terms of Paragraph 2.

9. You and we each represent and warrant to the other that we and you have not assigned and will not assign to any other party any of the claims released by this Release of Claims and Termination Agreement.

10. NOTWITHSTANDING ANY OF THE FOREGOING, THIS RELEASE DOES NOT INCLUDE any amounts (1) debited or credited to you after the date of this Release of Claims and Termination Agreement, or (2) owing to either party (the "Final Settlement") as reflected on the final Financial Summaries prepared by us. You acknowledge that all Financial Summaries prepared to the date of this Release of Claims and Termination Agreement are true and correct and that this release includes all claims affecting the figures stated in such Financial Summaries. Your endorsement of a Final Settlement check delivered to you after the preparation of the final Financial Summaries, or other acceptance of funds tendered by us, acknowledges your release of all claims affecting the figures stated on your final Financial Summaries. You acknowledge that your relationship with 7-Eleven under the Agreement is that of a franchisee and independent contractor and that you were not employed by 7-Eleven during the term of the Agreement.

11. FURTHER NOTWITHSTANDING ANY OF THE FOREGOING, this release does not include (1) any claim that you may have against any person or entity other than us, our parent, subsidiary or Affiliated entities, and their respective officers, directors and employees; (2) any indemnity claim that you may have against us pursuant to the indemnification provisions of the Franchise Agreement when you are sued by a third party for acts or omissions occurring during your operation of the Store; (3) any rights that you have

to payments from us determined under Exhibit J to the Agreement, provided that you executed a Store Franchise Agreement edition 04/2004 or later; and (4) any outstanding promissory notes you have signed that are payable to us.

12. FURTHER NOTWITHSTANDING ANY OF THE FOREGOING, IF YOU ARE A MARYLAND FRANCHISEE, THIS RELEASE DOES NOT INCLUDE ANY CLAIMS PERTAINING OUR ALLEGED FAILURE TO COMPLY WITH THE MARYLAND FRANCHISE REGISTRATION AND DISCLOSURE LAW.

FRANCHISEE

By ______________________ By ______________________

Sung Hun Choe

Date 12-27-18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

7-ELEVEN, INC.

By ______________________

Arron B. Yount

Date 12/31/18

MARKET/STORE # 2367 - 16981C

Form **8655** (Rev. August 2014) Department of the Treasury Internal Revenue Service

# Reporting Agent Authorization

► Information about Form 8655 and its instructions is at *www.irs.gov/form8655*.

OMB No. 1545-1058

## Taxpayer

1a Name of taxpayer (as distinguished from trade name): Sung Hun Choe

2 Employer identification number (EIN): [redacted]

1b Trade name, if any: dba 7-Eleven 2367 - 16981C

4 If you are a seasonal employer, check here . . . . . . . ☐

3 Address (number, street, and room or suite no.): 801 Broadway

5 Other identification number

City or town, state, and ZIP code: King City, CA 93930-3303

6 Contact person: Sung Hun Choe

7 Daytime telephone number: (831) 385-5164

8 Fax number

## Reporting Agent

9 Name (enter company name or name of business): 7-Eleven, Inc.

10 Employer identification number (EIN): [redacted]

11 Address (number, street, and room or suite no.): PO Box 711 - Loc 0278

City or town, state, and ZIP code: Dallas, TX 75221

12 Contact person: Audrey Russell

13 Daytime telephone number: 972-828-7523

14 Fax number: 972-828-8989

## Authorization of Reporting Agent To Sign and File Returns (Caution: See *Authorization Agreement*)

15 Use the entry lines below to indicate the tax return(s) to be filed by the reporting agent. Enter the beginning year of annual tax returns or beginning quarter of quarterly tax returns. See the instructions for how to enter the quarter and year. Once this authority is granted, it is effective until revoked by the taxpayer or reporting agent.

| | | | | | |
|---|---|---|---|---|---|
| 940 2018 | 941 03/2018 | 940-PR 2018 | 941-PR 03/2018 | 941-SS 03/2018 | 943 ______ |
| 943-PR ______ | 944 2018 | 945 2018 | 1042 ______ | CT-1 ______ | |

## Authorization of Reporting Agent To Make Deposits and Payments (Caution: See *Authorization Agreement*)

16 Use the entry lines below to enter the starting date (the first month and year) of any tax return(s) for which the reporting agent is authorized to make deposits or payments. See the instructions for how to enter the month and year. Once this authority is granted, it is effective until revoked by the taxpayer or reporting agent.

| | | | | | |
|---|---|---|---|---|---|
| 940 03/2018 | 941 03/2018 | 943 ______ | 944 03/2018 | 945 ______ | 720 ______ |
| 1041 ______ | 1042 ______ | 1120 ______ | CT-1 ______ | 990-PF ______ | 990-T ______ |

## Disclosure of Information to Reporting Agents

17a Check here to authorize the reporting agent to receive or request copies of tax information and other communications from the IRS related to the authorization granted on lines 15, 16, and/or line 18 . . . . . . ☒

b Check here if the reporting agent also wants to receive copies of notices from the IRS . . . . . . ☒

## Disclosure Authorization

18a The reporting agent is authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices relating to the Form W-2 series information returns. This authority is effective for calendar year forms beginning ______ .

b The reporting agent is authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices relating to the Form 1099 series information returns. This authority is effective for calendar year forms beginning ______ .

c The reporting agent is authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices relating to the Forms 3921 and 3922. This authority is effective for calendar year forms beginning ______ .

## State or Local Authorization (Caution: See *Authorization Agreement*)

19 Check here to authorize the reporting agent to sign and file state or local returns related to the authorization granted on line 15 and/or line 16 ☐

## Authorization Agreement

**I understand that this agreement does not relieve me, as the taxpayer, of the responsibility to ensure that all tax returns are filed and that all deposits and payments are made and that I may enroll in the Electronic Federal Tax Payment System (EFTPS) to view deposits and payments made on my behalf.** If line 15 is completed, the reporting agent named above is authorized to sign and file the return indicated, beginning with the quarter or year indicated. If any starting dates on line 16 are completed, the reporting agent named above is authorized to make deposits and payments beginning with the period indicated. Any authorization granted remains in effect until it is revoked by the taxpayer or reporting agent. I am authorizing the IRS to disclose otherwise confidential tax information to the reporting agent relating to the authority granted on line 15 and/or line 16, including disclosures required to process Form 8655. Disclosure authority is effective upon signature of taxpayer and IRS receipt of Form 8655. The authority granted on Form 8655 will not revoke any Power of Attorney (Form 2848) or Tax Information Authorization (Form 8821) in effect.

**Sign Here** I certify I have the authority to execute this form and authorize disclosure of otherwise confidential information on behalf of the taxpayer.

► [signature] Signature of taxpayer ► ______ Title ► 12.27.18 Date

**For Privacy Act and Paperwork Reduction Act Notice, see instructions.** Cat. No. 10241T Form **8655** (Rev. 8-2014)

Form 4401016 1/04
Reporting Agent

EDD Employment Development Department State of California

# POWER OF ATTORNEY (POA) DECLARATION

SEE INSTRUCTIONS ON THE BACK OF THIS FORM.

## I. EMPLOYER/TAXPAYER INFORMATION *(please type or print)*

| | | |
|---|---|---|
| California Employer Payroll Tax Account Number: *(if applicable)* | Taxpayer Identification Number: | [redacted]ification Number: |
| Owner/Corporation Name: Sung Hun Choe | | Social Security Number (SSN)/Corporate Identification Number: [redacted] |
| Business Name/Doing Business As (DBA): 7-Eleven # 2367 16981C | | |
| Business Mailing Address: 801 Broadway | City: King City | State: CA ZIP Code: 93930-3303 |
| Business Phone Number: (831) 385-5164 | Business Fax Number: | |
| Business Location *(if different from above)*: | City: | State: ZIP Code: |

## II. REPRESENTATIVE DESIGNATION *(please type or print)*

I hereby appoint the following person to represent the employer/taxpayer for specified tax matters arising under the California Unemployment Insurance Code.

| | | |
|---|---|---|
| Representative's Business: 7-Eleven, Inc. | | |
| Representative's Name: | Phone Number: | Fax Number: |
| Business Mailing Address: | City: | State: ZIP Code: |

## III. AUTHORIZED ACT(S)

☐ **GENERAL AUTHORIZATION:** If you want to give the representative general authority to perform all acts on your behalf with regard to your state tax matters.

☐ **SPECIFIC DECLARATION:** From ________ To ________ If you want to give the representative limited authority with regard to your state tax matters, indicate the specific dates and acts you are authorizing.

☐ To represent the employer/taxpayer for any and all
☐ Tax Reporting ☐ Benefit Reporting ☐ Both matters relating to the reporting period indicated above.

☐ To represent the employer/taxpayer for changes to their mailing address for any and all
☐ Tax Reporting ☐ Benefit Reporting ☐ Both matters relating to the reporting period indicated above.

☐ Other acts: *(describe specifically)* ______________________________

☐ Subject to revocation, the above representative is authorized to receive confidential information.

## IV. SIGNATURE AUTHORIZING POWER OF ATTORNEY

**Signature of the employer/taxpayer, owner, officer, receiver, administrator, or trustee for the employer/taxpayer:** If you are a corporate officer, partner, guardian, tax matters partner/person, executor, receiver, administrator, or trustee on behalf of the employer/taxpayer, you are certifying that you have the authority to execute this form on behalf of the employer/taxpayer by signing this Power of Attorney Declaration.

***If this Power of Attorney Declaration is not signed and dated, it will be returned as invalid.***

I certify under penalty of perjury that the above information is true, correct, and complete, and that these actions are not to be taken to receive a more favorable Unemployment Insurance rate. I further certify that I have the authority to sign on behalf of the above business.

[signature] ______________________ ______________________

Signature Title (Owner, Partner, Corp. Officer: Pres., Vice Pres., CEO or CFO)

Sung Hun Choe ______________________ 12.27.18

Print Name SSN Date



Form 4401265 8/08 California
Power of Attorney Declaration

MARKET/STORE # 2367 - 16981C

CDTFA-392 (FRONT) REV. 11 (1-18)

**POWER OF ATTORNEY**

STATE OF CALIFORNIA
CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION
EMPLOYMENT DEVELOPMENT DEPARTMENT

*Check below to indicate the appropriate agency. Please note that a separate form must be completed and provided to each agency checked.*

☒ **CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION**
**PO BOX 942879**
**SACRAMENTO, CA 94279-0001**
**1-800-400-7115 (TTY:711)**

☐ **EMPLOYMENT DEVELOPMENT DEPARTMENT**
**PO BOX 826880 MIC 28**
**SACRAMENTO CA 94280-0001**
**1-916-654-7263 • FAX 1-916-654-9211**

| TAXPAYER'S OR FEEPAYER'S NAME | BUSINESS OR CORPORATION NAME | TELEPHONE NUMBER | FAX NUMBER |
|---|---|---|---|
| Sung Hun Choe | | (831) 385-5164 | ( ) |
| [redacted] | [redacted] FEDERAL EMPLOYER IDENTIFICATION NUMBER | CALIFORNIA SECRETARY OF STATE NUMBER(S) | |
| CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION ACCOUNT/PERMIT(S) | | EDD EMPLOYER ACCOUNT NUMBER | |

MAILING ADDRESS *(Number and Street, City, State, ZIP Code)*
7-Eleven # 2367 - 16981C 801 Broadway, King City, CA 93930-3303

☐ **INDIVIDUAL** ☐ **PARTNERSHIP** ☐ **CORPORATION** ☐ **LIMITED LIABILITY COMPANY**

☐ **OTHER**

**As owner, officer, receiver, administrator, or trustee for the taxpayer or feepayer, or as a party to the tax or fee matter before the:**

☒ **California Department of Tax and Fee Administration** ☒ **Employment Development Department**

**I hereby appoint:** *[enter below the individual appointee(s) name(s), address(es) (including ZIP code), telephone number(s) and fax number(s)—do not enter names of accounting or law firms, partnerships, corporations, etc., as the appointee name]*

| APPOINTEE NAME | | | APPOINTEE NAME | | |
|---|---|---|---|---|---|
| Tien Tran | | | Corey Donaway | | |
| APPOINTEE BUSINESS NAME *(if applicable)* | | | APPOINTEE BUSINESS NAME *(if applicable)* | | |
| 7-Eleven, Inc. | | | 7-Eleven, Inc. | | |
| APPOINTEE ADDRESS *(Number and Street)* | | | APPOINTEE ADDRESS *(Number and Street)* | | |
| PO Box 711 - Loc 0278 | | | PO Box 711 - Loc 0278 | | |
| *(City)* | *(State)* | *(ZIP Code)* | *(City)* | *(State)* | *(ZIP Code)* |
| Dallas | TX | 75221-0711 | Dallas | TX | 75221-0711 |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| (972) 828-7449 | (972)828-8958 | | (972) 828-6031 | (972) 828-8957 | |

**As attorney(s)-in-fact to represent the taxpayer(s) or feepayer(s) for the following tax or fee matters:** *[specify type(s) of tax]*

☐ Tax and Fee Programs Administered by CDTFA
☐ Payroll Tax Law
☐ Benefit Reporting
☒ Other: Sales and Use Tax Law

SPECIFY THE TAX OR FEE YEAR(S) OR PERIOD(S)
2018-2023

**The attorney(s)-in-fact (or any of them) are authorized, subject to revocation, to receive confidential tax information and to perform on behalf of the taxpayer(s) the following acts for the tax or fee matters described above:** *[check the box(es) for the powers granted]*

☒ General Authorization (including all acts described below).

☐ Specific Authorization (selected acts described below).

- ☐ To confer and resolve any assessment, claim or collection of a deficiency or other tax or fee matter pending before the identified agency and attend any meetings or hearings thereto for the specified law identified above.
- ☐ To receive, but not to endorse and collect, checks in payment of any refund of taxes, penalties or interest.
- ☐ To execute petitions, claims for refund and/or amendments thereto.
- ☐ To execute consents extending the statutory period for assessment or determination of taxes.
- ☐ To represent the taxpayer for changes to their mailing address for any and all Payroll Tax Law, Benefit Reporting, both Payroll Tax Law and Benefit Reporting.

*(The back of this form must be completed)*

CDTFA-392 (BACK) REV. 11 (1-18)

- ☐ To execute settlement agreements under section 1236 of the California Unemployment Insurance Code.
- ☐ To delegate authority or to substitute another representative.
- ☐ To Other acts (specify):

**This Power of Attorney revokes all earlier Power(s) of Attorney on file with the California Department of Tax and Fee Administration or the Employment Development Department as identified above for the same matters and years or periods covered by this form, except for the following:** *[specify to whom granted, date and address, or refer to attached copies of earlier power(s)]*

| NAME | DATE POWER OF ATTORNEY GRANTED |
|---|---|
| | |

ADDRESS *(Number and Street, City, State, ZIP Code)*

**Unless limited, this Power of Attorney will remain in effect until the final resolution of all tax or fee matters specified herein.**
*[specify expiration date if limited term]*

TIME LIMIT/EXPIRATION DATE (for California Department of Tax and Fee Administration purposes)

**Signature of Taxpayer(s) or Feepayer(s)**—If a tax or fee matter concerns a joint return, **both** spouses must sign if joint representation is requested. If you are a corporate officer, partner, guardian, tax or fee matters partner/person, executor, receiver, registered domestic partner, administrator, or trustee on behalf of the taxpayer or feepayer, by signing this Power of Attorney you are certifying that you have the authority to execute this form on behalf of the taxpayer or feepayer.

▶ **IF THIS POWER OF ATTORNEY IS NOT SIGNED AND DATED BY AN AUTHORIZED INDIVIDUAL, IT WILL BE RETURNED AS INVALID.**

| SIGNATURE | TITLE *(if applicable)* | DATE |
|---|---|---|
| Sung Hun Choe [signature] | | 12-27-18 |
| PRINT NAME | | TELEPHONE ( ) (831) 385-5164 |
| SIGNATURE | TITLE *(if applicable)* | DATE |
| PRINT NAME | | TELEPHONE ( ) |

# TSC FINANCING AMENDMENT
# CALIFORNIA

THIS TSC FINANCING AMENDMENT ("Amendment") is signed by the undersigned Franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment.

## BACKGROUND INFORMATION

You and we signed a 7-Eleven Franchise Agreement (the "Franchise Agreement") covering 7-Eleven Store No. 2367 - 16981C (the "Store");

You and we desire to amend the Franchise Agreement to provide for certain changes to the financing we provide.

## The parties agree as follows:

A. Notwithstanding anything in the Franchise Agreement to the contrary:

(1) We will transfer the financing obligations and rights under the Franchise Agreement to TSC Lending Group, Inc. ("TSC Group"), one of our subsidiaries. TSC Group is licensed under the California Finance Lenders Law contained in Division 9 of the California Financial Code to make commercial loans, and it will make open-end commercial loans to you. Contemporaneously with the execution of this Amendment, you will execute a Revolving Credit Agreement (the "Credit Agreement") with TSC Group. You will also execute a Security Agreement (the "TSC Security Agreement") and such renewal, assignment and continuation financing statements or other documents relating to the TSC Security Agreement as are requested by and acceptable to TSC Group. Your execution of the TSC Security Agreement will not be a breach of the existing security agreement between us and you (the "7-Eleven Security Agreement"). The transfer of the financing obligations and rights under the Franchise Agreement to TSC Group will take effect upon written notice from us to you stating the effective date of such transfer ("Financing Effective Date").

(2) As soon as practicable after the Financing Effective Date, TSC Group will make an initial loan advance to us on your behalf in an amount equal to the unpaid balance in your Open Account, as shown on your most recent Financial Summaries for the Store. The amount advanced to us on your behalf will be charged to your loan account with TSC Group.

(3) If you are not in material breach of the Franchise Agreement, the Credit Agreement, the TSC Security Agreement, or the 7-Eleven Security Agreement, and subject to the conditions set forth in the Franchise Agreement, your Receipts, Operating Expenses, regular draws, Purchases, discounts, allowances, and other items affecting Cost of Goods Sold, will be credited and charged to the Open Account during each Accounting Period, pursuant to our usual procedures, and the balance in the Open Account will be computed at the end of each Accounting Period. We will not charge or pay interest on any balance in the Open Account, either debit or credit. If there is an unpaid balance in the Open Account at the end of an Accounting Period, as soon as practicable after Financial Summaries for such Accounting Period become available, TSC Group will advance to us, and charge the loan account with, the amount needed to reduce the balance in the Open Account to zero. If there is a credit balance in the Open Account at the end of an Accounting Period, we will transfer the balance to TSC Group as soon as practicable after Financial Summaries for the Accounting Period become available, and TSC Group will credit such amount to your loan account.

(4) The Accounting Period for your loan account with TSC Group will be the same as the Accounting Period specified in the Franchise Agreement. The unpaid balance in the TSC Group loan account will bear interest at the rate provided in the Credit Agreement computed on the average daily balance in the loan account. During an Accounting Period, the balance in the loan account will be increased for advances made by TSC Group to you on your behalf, including, (i) the net debit balance resulting from the monthly activity in the Open Account as described in A.3. above, as soon as practicable after the date that Financial Summaries become available; and (ii) any special or additional draws paid to you by us, or any unauthorized draws taken by you, on the date paid or taken. During an Accounting Period, the balance in the loan account will be reduced by, (i) an advance to TSC Group by us of a credit balance in the Open Account as soon as practicable after the date that Financial Summaries become available; and (ii) any payment made by you to us or TSC Group for the purpose of repaying part or all of the loan balance, on the date of receipt by either us or TSC Group. Interest for the Accounting Period will be charged to the loan account as of the last day of the Accounting Period. The daily balance in the loan account will be computed by taking the beginning balance each day and adding or subtracting, as appropriate, the charges and credits as described above. The average daily balance will be computed by totalling the daily balances for each day in the Accounting Period, and dividing the total by the number of days in the Accounting Period. If the average daily balance reflects a credit balance, TSC Group will credit the loan account with interest as provided in the Credit Agreement.

(5) We consent to you granting TSC Group a security interest in the Inventory, and premium or going concern value, if any in the franchise.

(6) For purposes of computing your Net Worth under the Franchise Agreement, your loan balance with TSC Group will be treated as a liability and will be reflected as such on the Financial Summaries.

(7) TSC Group's obligation to provide financing will be subject to the terms and conditions set forth in the Franchise Agreement and TSC Security Agreement. Upon expiration or termination of the Franchise Agreement, your indebtedness to TSC Group will be immediately due and payable.

(8) You agree that we and TSC Group can exchange all financing information necessary to effectuate this agreement.

(9) TSC Group may assign the financing obligations and rights under the Franchise Agreement back to us at any time, at which time this Amendment will terminate and the financing provisions of the Franchise Agreement will apply.

B. Unless otherwise defined in this Financing Amendment or in context, the terms used in this Financing Amendment have the meaning defined for them in the Franchise Agreement.

In all other respects, the Franchise Agreement is ratified and reaffirmed.

The parties have signed this Amendment as of the last date set forth below.

FRANCHISEE

By ______________________
Sung Hun Choe

Date 12.27.18

By ______________________

Date ______________________

By ______________________

Date ______________________

By ______________________

Date ______________________

7-ELEVEN, INC.

By ______________________
Arron B. Yount

Date 12/31/18

# TSC REVOLVING CREDIT AMENDMENT
# CALIFORNIA

THIS TSC REVOLVING CREDIT AMENDMENT (the "Amendment") is signed by TSC Lending Group, Inc. ("we", "us" or "our") and the undersigned borrower, ("you" or "your"), to be effective as of the Financing Effective Date (as defined in this Agreement).

## RECITALS

You and 7-Eleven, Inc. ("7-Eleven") have signed a 7-Eleven Franchise Agreement (the "Franchise Agreement"), covering 7-Eleven Store No. 2367 - 16981C (the "Store");

You and 7-Eleven signed a TSC Financing Amendment, (the "Amendment") in which you and 7-Eleven agreed to allow us to provide you certain financing in connection with your operation of the Store.

You desire to obtain a revolving loan (the "Loan") from us to finance the repayment of certain amounts You owe to 7-Eleven and to finance certain expenses you will incur in operating the Store.

The parties agree as follows:

(1) Any capitalized terms in this Agreement and not specifically defined in this Agreement will have the definitions given them in the Franchise Agreement.

(2) As provided in the Amendment, this Agreement will take effect when 7-Eleven delivers written notice to you stating the effective date of 7-Eleven's transfer of its financing obligations and rights under the Franchise Agreement to us (the "Financing Effective Date").

(3) As soon as practicable after the Financing Effective Date, we will make an initial loan advance on your behalf to 7-Eleven in an amount equal to the unpaid balance in your Open Account, as shown on your most recent Financial Statements or Summaries (the "Financial Summaries") for the Store. The amount advanced on your behalf to 7-Eleven will be charged to your Loan account under this Agreement.

(4) Subject to the terms of this Agreement, as soon as practicable after the end of each Accounting Period and as soon as Financial Summaries for each Accounting Period are available, we will make a loan advance on your behalf to 7-Eleven in an amount equal to any unpaid balance in your Open Account for that Accounting Period, as shown on your Financial Summaries for each such Accounting Period. Loan advances may be made by us on your behalf to 7-Eleven after the termination or expiration of the Franchise Agreement if there are any unpaid balances in your Open Account after such termination or expiration.

(5) Any special, additional or unauthorized draws paid to or taken by you from 7-Eleven during an Accounting Period will be deemed to be a request by you to us to make additional loan advances on your behalf to 7-Eleven in the amount of such draws. If we agree to make such loan advances, the loan advances will be made as of the date such draws are paid to or taken by you. You authorize us to make all such advances to 7-Eleven on your behalf.

(6) If, at the end of an Accounting Period, your Open Account has a credit balance, as shown on the Financial Summaries for such Accounting Period, you authorize the transfer of the credit balance by 7-Eleven to us, as soon as practicable after the end of the applicable Accounting Period and as soon as Financial Summaries for such Accounting Period are available, to reduce the unpaid balance of the Loan. Any other payment made by you to 7-Eleven or us, for the purpose of repaying part or all of the Loan balance, will reduce the unpaid balance

of the Loan on the date such payment is received by either 7-Eleven or us. You also must make such repayments on the Loan as may be necessary to maintain the minimum Net Worth required under and pursuant to the Franchise Agreement.

(7) You agree to repay the Loan, with interest charges, as provided in this Agreement. If not sooner paid, the entire unpaid balance of the Loan will be due and payable immediately upon expiration or termination of the Franchise Agreement for any reason, without any further notice of any type whatsoever being required.

(8) You must execute a Security Agreement (the "TSC Security Agreement"), financing statement and all necessary continuations and renewals, and all such other documents as are requested by and acceptable to us to grant us a security interest in the Inventory and premium or going concern value, if any, and to establish and maintain the perfection of such security interest. The TSC Security Agreement will be subject only to the existing security agreement between you and 7-Eleven (the "7-Eleven Security Agreement"), and you will not grant any security interest in the Inventory or goodwill or going concern value other than as provided in this paragraph. We will have the right to enter the Store at all reasonable times to inspect and audit the Inventory.

(9) Our obligation to provide financing is subject to the terms and conditions set forth in the Franchise Agreement and the TSC Security Agreement. You will be in default under this Agreement if, at any time, (i) you fail to perform your obligations under this Agreement, (ii) there is a default under the TSC Security Agreement or the 7-Eleven Security Agreement, or (iii) there is a Material Breach or default under the Franchise Agreement. If a default occurs, we may stop making advances on the Loan and declare the unpaid balance of the Loan to be immediately due and payable.

(10) The Accounting Period for the Loan will be the same as the Accounting Period specified in the Franchise Agreement. We will assess an interest charge each Accounting Period at an initial annual rate of interest of 6.50 %. The annual interest rate will be adjusted, effective each March 1, and continuing in effect through the last day of February of the succeeding year, to equal the rate which is 2% in excess of the prime rate charged by Bank of America ("Bank of America") (or any successor) as of the first business day of the calendar year during which such adjustment becomes effective. The interest charge will be based on an average daily balance of the Loan and will be added to the unpaid balance of the Loan as of the last date of each Accounting Period. The average daily balance for each Accounting Period will be computed by taking the beginning balance each day of the Accounting Period and adding or subtracting, as appropriate, the loan advances we made and the payments we received for each day during the Accounting Period. All of the daily balances will then be totaled and divided by the number of days in the Accounting Period to determine an average daily balance. Since the unpaid balance of the Loan will include prior interest charges, you will be required to pay compound interest (or interest on interest).

(11) If there is an average daily credit balance for the Loan during any Accounting Period, we will credit the Loan account with interest at an annual interest rate equal to the prime rate at Bank of America (or any successor), as of the first business day of each calendar year, minus 2 percentage points, effective each subsequent March 1. We may, at our option, limit the credit balance amount upon which we will pay interest upon notice to you.

(12) You consent to the disclosure between 7-Eleven and us of all information regarding you, the Loan and the operation of the Store.

(13) If more than one individual signs this Agreement, the obligations of such persons will be joint and several.

(14) You must not agree to an amendment of the Franchise Agreement which would affect any of the terms or provisions of this Agreement without our prior written consent.

(15) This Agreement will be governed by and construed according to the laws of the state of California.

(16) You may not assign any rights or obligations under this Agreement without our prior written consent.

(17) This Agreement, the TSC Security Agreement, the 7-Eleven Security Agreement, the Amendment and any other agreements referenced in this Agreement (including, but not limited to the Franchise Agreement and all addenda and amendments to the Franchise Agreement), contain all agreements concerning the Loan, all prior or contemporaneous promises, representations, agreements or understandings being expressly merged and superseded.

The parties have executed this Agreement as of the last date set forth below.

Lender: TSC Lending Group, Inc.

By: ______________________

Its: ______________________

Date: ______________________

Borrower:

FRANCHISEE:

______________________

Sung Hun Choe

Date: 12.27.18

______________________

Date: ______________________

______________________

Date: ______________________

______________________

Date: ______________________

# TSC SECURITY AGREEMENT
# CALIFORNIA

THIS TSC SECURITY AGREEMENT (the "Security Agreement") is executed by the undersigned debtor Franchisee(s) jointly and severally if more than one ( such debtor(s) are referred to individually or collectively as "you" or "your"), to and for the benefit of TSC Lending Group, Inc. ("we", "us" or "our").

## RECITALS

A. You and 7-Eleven, Inc. ("7-Eleven") signed a 7-Eleven Franchise Agreement (the "Franchise Agreement"), under which 7-Eleven granted you the right to operate a 7-Eleven convenience store franchise. 7-Eleven agreed to make loans and other financial accommodations to you upon the terms and subject to the conditions set forth in the Franchise Agreement.

B. You and 7-Eleven signed a Financing Amendment under which you agreed that 7-Eleven would assign its financing obligations under the Franchise Agreement to us. You and we signed a Revolving Credit Agreement (the "Credit Agreement") covering the terms of the loans and other financial accommodations we will make to you pursuant to 7-Eleven's assignment of its financing obligations to us.

C. Our obligation to make such loans and other financial accommodations to you under the Credit Agreement is subject, among other conditions, to receipt by us of this Security Agreement, duly executed by you.

## AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are acknowledged, you agree as follows:

1. Definitions and Interpretation. When used in this Security Agreement and the Attachments to this Security Agreement, (a) the terms Account, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixtures, Goods, Inventory, Instrument, Payment Intangible and Proceeds, have the respective meanings assigned to them in the UCC (as defined below); (b) capitalized terms which are not otherwise defined in this Security Agreement have the respective meanings assigned to them in the Franchise Agreement and the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"Collateral" means, with respect to you, all of your property and rights in which a security interest is granted under this Security Agreement.

"Computer Hardware and Software" means, with respect to you, all of your rights (including rights as licensee and lessee) with respect to: (i) computer and other electronic data processing hardware; (ii) all software programs designed for use on the computers and electronic data processing hardware described in clause (i) above, (iii) any firmware associated with any of the foregoing; and (iv) any documentation for hardware, software and firmware described in clauses (i), (ii) and (iii) above.

"Event of Default" means (i) a Material Breach; (ii) your failure to perform or observe any term, promise, condition or obligation contained in this Security Agreement; or (iii) your breach of any representation or warranty made by you to us in or in connection with the Store, the Franchise Agreement, the Credit Agreement or this Security Agreement.

"General Intangibles" means, with respect to you, all of your "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of your premium and going concern value and goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, Payment Intangibles (including Receipts as defined in the Franchise Agreement), security interests and rights to reimbursement and/or indemnification.

"Obligations" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by you to us of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or arising, in the future pursuant to the terms of the Credit Agreement or any other agreement by or among you and us, and/or modification, renewal, or extensions of any of the foregoing, including (without limitation) all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to and payable by you under this Security Agreement or under the Franchise Agreement or any other agreement by or among you and us.

"Related Contracts" means the meaning given to that term in Attachment 1 attached to this Security Agreement and incorporated into this Security Agreement.

"Store" means 7-Eleven Store No. 2367 - 16981C.

"UCC" means the Uniform Commercial Code as in effect in the State of California on the date of this Security Agreement, as may be amended or modified from time.

2. Grant of Security Interest. As security for the Obligations, you pledge and assign to us and grant to us a continuing security interest in and lien on, all of your property, whether now owned, or acquired in the future or arising, and wherever located, including (without limitation) those types of property described on Attachment 1 to this Security Agreement.

3. Representations and Warranties. You represent and warrant to us that:

(a) We have (or in the case of after-acquired Collateral, at the time you acquire rights in the Collateral, will have) a first priority perfected security interest in the Collateral, subject only to the security interest you granted to 7-Eleven.

(b) Your chief executive office and principal place of business are as set forth on Attachment 2 to this Security Agreement, and each other location where you maintain a place of business is also set forth on Attachment 2 to this Security Agreement.

[USE FOR ENTITY FRANCHISEE: (c) You are a Corporation, duly organized, validly existing and in good standing under the laws of the state set forth on Attachment 2 to this Security Agreement, and are a "registered organization" (as such term is defined in the UCC) in such state.]

[USE FOR INDIVIDUAL FRANCHISEE: (c) You are an individual located in California.]

(d) You are duly qualified, licensed to do business and in good standing in all jurisdictions in which such qualification or licensing is required.

(e) Your exact legal name is as set forth on the signature pages of this Agreement, and during the five years preceding the date of this Security Agreement you have not been known by any different legal name nor have you been the subject of any merger or other corporate reorganization.

(f) Attachment 3 to this Security Agreement contains a complete listing of all of your Instruments, Deposit Accounts, Chattel Paper, Documents and Commercial Tort Claims.

4. Covenants. You agree as follows:

(a) You must perform all acts that may be necessary to maintain, continue, preserve, protect and perfect the Collateral, the security interest granted to us in the Collateral and the first perfected priority of such security interest, subject only to the security interest you granted to 7-Eleven.

(b) You may not use or permit any Collateral to be used in violation of any provision of the Franchise Agreement, the Credit Agreement or this Security Agreement.

(c) You must pay promptly when due all taxes and other governmental charges, all liens and all other charges now or imposed in the future upon or affecting any Collateral.

(d) Without 30 days' prior written notice to us, you may not (i) change your name or place of business (or, if you have more than one place of business, your chief executive office), (ii) keep Collateral consisting of Chattel Paper at any location other than at your chief executive office, (iii) keep Collateral consisting of Equipment at any location other than the Store; or (iv) adopt a plan of conversion or reorganize under the laws of a state other than your state of organization as set forth on Attachment 2 to this Security Agreement.

(e) If we give value to enable you to acquire rights in or the use of any Collateral, you must use such value for such purpose.

(f) You must promptly notify us in writing upon acquiring or otherwise obtaining any Collateral after the date of this Security Agreement consisting of Deposit Accounts or Electronic Chattel Paper and, upon our request, you will promptly execute such other documents, and do such other acts or things we deem appropriate to deliver control to us with respect to such Collateral.

(g) You must promptly notify us in writing upon acquiring or otherwise obtaining any Collateral after the date of this Security Agreement consisting of Documents or Instruments and, upon our request, will promptly execute such other documents, and do such other acts or things we deem appropriate to deliver possession to us of such Documents which are negotiable and Instruments, and, with respect to nonnegotiable Documents, to have such nonnegotiable Documents issued in our name.

(h) You must promptly notify us in writing upon incurring or otherwise obtaining a Commercial Tort Claim related to the Store or your operations at the Store after the date of this Security Agreement against any third party, and, upon our request, will promptly enter into an amendment to this Security Agreement, and do such other acts or things we deem appropriate to give us a security interest in such Commercial Tort Claim.

(i) You further agree to take other action we reasonably request to insure the attachment, perfection and first priority of, and our ability to enforce, the security interests in all of the Collateral.

(j) You must keep separate, accurate and complete records of the Collateral and must provide us with such records and such other reports and information relating to the Collateral as we may reasonably request from time to time.

(k) You may not sell, encumber, lease, rent, or otherwise dispose of or transfer any Collateral or right or interest in such Collateral except as expressly permitted in the Franchise Agreement and you must keep the Collateral free of all liens.

(l) You must comply with all material legal requirements applicable to you which relate to the production, possession, operation, maintenance and control of the Collateral and operation of the Store (including (without limitation) the Fair Labor Standards Act).

5. Authorized Action by Agent. You irrevocably appoint us as your attorney-in-fact and agree that we may, on or after an Event of Default, perform (but we will not be obligated to and will incur no liability to you or any third party for failure to so perform) any act which you are obligated by this Security Agreement to perform, and to exercise such rights and powers as you might exercise with respect to the Collateral. You acknowledge and agree that this Security Agreement is an "authenticated record" for purposes of UCC Articles 9.509(a) and (b), and you authorize the filing by us of UCC financing statements naming you as the "debtor(s)" in such financing statements.

6. Default and Remedies. In addition to all other rights and remedies granted us by this Security Agreement, the Franchise Agreement, the Credit Agreement, the UCC and other applicable law, we may, upon the occurrence and during the continuance of an Event of Default, exercise any one or more of the following rights and remedies: (a) foreclose or otherwise enforce our security interests in any or all Collateral in any manner permitted by applicable law, the Franchise Agreement, the Credit Agreement or this Security Agreement; (b) notify any or all Account debtors to make payments on Receivables directly to us and enforce your rights against such Account debtors; (c) sell or otherwise dispose of any or all Collateral at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery, on such terms and in such manner as we may determine; (d) require you to assemble the Collateral and make it available to us at a place to be designated by us; (e) enter onto any property where any Collateral is located and take possession of such Collateral with or without judicial process; and (f) prior to the disposition of the Collateral, store, process, repair or recondition any Collateral consisting of Goods, perform any obligations and enforce any of your rights under any Related Contracts or otherwise prepare and preserve Collateral for disposition in any manner and to the extent we deem appropriate. You agree that 10 days' notice of any intended sale or disposition of any Collateral is reasonable. We will have no duty as to collection or protection of the Collateral or any income on such Collateral, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining to prior parties beyond, in the case of any Collateral in our possession, the same safe custody of such Collateral to the extent afforded to our property. All of our rights and remedies whether or not granted under this Security Agreement will be cumulative and may be exercised singularly or concurrently.

7. California Law. You acknowledge that you have read Section 504(b) of the California Penal Code which provides:

"Where under the terms of a security agreement, as defined in Section 9105 of the Commercial Code, the debtor has the right to sell the property covered thereby and is to account to the secured party for, and pay to the secured party the indebtedness secured by the security agreement from, the proceeds of the sale of any of the said property, and where such debtor, having sold the property covered by the security agreement and having received the proceeds of such sale, willfully and wrongfully, and with the intent to defraud, fails to pay to the secured party the amounts due under the security agreement, or the proceeds of such sale, whichever is the lesser amount and appropriates such money to his own use, said debtor shall be guilty of embezzlement and shall be punishable as provided in Section 514".

8. Miscellaneous.

(a) Notices. All notices, requests, demands, consents, instructions or other communications to or upon you or us under this Security Agreement must be in writing.

(b) Waivers; Amendments. Any term, promise, agreement or condition of this Security Agreement may be amended or waived if such amendment or waiver is in writing and is signed by you and us. No failure or delay by us in exercising any right under this Security Agreement will operate as a waiver of such right or of any other right nor will any single or partial exercise of any such right preclude any other further exercise of such right or of any other right. Unless otherwise specified in any such waiver or consent, a waiver or consent given under this Security Agreement will be effective only in the specific instance and for the specific purpose for which given.

(c) Successors and Assignments. This Security Agreement will be binding upon and inure to our benefit and your benefit and to the benefit of our respective successors and assigns, including all persons and entities that become bound by this Security Agreement; provided, however, that you may sell, assign and delegate your respective rights and obligations under this Security Agreement only as permitted by the Franchise Agreement. We may disclose this Security Agreement, the Franchise Agreement, the Credit Agreement and any financial or other information relating to you to any assignee or potential assignee.

(d) JURY TRIAL. YOU AND WE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY AS TO ANY ISSUE RELATING TO THIS SECURITY AGREEMENT IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT.

(e) Cumulative Rights, Etc. Our rights, powers and remedies under this Security Agreement will be in addition to all rights, powers and remedies given to us by applicable law, the Franchise Agreement or any other agreement, all of which rights, powers, and remedies will be cumulative and may be exercised successively or concurrently without impairing our rights under this Security Agreement. You waive any right to require us to proceed against any person or to exhaust any Collateral or to pursue any remedy in our power.

(f) Governing Law, Construction. This Security Agreement will be governed by and construed according to the laws of the state in which you are located from time to time in effect except to the extent preempted by United States Federal law. It is expressly stipulated and agreed to be your intent and our intent at all times to comply with applicable law governing the highest lawful rate or amount of interest payable on the Obligations. If the applicable law is ever judicially interpreted so as to render usurious any amount called for under the Franchise Agreement or the Credit Agreement, or contracted for, charged, taken, reserved or received with respect to the Obligations, or if our exercise of our remedies under this Security Agreement, the Franchise Agreement or the Credit Agreement or if any payment by you results in you having paid any interest in excess of that permitted by applicable law, then it is your and our express intent that all excess amounts previously collected by us be credited on the principal balance of the Obligations (or, if the Obligations have been or would be paid in full, refunded to you), and the provisions of the Franchise Agreement immediately be deemed reformed and the amounts collectible thereafter under this Security Agreement, the Franchise Agreement or the Credit Agreement reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for under this Security Agreement, the Franchise Agreement or the Credit Agreement. All sums paid or agreed to be paid to us for the use, forbearance or detention of the Obligations will, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Obligations until payment in full so that the rate or amount of interest on account of the Obligations does not exceed the usury ceiling from time to time in effect and applicable to the Obligations for so long as the Obligations are outstanding.

(g) Conflicting Provisions. To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and the terms of the Franchise Agreement, the terms of the Franchise Agreement will govern. To the extent there exists any conflict or inconsistency between the terms of this Security Agreement and terms of the Credit Agreement, the terms of the Credit Agreement will govern.

(h) Counterparts. This Security Agreement may be executed in any number of identical counterparts, any set of which signed by all the parties to this Security Agreement will be deemed to constitute a complete, executed original for all purposes.

IN WITNESS WHEREOF, you have caused this Security Agreement to be executed as of the last date set forth below.

BORROWER(S)

By ______________________ By ______________________
Sung Hun Choe

Date 12.27.18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

ACCEPTED this ________ day of ______________________, 20______.

LENDER: TSC LENDING GROUP, INC.,

By: ______________________

Name: ______________________

Title: ______________________

ATTACHMENT 1
TO SECURITY AGREEMENT

All Goods (including Equipment, Fixtures and Inventory) held or maintained on the Store or otherwise used in the ownership or operation of the Store, including (without limitation) money order blanks, bank drafts and store supplies, and all embedded software, accessions, additions, attachments, improvements, substitutions and replacements to such Goods and for such Goods;

All premium or going concern value of the franchise interest in the Store;

All Computer Hardware and Software and all rights with respect to such Computer Hardware and Software, including, all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

All Accounts, Chattel Paper (including Electronic Chattel Paper), Commercial Tort Claims, Deposit Accounts, Documents, Instruments, money (of every jurisdiction whatsoever), and other rights to the payment of money (including (without limitation) General Intangibles and contract rights) arising as a result of any activities conducted by, through or at the Store, and all contracts, security agreements, leases, guaranties and other agreements evidencing, securing or otherwise relating to any of the foregoing (collectively, the "Related Contracts");

All other General Intangibles and contract rights not otherwise described above acquired, held, used, sold or consumed in connection with the Store or relating to or arising out of the Store (including (without limitation) customer and supplier lists and contracts, books and records, computer programs and other intellectual property, insurance policies, and tax refunds and all of your goodwill);

All other property not otherwise described above acquired, held, used, sold or consumed in connection with the Store or relating to the Store or the management of the Store (including (without limitation) all money, documents and goods); and

All proceeds of the foregoing (including (without limitation) whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, returned, substituted or otherwise disposed of, whether such disposition is voluntary or involuntary, including rights to payment and return premiums and insurance proceeds under insurance with respect to any Collateral, and all rights to payment with respect to any cause of action affecting or relating to the Collateral).

# ATTACHMENT 2
# TO SECURITY AGREEMENT

(Complete for each Incorporated Franchisee)

Exact Legal Name:

State or Organization California

Type of Organization:

Place of Business (or, if more than one, the Chief Executive Office):

801 Broadway, King City, CA 93930-3303

# ALCOHOLIC BEVERAGE AMENDMENT
# UNIFORM

THIS UNIFORM ALCOHOLIC BEVERAGE AMENDMENT (the "Amendment") is signed by the undersigned franchisee(s) ("you" or "your") and 7-Eleven, Inc. ("we", "us" or "our") as of the date stated in the last paragraph of this Amendment,

BACKGROUND INFORMATION

You and we signed a 7-Eleven Franchise Agreement (the "Agreement") covering 7-Eleven Store No. 2367 - 16981C (the "Store");

You and we desire to amend the Agreement to cover your acquisition of an alcoholic beverage license and your sale of alcoholic beverages at the Store.

The parties agree as follows:

An offsale (general alcoholic beverage license) is available for the Store. You must pay all costs related in any way to the license as specified in the Agreement, except for $1 which we will pay. Upon any transfer of the license, our interest in the proceeds will be limited to $1.

You and we have signed this Amendment as of the last date set forth below.

FRANCHISEE

By ______________________ By ______________________

Sung Hun Choe

Date 12.27.18 Date ______________________

By ______________________ By ______________________

Date ______________________ Date ______________________

7-ELEVEN, INC.

By ______________________

Arron B. Yount

Date 12/31/18

Form 4400237 1/04 Uniform
Alcoholic Beverages

FRANCHISE FEE ACKNOWLEDGEMENT

You and we signed a 7-Eleven Store Franchise Agreement (the "Agreement") covering 7 Eleven Store No. 2367 - 16981C (the "Store").

The current franchise fee for your Store is $ 18,165.33. You desire to pay this amount through, and we will process, a charge to your Open Account in 36 equal monthly installments in the amount of $ 504.59 per month. If the Agreement terminates before the 36 monthly installments are charged, we will charge any remaining balance to your Open Account immediately upon such termination

FRANCHISEE

By [signature]

Sung Hun Choe

Date 12·27·18

By ____________________

____________________

Date ____________________

By ____________________

____________________

Date ____________________

By ____________________

____________________

Date ____________________

7-ELEVEN, INC.

By [signature]

Arron B. Yount

Date 12/31/18

## COMPLETED AGREEMENT ACKNOWLEDGEMENT

In order to comply with Federal Trade Commission (FTC) regulations, I (we) ____________ Sung Hun Choe ____________, this ______ day of ______________, 20_____ at _______ ☐ A.M. ☐ P.M. hereby acknowledge receipt of a completed copy of the 7-Eleven Franchise Agreement, Addenda and all other forms relating to the franchising of Store # 2367 - 16981C. These forms, extended this day, were received at least seven (7) calendar days before I (we) intend to sign them.

PROSPECTIVE FRANCHISEE

By ______________________ By ______________________

Sung Hun Choe ______________________

Date ______________________ Date ______________________

By ______________________ By ______________________

______________________ ______________________

Date ______________________ Date ______________________

7-ELEVEN, INC.

By ______________________

______________________
Arron B. Yount

Date 12/31/18

Original - Prospective Franchisee

Copy - Franchisee File

Form 4400164 7/08 Uniform
Completed Agreement Acknowledgement